**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| U.S. BEVERAGE, INC., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06-cv-496-MEF |
| | ) | |
| JOHN BUSTER WALKER, II; TRIDENT | ) | |
| MARKETING, INC.; and A, B, C, and D, | ) | |
| fictitious defendants, whose names are | ) | |
| otherwise unknown but which will be | ) | |
| supplemented by amendment, | ) | |
| | ) | |
|     Defendants. | ) | |

**BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Comes now Plaintiff U.S. Beverage, Inc. and submits this brief in support of its Motion for Preliminary Injunction against Defendants John Buster Walker, II and Trident Marketing, Inc., and shows as follows:

**INTRODUCTION**

U.S. Beverage, Inc. ("U.S. Beverage") is a closely held corporation composed of three shareholders: Grady Kittrell, Tom Clark and John "Buster" Walker. At the outset, while the nature of U.S. Beverage's business is not a claim upon which the Court is directly to decide, an explanation of what U.S. Beverage does is essential to the understanding of the claims made in this lawsuit.

Primarily, U.S. Beverage is a marketer and seller/distributor of a juice product, (a generic substance), which is not made by U.S. Beverage, but is composed of 100 % fruit juice. <u>See gen.</u> [Deposition of Grady Kittrell ("Kittrell Depo.") at pages 38-40; page 98, line 16-19; page 179, line 13 - page 180, line 8]; [Deposition of Tom Clark ("Clark Depo.") at page 77, lines 10-20].

The juice (which is the same juice, no matter what) can be sold in various forms, such as a slush or a liquid.  Id.  The fruit juice was, and is, primarily manufactured by a manufacturer in New Jersey, Supreme Manufacturing.  Although the juice itself is generic, the juice is most often sold under a brand name so as to help identify and market the product.  Today, U.S. Beverage's current largest client of juice slush is public elementary schools in various states in the Southern United States, which require public bidding for their contracts.

This lawsuit concerns the actions of John B. Walker ("John Walker" or "Mr. Walker"), who, albeit incredibly after his recent actions, is still a shareholder and a fiduciary of U.S. Beverage.  In this lawsuit, U.S. Beverage has asserted, against Mr. Walker and his company Trident Marketing, claims for: breach of fiduciary duty, intentional interference with business affairs, violation of a non-compete agreement, fraudulent registration of a trademark and declaratory judgment, and U.S. Beverage seeks monetary damages, declaratory relief and the present injunctive relief.

## FACTUAL SUMMARY[1]

In April, 2002, U.S. Beverage, seeking to expand its business, approached Tropical Perfections, a fruit juice/slush business centered in the Auburn area.[2]  John Walker was the sole shareholder and owner of Tropical Perfections.  In a stock exchange agreement, U.S. Beverage purchased Tropical Perfections and all of its accounts receivable, good name and goodwill, in

---

[1]  While U.S. Beverage has attempted to give a very detailed factual summary for the Court's benefit, it specifically does not contend that it has included, in this summary, every fact upon which it bases its claims.

[2]  At the time, Grady Kittrell and Tom Clark were the only shareholders of U.S. Beverage.

exchange for giving John Walker 500 shares of U.S. Beverage, equal to a one-third interest in U.S. Beverage.  See Exhibit 1.  Upon the execution of this agreement, John Walker became an officer/director of U.S. Beverage and head of U.S. Beverage's sales.  See e.g. [Deposition of John Walker ("Walker Depo.") at page 37, lines 1-6; page 41, lines 11-23].  Because the three shareholders/owners of U.S. Beverage realized that they each would obtain important proprietary information of U.S. Beverage and that any withdrawal of one the shareholders could cause great harm to the company, they mutually agreed to a territorial non-compete agreement should one of the owners decide to leave the company.  See Exhibit 2, Non-Compete Agreement.

At the time of the acquisition, Tropical Perfections was selling fruit juice/slush under the brand name Cool Tropics, which U.S. Beverage continued after the acquisition. [Kittrell Depo. at page 57, line 15 - page 60, line 6].  This would continue until U.S. Beverage began selling fruit juice/slush under the brand name "Juice Alive", which is now contested in this lawsuit.

Unfortunately, problems for the three shareholders began soon after the purchase of Tropical Perfections.  Shortly after the purchase, it was discovered that John Walker filed an amended tax return for Tropical Perfections, shifting tax burdens of Tropical Perfections over to U.S. Beverage, to John Walker's gain and U.S. Beverage's detriment.  See Exhibit 3; [Kittrell Depo. at page 313, line 17 - page 316, line15]. Furthermore, in what would later become a major problem, Mr. Walker, fiduciary, shareholder and director of U.S. Beverage's sales, immediately informed U.S. Beverage that he was moving to Texas, clearly not advantageous to a company primarily centered in Alabama, Georgia and Mississippi at the time.  [Kittrell Depo. at page 71, line 6 - page 72, line 21].  While these two incidents are not necessarily per se part of the damages/injunctive relief sought in this lawsuit, they are indicative of the lack of fiduciary

responsibility that John Walker would display in the later years.

By late 2003, with John Walker residing in Texas, U.S. Beverage was financially strapped, and the shareholders met and decided to suspend the owners' draws as the company could not financially sustain them. [Kittrell Depo. at page 136, line 21 - page 137, line 3]. The company also, as an incentive for John Walker to produce more sales, made part of Mr. Walker's salary a reflection of the amount of sales that he procured. [Kittrell Depo. at page 138, line 20 - page 139, line 5]. However, despite Mr. Walker's apparent contentions in this suit, John Walker's regular salary was not cut, and actually increased in this time period. See Exhibit 4; [Kittrell Depo. at page 137, line 5-13]. Furthermore, John Walker was present at these meetings and agreed to all of the company's decisions. [Kittrell Depo. at page 144, line 5-13].

