```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF ALABAMA
                 NORTHERN DIVISION

US BEVERAGE, INC.,
      Plaintiff,
vs.
JOHN BUSTER WALKER,
II, and TRIDENT                CIVIL ACTION NO.
MARKETING, INC.,
      Defendants.              2:06-CV-496-SRW
---------------------
JOHN BUSTER WALKER,
II, and TRIDENT
MARKETING, INC.,
      Counterclaim
      Plaintiffs,
vs.
US BEVERAGE, INC.,
      Counterclaim
      Defendant,
and
GRADY DOWLING
KITTRELL, THOMAS GOIN
CLARK, III, and
NORMAN "BUDDY" TODD,
      Third Party
      Defendants.


       *    *    *    *    *    *

      DEPOSITION OF THOMAS GOIN CLARK, III,
taken pursuant to notice and stipulation on
behalf of the Defendants/Counterclaim
Plaintiffs, in the Law Offices of Copeland,
Franco, Screws & Gill, 444 South Perry Street,
Montgomery, Alabama, before Tiffany B.
Beasley, Certified Court Reporter and Notary
Public in and for the State of Alabama at
Large, on November 16, 2006, commencing at
8:57 a.m.
```

```
 1   A.   I don't recall.
 2   Q.   What do you recall about the proposal to sell
 3        Juice Alive to day care centers?
 4   A.   I recall that -- there being some arrangement
 5        where John and Ryan Hamner would create a
 6        market for our day care product on the
 7        Internet.
 8   Q.   And what was the day care product?  Just
 9        describe it.
10   A.   It was a hundred percent seven-plus-one juice.
11        Hundred percent juice.  Mixed ratio was
12        seven-plus-one.
13   Q.   And this juice, would this be a frozen slush
14        or just a --
15   A.   It's the -- it's the same juice as the frozen
16        slush, but it was just juice for -- sold in a
17        juice -- I mean, sold the exact same way,
18        packed the exact -- the exact same -- or
19        similar way.  Just not frozen.  The end user
20        didn't freeze it.
21   Q.   Who brought up this proposal to sell the day
22        care juice under the Juice Alive name?
23   A.   I believe John and Ryan.
```

*THOMAS GOIN CLARK, III -- November 16, 2006*

95

```
 1   A.      Gary is the -- our representative with Supreme
 2           Manufacturing.
 3   Q.      And you mentioned that this was signed under
 4           coercion.
 5   A.      Yes.
 6   Q.      Can you describe that for us?
 7   A.      Yes.  John contacted -- we were -- this was
 8           signed at the Mississippi -- or this agreement
 9           was made at the Mississippi trade show, if I'm
10           not mistaken.  And Grady and John met and
11           discussed some things, then I was brought in
12           at the end of the deal, I think.  When they
13           laid out the solution for -- for logical
14           separation, prior to that arrangement, or
15           prior to that meeting, Mr. Walker had called
16           me and notified me that he had a booth at the
17           Mississippi show and was going to be selling
18           his Juice Alive product individually unless --
19           and we also had a booth there -- and that
20           unless we agreed to -- to start selling his
21           product, that he would compete against us.  We
22           were already in extreme financial trouble.  We
23           had no sales force.  Our -- John had
```

1  abandoned -- or John had not been selling in
2  our business for quite some time, and we were
3  essentially on our last leg financially.
4           And we had -- we felt like we
5  had no choice at this point in time but to
6  cooperate with John so that we could join
7  forces and sell -- it was the only chance we
8  were going to have to -- only chance we had of
9  making it financially, we felt like at the
10 time, was to submit to this coercive behavior.
11          You know, either you -- which
12 was presented to us, either you buy our
13 product, or I'm competing against you, and
14 I'll put you out of business.  Because as John
15 is our salesperson to all of our contacts at
16 that time, John was still -- John was all our
17 contacts knew of US Beverage.  And our -- like
18 any other sales thing, it's a relationship.
19 There's not necessarily a loyalty to the
20 company; there's a loyalty to the
21 relationship.  And we had absolutely no choice
22 at the time but to sign it or go out of
23 business.

