**FREEDOM COURT REPORTING**

```
                                                    Page 1
 1    IN THE UNITED STATES DISTRICT COURT FOR
 2       THE NORTHERN DISTRICT OF ALABAMA
 3              MIDDLE DIVISION
 4
 5    CASE NUMBER:   CV2:06-CV-496-MEF
 6
 7    U.S. BEVERAGE, INC.,
 8          Plaintiff,
 9          vs.
10
11    JOHN BUSTER WALKER, II; et al.,
12          Defendants.
13
14             S T I P U L A T I O N
15          IT IS STIPULATED AND AGREED by
16    and between the parties through their
17    respective counsel, that the deposition
18    of RYAN HAMNER may be taken before
19    Leslie K. Hartsfield, at the offices of
20    Raymond L. Jackson, Jr., 600 N. College
21    Street, Suite D, Auburn, Alabama, 36830,
22           DEPOSITION OF RYAN HAMNER
23    taken on the 16th day of November, 2006.
```

COPY

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 33

1  any recollection that you actually
2  approached John and said let's go sell
3  juice to day cares?
4      A.   I don't have any
5  recollection, no.
6      Q.   Do you have any recollection
7  of the reverse, of John saying that to
8  you?
9      A.   Maybe John asked me what I
10 was doing, if I was still doing my
11 business.
12     Q.   Was this before or after you
13 had been to U.S. Beverage about a
14 website?
15     A.   This is before.
16     Q.   This is before?
17     A.   Before.
18     Q.   So you and John are
19 discussing a business together about
20 juice for day cares before you've ever
21 had anything to do with U.S. Beverage;
22 is that correct?
23     A.   Yes.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 34

1  Q.   We're going to go back to
2  that, but tell me what you remember
3  about this.  You've given me kind of a
4  generalization of a website for U.S.
5  Beverage.  Tell me in your own words
6  what was going on.
7       A.   About the website?
8       Q.   Yeah.  You know, what you
9  thought you were doing.
10      A.   It was just we were going --
11 we -- we -- it was just so clear to me
12 that we had an agreement with them
13 that -- I remember just designing not
14 only the website I think I actually -- I
15 remember putting together a document
16 myself that talked about the website and
17 maybe it was an e-mail or something
18 about a mailer.  And I know I designed
19 their mailer and I designed their
20 website too all around the same time.
21      Q.   You're saying their, you're
22 saying U.S. Beverage's website?
23      A.   Yeah.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 35

1    Q.    And a mailer for U.S.
2  Beverage?
3    A.    Yeah.
4    Q.    Was there ever an occasion
5  in which you were essentially going to
6  come on board to do all of U.S.
7  Beverage's web work or something?
8    A.    By come on board, do you
9  mean like work for them as an employee?
10   Q.    Well, yeah.  I think you
11 answered this but yeah; as an employee.
12   A.    No.  No.  Not as an
13 employee.  I was -- we -- Trident
14 Marketing, we were -- Juice Alive was
15 under Trident Marketing.  We were going
16 to handle all their marketing stuff
17 including their website, their mailers,
18 their -- I mean.
19   Q.    Every time you say they,
20 you're talking about U.S. Beverage;
21 right?
22   A.    Yes, U.S. Beverage.  We were
23 going to handle U.S. Beverage's mailers,

FREEDOM COURT REPORTING

Page 36

1  their website, their, you know.  I was
2  saying we need to do e-mail, we need to
3  do -- get an online presence.  I mean,
4  those guys had no idea about that stuff.
5  And that's what I was, you know, I'd
6  even talked to them about it when we
7  went over there that day.  I remember
8  showing them some websites and just
9  going over some stuff.
10         Q.    Do you remember what day
11 that was?
12         A.    No.
13         Q.    You don't have any general
14 idea?
15         A.    (Shook head negatively.)
16         Q.    I think we're kind of
17 talking past each other a little bit.
18 Let's try to -- when is -- we started
19 with you and John having a conversation
20 about selling juice to day cares.  When
21 did Trident Marketing come out of that
22 conversation?  I mean, was that the
23 first conversation that y'all had in

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 37

1  terms of doing business together?  Let
2  me ask you that first.
3        A.   The Juice Alive, yes.  Juice
4  Alive was our first business anything
5  that we ever talked about doing and
6  Trident Marketing was -- that was like
7  came right with it.  I mean, it was just
8  like, you know, we had -- he was doing
9  more the business.  I was doing more the
10 technical and the graphic design.  But
11 the way I understood it was, you know,
12 Trident Marketing was the marketing
13 company for Juice Alive and it was, you
14 know, we put the whole thing together.
15 I came up with the name, the logo,
16 everything.  The thing that -- going
17 back to the other question, I definitely
18 never tried to get a job with U.S.
19 Beverage.
20       Q.   That's fine.  What did you
21 think Juice Alive was for?
22       A.   Juice Alive the logo, the
23 brand?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 38

1    Q.    Uh-huh (affirmative
2  response).
3    A.    It was our brand name that
4  was going to go on our day-care juice.
5    Q.    It was your brand name to go
6  on day-care juice?
7    A.    It was Trident
8  Marketing's.
9    Q.    What was Trident Marketing's
10 purpose?
11   A.    To market the juice, to
12 market Juice Alive, to sell the juice
13 on -- I mean, we created a website.  We
14 were going to sell the juice online.  We
15 were going to sell it through direct
16 mail.  We had the agreement set up with
17 U.S. Beverage.  We were going to market
18 the juice for them.
19   Q.    So you were going -- I mean,
20 selling juice was one of your primary
21 purposes?
22   A.    Yeah, selling day-care
23 juice.

