US BEVERAGE, INC.,

Plaintiff,

v.

JOHN BUSTER WALKER, II, and TRIDENT MARKETING,

INC.,

Defendants.

-----------------------------------------------

JOHN BUSTER WALKER, II, and TRIDENT MARKETING,

INC.,

Counterclaim Defendants,

and

GRADY DOWLING KITTRELL, THOMAS GOING CLARK,

III, and NORMAN "BUDDY" TODD,

Third Party Defendants.


CIVIL ACTION NO.

2:06-CV-496-SRW




DEPONENT:   Grady Dowling Kittrell

DATE:   September 15, 2006

WORDCRAFT REPORTING, LLC
334.462.4665

37

1  A.  Not without a -- not without a P&L.
2  Q.  Okay. What about in terms of just sale of
3      slush products. How big a chunk of your
4      business was the sale of slush products?
5  A.  It's not going to be the major portion at that
6      point, and that's one of the reasons we were
7      aggressively seeking to get into it.
8  Q.  Okay. Do you have any idea? Can you give us
9      a rough estimate? 20 percent?
10 A.  Again, without a P&L and a specific time
11     stamp, I couldn't off the top of my head give
12     you that information.
13 Q.  I assume your business keeps those type
14     records that we could eventually obtain.
15 A.  Oh, sure.
16 Q.  What about -- let's talk about after
17     Mr. Walker came onboard with your company.
18     How big a component is the sale of slush
19     products for your business, let's say today?
20 A.  Oh, it's a large component today.
21 Q.  Could you put a percentage basis or rough
22     percentage on it today?
23 A.  I couldn't give you -- again, without looking

38

1      at financial information, give you a --
2      anything would just be a stab in the dark.
3  Q.  Okay. There's -- what about proportionality
4      in terms of comparing your slush business
5      before Mr. Walker came onboard with you
6      compared to today. Two times greater? Three
7      times greater?
8  A.  Well, again, I guess I get confused with the
9      term "slush." It's still just juice
10     concentrate. It's all juice concentrate to
11     me, so I see it as product business makes up
12     the majority of our business.
13 Q.  Well, in terms of your sales of fruit juice
14     concentrate, sitting here today, how much of
15     the sales would you attribute to just the sale
16     of just product that ends up just being juice,
17     you know, not slushy machine or --
18 A.  Yeah. The juice business is the majority of
19     our business. It's always been the focus of
20     our business.
21 Q.  Okay. And, again, I'm trying to ask you to
22     explain for us the -- the makeup or the
23     breakdown of that business. And I know

39

1      your -- I'm talking about slush, and I know
2      you're saying that you're considering fruit
3      juice concentrate to be all the same.
4  A.  Correct.
5  Q.  But in terms of selling juice in a slush
6      product or a product that's intended to be
7      sold to the customer in slush form, compared
8      to a product that's continued to be sold to
9      the customer in a liquid form, can you break
10     down for us the breakdown percentages between
11     the two?
12 A.  I cannot. And, again, I view them as the
13     juice concentrate being sold. I don't
14     distinguish the difference as the makeup of
15     our business. It's the same product --
16 Q.  Okay.
17 A.  -- is what I'm saying. I mean, so I don't
18     know how the customer may end up using it.
19     They may dispense it as a liquid sometimes.
20     They may dispense it as a slush sometimes.
21     Sometimes we package the same product in
22     bag-in-a-box to be dispensed through a
23     machine. I don't understand the distinction

40

1      you're making. I'm sorry.
2  Q.  So I guess if your company is putting slush
3      machines into convenience stores, when you're
4      selling that juice to go into a slush machine,
5      your accountants don't in some way distinguish
6      so you can find out how much your sales are
7      from the slush machine compared to other
8      sales?
9  A.  Sure. We can distinguish whether it was a day
10     care, a C-store, a ballpark or any of those
11     things. I cannot -- I cannot accurately
12     depict that today, though, without a P&L in
13     front of me.
14 Q.  Okay.
15 A.  Because, again, when I look at numbers, I look
16     at it as juice concentrate. Product sales is
17     how I view it versus equipment.
18 Q.  Has US Beverage ever been in the business of
19     creating promotional materials or POS
20     materials for customers?
21 A.  Have we ever been in the business of that? I
22     don't understand the question.
23 Q.  Okay. Has that ever been a, I guess, part of

1  Q.  I've just never -- I don't know if I've heard
2      nepotism used in a positive sense. Have you?
3  A.  Well, and I can strike nepotism and use
4      another word.
5  Q.  Okay. Well, what word would you like to use
6      instead of nepotism?
7  A.  I would say that through family ties, she had
8      relocated to follow him when he left Phenix
9      City to go take on as the state manager of
10     Texas. He brought her in under him. That was
11     my understanding of the situation, and I may
12     be misunderstanding.
13 Q.  Okay. If you were upset with Mr. Walker
14     moving to Texas, why didn't US Beverage just
15     buy him out in 2002?
16 A.  Well, again, we felt that John could have a
17     participation in the company. I mean, our
18     goal was to make the company work.
19 Q.  Okay. And let's talk about the calendar year
20     2002. Were you satisfied or dissatisfied with
21     John's participation in the company?
22 A.  2002. I would say that we were dissatisfied
23     in certain regards but kept thinking that John

1      business to work with us after repeated,
2      repeated conferences with Mr. Walker to get
3      him engaged with us to grow the business and
4      save the business, increase sales.
5              But were we dissatisfied? I
6      would say that we're always never satisfied
7      with where we're trying to get with our
8      company. We have goals we're trying to reach,
9      and sometimes we don't reach them. We were
10     very dissatisfied with Mr. Walker's
11     participation in the company. We felt he was
12     absent.
13 Q.  What about taking it to 2005? Same question.
14     Satisfied or dissatisfaction with the
15     participation?
16 A.  I think we became very dissatisfied when we
17     became aware of John Walker creating
18     competition for us, or what we perceived to be
19     competition.
20 Q.  And when did you become aware of that?
21 A.  I believe it was sometime in September or
22     October of '04.
23 Q.  Okay. What did you become aware of