However, after agreeing to the salary changes, unbeknownst to the remaining shareholders, Walker apparently decided to begin going behind U.S. Beverage to discuss starting his own business in early 2004. [Walker Depo. at page 99, lines 19-23]; [Deposition of Ryan Hamner ("Hamner Depo."), page 33, lines 18-23]. The business, of course, was the juice business, the same business that John Walker was presently engaged in with U.S. Beverage, and the business that he had been engaged in with Tropical Perfections. Ryan Hamner, John Walker's apparent partner, testified that he and Walker began discussing starting a business to market juice to day-care centers. See gen. [Hamner Depo. at pages 33- 40]. Walker admitted that they began discussing starting a company to market a juice product, just as U.S. Beverage did. [Walker Depo. at page 102, lines 1-10]. Mr. Walker acknowledges that this was the business that U.S. Beverage was engaged in at the time. [Walker Depo. at page 102, lines 11-23 ("they did sell that brand or product")].

-4-

This proposed juice business of Mr. Walker and Mr. Hamner, was, "in the middle or latter" part of 2004, incorporated into Trident Marketing, Inc., one of the defendants in this case.[3]  [Walker Depo. at page 106, lines 11-14].  Mr Walker testified that the purpose of Trident Marketing was to "create, brand and market a line of juice products for sale via the internet." [Walker Depo. at page 130, line 18 - page 131, line 1].  When questioned as to what he contended was the distinction between Trident Marketing's business and U.S. Beverage's business, Mr. Walker stated: "It's [U.S. Beverage is] selling juice products, they're [U.S. Beverage are] not branding and marketing and selling them via the internet." [Id at page 131, lines 12-15; page 134, lines 16-22 ("they [U.S. Beverage] don't sell it in the same manner")].  Mr. Walker, apparently realizing the problem with this testimony, then contended that he started Trident Marketing: "to offer services that U.S. Beverage needed." [Walker Depo. at page 120, lines 14-17].

Sometime during the Spring/Summer of 2004, Mr. Walker allegedly, apparently with the help of his partner Ryan Hamner, through their newly created company, Trident Marketing, came up with "Juice Alive". [Walker Depo. at page 140, line 22 - page 141, line 11].  At the time, Walker was an officer, director and shareholder of U.S. Beverage, in charge of sales and marketing at U.S. Beverage. [Walker Depo. at page 152, lines 6-18].  This position included developing a brand for U.S. Beverage. [Kittrell Depo. at page 172, line 22 - page 173, line 11]. However, Mr. Walker instead went out and established his own company, with his own brand. [Walker Depo. at page 150, lines 2-5].  On September 6, 2004, Trident Marketing submitted an

---

[3]  The actual date of the inception of the incorporation was August 2, 2004, with an effective date of November 1, 2004.  See Exhibit 5.

application to the U.S. Patent and Trademark Office ("USPTO") to register "Juice Alive" as a

trademark.[4]  See Exhibit 6; [Walker Depo. at page 150, line 16 - page 152, line 5].  The first, or

"one of the first", as Mr. Walker states, Juice Alive use or advertisement was in a flier with the

heading "U.S. Beverage presents", which provided U.S. Beverage's phone number at the bottom.

See Exhibit 7 (date of 9/27/04 at top); [Walker Depo. at page 139, line 17 - page140, line 14].

Mr. Walker testified that it was to "help" U.S. Beverage in its sales area. [Walker Depo. at page

137, line 21; page 154, lines 10-16].  However, this "help" ultimately would consisted of

charging U.S. Beverage a commission for the use of Juice Alive. [Walker Depo. at page 138, line

17 - page 139, line 4].  However, when Juice Alive was first developed and used by U.S.

Beverage, no fee was charged, and it was represented to be an asset of U.S. Beverage.  Later, as

Grady Kittrell describes, the company was stunned and paralyzed when John Walker then came

to it and threatened to take its business away if it did not pay him for the brand that he had

developed for his own personal benefit while supposedly acting as a fiduciary for U.S. Beverage.

[Kittrell Depo. at page 170, line 20 - page 172, line 17].  Despite the egregiousness of this, Mr.

Walker was not only attempting to gain a personal profit on U.S. Beverage's juice sales, but he

was attempting to actually sell juice to customers in areas that he believed U.S. Beverage was

not currently selling, rather than expanding U.S. Beverage's sales, as he was obligated to do.

[Walker Depo. at page 138, lines 17 -23; page 204, lines 4 - 16].

     Although unknown to U.S. Beverage at the time, Mr. Walker/Trident Marketing was also

sending mailers to states outside of U.S. Beverage's region that did not contain the "U.S.