1  Q.   Well, why didn't you go to court and ask for
2       an injunction?
3  A.   Well, you're an attorney.  You know that would
4       be ridiculous, two or three days before the --
5       before the show.  We had neither the time nor
6       the money to do that.
7  Q.   You filed a lawsuit approximately six months
8       later, didn't you?
9  A.   That wasn't going to help us at the show.
10 Q.   Did you consult an attorney before you signed
11      this?
12           MR. GILL:  Object to the form.
13 A.   No.
14 Q.   Well, any other form of coercion, anything
15      else that -- other than what you've described,
16      that you're alleging?
17 A.   For that agreement right there?
18 Q.   Yes.
19 A.   Oh, sure.  Coercion since -- since the very
20      beginning.  That summer when -- or the -- in
21      the May, I believe, of that year, John came to
22      us and said, I've got several accounts that I
23      can sell, but quite frankly, I don't feel like

|   |   |   |
|---|---|---|
| 1 |   | I should turn these over unless we can come to |
| 2 |   | some agreement about the buyout. And once |
| 3 |   | again, the record will show extreme financial |
| 4 |   | problems due to a lot of things, but certainly |
| 5 |   | a sales effort that had no robustness about it |
| 6 |   | at all. |
| 7 |   | And then there was in April of |
| 8 |   | the -- I believe April of this year at the |
| 9 |   | trade show, at the Alabama trade show, we had |
| 10 |   | signed this agreement and were paying the 1.20 |
| 11 |   | and doing what we were supposed to do trying |
| 12 |   | to work out an agreement. John comes to me |
| 13 |   | again at the trade show and says that, I've |
| 14 |   | just had lunch with your competitor, and he's |
| 15 |   | willing to pay more for the product. If |
| 16 |   | you're not willing to pay more for it and do |
| 17 |   | certain things, I will compete against you; I |
| 18 |   | will sell to them, and I will put you out of |
| 19 |   | business. |
| 20 | Q. | Okay. So you -- and I'm sorry. Are you |
| 21 |   | telling -- I'm asking you about coercion that |
| 22 |   | you allege led you to sign this document dated |
| 23 |   | November 18th, 2005 -- |

|     |    |                                                              |
|-----|----|--------------------------------------------------------------|
| 1   |    | testimony that -- that the decision by US                    |
| 2   |    | Beverage to create the Fruzers brand occurred                |
| 3   |    | after US Beverage received a cease-and-desist                |
| 4   |    | lawyer -- letter from a lawyer representing                  |
| 5   |    | John Walker?                                                 |
| 6   | A. | Yes.                                                         |
| 7   | Q. | Was that the only reason that US Beverage                    |
| 8   |    | decided just to create the Fruzers brand?                    |
| 9   | A. | No.  Our -- we began thinking about it after                 |
| 10  |    | we were giving an -- we were given an                        |
| 11  |    | ultimatum after the Alabama trade show to                    |
| 12  |    | either start paying extremely high prices for                |
| 13  |    | what we were receiving -- as a matter of fact,               |
| 14  |    | at the show, John said, I've been holding back               |
| 15  |    | on you, which was -- I could give you more,                  |
| 16  |    | but I have not done so -- which was                          |
| 17  |    | reminiscent of Cool Tropics -- and more                      |
| 18  |    | coercive behavior, we started looking at the                 |
| 19  |    | possibilities -- doing an exploration of what                |
| 20  |    | it would cost and what it would take to form a               |
| 21  |    | brand, but it wasn't until we were given a                   |
| 22  |    | cease-and-desist letter that we decided to --                |
| 23  |    | that that was what we would do as a company.                 |

```
1   A.    It starts -- the only thing I know it starts
2         with is when we have the money to do it, that
3         we would do it.  And that's my -- that's my
4         recollection.
5   Q.    Okay.  Again, I'm just trying to understand,
6         but you --
7   A.    Mr. Jackson, the understanding is, we had just
8         purchased a little over a hundred and
9         something thousand, I believe, of Juice Alive.
10        And after we received our -- few days, while
11        our last purchase was on its way, received a
12        cease-and-desist notice from somebody
13        representing Juice Alive.  And I felt that it
14        was -- it put us in a desperate situation
15        because we were going into bidding season, and
16        our -- for the schools, and this was some of
17        the knowledge that Mr. Walker had of our
18        business.  He knew that we -- I believe that
19        he knew that we needed -- we all knew we
20        needed a brand for the business.  And I've got
21        a cease-and-desist letter, and I've got bids
22        I've got to put a brand name on, and I asked
23        my buddy to help me out and that we'd work the
```