FREEDOM COURT REPORTING

Page 39

1   Q.   That's what you wanted to
2   do?
3   A.   (Nodded head affirmatively.)
4   Q.   Would that have been the
5   type of business U.S. Beverage was doing
6   at that time?
7   A.   I don't think so.  It was --
8   I think it was a business they wanted to
9   do because I mean, there have been
10  agreements where we're going to market
11  it for them.  I developed mailers for
12  them to send out.
13  Q.   Well, I understand.  But we
14  talked earlier about John being in the
15  slush business --
16  A.   Yeah.
17  Q.   -- working for U.S. Beverage
18  and now you're talking about marketing
19  juice, slush to day-care centers.  Do
20  you not think that those are the same
21  type of businesses?
22  A.   I mean, it depends on a lot.
23  I mean, ones -- I mean, a slushy can go

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 40

1   in a bar.  I don't know much about where
2   the slushies go.  I mean --
3        Q.    I understand.
4        A.    They can both use fruit
5   juice so.
6        Q.    Right.  Tell me what was
7   U.S. Beverage marketing and selling.
8   I'm not asking where.  I'm asking what.
9        A.    Slushies and slush
10  machines.
11       Q.    And what was Trident
12  Marketing going to market and sell?
13       A.    Day-care juice.
14       Q.    Also slush and juice?
15       A.    When we got going, day-care
16  juice was -- that was our primary focus
17  was on day-care juice.
18       Q.    Your primary focus was on
19  day-care juice; is that right?
20       A.    Yes.
21       Q.    Did you have any other
22  focus?
23       A.    I mean, I just remember the

**FREEDOM COURT REPORTING**

Page 69

```
 1   end point for your job at Trident
 2   Marketing.  So you think maybe May
 3   2005?
 4         A.    Yeah.  That's, yeah, maybe.
 5   I mean, I don't know.  I mean --
 6         Q.    Okay.  Setting that aside,
 7   do you have any personal knowledge of
 8   Trident Marketing doing other things
 9   besides day-care juice?
10         A.    Well, see, if John was in
11   town doing -- I don't -- I would
12   sometimes see him.  I might meet him
13   somewhere else and he would be in town
14   for something else and I don't know if
15   he was in town doing whatever job it was
16   for for us, this is on the end, or if it
17   was for U.S. Beverage or whatever.  But
18   nothing specifically.  I don't
19   remember -- I mean, I don't know what
20   you mean by anything else.  Pretty much
21   when I was there when I worked with him,
22   not pretty much, all I ever shipped for
23   them, ever had anything to do with was
```

FREEDOM COURT REPORTING

Page 70

1  sending juices, juice to day cares,
2  bottles of juice to day cares, that's
3  it.
4      Q.   So you said when -- you just
5  said when John was in town, you didn't
6  know what -- whether John was working
7  for Trident or U.S. Beverage, did you
8  just say that?
9      A.   Well, I mean, yeah, if he
10 was in town.  I mean, oh, God, this is
11 just -- I can remember one time that I
12 met John and I don't know why I met John
13 but we met at Columbus High School.  And
14 I don't even know what it was for.  I
15 think maybe I came up there to see how
16 they installed a machine and I don't
17 know if it was for us or for U.S.
18 Beverage.  I don't know.  But that's the
19 only time I'd seen anything with the
20 machines.  So I mean --
21     Q.   So John could have been
22 installing a machine for Trident
23 Marketing in Columbus High School?

Page 71

1   A.   That's a stretch 'cause I
2   mean --
3   Q.   You just said you didn't
4   know whether if it was for us or for
5   them?
6   A.   Well, I mean, I'm just
7   saying if you're saying Trident
8   Marketing was doing something else.  I
9   saw John -- I went up there and saw
10  whatever they did with the machines and
11  how they handled their machines.  You
12  can probably go look it up with U.S.
13  Beverage or whoever and see whose
14  account it is.  I don't know.
15  Q.   Trident Marketing had its
16  own accounts in the surrounding area?
17  A.   No.  No.  'Cause I remember
18  specifically we weren't supposed to do
19  that.  They had something in the
20  agreement that something.  I don't know.
21  But no.
22  Q.   So you remember specifically
23  John telling you that he wasn't supposed

**FREEDOM COURT REPORTING**

Page 72

1  to do it in the surrounding area, but
2  it's all right to do it in other places,
3  your business?
4       A.   Well, whatever we had set up
5  on the mailers.
6       Q.   So you're just saying
7  that --
8       A.   I know whatever we agreed
9  to, and there's a letter, whatever we
10 agreed to in the letter there were
11 certain states that we sent this mailer
12 to and this mailer to (indicated). And
13 you called this number, you get U.S.
14 Beverage. You call this number
15 (indicated), you get us. Pretty much
16 that simple, what I remember it.
17      Q.   Did you tell U.S. Beverage
18 you were selling juice in other states
19 other than their states?
20      A.   Did I tell them we were
21 selling -- what now?
22      Q.   Juice.
23      A.   In?