1      was a competent person and could help us build
2      the business and that we desperately wanted
3      him involved with us to build the business.
4      We needed the guy who was in charge of our
5      sales working with us every day to grow the
6      business.
7  Q.  What about 2003? Satisfied or dissatisfied
8      with Mr. Walker's participation in the
9      company?
10 A.  I would say that we would have to be
11     dissatisfied with his participation and
12     frustrated with his lack of commitment to the
13     company.
14 Q.  Okay. Well, let's move to 2004. Same
15     question. Satisfied or dissatisfied with
16     Mr. Walker's participation in the company?
17 A.  Still dissatisfied but thinking that
18     throughout these discussions with Mr. Walker,
19     we kept feeling if he would come back and
20     participate as a full-blown operating person
21     in the business, that we would gain tremendous
22     benefit from him being involved with us. Our
23     intention was to engage Mr. Walker into the

1      specifically in September or October '04?
2  A.  We -- somehow we became informed through one
3      of our vendors that Mr. Walker had negotiated
4      to purchase machines for a separate entity
5      when we thought he was out there working to
6      grow on behalf of us.
7  Q.  And where were these machines purchased, or
8      where were they purchased to be put at?
9  A.  Couldn't -- couldn't accurately identify that,
10     but it was done through one of our vendor
11     relationships. And I was told at the time
12     that it started as a negotiation on US
13     Beverage's behalf to obtain that pricing.
14 Q.  And who was it that told you that?
15 A.  Jim Marmion at Carpigiani.
16 Q.  Did you discuss this with Mr. Walker?
17 A.  Yes. And, in fact, I think it was stated in
18     the letter that we gave to him December 20th,
19     2004.
20 Q.  And is that the initial buyout offer that US
21     Beverage sent to --
22 A.  I believe it to have been.
23 Q.  Okay. Just one second.

97

1  helped draw out the designs for the POS
2  materials for Harvest Pure?
3  A. It is my testimony that we would bring a need
4  to the table and we would be involved in our
5  input as to what we thought we needed to
6  create the image that we needed to
7  successfully market the product.
8  Q. Okay. And what would your participation be --
9  how would that be different than any of the
10 other companies buying Harvest Pure and
11 selling Harvest Pure across the country?
12 A. Well, as a buying group, we all participated
13 in that program. I mean, some had less
14 purchases than we did, maybe, but all in all,
15 it operated as a group, as a buying group.
16 Q. But you mentioned the person from Charleston,
17 South Carolina --
18 A. Uh-huh.
19 Q. Is that Mr. Ragodo (phonetic); is that his
20 name?
21 A. Ladery.
22 Q. Ladery. I'm sorry. And you said that it was
23 actually Mr. Ladery that had the idea for the

98

1  name "Harvest Pure"?
2  A. Yeah. That was his creation.
3  Q. What about the point-of-sale materials, did
4  Mr. Ladery act --
5  A. He spearheaded that. That was his -- that was
6  his role in the buying group as the head of
7  it.
8  Q. Okay. At any point was there a federal
9  trademark issued or sought for Harvest Pure?
10 A. I could not answer that. I don't know if
11 there was or was not.
12 Q. Okay. Do you know of any other efforts that
13 were made to help push this brand, Harvest
14 Pure, other than creating POS materials and so
15 forth? Any advertising?
16 A. Oh, yeah. There was advertising and promotion
17 and marketing towards these products, and even
18 what we do as a company is a marketing effort
19 to advertise and promote these products.
20 Q. Any joint advertising between the different
21 members of the buying group?
22 A. I would need for you to specifically define
23 advertising for me.

99

1  Q. Well, let's just break it down. Let's start
2  with radio ads. Were any radio advertisements
3  purchased?
4  A. Not a necessary function of our industry.
5  Q. Okay. Why -- just explain for us, why would
6  radio advertising promoting Harvest Pure not
7  be a necessary function of your industry?
8  A. Because in an institutionally-delivered
9  product, at the time, we were driving the use
10 of the product through our customers, meaning
11 the restaurant, the bar, the bowling alley,
12 wherever it may be. Most people were not so
13 concerned about a brand identity in the public
14 streets at that time. Radio is very costly.
15 Difficult for small companies to afford radio
16 or electronic media.
17 Q. Okay. Let me make sure I understand this. In
18 essence are you saying that if I'm buying
19 slush or juice concentrate at a bowling alley,
20 as a consumer, you're not very -- at that
21 point in time, you weren't concerned about
22 whether me as a consumer knew about the
23 Harvest Pure name or didn't? I just -- if I

100

1  was going to buy a slush at the bowling alley,
2  I was going to buy a slush -- is that kind of
3  what you were saying?
4  A. No. What I'm saying is in a captive audience
5  situation, we could have called it one of a
6  hundred things. It was the only slush
7  available or soda available. The consumer was
8  not as sensitive to that buying decision as
9  would be believed. It's a captive audience.
10 They can't -- there's not choices on that
11 shelf for that genre. They got one. I can
12 get the green one right there, end of story.
13 Q. Okay.
14 A. The branding does help identify what you call
15 it, but lemonade is lemonade. Frozen, liquid,
16 in powder form, it's lemonade, and the
17 customer is going to request lemonade. They
18 don't request Harvest Pure lemonade
19 specifically, nor do you order Minute Maid
20 orange juice; you order orange juice.
21 Q. Okay. Well, again, other than anything else
22 you've already testified previously in terms
23 of buying the product or participating at

                                                                                                    121                                                                                                    123

| | | |
|---|---|---|
| 1 | | whatever. The simple question is, during |
| 2 | | these discussions, was there ever a point in |
| 3 | | time where -- where there was a consensus or |
| 4 | | there were statements made by people in the |
| 5 | | meetings of the partners that by bringing John |
| 6 | | back to Montgomery and having here -- having |
| 7 | | him here onsite with US Beverage that the |
| 8 | | problems that we've talked about between the |
| 9 | | three partners would be made worse? |
| 10 | A. | Not made worse but would still exist. |
| 11 | Q. | Okay. Move on. Has US Beverage ever filed |
| 12 | | bankruptcy? |
| 13 | A. | No. |
| 14 | Q. | Has any of the owners of US Beverage ever |
| 15 | | filed bankruptcy? |
| 16 | A. | I have not. |
| 17 | Q. | What about any of the other owners of US |
| 18 | | Beverage? |
| 19 | A. | Tom Clark, I believe, may have filed in 1988 |
| 20 | | or '89. |
| 21 | Q. | Would he have filed individually or on behalf |
| 22 | | of the company? |
| 23 | A. | I don't have that knowledge. |