Beverage presents" language, but sought to market the "Juice Alive" brand.  See Exhibit 8 (in

---

[4]  The trademark was not registered until December, 2005.

comparison with Exhibit 7); [Walker Depo. at page 156, lines 1-4]. Furthermore, Mr. Walker also created a sole proprietorship, John Walker d/b/a Juice Alive through which, "in late 2004 or early 2005", he and his brother began putting out granita machines (machines that are used to dispense the juice) in North Carolina, and perhaps elsewhere. [Walker Depo. at page 156, line 5 - page 158, line 10]. In those machines, he began putting juice (the same juice as U.S. Beverage was using), which he obtained through U.S. Beverage's manufacturer, Supreme Manufacturing, for which he was making a profit. Id. At no time did Mr. Walker share any of those profits with U.S. Beverage. Id. Mr. Walker also, as time went on, under threat of destroying U.S. Beverage, placed a "surtax" on the juice that U.S. Beverage was selling to customers (through the manufacturer, Supreme Manufacturing), so that he could gain a profit on the side. See Exhibit 9; [Walker Depo. at page 159, lines 7 - 16; page 164, line 7 - page 165, line 11]. In other words, the juice that U.S. Beverage marketed and sold cost more because of an extra cost caused by and paid to its shareholder/officer/director, John Walker. As Supreme Manufacturing was essentially the only manufacturer of the juice product, and U.S. Beverage had to make sales to stay in existence, there was nothing that U.S. Beverage could do in regards to Mr. Walker's demands. [Kittrell Depo. at page 122, line 20 - page 123, line 19; page 170, line 20 - page 173, line 11].

At the same time that he was apparently beginning to formulate his plan to start his own juice business, John Walker was signing (as an officer and 1/3 shareholder) corporate by-laws of U.S. Beverage and, in his fiduciary capacity, was placing his personal guarantee on loans extended to U.S. Beverage. [Walker Depo. at page 122, line 16 - page 124, line 21]. Furthermore, Walker gained a 1/3 interest in the LLC that owns the building where U.S. Beverage's office resides. Id. None of this has changed today, as John Walker refuses to

relinquish any of his interest.

By late 2004, U.S. Beverage began realizing that Mr. Walker was not acting on its behalf, although it had no idea of the full extent of his betrayal, as, in one instance, it learned that Mr. Walker had been purchasing machines for himself, while he was supposed to be promoting U.S. Beverage.  [Kittrell Depo. at page 83, line 16 - page 84, line 6].  Because of this, and numerous other factors, U.S. Beverage attempted to reach an agreement to buy Walker out so that it could properly run the company.  See Exhibit 10 (list of factors).  However, Walker, while pretending to negotiate, refused to agree to anything, and refused to relinquish his shares in the company. See Exhibit 11.

During this time and into 2005 and further, John Walker was apparently engaged in a dual role, one as a supposed fiduciary of U.S. Beverage, and the other for himself.  Mr. Walker testified that he was making sales for U.S. Beverage, yet also personally profiting through those transactions, if they involved Juice Alive. [Walker Depo. at page 159, lines 7 - 16; page 165, lines 2-11].  Additionally, he was marketing and selling Juice Alive on his own in areas where he believed U.S. Beverage was not involved. [Walker Depo. at page 154, lines 7-20; page 204, lines 8 - 19].  He testified that he engaged in Trident Marketing/Juice Alive business on his U.S. Beverage cell phone, as well as on trips for U.S. Beverage business, for which U.S. Beverage paid for his gas. [Walker Depo. at page 182, line 22 - page 184, line 13].  However, Mr. Walker doesn't see anything wrong with that.  Id.  Even his partner, Ryan Hamner, testified that when he met with Mr. Walker about their "side business", he did not know whether Mr. Walker was there on U.S. Beverage business, or on his own. [Hamner Depo. at page 69, line 10 - page 71, line 21]. Mr. Hamner ultimately concluded that Walker must have been acting on U.S. Beverage business

when they met because he knew that Trident Marketing specifically was not supposed to open up accounts in the surrounding area (the Georgia area).[5]  Id.  Mr. Walker was further using his position with U.S. Beverage to purchase machines and supplies for his own business from Supreme Manufacturing, the primary juice supplier to U.S. Beverage and a company called Carpigiani, the granita machine supplier. [Walker Depo. at page 271, lines 11-14]; [Kittrell Depo. at page 122, line 10 - page 123, line 22; page 127, line 10 - page 129, line 15].

This pattern progressed to crescendo in 2005.  In John Walker's continuing method of pretending to negotiate the price of a buyout, he approached U.S. Beverage in May, 2005 with some accounts that he was apparently holding on his own, as a bargaining chip for more money in the buyout proposal. [Clark Depo. at page 97, line 19 - page 98, line 19].  However, despite every attempt by U.S. Beverage, Mr. Walker would not agree to any buyout.  See Exhibit 12, 2005 Buyout Proposal.  Furthermore, Mr. Walker never offered to sell or attempted to sell his shares on his own. [Walker Depo. at page 215, lines 6-15].

On account of a financial crisis in the company, all three partners agreed to suspend their salaries in July, 2005.  However, John Walker refused to work while he was not on salary, but demanded that the remaining shareholders keep up the profitability of U.S. Beverage. [Kittrell Depo. at page 155, lines 9-15]. After this, John Walker essentially abandoned any pretense of acting on U.S. Beverage's behalf. [Walker Depo. at page 262, lines 1-5 ("Around this time is when I started spending more of my time working for Trident Marketing or John Walker doing

---

[5]  The importance of this is, as will be shown in later facts, that John Walker apparently is attempting to justify all of his actions on the basis of the Non-Compete Agreement, which provided a geographical non-compete after a shareholder left the company.  Unfortunately for Mr. Walker, he is the director of sales for U.S. Beverage during this time frame, as well a present shareholder of U.S. Beverage.