| | | |
|---|---|---|
| 1 | | details out down the road.  We talked about a |
| 2 | | lot of things, but we have nothing set -- we |
| 3 | | have nothing set in stone. |
| 4 | Q. | You say you've got a sliding scale based on |
| 5 | | volume? |
| 6 | A. | That I proposed to him, yes, and I did not |
| 7 | | write it down. |
| 8 | Q. | And what is your buddy's name again? |
| 9 | A. | Carrie Bynum. |
| 10 | Q. | Do you think Mr. Bynum could shed some light |
| 11 | | on what the -- this proposed sliding scale |
| 12 | | would be? |
| 13 | A. | I'm sure he could. |
| 14 | Q. | Has US Beverage trademarked the Fruzers name? |
| 15 | A. | We've applied for the trademark. |
| 16 | Q. | When was that applied for? |
| 17 | A. | Sometime this past summer, I believe. |
| 18 | Q. | When you say, you applied, you mean you |
| 19 | | applied with the US Patent and Trademark |
| 20 | | Office; correct? |
| 21 | A. | Yes.  And Carrie -- Carrie Bynum handled that |
| 22 | | for us on our behalf.  He acquired the |
| 23 | | attorney and liaised that whole situation. |

1   depositions it was noted that our competitors
2   have not done particularly well against us in
3   some areas, they have caused us to lower our
4   bids.
5             We bid against Juice Alive
6   in -- in one bid in North Carolina, and it was
7   very malicious the way that it was done.
8   Juice Alive representatives posing -- or
9   confusing the child nutrition people that they
10  were -- that they were us and then switching
11  the Juice Alive brand on them and then sending
12  Dispensing Systems out there to bid it, forced
13  us into -- once it was all fared out and we
14  were given the opportunity to go into this
15  particular buying group, the -- somebody
16  representing Juice Alive said, well, we want
17  to force this into a bid, and we were
18  already -- we were at 59.94, so we went to --
19  so we went into the bid. We bid 56.94, I
20  believe, and our competitor bid $86 knowing
21  that the -- that we were already at 59.94.
22  And then at the South Carolina show, they made
23  mention of that, why did you-all bid so low on

```
 1          that when you could have bid a lot more than
 2          that?  I see that as malicious, and I really
 3          don't feel that since Mr. Walker is still
 4          benefiting every day from his association with
 5          US Beverage that he has the right to do that
 6          and he has the right to take the Juice Alive
 7          name, which is ours, to simply destroy our --
 8          to destroy our profitability, to confuse the
 9          marketplace, or to gain personally off of
10          something that he created with -- as
11          vice-president of sales, charged with the
12          idea -- with the mission of creating a market
13          for US Beverage products.
14    Q.    You just mentioned something I've never heard
15          of before.  Who is it you contend posed as a
16          US Beverage employee in North Carolina?
17    A.    That, I don't know.  I was told -- this is
18          third-party information, but I was told by
19          Buddy Todd when he called and tried to sell to
20          one of these accounts -- and I would love for
21          this to go on the record, quite honestly --
22          that they had already made the decision to go
23          with the company they met at the show.  Buddy
```

```
 1              reminded them that they hadn't met them at the
 2              show; they had met us.  And they go, you know,
 3              that's right, but they spoke as though we had
 4              met them at the show, and they talked about
 5              the product as though we had met them at the
 6              show, but it was really US Beverage we met at
 7              the show; huh, I don't like that; okay, I'm
 8              going to tell them that I don't like the way
 9              they do business; I'm going to tell them they
10              can't do it.  So they give us -- they gave it
11              to us at 59.94.  But I think the records -- I