                                                                                                    122

| | | |
|---|---|---|
| 1 | Q. | Do you claim that Mr. Walker was using any of |
| 2 | | US Beverage's assets for the purpose of |
| 3 | | benefiting any other companies including |
| 4 | | Trident Marketing? |
| 5 | A. | Yes. |
| 6 | | MR. GILL: Object. |
| 7 | Q. | Okay. How so? What company assets do you |
| 8 | | believe he was using to benefit -- let's start |
| 9 | | with Trident Marketing. |
| 10 | A. | It would be my personal belief that the assets |
| 11 | | such as the cell phone, the gas card, |
| 12 | | utilizing expenses that would have been for |
| 13 | | the purpose of US Beverage's purposes, were |
| 14 | | utilized in doing that. I believe that our |
| 15 | | relationships with our vendors is proprietary |
| 16 | | to US Beverage and is an asset to US Beverage. |
| 17 | Q. | And which vendors do you allege that |
| 18 | | Mr. Walker utilized? |
| 19 | A. | Supreme Manufacturing and Carpigiani. |
| 20 | Q. | And what do you obtain from Supreme |
| 21 | | Manufacturing? |
| 22 | A. | Juice product, concentrates. |
| 23 | Q. | Do you buy exclusively from Supreme? |

| | | |
|---|---|---|
| 1 | A. | Exclusively? |
| 2 | Q. | In terms of juice products. I'm not talking |
| 3 | | about your other products. |
| 4 | A. | No, not exclusively. |
| 5 | Q. | Okay. What about the fruit juice that goes in |
| 6 | | the slush machines? Do you buy that |
| 7 | | exclusively from Supreme? |
| 8 | A. | I would say currently they get the bulk of it. |
| 9 | | Is it exclusive -- |
| 10 | Q. | They don't get all of it? |
| 11 | A. | There would be a couple of products because of |
| 12 | | our size -- we've had to spread our purchasing |
| 13 | | power to make sure that we don't outrun our |
| 14 | | supply chain. |
| 15 | Q. | What about your Fruzers product? Does Supreme |
| 16 | | make your Fruzers product? |
| 17 | A. | Yes. |
| 18 | Q. | Make all of it? |
| 19 | A. | Currently, yes. |
| 20 | Q. | Okay. What do you obtain from Mr. -- from |
| 21 | | Carpigiani? |
| 22 | A. | The Granita machines. |
| 23 | Q. | Anything else from Carpigiani? |

                                                                                                    124

| | | |
|---|---|---|
| 1 | A. | Just parts. |
| 2 | Q. | Do you have any sort of exclusive relationship |
| 3 | | with Carpigiani? |
| 4 | A. | We did at one time. |
| 5 | Q. | Can you describe that? |
| 6 | A. | We were a Carpigiani distributor. |
| 7 | Q. | Did you have a sales territory? |
| 8 | A. | Yes. |
| 9 | Q. | What was that? |
| 10 | A. | Related to specific pieces of equipment, we |
| 11 | | had Alabama, parts of Mississippi, and |
| 12 | | Georgia, I believe. As related to Granita, we |
| 13 | | were unencumbered. |
| 14 | Q. | Were there any products that Carpigiani |
| 15 | | exclusively sold to US Beverage and couldn't |
| 16 | | sell to other companies? |
| 17 | A. | Within a -- within a territory, yes. |
| 18 | Q. | Okay. And what would those have been? Again, |
| 19 | | Granita machines? |
| 20 | A. | No. That would have been related to the ice |
| 21 | | cream line. Equipment. |
| 22 | Q. | Ice cream equipment? |
| 23 | A. | Uh-huh. |

1  A. No.
2  Q. What about Jeff Bernstein? When did you have
3     discussions with him?
   A. I think we were actually engaged in business
      with him in some form or fashion probably two
6     years ago.
7  Q. What city in North Carolina is Jeff Bernstein?
8  A. I'm not sure.
9  Q. Did you actually sell any product to Jeff
10    Bernstein?
11 A. Currently, no.
12 Q. Well, in the past, have you sold any product?
13 A. I'd have to look at the records as to what the
14    transactions were for, if it was related to
15    supporting the Granita equipment that he was
16    using or if it was products that he was using.
17 Q. Okay. But you think you might have had some
18    dealings with him on equipment?
19 A. I believe we had some dealings with him, and
20    I'm not -- I'm not certain. But we certainly
21    called on these people to become customers.
22 Q. Was Jeff Bernstein a Cool Tropics'
23    distributor?

134

   A. Yeah. I believe.
2  Q. You believe. Do you know if he still is a
3     Cool Tropics' distributor?
4  A. I couldn't answer that.
5  Q. How about Books-A-Million in North Carolina;
6     when did you make contact with them?
7  A. We had made contact with Books-A-Million prior
8     to acquiring Tropical Perfections. And once
9     we did acquire them, they came on as a
10    customer of ours.
11 Q. Were you selling any products to
12    Books-A-Million stores in North Carolina?
13 A. No. Equipment only. And probably more
14    specifically parts.
15 Q. Do you sell products to any Books-A-Million
16    store in terms of the product, not the
17    equipment?
18 A. We've attempted on many occasions and have not
19    been successful.
   Q. Okay. Okay. And you mentioned another -- was
21    it Tropical Perfections, the other --
22 A. Paradise, I believe.
23 Q. Paradise. Okay. Do you recall when you made

135

1     contact with that company?
2  A. Two to three years ago.
3  Q. Do you know who your contact person was with
4     Tropical Paradise?
5  A. I cannot remember his name.
6  Q. Do you know what city Tropical Paradise is out
7     of in North Carolina?
8  A. No.
9  Q. Do you recall if you sold any products to
10    Tropical Paradise?
11 A. We sold products to them.
12 Q. What sort of products did you sell to them?
13 A. Juice concentrates.
14 Q. What about equipment; did you sell equipment
15    to them?
16 A. That, I could not answer.
17 Q. What sort of business is Tropical Paradise?
18 A. He is a school slush and juice concentrate
19    provider. And I hope I have the name right.
20 Q. Do they do anything else, convenience stores
21    or any other --
22 A. I couldn't answer that, the full mix of their
23    business.