business as Juice Alive.")].  In November, 2005, at the Mississippi Trade Show (one of the

primary marketing methods for U.S. Beverage, or any business of this type, to gain business),

John Walker presented himself at the show, on behalf of Juice Alive, and threatened to compete

against U.S. Beverage and sell Juice Alive to competitors, if U.S. Beverage did not agree to his

price for use of Juice Alive. [Clark Depo. at page 95, line 7 - page 96, line 23] [Walker Depo. at

page 286, line 14 - page 288, line 3 (Walker testifies that U.S. Beverage was made aware that he

was negotiating with Dispensing Systems, a direct competitor)].  Although U.S. Beverage

strongly believed that Juice Alive belonged to U.S. Beverage, at that point, U.S. Beverage had

no choice but to agree to the extortion demands because otherwise it would not have any product

to sell.  Id; [Kittrell Depo. at page 231, lines 9-16].  After this holdup, U.S. Beverage once again

attempted to buy out Mr. Walker's shares; however, Mr. Walker would not agree and simply

kept increasing his price and demands.  See Exhibit 12; [Walker Depo. at page 306, lines 5-20

("No, I've never accepted an offer)].  At the Alabama Trade Show, Walker again threatened to

put U.S. Beverage out of business, if it did not agree to an increase in payment for Juice Alive.

[Clark Depo. at page 97, line 19 - page 98, line 19]; [Walker Depo. at page 291, lines 10-17 ("I

told them that in order for me to support them the way I felt that they needed to be supported,

that a dollar and twenty cents wasn't going to be enough . . . .")].  John Walker even announced

at this trade show that he had been directly negotiating with competitors. [Clark Depo. at page

97, line 19 - page 98, line 19].  He further, in 2006, precluded U.S. Beverage from attending the

Georgia Trade Show because he purchased booth space on his own and would not allow U.S.

Beverage to attend.

       Matters continued on a downhill slide after this, leading up to the lawsuit last year.

However, Walker's actions have not abated and have continued to grow worse.  Mr. Walker essentially took Juice Alive away from U.S. Beverage through collusion, or coercion, with the manufacturer, Supreme Manufacturing.  This forced U.S. Beverage to develop a new brand, *Fruzers*, and incur extensive costs because of the lack of a brand. [Clark Depo. at page 103, lines 9-23; page 108, line 7 - page 109, line 3].  Walker has also admitted to directly bidding against U.S. Beverage and to colluding with competitors to bid against U.S. Beverage.  [Walker Depo. at page 275, lines 4-18; page 278, line 1; page 333, line 4 - page 334, line 18; page 350, line 4 - page 352, line 10].  In a specific instance, John Walker admits to colluding with Dispensing Systems in an Alabama bid, for Dispensing Systems to bid Juice Alive against U.S. Beverage. [Walker Depo. at page 352, lines 5-10; pages 354 -357].  John Walker has also directly contacted clients of U.S. Beverage in an attempt to gain their business, as well as to coerce clients to drop U.S. Beverage, based upon knowledge that he gained while at U.S. Beverage. [Walker Depo. at page 243, line 3 - page 244, line 23]; [Deposition of Norman Todd, page 45, line 16 - page 46, line 15].  John Walker has also influenced U.S. Beverage's bid level at certain bids by utilizing his knowledge of U.S. Beverage's business. [Clark Depo. at page 121, line 5 - page 123, line 15; page 138, line 2 - page 140, line 5].  John Walker has also contacted and taken U.S. Beverage employees and otherwise sought every way to destroy U.S. Beverage.  All the while, he will not relinquish his shares of U.S. Beverage.

These actions have caused extreme damage to U.S. Beverage, which is discussed in detail at the end of this brief, and has nearly put U.S. Beverage out of business.

## PRELIMINARY INJUNCTION STANDARD AND ARGUMENT

A preliminary injunction may be granted if a party shows the following:

(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. See e.g. All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc., 887 F.2d 1535, 1537 (11th Cir.1989).

In the discussion below, U.S. Beverage shows a likelihood of success on the merits of each of the claims in this lawsuit. Further, U.S. Beverage addresses the past, and ongoing damages to the company, and the likelihood that Mr. Walker's continued actions will cause further irreparable injury to U.S. Beverage. Lastly, U.S. Beverage addresses the relief sought and the benefit to the public.

## A. Breach of Fiduciary Duty

It is unquestioned that as an officer, director and 1/3 shareholder of a close corporation, John Walker owes a fiduciary duty to U.S. Beverage. Yet, John Walker ignored, and still ignores today, that duty. While there are multiple claims in this lawsuit, each stems from, or relates to, John Walker's breach of his fiduciary duty, as it is multifaceted and extensive.

Corporate fiduciary duty has been described in various ways; however, it generally consists of a "duty of care" and a "duty of loyalty" to the corporation. See Massey v. Disc Mfg., Inc., 601 So.2d 449, 456 (Ala. 1992). "The duty of care has been described as requiring officers and directors to act as "ordinarily prudent and diligent men ... under similar circumstances." Id (internal citations omitted). On the other hand, the duty of loyalty "prohibits faithlessness and self-dealing by corporate directors . . . :

By assuming his office, the corporate director commits allegiance to the enterprise and acknowledges that the best interest of the corporation and its shareholders must prevail over any individual interest of his own. The basic principle to be observed is that the director should not use his corporate position to make a personal profit or gain other personal advantage.