12              mean, I'd be happy for you to speak to
13              somebody about that, because I do think
14              that's -- it raises your eyebrow; it raised
15              mine.  And I --
16    Q.        And you can't put it --
17    A.        If I were you, I wouldn't want you to do that
18              because --
19    Q.        I didn't ask you the question because it
20              raised any damn eyebrows.  I asked you the
21              question because I'm giving your deposition.
22                     MR. GILL:  You don't need to argue
23                     with him.
```

```
 1              THE WITNESS:  Okay.
 2   A.    As I stated earlier, to a significant number
 3         of our -- at the time of the -- or at the time
 4         that Mr. Walker started competing against
 5         himself, against US Beverage, to the line
 6         share of our business -- he was US Beverage.
 7         It's a relationship business, and it's not a
 8         loyalty to a -- it's not a loyalty to a brand
 9         as much as -- or a company as much it is a
10         loyalty to the relationship.
11                   Mr. Walker was receiving --
12         Mr. Walker had prepared up to the time that
13         he was no longer actively involved in the
14         company, kept all of those contacts in a
15         couple of forms on his -- you know, his
16         computer at home, on his PDA thing, whatever
17         that thing is called, in his phone, phone
18         records, phone numbers, and he also received
19         regular copies of our books, and he also
20         prepared every one of our bids that I can
21         recall.  And so he had a -- very, very
22         exponent knowledge since they all -- even at
23         the show, Mississippi show, I presented John
```

```
1    still as our partner, believed that John was
2    with US Beverage.  And -- and as our single
3    sales force, they wouldn't know anybody else
4    but John.  And John would know -- and John had
5    every one of those contacts.  He knows our
6    prices, he knows what we pay for our product
7    because he received a royalty on the 1.20
8    agreement.  Over and above our invoice price
9    we invoiced, we sent him POs along with
10   Supreme, so he knew exactly what we paid for
11   the product; he knew how to structure our
12   bids -- or he knew how we structured our bids
13   because he had been doing the bidding, and he
14   knew every -- John intimately, because he was
15   our sales force through -- intimately to every
16   facet of that side of the business.
17 Q. Any other type of proprietary knowledge other
18   than what you've already listed?
19 A. He knew our financial position; he knew our
20   debts, he knew or pay scales, he knew all of
21   our employees.  You know, in that -- he also
22   used -- in developing the Juice Alive brand,
23   used our resources and started developing
```

```
 1        customers under the Juice Alive name that we
 2        didn't know about that we felt like were ours
 3        and did not have access to those.  So John --
 4        John was US Beverage to our customers.
 5        That's...
 6   Q.   You mentioned bids, in preparing bids.  Were
 7        these bids for public contracts?
 8   A.   Yes.
 9   Q.   Do you know if your bids would be public
10        record?
11   A.   Yes, our bids would be public record.
12   Q.   What about the identity of your public
13        clients, like your clients in school systems
14        and so forth; is that information -- would
15        that be publicly available?
16   A.   Now, that, I don't know.  Both our bid price
17        and our -- and who our clients are, you can --
18        if you owned the company, you could find that
19        out in seconds.  Just look at your books.
20        We -- you have to work very, very hard at
21        times to get bid prices and find out who those
22        customers are without just driving to the
23        location and looking to see who they are.  But
```