136

1  Q. Are you currently selling anything to Tropical
2     Paradise?
3  A. They owe us money still.
4  Q. Is that why you stopped doing business with
5     Tropical Paradise?
6  A. (Nods head.)
7  Q. Is that a yes?
8  A. Yes.
9  Q. She can't take down nods.
10 A. Sorry. Sorry.
11 Q. That's fine. Is Tropical Paradise in
12    Virginia?
13 A. Yes.
14 Q. Are they actually based in Virginia not North
15    Carolina?
16 A. Based in Virginia.
17 Q. Okay.
18          MR. WALKER: He already answered
19              that question.
20          MR. JACKSON: Okay.
21 Q. Okay. Let's change gears a little bit. Let
22    me ask you about the decision that was made in
23    2003 by the -- I guess, the owners of US

137

1 Beverage to change the compensation
2 arrangement for Mr. Walker. Do you recall
3 that decision?
4 A. Yes, sir.
5 Q. How -- first, tell me what -- what exactly
6 happened? How was Mr. Walker's compensation
7 with the company changed after that meeting?
8 A. His salary was increased.
9 Q. Okay. What -- do you recall what his salary
10 was before the October 2003 meeting?
11 A. I believe his salary was $900 a week.
12 Q. And what was it increased to?
13 A. 1300 a week plus commissions.
14 Q. Was there any -- anything reduced that had
15 previously been given to --
16 A. We had -- we had been compensating ourselves
17 through a draw against profits. And what
18 actually happened was John Walker's salary was
19 increased and given commission to reach the
20 $102,000 a year, I believe, was the number
21 that he could -- he could max that in
22 commissions. And he still received any
23 profits or distributions from the company.

138

1 That was not taken from him. It's just there
2 was no profits or distributions to be gained
3 at that time.
4 Q. Okay. After the October 2003 meeting, how
5 were you and Mr. Clark paid?
6 A. On salary.
7 Q. And what was you and Mr. Clark's salary?
8 A. I believe I was 102,000, and I believe that
9 Mr. Clark might have been 120.
10 Q. And is it your testimony that Mr. Walker would
11 max out at 102,000 a year?
12 A. In salary and commissions, he and I would
13 emulate each other's.
14 Q. Well, I guess you and Mr. Walker would emulate
15 each other if Mr. Walker maxed out; is that
16 correct -- in sales?
17 A. Correct.
18 Q. What if Mr. Walker's sales weren't up to the
19 level that you had set for him?
20 A. Well, per the agreement, we did the commission
21 to incentivize (phonetic) him to participate
22 in the company, because at the time, he had
23 withdrawn quite a bit.

139

1 Q. Okay. Do you recall what the -- was there a
2 sales goal made for Mr. Walker? How --
3 A. No. He was -- he was based on a
4 commissionable rate that would have been
5 easily obtainable to max out at the 102.
6 Q. Do you recall what level of sales he would
7 have to obtain to max out at 102,000?
8 A. Without a calculator, I couldn't -- I couldn't
9 do the math.
10 Q. And we talked before about the -- you know,
11 distinction that your company or you were
12 making between, you know, customers that may
13 have Mr. Walker's name on the invoice,
14 compared to customers you actually physically
15 opened.
16 A. Correct.
17 Q. For what was Mr. Walker going to be
18 compensated for in terms of these sales
19 commissions? What would he have to do to turn
20 a customer from -- to actually make money
21 through having dealt with the customer?
22 A. He would have to make the initial contact,
23 present the products, create the customer

140

1 profile sheet, basically, create the sales
2 event. And then it was his job to maintain
3 that relationship and maintain the ongoing
4 account maintenance of that relationship for
5 its entirety. It was not an open it and walk
6 away from it. It was to maintain -- there was
7 a residual income attached to that.
8 Q. Okay. And let's say if he lost a customer,
9 would he lose the residual income?
10 A. No. There's no income there.
11 Q. No income at all?
12 A. For that customer. If they're not buying
13 product, there's no commission.
14 Q. Okay. What about past commission? You lose
15 that too?
16 A. If they didn't pay the bill, there's no
17 commission owed.
18 Q. Okay. What if they did pay the bill?
19 A. Potentially, if he had maintained the account.
20 Q. I guess what -- I guess what I'm trying --
21 and, again, maybe we're misunderstanding each
22 other -- let's say Mr. Walker opened an
23 account in August --

141

1  A.  Uh-huh.
2  Q.  -- the customer buys $20,000 worth of slush or
3      whatever, juice products, three months later
4      decides to become another -- to associate with
5      another slush company; $20,000 worth of
6      product that had been bought and paid for.
7      Would Mr. Walker have retained a commission
8      for that?
9  A.  It would depend on if Mr. Walker maintained
10     the account. There's more to it than just
11     signing the initial customer profile. That
12     means constant maintenance and contact with
13     the customer; that means visitations to the
14     company; that means solving service-related
15     problems for the customer; that means taking
16     orders from the customer when necessary, when
17     they're short-falling; that means delivering
18     that product to that customer during a
19     shortfall, not alienating the customer.
20 Q.  Who made the decision as to whether Mr. Walker
21     had maintained the customer?
22 A.  That would probably have fallen on the
23     responsibility of Mr. Clark, because all