> The duty of loyalty is thus transgressed when a corporate fiduciary ... uses his
> corporate office ... to promote, advance or effectuate a transaction between the
> corporation and such person (or an entity in which the fiduciary has a substantial
> economic interest, directly or indirectly) and that transaction is not substantively
> fair to the corporation.  Id.

Furthermore, corporate officers "are required to act with fidelity and in good faith, subordinating

their personal interests to the interests of the corporation."  Hardy v. Hardy on Behalf of Mortg.

Investments, Inc., 507 So.2d 404, 406 (Ala.1986).  The responsibility of a corporate officer:

> . . . demands of a corporate officer or director, peremptorily and inexorably, the
> most scrupulous observance of his duty, not only affirmatively to protect the
> interests of the corporation committed to his charge, but also to refrain from doing
> anything that would work injury to the corporation, or to deprive it of profit or
> advantage which his skill and ability might properly bring to it, or to enable it to
> make in the reasonable and lawful exercise of its powers. The rule that requires an
> undivided and unselfish loyalty to the corporation demands that there shall be no
> conflict between duty and self-interest. The occasions for the determination of
> honesty, good faith and loyal conduct are many and varied, and no hard and fast
> rule can be formulated. The standard of loyalty is measured by no fixed scale.
> Morad v. Coupounas, 361 So.2d 6, 8-9 (Ala. 1978) (internal citations omitted)
> (emphasis added).

Most certainly, this would require that a corporate officer/fiduciary should not compete with the

corporation, or usurp his duties to benefit himself.

   While there are countless cases discussing corporate fiduciary duty, John Walker has, in

every way, violated every known notion of fiduciary duty to a corporation.  He, while an active

shareholder, officer and director of U.S. Beverage, started his own company, Trident Marketing,

which competed in the same business as U.S. Beverage.  He then negotiated with/against U.S.

Beverage to charge U.S. Beverage a fee for its own product, so that he could personally make a

profit on the side off of any U.S. Beverage sales.  This proceeded to effectively an extortion

demand in which he threatened to put U.S. Beverage out of business if it did not agree to his

-13-

price. Walker, meanwhile, while supposedly acting and working on behalf of U.S. Beverage, used his time to promote and sell the same product that he was obligated to be selling with U.S. Beverage, for his own company's benefit. In his testimony, Mr. Walker, attempts to make some distinction, or argument, that he believes he was (is) not violating his non-compete agreement (with U.S. Beverage), by attempting to sell products for his competing business in areas that he believed U.S. Beverage was not yet in (although as head of sales, he was charged with expanding the business), or that he was selling products under different entities (John Walker d/b/a Juice Alive); however, at all times, John Walker was, and still is, an officer/director/shareholder of U.S. Beverage. He has never relinquished, offered to sell, or otherwise disposed of his shares to U.S. Beverage and has refused every buyout attempt of U.S. Beverage.

This behavior has proceeded to the point where Walker has been working for other companies to bid against U.S. Beverage (Dispensing Systems) and having his own company actively bid against U.S. Beverage. There is evidence that he has stolen customers from U.S. Beverage, that he has stolen employees from U.S. Beverage and that he has used his knowledge of U.S. Beverage's business and financial condition to gain an advantage in the market. Although more focal in regard to the intentional interference claim, John Walker has used his agents to disrupt prior business relationships of U.S. Beverage, by falsely informing them that U.S. Beverage was going into Bankruptcy, by also contacting them pretending to be a representative of U.S. Beverage, and this is just the tip of the iceberg.

For instance, in the current state of affairs, John Walker is actively in the market, as Trident Marketing, Juice Alive or Dispensing Systems, bidding against U.S. Beverage for clients

while he still remains an owner and 1/3 shareholder of U.S. Beverage.  In other words, he is

acting on both sides of the table.  This cannot be a proper fiduciary act.  Nor could it possibly

benefit the public as it certainly is unfair in a public bid situation.

While this brief sets out many of the details of the actions of John Walker, further

testimony and evidence will show a concerted and intentional effort by Mr. Walker to destroy his

own company, U.S. Beverage.  This evidence will show more than a substantial likelihood of

success on the merits, as the evidence is overwhelming.  At this preliminary injunction stage,

U.S. Beverage primarily seeks to have Mr. Walker cease breaching his fiduciary duty and

relinquish his interest in the company so that the company can properly function.  However, U.S.

Beverage has suffered extensive monetary damages as a result of Mr. Walker's actions, and

certainly any continued breach of fiduciary duty will cause irreparable damage to U.S. Beverage,

likely putting it out of business.  While the actual damages are an element of any breach of

fiduciary duty claim, some damages are likely incalculable, and in any event, apply globally to

all of the claims in this lawsuit.  For this reason, damages are addressed as a whole at the end of

this brief.

## B.  Intentional Interference with Business Relations

While Walker's intentional interference with U.S. Beverage's business relations is a

separate tort, as John Walker is intentionally using his knowledge of U.S. Beverage's business

relationships to injure U.S. Beverage, this claim is, indeed, further evidence of a breach of

fiduciary duty.  In order to establish a prima facie case of intentional interference with a business

or contractual relationship, there must be proof of each of the following:

> (1) The existence of a contract or business relation; (2) the defendant's knowledge
> of the contract or business relation; (3) intentional interference by the defendant

with the contract or business relation; and (4) damage to the plaintiff as a result of
the defendant's interference. <u>McCluney v. Zap Prof'l Photography, Inc.</u>, 663
So.2d 922, 925 (Ala.1995) (internal citations omitted).