142

1      service negotiations and all delivery
2      shortfalls come through him.
3  Q.  Okay. Are you aware of any situations where
4      there was product sold through Mr. Walker for
5      which he's not been paid commission?
6  A.  I would have to look at the records. I
7      believe that Mr. Walker has been paid
8      commissions for what he's owed.
9  Q.  Okay. But were there instances where product
10     was sold but there was a decision made that
11     the customer had not been maintained?
12 A.  Without records in front of me, I couldn't
13     answer that accurately.
14 Q.  You don't have any idea? I'm not asking
15     you -- if you could just quantify it for us.
16 A.  I could not.
17 Q.  Did the -- the agreement that we have here
18     before -- in Plaintiff's (sic) Exhibit 1 and
19     2, did it provide that the partners of US
20     Beverage, the three of y'all were supposed to
21     be paid equally?
22 A.  As well as equally manage the business.
23 Q.  Okay. But it did provide that the partners

143

1      were supposed to be paid equally?
2  A.  Provided there was --
3          MR. GILL: Object to the form.
4  A.  -- equal participation.
5  Q.  Well, we'll go through it. Let's find that
6      portion of the contract.
7          MR. GILL: Are you talking about
8                  Page 11? Is that what you're
9                  talking about? If that's not
10                 what you're talking about, I
11                 apologize.
12 Q.  Okay. Yeah. I believe what's Bates-stamped
13     at the bottom US Beverage 011 and US Beverage
14     012 on Plaintiff's (sic) Exhibit 1. Let's
15     just -- if you don't mind for the record just
16     read numbered Paragraph 5. Just read it
17     aloud, if you don't mind.
18 A.  Okay. (As read:) The stockholders should
19     jointly manage the business.
20         (Off-the-record discussion.)
21 A.  (As read:) Any increase in compensation shall
22     require a two-thirds vote of the shares of
23     outstanding stock in the corporation. Any

144

1      increase shall apply to all stockholders
2      equally. Any decrease will require unanimous
3      vote of all shareholders to the outstanding
4      stock of the corporation.
5  Q.  Okay. Did Mr. Walker consent to having --
6      being changed to this sales commission
7      arrangement we've just discussed?
8  A.  Absolutely.
9  Q.  He did?
10 A.  Yes, he did.
11 Q.  It's your testimony today that he agreed to
12     that --
13 A.  Absolutely.
14 Q.  Do you have any paperwork or documents to show
15     his agreement to that?
16 A.  I will have to search. Probably not.
17 Q.  Did Mr. Walker agree to allow you and Mr. --
18     you and Mr. Clark to increase your salaries in
19     October of 2003?
20         MR. GILL: Object to the form.
21 A.  Yes, he did.
22 Q.  Is it your -- is it your belief that the
23     arrangement you just testified to is

1  those during the break, lunch
2  break.
3  (The referred-to document was
4  marked for identification as
5  Defendants' Exhibit No. 3.)
6  Q. But -- and, again, Mr. Kittrell, is the
7  outline you were just discussing?
8  A. This -- this was one of the outlines that
9  was -- that was utilized that day, I believe.
10 Q. Are there any other outlines that...
11 A. I don't recall.
12 Q. Was this produced before or after the meeting?
13 A. This was produced prior to the meeting. This
14 was a coverage of my recommended action plan,
15 is what this was.
16 Q. Okay. Were there any notes or minutes
17 produced as a result of the meeting?
18 A. There was probably notes taken by all three of
19 us on that day. It was a very lengthy
20 meeting, and what has happened to everyone's
21 notes on that, I couldn't tell you.
22 Q. Are there any official notes or corporate
23 records taken?

154

1  A. Again, I will have to say that Tom Clark
2  usually presided as the secretary and
3  treasurer of the meetings and usually took
4  notes. Where those have gotten to, I couldn't
5  attest.
6  Q. Okay. Did John Walker agree to handle the
7  day-to-day affairs of Rio Grande?
8  A. No.
9  Q. Did he agree to go on the payroll of Rio
10 Grande?
11 A. No.
12 Q. Was there a decision made at that -- on that
13 meeting, that day, that Mr. Walker would not
14 return to the payroll of US Beverage?
15 A. There was not a decision made that day, no,
16 other than his own.
17 Q. Okay. And I may be misunderstanding what you
18 testified earlier. I thought you testified
19 that a decision was made that Mr. Walker
20 should go take over working for Rio Grande and
21 be paid out of Rio Grande. Did I
22 misunderstand you?
23 A. That was -- that was a suggestion in my plan,

155

1  to eliminate his travel so that he could be
2  more effective.
3  Q. Okay. And there wasn't any discussion at that
4  point of him going on Rio Grande's payroll and
5  dropping off of US Beverage's payroll?
6  A. There was that discussion, yes.
7  Q. Are you saying there wasn't a decision made
8  that day?
9  A. I'm saying that John Walker told us at that
10 meeting that he would not participate, but he
11 would agree to not taking a salary, but he
12 would not work without getting compensated but
13 expected us to continue to maintain the
14 profitability of the company and work every
15 day while he did not participate.
16 Q. Are those the exact words he used?
17 A. I cannot say that.
18 Q. Did he tell you he refused to participate in
19 US Beverage?
20 A. He said, if I don't get paid, I don't work.
21 Q. Is that a fair statement?
22 A. No.
23 Q. I mean, we talked yesterday about hats;

156

1  there's many hats that people wear,
2  corporate -- corporate officer, shareholder,
3  employee. Do you expect employees to work
4  without being paid?
5  A. I expect a fiduciary to either answer to a
6  cash call or elect that he be diluted for a
7  cash call, resign as an officer so that we can
8  place someone in fact who would carry on that
9  fiduciary. But I do expect someone who has
10 made a capital investment in something, who is
11 an officer, shareholder, and employee, to work
12 at all means to save the investment.
13 Q. Did Mr. Walker agree during this July 19th
14 meeting to permanently drop off the payroll of
15 US Beverage?
16 A. I would have to say no, he didn't agree to
17 permanently drop off.
18 Q. Was there any discussion of this decision to
19 stop paying the three members, or three
20 shareholders, of US Beverage as being -- any
21 discussion of a particular time limit,
22 60 days, 90 days?
23 A. Yes, there was.