It is undisputed that U.S. Beverage had, and still has multiple contracts and business

relations that John Walker is aware of. As an example, Walker produced documents in his

possession containing U.S. Beverage's complete customer lists and other financial information,

such as its costs and bid levels. It is further undisputed that John Walker himself, or through his

agents, is attempting to interfere with those relations. In one instance, Mr. Walker posed as a

U.S. Beverage employee in an attempt to confuse the client, and to gain a personal contract

through such confusion. In another instance, Mr. Walker contacted multiple U.S. Beverage

clients in Mississippi directly in order to entice them into leaving U.S. Beverage. This prompted

U.S. Beverage to have to send a letter to the schools of Mississippi in order to inform them of the

tactics. And testimony will show that this behavior is not limited to these instances, but ongoing

in multiple locations. This behavior would be bad enough if Walker were not an officer and

shareholder of U.S. Beverage, but it is compounded by the insanity of the fact that John Walker

is intentionally hurting his own company, while he refuses to relinquish his interest in U.S.

Beverage because he wants to be paid some unknown value for it.[6]

In addition to specific acts, U.S. Beverage contends that John Walker is intentionally

interfering with all of U.S. Beverage's business relationships because he will not relinquish his

shares, or relinquish his interest in U.S. Beverage's building, so as to allow U.S. Beverage to

restructure its financing or seek further financing, thus threatening all of U.S. Beverage's

---

[6] Most of these specific instances in this section have not been specifically cited to in this
portion of the brief as they are discussed in the factual summary portion of the brief.

business.  Mr. Walker is quite well aware of the fact that he is keeping U.S. Beverage from

obtaining financing, yet at the same time, he has sought to use U.S. Beverage's tax returns as a

method for him to obtain personal financing. [Walker Depo. at page 308, lines 15-21]; Exhibit

13. This is an intentional and deliberate scheme which has left U.S. Beverage in extreme

financial straits.

As will be discussed under the damages heading, U.S. Beverage has lost business due to

these tactics, has lost profits because it had to decrease its bids, and otherwise has lost the ability

to run its business.  Therefore it has a likelihood of success on the merits of this claim.

## C.  Breach of The Non-Compete Agreement

The Non-Compete Agreement was signed as part of the purchase of Mr. Walker's initial

company, Tropical Perfections.  See Exhibit 2.  It was an agreement between the owners of the

new company, that if one, or more, of the owners left the company, then, as they would have

extensive knowledge of the company and an unfair advantage in the market, they would not

compete in the geographical region in which the company was operating.  While U.S. Beverage

is certainly aware of Alabama's general disfavor of non-compete agreements, this is a perfectly

reasonable non-compete under Alabama law.  See Ala. Code § 8-1-1 (b).

However, before directly addressing this non-compete, the real question is whether or not

John Walker has "left" the company.  There is little doubt that Mr. Walker is not working "for"

U.S. Beverage; however, Walker is playing a game with U.S. Beverage.  He has openly

announced that he is competing with U.S. Beverage outside of the radius in the non-compete,

yet, at the same time, he has not relinquished his interest in U.S. Beverage.  The non-compete

agreement specifically addresses the shares of the corporation and states that if the shares are

relinquished, then the agreement would not apply.  <u>See</u> Exhibit 2.  Why would this be so?

Because, under the current situation, Walker, by holding onto his shares, is hindering the

company by not allowing the company to function effectively (debt issues, building, etc.), yet

Walker is able to freely compete in the market against a weakened U.S. Beverage.

      If John Walker had relinquished his shares of, and interest in, U.S. Beverage and then

proceeded to start his own company which competed against U.S. Beverage in Northern

Tennessee (without the use of U.S. Beverage's proprietary information), then there might be

some conceivable argument as to the breadth of the non-compete, but the current situation is

ridiculous.  Walker testified that as early as late 2004, he was selling juice under his own brand

while he was acting as U.S. Beverage's director of sales.  When questioned about this, he

responded that he did not believe that those activities violated the non-compete agreement.

[Walker Depo. at page 210, lines 2-21].  It is possible to conclude that the non-compete

agreement does not apply to these actions, yet Walker was the current vice president of sales at

U.S. Beverage at the time, and he was selling juice in other states for his own benefit?  This

behavior has continued until the present day.

      As it is clear from the testimony, Defendants would like to argue that the non-compete

agreement is the primary issue in this case, but that is simply untrue.  Defendants would like to

do this because Mr. Walker is attempting to use the non-compete as some sort of excuse for his

violations of his fiduciary duty.  He cannot unilaterally state that he has decided that he does not

work for the company anymore, at some specific time of day, and then start arguing the non-

compete.  He must relinquish his interest in U.S. Beverage, otherwise he owes the company a

fiduciary duty.

However, even under Walker's convoluted theory of the non-compete, he has testified that he has been actively engaged with the company Dispensing Systems in bidding against U.S. Beverage in Alabama.  Of course, Mr. Walker was a shareholder and officer of U.S. Beverage at the time, but assuming that Mr. Walker contends that he had "left" U.S. Beverage, this is a direct violation of the non-compete because Dispensing Systems was bidding Juice Alive on behalf of Mr. Walker's "companies", Trident Marketing and John Walker d/b/a Juice Alive.  [Walker Depo. at page 352, lines 5-10; pages 354 -357].