169

1  replaced Mr. Walker? Could you have hired
2  someone else to fill his role in the company?
3  A.  I believe that's the current position that
4      we're in now.
5  Q.  But back in, let's say, 2002 or 2003 when he
6      moved to Texas, would it have been possible
7      for you to hire someone to fill the role of
8      sales -- being in charge of sales for your
9      company?
10 A.  You know, at that time, we had -- would it be
11     possible? I guess I don't understand the
12     question fully. And I'm not trying to be
13     evasive; I just don't understand --
14 Q.  And, again, we're talking about, you know --
15     we talked earlier about Mr. Walker having
16     various hats with the company.
17 A.  Correct.
18 Q.  And, you know, some hats are easier to remove
19     than other hats. But in terms of his --
20        MR. BILL: Object to the form.
21 Q.  -- some of his -- in terms of his role as an
22     employee of the company, would it have been
23     possible, you know, in view of your

170

1  dissatisfaction with his role in the company
2  to have just fired him and replaced him with
3  a -- with another employee to fill his role?
4     MR. GILL: Object to the form.
5  A.  Would it have been possible? I mean, anything
6      is possible, I guess. The problem that I'm
7      going to say that we faced is we had set John
8      up to be the face of US Beverage, and we had
9      made those relationships that US Beverage had
10     that were proprietary to customers'
11     relationships that John interacted with on a
12     daily basis. We at times felt we were
13     probably unable to make good decisions based
14     on his lack of participation.
15 Q.  Well, let's go back to Trident Marketing. Did
16     US Beverage ever have any business
17     relationship with Trident Marketing?
18 A.  Yes.
19 Q.  Can you describe that relationship?
20 A.  When we became aware, again, my belief is that
21     we felt that John was creating a competitive
22     spirit against us, and if we were not willing
23     to cower to his demands and start paying what

171

1  I call extortion money to Trident Marketing,
2  then he would take our business infinitely
3  because he had those relationships. We feared
4  for the company once he made that maneuver.
5  And we did engage in business with Trident
6  Marketing for the betterment of the business
7  of US Beverage so that it didn't collapse.
8  Q.  And what business was that, again? What
9      business -- and I'm asking you what business
10     you engaged with Trident Marketing. I know
11     you just described why you engaged in
12     business, but let's say just specifically what
13     business did you engage with Trident
14     Marketing?
15 A.  Well, at the time, we had just had several
16     discussions about developing a brand
17     internally and its priority within our
18     organization. We felt that it did have a
19     priority, but it was not the primary focus of
20     what John Walker should be doing for our
21     company. It was one of the many
22     responsibilities that he had, along with
23     developing a Web site, developing POS,

172

1  developing these other things. But it was
2  still our intent that he needed to be selling
3  day to day, door to door to help us
4  financially move the company forward while we
5  had shifted the day-to-day responsibilities to
6  ourselves so that he could be freed to go out
7  there and interact with customers. And that
8  was his sole responsibility, sales and
9  marketing.
10        When he brought to us the
11 Trident Marketing issue, we were in a
12 situation where we were almost mortified. I
13 mean, we were paralyzed to know what to do.
14 So what we did was we did as he requested, we
15 engaged in business with him so that we
16 wouldn't lose the connection to him and
17 destroy our business.
18 Q.  Okay. And, again, I'm asking you just
19     describe for us the specific type of business
20     you did with Trident Marketing. What goods or
21     services or --
22 A.  John Walker, again, was to produce a brand for
23     us. That was part of his responsibility as a

173

   sales and marketing manager. He went off and
   did that, we feel, with our resources and
   created a brand that we feel is intellectual
   property of ours and is an asset of US
   Beverage, though it may be registered
   somewhere else, and then came to us and
   declared that if we did not pay him for the
   use of that brand, he would take our business
   from us and those relationships that he had
   personal contact with and destroy us. So we
   engaged in buying that brand from him.
Q. And, again, let me ask you -- you know, when
   you said that he said he would -- are you
   saying that's a direct quote from Mr. Walker,
   that he would destroy US Beverage?
A. I've had several discussions with Mr. Walker
   where he has described either I pay him what
   he asks or he will seek to put us out of
   business.
Q. On how many occasions has he said that?
A. I would say more than four to five.
Q. Has he ever said that in front of anybody
   else?

174

A. Yes.
Q. Who?
A. Tom Clark, Buddy Todd.
Q. Who else?
A. I couldn't describe the other people that he
   may have said that in front of. He may have
   said that in front of his wife, possibly. I
   don't know.
Q. Well, being a person that's residing in Texas
   and you said he's not here in Alabama that
   much, how could he destroy your company?
A. Well, because he has proprietary accounting
   information to assist competitors in bids
   against us. He knows our purchasing price
   because he has our books. He has our customer
   list, which is in our books. And he can
   distribute that information to competitors so
   that they can seek to harm us in a vendetta.
Q. Well, but you earlier talked about him being
   set up to be the face of US Beverage to your
   customers, but you also testified that he's
   not here; he's in Texas.
A. That is true.

175

Q. How does he harm you as being the face of US
   Beverage when you -- I think part of your
   allegations is that he's not here?
A. Correct.
Q. He's not seeing your customers according to
   you; correct?
A. To us, it's still amazing how active he could
   get when he saw personal gain only and not the
   gain for the corporation. He became very
   active in trying to hurt the company. But,
   again, to have those books, that proprietary
   knowledge, to have our vendor contacts and our
   vendor pricing to pass to other competitors so
   that they may buy at the same price we had
   already negotiated and worked many years to
   obtain, that's very damaging to us.
Q. Let's talk about the creation of a brand.
   When do you first recall -- and you and John
   Walker -- talking about US Beverage creating
   its own brand for slush products?
A. I would say that the discussion probably arose
   the minute that he came onboard with us.
Q. Who brought up that discussion?