It is expected that Walker will argue that the non-compete possibly has too broad a geographical range, or that Mr. Walker was not "employed" with Dispensing Systems when he was competing against U.S. Beverage, but U.S. Beverage does not intend to engage in this argument as it is only an argument that he was breaching his fiduciary duty instead of violating the non-compete.[7]  As can be seen in the testimony, Walker is engaged in a continued exercise of attempted semantics; however, he cannot escape his actions.

The non-compete agreement contains a liquidated damages provision for $75,000.00 which U.S. Beverage contends is now due; however, at this stage, U.S. Beverage would understand if the Court were reluctant to award damages at a preliminary injunction hearing and would be content, for the time being, if the Court were to order Mr. Walker to stop competing with it, relinquish his interest in the company and allow U.S. Beverage to fairly compete in the market.

**D.  Fraudulent Registration of Trademark and Declaratory Judgment**

---

[7] In any event, he was certainly "employed", as the owner, of a company that would benefit from the competition with U.S. Beverage.

U.S. Beverage has brought a claim pursuant to 15 U.S.C. § 1120 for the fraudulent registration of a trademark, which provides:

> Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

U.S. Beverage also seeks that the Court declare that it is the owner of "Juice Alive". Of course, these two claims go hand-in- hand, as the fraudulent registration relates to the claimed ownership of the trademark.

While there is little doubt that Walker is going to claim that he and Ryan Hamner came up with the brand name "Juice Alive", U.S. Beverage asks only that the Court look at the facts of this situation.

The trademark application for Juice Alive was first submitted in September, 2004, and consummated in December, 2005. During all of that time, John Walker was an officer, director and 1/3 shareholder of U.S. Beverage. He was also the director of sales at U.S. Beverage, in which he was charged with selling "juice" and creating a brand name for U.S. Beverage. As discussed, Mr. Walker plainly owed a fiduciary duty to U.S. Beverage.

Mr. Walker is likely to argue that "Juice Alive" was some sort of corporate opportunity, but that is simply untrue. "Juice Alive" is not a product, but a brand name; the product is the juice concentrate being sold by U.S. Beverage. Walker testified that when the application was submitted, its first use in trade was in a flier with the heading "U.S. Beverage presents". See Exhibit 2. U.S. Beverage was also not charged for Juice Alive at its inception, and only later was U.S. Beverage extorted into paying a fee for Juice Alive. Certainly, Mr. Walker's contention now that Juice Alive does not belong to U.S. Beverage should cause a likelihood of

confusion.  Furthermore, a brand name for the product of the company that a person is engaged as the director of sales is not a corporate opportunity, it is the property of the corporation.  As Grady Kittrell testified, U.S. Beverage's only purpose is to market and sell juice to customers.  Mr. Walker was thereby, as is evidenced by his testimony, attempting to start his own juice business with the trademark of Juice Alive, a property of U.S. Beverage.  This he cannot do as a fiduciary of U.S. Beverage.

While Mr. Walker's counterclaim seems to insinuate that U.S. Beverage did not want Juice Alive, or "allowed him" to go about this competing business, the testimony of Mr. Walker, and others, does not reflect this:

Q.  So you [Mr. Walker] came to them [Grady Kittrell and Tom Clark] and said we think that - or I think that you need to keep - you need to have a brand identity of your own?

A.  I felt that it was important (nodding head) --

Q.  Right.

A.  – yes.

Q.  And are you saying that they did not feel that was important?

A.  I don't think they felt that way, no.  I don't think they felt that there was any value in a brand.

Q.  They told you they didn't think there was any value in a brand, you're going to testify to that?

A.  I can't recall if they specifically said that to me or not, but the feeling that I got was that they were not going to invest the time or the money to create one.

[Walker Depo. at page 176, line 7 - page 177, line 4; see also page 180, lines 20-23].

So now, the director of sales, a fiduciary and 1/3 shareholder in the corporation, gets a

"feeling" and thereby is allowed to go out and start a competing business, trademark a brand name on his own, so that he can essentially steal from the corporation. And did Mr. Walker, now contending that he personally owns Juice Alive, ever offer to give that brand to U.S. Beverage? According to Mr. Walker, absolutely not. [Walker Depo. at page 162, lines 7-13]. Thus, even if a "corporate opportunity", Mr. Walker did not notify the corporation of his intentions, or offer Juice Alive to the corporation, he simply took it.

A trade name developed by the Vice President of Sales of the corporation, a fiduciary, while he was supposed to be producing a brand for U.S. Beverage and making sales, that was first sent out under U.S. Beverage's name, on U.S. Beverage's product for no charge, belongs to U.S. Beverage. Certainly, everyone else at U.S. Beverage believed this to be so, as certainly the general public also believed it.

Consequently, Walker's registration of "Juice Alive" under his corporation, Trident Marketing, was an overt fraud, and U.S. Beverage is entitled to the name and to all consequential damages caused by Mr. Walker's fraudulent use of it.

### E.    Damages

U.S. Beverage would concede that some of the damages that John Walker and Trident Marketing have caused are so extensive as to simply be incalculable; however, U.S. Beverage is not required to calculate every penny of damages. Jot-Em-Down Store (JEDS) Inc. v. Cotter and Co., 651 F.2d 245, 248 (5th Cir. 1981) ("While the damages may not be determined by mere speculation or guess, it will be enough if the evidence show(s) the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.").

In any event, testimony and documents will show that John Walker's breach of his

fiduciary duty, intentional interference, competition and misappropriation of Juice Alive have caused significant harm to U.S. Beverage, and if allowed to continue, certainly will cause irreparable harm.