176

A. Well, that discussion had been going on
   between Tom Clark and myself for a long time
   about developing a blanketed brand for all of
   our products. This was not a new discussion
   to US Beverage.
Q. Did John Walker ever approach you and ask
   you -- or ask you and Mr. Clark to invest
   resources toward creating an in-house brand?
A. We felt he asked us to invest excessive
   resources.
Q. What did he ask you specifically? Did he ask
   for a particular amount of money toward that?
A. Again, part of it was in the Ryan Hamner
   discussions, he was bringing friends or
   associates of his, not shopping the best price
   for us, we felt. And all we asked for was,
   please, get us several quotes on these type of
   things. We actually set up a marketing
   company to meet with Mr. Walker to assist him
   in this project, which Mr. Walker just
   wouldn't even engage in the conversations, was
   not eager to engage this other company to help
   us in the development of that brand, which was

| | | | | |
|---|---|---|---|---|
| 1 | | one that we had all gone and met with. We had | 1 | Q. | Okay. Just to make sure I understand, I guess |
| 2 | | agreed to allocate some resources but not | 2 | | at some point there was a decision made that |
| 3 | | millions of dollars. We just didn't think | 3 | | US Beverage, first, doesn't want to spend the |
| 4 | | that was a necessary function. We just didn't | 4 | | money that Mr. Walker had proposed, or however |
| 5 | | think that the brand development was going to | 5 | | he had budgeted the money; and, secondly, that |
| 6 | | cost that much. The value of the brand is | 6 | | the other members of the company wanted |
| 7 | | based on the marketing and distribution of the | 7 | | Mr. Walker to spend his time on developing |
| 8 | | brand. | 8 | | customers rather than developing a new brand; |
| 9 | Q. | Is it your testimony today that John Walker | 9 | | is that -- |
| 10 | | asked the company to invest millions of | 10 | | MR. GILL: Object to the form. |
| 11 | | dollars toward the creation of a brand? | 11 | A. | No, that's not accurate. |
| 12 | A. | No. I said we did not feel that we needed to. | 12 | Q. | Okay. Well -- |
| 13 | Q. | Okay. Well, I'm asking you what your | 13 | A. | We feel that the majority of his time should |
| 14 | | recollection is of what Mr. Walker asked in | 14 | | have been spent on the day-to-day business |
| 15 | | terms of financial resources from US Beverage | 15 | | that US Beverage was engaged in. But that the |
| 16 | | to help to create a brand. | 16 | | marketing is a very essential part of what we |
| 17 | A. | I would say that the initial discussions were | 17 | | do. We are nothing more than a marketing |
| 18 | | in excess of $5,000. | 18 | | company. That is what we do. We take a |
| 19 | Q. | And you thought a $5,000 investment in a new | 19 | | product; we go to the streets and we market |
| 20 | | brand was excessive? | 20 | | and we sell; and then we distribute. It's all |
| 21 | A. | I thought that the way that he wanted to | 21 | | a function of marketing. We felt that a brand |
| 22 | | allocate the funds could be perceived to be | 22 | | was important to us, but at the time when you |
| 23 | | excessive. I thought we could have come up | 23 | | cannot pay your bills, the most important |

| | | | | |
|---|---|---|---|---|
| 1 | | with several names to start exploring | 1 | | thing -- not to lessen the importance of a |
| 2 | | development of, as opposed to paying a Ryan | 2 | | brand -- but the most important thing was to |
| 3 | | Hamner or someone 5,000 just for a logo. | 3 | | continue the path that we had all signed off |
| 4 | Q. | And is that your testimony, that he proposed | 4 | | on and to develop the brand as an addition to |
| 5 | | to just spend $5,000 paying Ryan Hamner, and | 5 | | the marketing plan, not that the sole function |
| 6 | | that was the only thing he proposed to you in | 6 | | of John Walker came to be a brand-development |
| 7 | | terms of -- | 7 | | manager. That was not the direction we wanted |
| 8 | | MR. GILL: Object to the form. | 8 | | to go. |
| 9 | A. | No. That would not be. I've misstated that. | 9 | Q. | When did you first hear the name Juice Alive? |
| 10 | Q. | Okay. Well, and I misunderstood you, so you | 10 | A. | I would say the first recollection I have of |
| 11 | | can clarify that. | 11 | | Juice Alive as a name would have been at the |
| 12 | A. | We did not feel that the amount of money was | 12 | | time -- I could not give you a definite date |
| 13 | | necessarily the issue. We felt that the | 13 | | on that. |
| 14 | | amount of focus that John Walker wanted to | 14 | Q. | Did you come up with the name Juice Alive? |
| 15 | | designate to that project was a little -- we | 15 | A. | No. |
| 16 | | still felt he needed to be selling day to day | 16 | Q. | What about Mr. Clark; do you think he -- are |
| 17 | | and working on that project in his spare time, | 17 | | you contending he came up with the name Juice |
| 18 | | not that that became the focus; that those | 18 | | Alive? |
| 19 | | resources were better used day to day making | 19 | A. | I do not think he did. |
| 20 | | sure that our accounts were taken care of; | 20 | Q. | Well, do you think the first time you heard |
| 21 | | that the cash flow of the business was secure | 21 | | about the name Juice Alive would have been |
| 22 | | so that we could pay our bills and continue to | 22 | | from John Walker? |
| 23 | | grow and then develop a brand through that. | 23 | A. | Yes, I believe that. |

Page 229

1  intention -- at least the documents produced
2  by -- or created by US Beverage or you, the
3  intention of which was to create an exclusive
4  distributorship everywhere?
5  A.  That was our intention, was to be the sole
6  distributor for that product. We felt it was
7  our product brand.
8  Q.  In the entire US?
9  A.  In the entire US that we could set up
10  sub-distributors through us and things like
11  that for other means of distribution, but that
12  it would all flow through US Beverage. The
13  references were to direct distribution, that
14  we would handle directly, not as a support
15  agent coming through us. We never intended to
16  give our company away. That was not the
17  intention of our documents.
18  Q.  I guess as we said before, the documents will
19  speak for themselves. But let's go to the
20  next document, then. Mark this Defendants'
21  Exhibit No. 16 and ask you if you can identify
22  it. Have you seen this document before?
23       (The referred-to document was

Page 230

1  marked for identification as
2  Defendants' Exhibit No. 16.)
3  A.  Yes, I have.
4  Q.  Can you identify it for the record?
5  A.  It is a correspondence between Gary Dukes and
6  Tom Clark.
7  Q.  Does that appear to be Tom Clark's signature
8  at the bottom?
9  A.  Yes, it does.
10  Q.  Do you have any reason to believe that this
11  did not come from Tom Clark?
12  A.  No, I do not.
13  Q.  If you'll read the first line -- just read the
14  first sentence of the -- underneath "Gary."
15  Read it aloud for the record.
16  A.  You need me to read it out loud?
17  Q.  Yes, sir.
18  A.  Okay. (As read:) We have reached an agreement
19  with Juice Alive to start distribution of the
20  Juice Alive brand in our 100 percent juice
21  products.
22  Q.  Just keep reading. Read the second sentence,
23  too.