For example, from August/September, 2004, when Walker had first begun Trident Marketing and began to register Juice Alive in his own company's name (while pretending to be working for U.S. Beverage), until Mr. Walker simply left, U.S. Beverage paid him at least $115, 659.00 in salary, as well as paid Mr. Walker some $16,000.00 in gas and phone expenses. As has been discussed, Mr. Walker was utilizing his time and expenses, while on the U.S. Beverage payroll, to run his own business to injure U.S. Beverage. U.S. Beverage paid at least $10,500.00 to Supreme Manufacturing as an up-charge for Juice Alive and lost $13,034.00 in Juice Alive product that it had already bought as a result of Walker causing Supreme Manufacturing to take Juice Alive away from U.S. Beverage.

Furthermore, U.S. Beverage contends that it has lost at least $69,768.00 in profit margin because Walker has intentionally caused U.S. Beverage's bids to be lowered, and has otherwise lost $35,620.00 in actual business in Mississippi, $39,945.00 in Arkansas and untold amounts in other states.

The loss of Juice Alive has cost U.S. Beverage at least $90,000.00 in lost Point of Sale Materials, lost sales and time for development of a new brand, not even including unknown amounts due to market confusion. In addition, U.S. Beverage contends that it lost roughly $300,000.00 a year because Walker was not making sales for U.S. Beverage, but instead working simultaneously for himself. Grady Kittrell and Tom Walker have likewise not received some $250,000.00 in salary and other compensation to keep the company afloat, and have had to

infuse some $450,000.00 into U.S. Beverage during the time that John Walker has not been present for shareholder meetings and has not met his share of the cash calls. As this only addresses some of the damages to U.S. Beverage, simply put, the damages to U.S. Beverage have been staggering.

However, the ongoing and future damages to U.S. Beverage are even worse if it cannot now stop John Walker from competing, using U.S. Beverage's proprietary information, interfering with its business and otherwise holding U.S. Beverage hostage by refusing to relinquish his interest in the company. As stated herein, John Walker is a 1/3 shareholder in U.S. Beverage, yet he will not participate in the company. U.S. Beverage cannot obtain financing, cannot restructure its current financing and ultimately cannot do anything as a company because Mr. Walker is holding a third of the interest in U.S. Beverage and a third of one of its most important assets, the building owned by the shareholders.

While U.S. Beverage contends that it is due the above damages, and can ultimately prove damages far in excess of those described herein, at this preliminary injunction, the most important issue is to get its company back, and to get it back on a level playing field. However, if the Court were to decide to treat the preliminary injunction hearing as a final hearing, and resolve all issues in the case, which it has the authority to do, U.S. Beverage is prepared to go forward with such a final hearing.

-24-

**CONCLUSION**

**Relief Sought; Injunctive Relief Standard**

U.S. Beverage realizes that this is brief is in support of a preliminary injunction, although it believes that the evidence described herein warrants a permanent injunction and substantial monetary damages, and would be willing to address it as a final hearing if the Court so directed. However, as the Court has ordered only the preliminary injunction hearing, U.S. Beverage seeks only the following:

1) That the Court order John Walker's shares of U.S. Beverage cancelled, including all of his interest in U.S. Beverage and its assets, including his interest in the LLC that owns the building.

2) That the Court order John Walker, without him incurring any <u>additional</u> personal debt, to cooperate with U.S. Beverage in any restructuring of existing debt and/or in obtaining financing new debt so as to allow U.S. Beverage to function in its ongoing business.

3) To order John Walker and Trident Marketing to cease and desist from all intentional interference with U.S. Beverage's business relations and to cease and desist from using any proprietary information of U.S. Beverage and to cease and desist from contacting or taking any more of U.S. Beverage's employees.

4) To order John Walker and Trident Marketing to cease and desist from competing in the area described by the non-compete agreement, or to immediately award liquidated damages of $75,000.00.

5) That the Court order that John Walker and/or Trident Marketing and/or John

Walker d/b/a Juice Alive is not to use "Juice Alive", in any way, until a final resolution/determination of this matter.

This relief would surely be in the public interest as it is not in the public interest for John Walker to be bidding for clients on both sides of transactions, or for Mr. Walker to be intentionally causing confusion with Juice Alive, or in any other manner, or for John Walker to be gaining a personal advantage through his knowledge of U.S. Beverage.  Furthermore, if this relief is granted, the benefit to U.S. Beverage would far outweigh any damage to John Walker as it would allow U.S. Beverage to compete on a level playing field, and only stop John Walker from gaining inappropriate benefits that he is not entitled to.

Wherefore, U.S. Beverage prays that upon consideration of this brief, and a hearing, the Court will grant the relief requested, and such further relief as the Court deems appropriate.

s/C. Nelson Gill
Richard H. Gill (GIL007)
C. Nelson Gill (GIL055)
Copeland, Franco, Screws & Gill, P.A.
444 South Perry Street
P.O. Box 347
Montgomery AL 36101-0347
Phone: 334/834-1180
Fax: 334/834-3172
Email: gill@copelandfranco.com
Email: ngill@copelandfranco.com
**Attorneys for U. S. Beverage, Inc.**

## CERTIFICATE OF SERVICE

I certify that on this 16th day of March, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

- **Raymond Lewis Jackson, Jr**
  rjackson@auburnattorney.com raymond@hidinc.com

s/C. Nelson Gill_____
Of Counsel