Page 231

1  A.  (As read:) Please let this signed fax serve as
2  official authorization for you to begin
3  selling to US Beverage, Inc., the Juice Alive
4  product with $1.20 increase per case to be
5  paid to Juice Alive.
6  Q.  Okay. And this document is US Beverage
7  agreeing to pay Juice Alive for the right to
8  distribute the Juice Alive product?
9  A.  This document is authorizing that, under
10  duress, US Beverage, for fear of losing
11  accounts based on proprietary information, we
12  were willing to engage in a contract that we
13  were being coerced into to protect the
14  business at hand, which was the distribution
15  of 100 percent juice products through the
16  vehicle US Beverage.
17  Q.  Let me ask you, you mentioned the word of
18  "duress." There's different forms of duress.
19  And your attorney can -- I'm sure has told you
20  that. Are we talking about physical duress?
21  A.  I'm talking physical, emotional, financial.
22  Q.  Well, I'm just asking about physical. What
23  sort of physical duress were you or Tom Clark

Page 232

1  under when you signed this document?
2  A.  The financial pressures revolving around which
3  causes --
4  Q.  And let's --
5  A.  That's physical duress to me. I can't sleep;
6  I can't eat; I'm sick all the time. I have
7  physical duress over the financial stability
8  of my company.
9  Q.  Okay. At any point did Mr. Walker threaten
10  violence against you or your person if you
11  didn't sign this agreement?
12  A.  On several occasions Mr. Walker has threatened
13  violence by threatening that he was an ex-navy
14  SEAL, and he could kill us at will. Not this
15  document, but we have been threatened on many
16  occasions.
17  Q.  Okay. Now, let me make sure I understand.
18  Are you testifying today that Mr. Clark signed
19  this document on behalf of US Beverage because
20  he had been threatened physically?
21       MR. GILL: Object to the form.
22  A.  I believe that any human who has been
23  threatened with physical violence will always

313

```
1       Beverage heard Scotty West make that comment?
2  A.   I couldn't answer yes or no to that.
3  Q.   I'm going to ask you about this.  But if
4       you'll look at the next document we're going
5       to mark Exhibit 26, Defendants' Exhibit 26.
6           (The referred-to document was
7            marked for identification as
8            Defendants' Exhibit No. 26.)
9  Q.   Okay.  And there was some discussions
10      yesterday during the deposition of my client,
11      Mr. Walker, about this document, his amended
12      tax return.
13 A.   Correct.
14 Q.   Are you familiar with this document?
15 A.   Very.
16 Q.   Okay.  What can you tell us about this?
17 A.   This was a tax document that was presented to
18      me sometime June or later of '02 when I was
19      preparing some documents for some loans, an
20      SBA loan, I believe, and some other various
21      loans from banks.  But John had alerted me to
22      the fact that he had amended the corporate
23      return.  And at that time, we had a very
```

314

```
1       specific meeting with Mr. Walker about the
2       fact that we now own Tropical Perfections and
3       he had no right or entitlement to go back and
4       change his tax return after we had purchased
5       the assets of the corporation.  And, in fact,
6       what he did was he said, well, it reduced my
7       tax liability and I got a bigger refund after
8       I filed the amended return.  And we discussed
9       with him then, but you passed a tax liability
10      on to US Beverage by doing so.  We already
11      owned the company.  He had no right to go back
12      and change this.  He no longer owned this tax
13      return.  This was an asset and property and
14      financial document of US Beverage.
15 Q.   Do you allege there's any sort of specific
16      loss to US Beverage as a result of this?
17 A.   Absolutely.  He passed on a tax liability.
18 Q.   How much?
19 A.   I'm going to say it may have been close to --
20      and without the other document in front of me,
21      it was probably 12 to $15,000 or greater.
22 Q.   And what's the date of this document?  Yeah.
23      It's toward the bottom of the page.  See the
```

315

```
1       line that says preparer's signature?
2  A.   6/20/02.
3  Q.   Would you have received this document sometime
4       around 6/20/02?
5  A.   I do not know when I specifically received the
6       document, but I said it was sometime after
7       June.
8  Q.   Okay.  How soon after June?
9  A.   I could not make a statement.
10 Q.   Within days or weeks?
11 A.   Again, it was -- I was working on getting
12      documents together for loan preparation, and
13      John had alerted me to this.  He may have
14      given it to me the 20th.
15 Q.   Did you demand that John withdraw the
16      amendment?
17 A.   We sat down with John.  And, again, as many
18      discussions with John are, they become very
19      circular.  John will do what John wants to do,
20      not necessarily what he's asked to do by the
21      corporation or any of those.  We sat down.  It
22      had been filed.  You know, at the time, again,
23      we worked very hard, very hard at trying to be
```

316

```
1       very amicable to John in many situations,
2       knowing that he had come into a different
3       organization, trying to make him comfortable.
4       And at the time, we said, look -- and I cannot
5       remember what the resolution was.  We said,
6       you've done it; it's over; we counseled him
7       and asked him not to continue this type of
8       behavior; and that we would move forward with
9       the relationship of US Beverage, and we would
10      try to keep doing business and move forward,
11      and this would be the new tax return that we
12      represented as the official closing tax
13      document of Tropical Perfections from that
14      date forward, and it is the one that I have
15      used since then.
16 Q.   Okay.  And I'm sorry.  It's been a long day,
17      but is that a no, because I asked you whether
18      or not you asked Mr. Walker to withdraw this
19      amendment?
20 A.   I would say no.
21 Q.   Are there any claims in the current lawsuit
22      relating to this amendment?  Are you making
23      any claims for repayment of money to US
```