## FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

MIDDLE DIVISION


CASE NUMBER:  CV 2:06-CV-496-MEF

U.S. BEVERAGE, INC.,

          Plaintiff(s),     **COPY**

          vs.

JOHN BUSTER WALKER, II; TRIDENT

MARKETING, INC; and A, B, C, and D,

fictitious defendants whose names are

otherwise unknown but which will be

supplemented by amendment,

          Defendant(s).


       S T I P U L A T I O N

          IT IS STIPULATED AND AGREED

by and between the parties through

their respective counsel, that the

deposition of JOHN B. WALKER, II may

be taken before TAMIE J. STORY,

Commissioner, at the offices of Raymond

L. Jackson, Jr., 660 North College

## FREEDOM COURT REPORTING

Page 37

1      Q.      A one-third shareholder in
2  the company?
3      A.      Correct.
4      Q.      And you agree you became an
5  officer of the corporation?
6      A.      Correct.
7      Q.      Would you agree with me
8  that -- Well, let me strike that.
9              Let's go through these real
10  quick.
11

12      (Whereupon, Plaintiff's Exhibit 1
13      was marked for identification and
14      same is attached hereto.)
15

16      Q.      Would you look at that
17  document for me and tell me what it is?
18      A.      (Witness complies).  It was
19  a meeting of the special minutes (sic)
20  of the shareholders of Tropical
21  Perfections.
22      Q.      Is that your company,
23  Tropical Perfections?

## FREEDOM COURT REPORTING

Page 41

1    Q.    I'm just going to go

2  through a couple of these real quickly.

3              This is an agreement to

4  purchase corporate stock of Tropical

5  Perfections, Incorporated; right?

6    A.    Correct.

7    Q.    And you signed this

8  individually and as a shareholder of

9  Tropical Perfections; is that correct?

10   A.    That's correct.

11   Q.    When this purchase took

12 place on April 24, 2002, you told me

13 that you agreed that you became a

14 shareholder and an officer?

15   A.    (Witness nodding head).

16   Q.    Did you take a title at

17 that point?

18   A.    I did.

19   Q.    What was that title?

20   A.    Vice president.

21   Q.    What was your primary area

22 that you were a vice president in?

23   A.    Sales.

## FREEDOM COURT REPORTING

1    through briefcase).

2             MR. JACKSON:  Now, what are

3    you getting out, John?

4             THE WITNESS:  This

5    (indicating).

6             MR. JACKSON:  Is that the

7    thing you wrote to me?  If he starts

8    referring to that, it becomes part --

9    You sent that to me when you retained

10   me, and I consider that to be attorney/

11   client privilege.  I don't want you to

12   -- don't refer to it, don't -- just put

13   it back up.  Just answer the question

14   the best way you can without referring

15   to any correspondence.

16            THE WITNESS:  Okay.

17        A.    I'm sorry.  What was the

18   question again?

19        Q.    When is the first time that

20   you remember discussing starting a

21   business with Ryan Hamner?

22        A.    I would say it was sometime

23   in early 2004.

# FREEDOM COURT REPORTING

1      Q.    That's not the question.  I

2  made a statement.  You told me -- It's

3  based on what you told me.  In early

4  2004, you were discussing with Ryan

5  Hamner starting a new company?

6      A.    Correct.

7      Q.    And you just told me that

8  the purpose of that company would be to

9  market a juice product?

10      A.    Correct.

11      Q.    Now, in early 2004, that

12  would have been the primary business

13  that U.S. Beverage was in at that

14  point; correct?

15           MR. JACKSON:  Object to the

16  form.

17      A.    No.  I wouldn't say it was

18  the primary business.

19      Q.    Well, it was certainly a

20  business that they were in, was it not?

21      A.    It was a part of the

22  business they were in, yes; they did

23  sell that brand or that product.

## FREEDOM COURT REPORTING

Page 106

1    Q.    When did Trident Marketing
2  come into existence?
3    A.    The day it was incor-
4  porated?
5    Q.    No.  When did it come into
6  existence?
7    A.    I would say sometime in mid
8  to early 2004.
9    Q.    Was it incorporated at a
10 later time than that?
11   A.    I think -- Yeah, I think it
12 was actually incorporated toward the
13 middle or the latter part of that
14 year.  I don't know the exact date.
15
16   (Whereupon, Plaintiff's Exhibit 7
17   was marked for identification and
18   same is attached hereto.)
19
20   Q.    I'm going to mark this as
21 Plaintiff's Exhibit 7.  Would you take
22 a look at that document and tell me
23 what it is.  This is a document you

## FREEDOM COURT REPORTING

Page 120

1      A.      No, I don't believe we did.

2      Q.      By the offer, I'm

3   referencing Plaintiff's 7.

4      A.      No, I don't believe we made

5   this offer to any other company.

6      Q.      All right.  Is it not true

7   that you were upset about what you

8   believed was a salary cut in October of

9   2003 and you were upset about Ryan

10  Hamner not being asked to work for U.S.

11  Beverage, so you decided to go start

12  Trident Marketing?

13     A.      No, that's not true.

14     Q.      Well, why did you start

15  Trident Marketing?

16     A.      To offer services that U.S.

17  Beverage needed.

18     Q.      Again, we'll go back to the

19  same question:  Was Trident Marketing's

20  sole purpose to benefit U.S. Beverage?

21     A.      It wasn't its sole purpose.

22  It was -- again, we were offering

23  something -- We had an opportunity to

**FREEDOM COURT REPORTING**

Page 122

1    Q.    You offered it to them at a

2    price; right?

3    A.    Certainly.

4    Q.    Now, at the same time in

5    early 2004, did you not -- let me show

6    you some documents.

7

8    (Whereupon, Plaintiff's Exhibit 8

9    was marked for identification and

10    same is attached hereto.)

11

12    Q.    I'll mark this as

13    Plaintiff's Exhibit 8.  I'm sorry, can

14    I see that a minute?

15    A.    (Witness complies).

16    Q.    Can you tell me what this

17    document is?

18    A.    It looks like the bylaws of

19    U.S. Beverage.

20    Q.    Would you look at the last

21    page of it.

22    A.    (Witness complies).

23    Q.    Can you tell me what date

## FREEDOM COURT REPORTING

Page 123

1  that is?

2         A.     March 24th of 2004.

3         Q.     Would you agree with me you

4  signed this --

5         A.     Yes.

6         Q.     -- as a shareholder and

7  officer of the corporation?

8         A.     Yes.

9         Q.     Tell me what GBD Holding,

10  LLC is.

11         A.     It's a company that owns

12  the building that U.S. Beverage is

13  housed in, that it operates out of.

14         Q.     Are you a member of that

15  LLC?

16         A.     I am.

17         Q.     So you're an owner of the

18  building?

19         A.     I'm a shareholder in the

20  corporation.

21         Q.     So you're still an owner of

22  U.S. Beverage's building?

23         A.     Apparently so (nodding

## FREEDOM COURT REPORTING

1   head).

2          Q.     Now, at this same time

3   frame, March, 2004, did you also sign

4   in regard to several -- at least one

5   loan that the company took out?

6          A.     I'm sure I did.  I signed

7   on a lot of different loans and leases

8   for U.S. Beverage.  I don't recall one

9   specifically on that date or that

10  month.

11         Q.     Why would you have to do

12  that?

13         A.     Because we needed money or

14  we needed financing for something.

15         Q.     Right.  And you were a

16  shareholder; correct --

17         A.     That's correct.

18         Q.     -- so they needed you to

19  sign to get those loans; correct?

20         A.     In some situations, they

21  did (nodding head).

22         Q.     Well, you understand that

23  -- well, strike that.

## FREEDOM COURT REPORTING

1  document here with me.

2              MR. GILL:  That's fine.  I

3  mean, I would like -- it's not going to

4  be a disputed fact.

5              MR. JACKSON:  Yeah.

6              MR. GILL:  I mean, it's

7  going to be incorporated --

8              MR. JACKSON:  If you'll

9  remind me on a break, I'll pull up the

10  web site and we'll pull up the record.

11              MR. GILL:  Okay.

12      Q.    When it was incorporated,

13  how many shareholders were there?

14      A.    Two.

15      Q.    That would be you and Ryan

16  Hamner?

17      A.    That's correct.

18      Q.    Now, when you incorporated

19  it, what was the general purpose of the

20  corporation?  Did you have any?

21      A.    It was to market a line of

22  -- it was to create, brand, and market

23  a line of juice products for sale via

## FREEDOM COURT REPORTING

1   the Internet.

2        Q.    Okay.  Which would be the

3   business that U.S. Beverage was in;

4   right?

5             MR. JACKSON:  Object to the

6   form.

7        A.    No, I don't think U.S.

8   Beverage was in that business.

9        Q.    Well, we know U.S. Beverage

10  is marketing juice products; I mean,

11  it's selling juice products?

12       A.    It's selling juice

13  products, they're not branding and

14  marketing and selling them via the

15  Internet.

16       Q.    So you're saying your

17  difference is that you can do it

18  through the Internet?

19            MR. JACKSON:  Object to the

20  form.

21       A.    That's not what I'm saying.

22       Q.    Well, did you not state

23  that that's -- I mean, is that not a

## FREEDOM COURT REPORTING

Page 134

1  that, no.

2        Q.    What else would it have

3  been for?

4        A.    It wasn't intended to be

5  used as a slush product.

6        Q.    What was it intended to be

7  used for?

8        A.    It was intended to be

9  marketed via the Internet.

10        Q.    What is "it"?

11        A.    The juice to daycare

12  centers.

13        Q.    So it's juice?

14        A.    But you said slush a second

15  ago.

16        Q.    Fine.  I apologize.  Juice.

17  Would you not agree that that's what

18  U.S. Beverage is doing?

19        A.    U.S. Beverage sells juice.

20  They don't sell it in the same manner

21  and they don't create and brand and

22  market products.

23        Q.    Well, do you not think that

## FREEDOM COURT REPORTING

1  couple of hours, but, I mean, you know

2  it's in their business.  I understand

3  what you're trying to say in that you

4  say you're marketing it and selling it

5  on the computer, or the Internet, I

6  apologize, but this is specifically for

7  the product that U.S. Beverage is

8  selling, distributing, anything you

9  want to call it?

10      A.    Specifically for?  I mean,

11  you will have to -- I'm not quite sure

12  what you're saying there.  I mean,

13  we're not coming after U.S. Beverage's

14  accounts with this product.

15      Q.    It's your testimony that

16  you're not coming after U.S. Beverage's

17  accounts?

18      A.    When this product was

19  created, it was not to sell to accounts

20  that U.S. Beverage was currently

21  selling to, it was to help them.

22      Q.    It was designed to sell to

23  different accounts?

## FREEDOM COURT REPORTING

Page 138

1      A.    It was created -- we were

2   marketing a product via the Internet to

3   daycare centers, something that U.S.

4   Beverage could not or did not do at

5   that point in time.

6      Q.    In the same location as

7   U.S. Beverage?

8      A.    In the same location?

9      Q.    In the same geographical

10  region as U.S. Beverage.

11     A.    We were going to provide

12  services to U.S. Beverage in -- If

13  you'll look at Plaintiff's Exhibit 7,

14  it outlines a specific area where we

15  were going to provide those services to

16  U.S. Beverage.

17     Q.    Right.  So you would do it

18  for U.S. Beverage in their region for a

19  commission?

20     A.    (Witness nodding head).

21     Q.    And you were going to do it

22  elsewhere on your own; is that fair?

23     A.    Correct, yes.

## FREEDOM COURT REPORTING

Page 139

1      Q.    And all the while, you're

2   still an officer and a shareholder of

3   U.S. Beverage?

4      A.    That's correct.

5

6      (Whereupon, Plaintiff's Exhibit 10

7      was marked for identification and

8      same is attached hereto.)

9

10     Q.    I'm going to mark this as

11   Plaintiff's Exhibit 10.  Now, this is

12   actually a copy of a card?

13     A.    Uh-huh (nodding head).

14     Q.    I can show you the actual

15   card if you're not familiar with it.

16     A.    I'm familiar with it.

17     Q.    When did this come out?  Do

18   you have any memory or recollection of

19   when this came out?

20     A.    It was produced sometime in

21   2004.

22     Q.    Would this have been the

23   first --

## FREEDOM COURT REPORTING

1    A.    The first?

2    Q.    -- Juice Alive thing that

3  came out or advertisement?

4    A.    I believe that it was one

5  of the first, yes.  There was another

6  one made in conjunction with this.

7    Q.    What is that telephone

8  number at the bottom?

9    A.    It's 1-800-337-5202.

10   Q.    Is that your number?

11   A.    Huh-uh, it's U.S.

12  Beverage's number.

13   Q.    It's U.S. Beverage's

14  number?

15   A.    That's correct.

16   Q.    I may have jumped ahead a

17  little bit here, but we were talking

18  about Trident Marketing, and you were

19  talking about marketing a brand or

20  whatever.

21   A.    Uh-huh (nodding head).

22   Q.    I understand from this

23  lawsuit it's your contention that you

## FREEDOM COURT REPORTING

1    and Ryan Hamner came up with Juice

2    Alive --

3         A.    Ryan created it (nodding

4    head).

5         Q.    -- for your corporation,

6    Trident Marketing?

7         A.    For our corporation

8    (nodding head).

9         Q.    And when was this done?

10        A.    He created the brand

11   sometime in early 2004.

12        Q.    And you still don't think

13   that this is the brand and the

14   marketing is not in the same business

15   that U.S. Beverage is in?

16        A.    I don't think that U.S.

17   Beverage was a marketing company.

18        Q.    Well, I understand that.

19        A.    Okay.  I'm not sure what

20   you're asking me then.

21        Q.    But you're saying you came

22   up with Juice Alive --

23        A.    I'm saying Ryan came up

**FREEDOM COURT REPORTING**

1   that not correct?

2       A.   I continued to make sales

3   throughout my employment with U.S.

4   Beverage and, yes, I did start another

5   company called Trident Marketing.

6       Q.   Do you contend you're not

7   employed with U.S. Beverage right now?

8       A.   I don't know whether I am

9   or not.

10       Q.   You certainly don't

11   disagree that you -- you're still a

12   shareholder, aren't you?

13       A.   Uh-huh (nodding head), I'm

14   still a shareholder, but I don't know

15   if I'm employed or not.

16       Q.   When did you and Ryan with

17   Trident Marketing attempt to get this

18   Juice Alive trademark?

19       A.   When did we attempt to?

20       Q.   When did you start the

21   process?

22       A.   I registered it with the

23   USPTO at some point in time.  I'm sure

## FREEDOM COURT REPORTING

Page 151

1    it's very easy to go back and get the

2    date that was done.

3         Q.    If I represent the document

4    says September of '04, would you

5    disagree with that date?

6         A.    If I saw the document, I'm

7    sure I wouldn't disagree with it.

8         Q.    This is several documents

9    regarding the trademark that was

10   produced to me by your attorney.  I'm

11   going to mark it as Plaintiff's Exhibit

12   11.

13

14        (Whereupon, Plaintiff's Exhibit 11

15        was marked for identification and

16        same is attached hereto.)

17

18        Q.    I'm just going to mark it

19   as one document.  Do you see where it

20   says filing date?

21        A.    Uh-huh (nodding head).

22        Q.    Do you see where it says

23   September 6, 2004?

## FREEDOM COURT REPORTING

Page 152

1          A.      Yes, I do.

2          Q.      Okay.  Do you agree that

3   you submitted the application in

4   September of 2004?

5          A.      Yes, I do.

6          Q.      And were you an officer of

7   U.S. Beverage at that time?

8          A.      Yes, I was.

9          Q.      Were you a shareholder of

10  U.S. Beverage at that time?

11         A.      Yes, I was.

12         Q.      Were you currently a vice

13  president?

14         A.      Yes, I was.

15         Q.      And was currently your job

16  to be in charge of sales at U.S.

17  Beverage?

18         A.      That's correct.

19         Q.      And Trident Marketing is

20  the one who submitted this application;

21  is that correct?

22         A.      I do believe that is

23  correct, yes.

## FREEDOM COURT REPORTING

Page 154

1  that U.S. Beverage is trying to sell?

2      A.    It's -- Part of it is to

3  sell it and to promote it, yes.

4      Q.    Were you doing that during

5  2004?

6      A.    Yes, I was.

7      Q.    Were you not promoting --

8  Were you promoting your own product,

9  Juice Alive?

10     A.    Um, we were trying to

11  market it for U.S. Beverage in a

12  certain geographic region.

13     Q.    And you were marketing on

14  your own or with other people in other

15  regions; is that correct?

16     A.    That's correct.

17     Q.    And it would be the same

18  product -- underlying product that U.S.

19  Beverage uses?

20     A.    It's a juice product

21  (nodding head).

22     Q.    Right.  And that's what

23  U.S. Beverage is doing at this point;

## FREEDOM COURT REPORTING

Page 156

1        A.      We were marketing Trident

2   Marketing Juice Alive in -- we did some

3   mailers for the states of Florida and

4   Texas.

5        Q.      You weren't doing anything

6   in North Carolina at that time?

7        A.      Not through Trident

8   Marketing, no.

9        Q.      Were you doing it through

10  somebody else?

11       A.      We had -- I think it was

12  late 2004, Patrick had -- my brother

13  had started putting out some Granita

14  machines in North Carolina.  It was

15  late 2004 or early 2005.  I don't

16  remember the specific date.

17       Q.      Were you associated with

18  your brother?

19       A.      Am I associated with my

20  brother?

21       Q.      Were you associated at the

22  time with your brother in some sort of

23  company?

# FREEDOM COURT REPORTING

1    A.    It was a sole

2  proprietorship.

3    Q.    Does it have a name?

4    A.    John Walker doing business

5  as Juice Alive.

6    Q.    John Walker doing business

7  as Juice Alive?

8    A.    Right.

9    Q.    So you were actually

10  selling machines -- Granita machines in

11  North Carolina in 2004?

12    A.    No, we were not selling the

13  machines then.

14    Q.    What did you just tell me

15  Patrick was doing?

16    A.    We had bought some

17  machines, and he had put some out.

18    Q.    What does that mean?  What

19  does that mean you put them out?

20    A.    It means we bought them and

21  then put them into the customers'

22  locations.  You are implying that we

23  are selling them, and we're not selling

1    them.

2         Q.    But you would put juice in

3    those machines; is that correct --

4         A.    That's correct.

5         Q.    -- which you were gaining a

6    profit from; correct?

7         A.    Correct.

8         Q.    Did you ever share any of

9    those profits with U.S. Beverage?

10        A.    No, I did not.

11        Q.    And you say you were --

12   During this time frame, you say you

13   were marketing Juice Alive for U.S.

14   Beverage --

15        A.    (Witness nodding head).

16        Q.    -- in the geographical

17   region?

18        A.    (Witness nodding head).

19        Q.    I don't understand what --

20   I mean, I understand what that means,

21   but when they delivered juice to

22   somebody that was called Juice Alive,

23   you were being paid for that; is that

1    not correct?

2        A.      Correct, uh-huh (nodding

3    head).

4        Q.      Trident Marketing was being

5    paid for that?

6        A.      Correct.

7        Q.      And it was being paid by

8    U.S. Beverage?

9        A.      No, it was being paid to

10   Trident Marketing from Supreme

11   Beverage.

12       Q.      Did U.S. Beverage have to

13   pay Supreme for it?

14       A.      Yes, they did.

15       Q.      So indirectly --

16       A.      Indirectly, yes.

17       Q.      -- it was coming from U.S.

18   Beverage?

19       A.      Correct.

20       Q.      So you're making a profit

21   off U.S. Beverage?

22       A.      I can't say if we were

23   making a profit.  Actually, I think we

## FREEDOM COURT REPORTING

Page 162

1    agreed to it?

2          A.    How do I think they agreed

3    to it?

4          Q.    Did you give them any

5    choice?

6          A.    Sure.  They had the option.

7          Q.    No.  Once you developed

8    Juice Alive, did you give U.S. Beverage

9    any option to have Juice Alive?

10         A.    Did I give them the option

11   to own the brand?

12         Q.    Yeah.

13         A.    No, I did not.

14         Q.    Right.  You just decided

15   you were going to make your own profit

16   off of it; right?

17         A.    No, I decided --

18               MR. JACKSON:  Object to the

19   form.

20         A.    The brand was created for

21   -- it was created by Trident Marketing.

22   It is not owned by U.S. Beverage.

23         Q.    So you've got your brother

## FREEDOM COURT REPORTING

Page 164

1  constitute -- Just as long as you can

2  show a few customer sheets, you're

3  doing your job with U.S Beverage --

4          MR. JACKSON:  Object to the

5  form.

6      Q.      -- is that your contention?

7      A.      I'm saying that I continued

8  to open up accounts and sell accounts

9  on behalf of U.S. Beverage during that

10  time period.

11      Q.      Which would also benefit

12  you because you were selling Juice

13  Alive; correct?

14      A.      I don't know if U.S.

15  Beverage had actually -- when you're

16  referring to selling accounts, you have

17  to make a distinction between what type

18  of account we were selling.  Was it the

19  daycare accounts or was it the school

20  accounts?  There were some accounts

21  that may have been using the Juice

22  Alive brand at that time.  I can't go

23  back and tell you for sure --

## FREEDOM COURT REPORTING

Page 165

1    Q.    Any accounts.

2    A.    -- whether they were using

3  Juice Alive or whatever.  But I still

4  continued to open up accounts for U.S.

5  Beverage during that time.

6    Q.    That's fine.  But if they

7  did use Juice Alive, you would be

8  making money on the side also, wouldn't

9  you?

10   A.    Trident Marketing would be

11  paid a fee for the use of their brand.

12   Q.    Well, I agree, but would --

13  I mean, Trident Marketing is not in

14  existence to lose money, is it?

15   A.    No.

16   Q.    You're trying to make

17  money, aren't you?

18   A.    Certainly.

19   Q.    Did U.S. Beverage have

20  accounts in North Carolina during that

21  time frame?

22   A.    Not that I'm aware of.

23   Q.    When did John Walker d/b/a

## FREEDOM COURT REPORTING

1  not own that.

2      Q.    Any others that you can

3  think of?

4      A.    Huh-uh (shaking head).  I

5  think those are the only two to come to

6  my mind.

7      Q.    So you came to them and

8  said we think that -- or I think that

9  you need to keep -- you need to have a

10  brand identity of your own?

11      A.    I felt that was important

12  (nodding head) --

13      Q.    Right.

14      A.    -- yes.

15      Q.    And are you saying that

16  they didn't feel that was important?

17      A.    I don't think they felt

18  that way, no.  I don't think they felt

19  that there was any value in a brand.

20      Q.    They told you they didn't

21  think there was any value in a brand,

22  you're going to testify to that?

23      A.    I can't recall if they

## FREEDOM COURT REPORTING

1  specifically said that to me or not,

2  but the feeling that I got was that

3  they were not going to invest the time

4  or the money to create one.

5      Q.    Well, that's it; that's

6  what you wanted to do rather than sell

7  products, isn't it?

8          MR. JACKSON:  Object to the

9  form.

10     A.    No.

11     Q.    Is it not true that you

12  told them that you wanted to not

13  travel, spend the whole time thinking

14  up a brand, and not do your job as

15  sales?

16     A.    That's not true, no.

17     Q.    What did you say to them?

18     A.    On what specific time are

19  you referring to?

20     Q.    Well, what time did you say

21  this to them?

22     A.    I made it clear to Grady

23  and Tom that I really didn't like to

## FREEDOM COURT REPORTING

Page 180

1   costs that are incurred with what I

2   consider to be marketing, and I think

3   that U.S. Beverage was unwilling to

4   incur those costs.

5        Q.    You think U.S. Beverage is

6   unwilling to incur costs to try to sell

7   its product which is what you were

8   supposed to be doing?

9        A.    Rephrase that.  I don't

10  quite get that question.

11       Q.    Well, I mean, I don't know

12  how you define marketing, but we've

13  just -- I mean, what I'm asking you is

14  that you don't think that -- under your

15  definition of marketing, you don't

16  think U.S. Beverage would want to do

17  that?

18       A.    Now or then?

19       Q.    Any time.

20       A.    I can't speak for them now.

21  I know that when I brought that subject

22  up to them, it never seemed to be very

23  important and there was never a

## FREEDOM COURT REPORTING

Page 182

1    Q.    Yes.

2    A.    We discussed time frames of

3  when I could move back, but I don't

4  recall ever giving them a formal date

5  as to when I would come back.

6    Q.    In time frames, I mean, did

7  you ever do it?

8    A.    Did I ever move back?

9    Q.    Yeah.  At any time frame.

10    A.    No.

11    Q.    Did you ever intend to move

12  back?

13    A.    We thought long and hard

14  about it, but as I mentioned to you

15  earlier, there was -- Grady and Tom

16  continually changed their mind between

17  me moving back and buying me out.  So,

18  I mean, I can't really make a decision

19  to uproot my family and move back to

20  Alabama when my partners aren't sure if

21  that's what they want to do.

22    Q.    Now, I assume in your

23  Trident Marketing that you and Ryan

# FREEDOM COURT REPORTING

1  Hamner are meeting on some occasions,

2  are you not --

3          A.      That's correct.

4          Q.      -- during 2004?

5          A.      That's correct.

6          Q.      Are you driving in from

7  Texas to meet him in Columbus?

8          A.      Sometimes I would -- I

9  don't know if I made any specific trips

10  back just to meet with him or not, or

11  if I may have met with him on times

12  when I was already back there.

13          Q.      Just on U.S. Beverage

14  business or something?

15          A.      Possibly (nodding head).

16          Q.      Did you call him on the

17  telephone?

18          A.      Did I call Ryan on the

19  telephone?

20          Q.      Yes.

21          A.      Certainly.

22          Q.      On your cell phone?

23          A.      Uh-huh (nodding head).

# FREEDOM COURT REPORTING

Page 184

1        Q.      Was U.S. Beverage paying

2   for all that?

3        A.      For the cell phone?

4        Q.      Yes.

5        A.      They did.

6        Q.      What about the gas when you

7   drove to see Ryan?

8        A.      I'm sure if it was using my

9   car, then U.S. Beverage probably paid

10  for the gas.

11       Q.      You don't think anything is

12  wrong with that?

13       A.      No, I don't.

14       Q.      You've been talking about a

15  buyout.  I'm going to show you

16  something from December of 2004, at

17  least that's what the document says.

18

19       (Whereupon, Plaintiff's Exhibit 12

20       was marked for identification and

21       same is attached hereto.)

22

23       Q.      I'm marking this as

## FREEDOM COURT REPORTING

Page 204

1   to see where am I competing with U.S.

2   Beverage at.

3          Q.     Well, I'm asking you.

4          A.     I don't know where I'm

5   competing with U.S. Beverage at, where

6   I'm on U.S. Beverage's time and

7   payroll.

8          Q.     You're putting products in

9   North Carolina, aren't you?

10          A.     Right.

11          Q.     Do you think that's not

12   competing with U.S. Beverage?

13          A.     I don't think U.S. Beverage

14   has a presence in North Carolina.

15          Q.     So you think that's fine

16   for you to go out do?

17          A.     For me to go out and do

18   what?  To sell products in North

19   Carolina?

20          Q.     Yeah, the exact same

21   product that U.S. Beverage is selling

22   in Alabama.

23                 MR. JACKSON:  Object to the

**FREEDOM COURT REPORTING**

Page 215

1    Q.    Okay.  Well, other than

2  responses -- going back to my original

3  question, other than -- I mean, this

4  would clearly be a response, like you

5  said.

6          Other than responses, did

7  you ever submit a letter to U.S.

8  Beverage that says "I want to sell my

9  shares of stock and I'm offering them

10  up to the company"?

11    A.    I don't believe I did.

12    Q.    All right.  And none of

13  these negotiations ever resulted in

14  your shares being purchased, did they?

15    A.    No, sir, they did not.

16          MR. JACKSON:  Can we take a

17  brief break?

18          MR. GILL:  Sure.

19

20      (Whereupon, a brief recess was

21      taken.)

22

23    Q.    Moving on into 2005, let's

Case 2:06-cv-00496-MEF-SRW    Document 24-6    Filed 03/16/2007    Page 38 of 61

## FREEDOM COURT REPORTING

1  distributors, they only sold to

2  schools.

3       Q.    I mean, you're making the

4  distinction, but is selling to schools

5  the same type of business as U.S.

6  Beverage?

7       A.    Yes.

8       Q.    And the people that you

9  were contacting would be some of U.S.

10  Beverage's customers?

11       A.    Some of the customers that

12  we contacted had bought from U.S.

13  Beverage in the past (nodding head).

14       Q.    And you would have gotten

15  that information because you knew it

16  already, didn't you?

17       A.    Well, not really.  I mean,

18  it's public information.

19       Q.    It's public information?

20       A.    That's correct.

21       Q.    It's public information as

22  to -- you're saying it's public

23  information as to what school is buying

## FREEDOM COURT REPORTING

Page 244

1  -- I mean, who they're buying what

2  product from, is that what you're

3  saying, because it's a public bid?

4        A.    That's public too, right.

5        Q.    But what I'm saying is you

6  called somebody up at the school that

7  was U.S. Beverage's customer -- I mean,

8  you know that because you had a contact

9  there already; right?

10            MR. JACKSON:   Object to the

11  form.

12        A.    There were some customers

13  that we called on that had bought from

14  U.S. Beverage in the past (nodding

15  head).

16        Q.    And you had a contact there

17  already; right?

18        A.    In some cases (nodding

19  head).

20        Q.    A contact that you gained

21  through U.S. Beverage?

22        A.    In some cases (nodding

23  head).

# FREEDOM COURT REPORTING

Page 262

1    A.    Around about this time is

2  when I started spending more of my time

3  working for either Trident Marketing or

4  John Walker doing business as Juice

5  Alive (nodding head).

6    Q.    Because you think that U.S.

7  Beverage is going under, don't you?

8    A.    I hope not.  I don't think

9  so.

10    Q.    You thought so at the time,

11  did you not?

12    A.    Did I think that -- what,

13  U.S. Beverage was going under?

14    Q.    Uh-huh (nodding head).

15  Going bankrupt or having financial --

16    A.    I was very concerned about

17  it, but as to whether or not they would

18  go out of business, I really don't

19  know.

20    Q.    Why wouldn't you have

21  stayed with them?

22    A.    What was your question

23  again; why wouldn't I have stayed on

## FREEDOM COURT REPORTING

1    Q.    -- do they have any
2   business around the southeast?
3        A.    No, they don't.
4        Q.    Who else?
5        A.    We have Giles Distributing
6   in Detroit, Michigan; we have Menu
7   Maker Foods in Jefferson City,
8   Missouri.
9        Q.    Giles Manufacturing?
10       A.    Giles Distributing.
11       Q.    Giles Distributing, I'm
12   sorry.
13            How long have you been
14   working with any of those companies?
15       A.    They all came on board in
16   June, July of 2006.
17       Q.    So just recently?
18       A.    Uh-huh (nodding head).
19       Q.    Okay.  Are they in the
20   southeast?
21       A.    No, they're not.  They're
22   on the westcoast except for the one in
23   Detroit.

# FREEDOM COURT REPORTING

Page 271

1    Q.    I mean, other than

2    yourself, you can distribute this

3    product, can't you, yourself; I mean,

4    Trident can do it?

5    A.    When you say "distribute,"

6    I mean, in what capacity are you

7    referring to?  Do you mean delivering

8    in a truck or shipping it  or --

9    Q.    Yeah.  I mean, it comes out

10    of -- let's go back.

11    Does the product all come

12    out of Supreme Manufacturing?

13    A.    All the product that we use

14    does, yes.

15    Q.    All that you use?

16    A.    Uh-huh (nodding head).

17    Q.    I'm just saying, in some

18    cases, you get it from Supreme and it

19    goes to a distributor like U.S.

20    Beverage?

21    A.    Correct, uh-huh (nodding

22    head).

23    Q.    What I'm saying is that --

## FREEDOM COURT REPORTING

Page 275

1    A.    If I'm in School A and

2  they're in School B, we're doing the

3  same business?

4    Q.    Well, let me rephrase it.

5  You're competing for schools in

6  Mississippi currently?

7    A.    Outside of the two hundred

8  mile radius that's outlined in the

9  non-compete, yes.

10    Q.    Okay.  You're paying close

11  attention to that two hundred miles?

12    A.    I try to (nodding head).

13    Q.    Okay.  And you realize

14  you're still a shareholder?

15    A.    That's correct.

16    Q.    You realize you're still on

17  the building loan?

18    A.    That's correct.

19    Q.    You realize you've still

20  got health insurance through U.S.

21  Beverage?

22    A.    No, I did not realize that.

23    Q.    Well, we'll get there in a

# FREEDOM COURT REPORTING

Page 278

1    A.    They're in Texas, they're

2  in Arkansas, they're in Mississippi,

3  they're in Alabama, and these are areas

4  where they have accounts.  They have

5  accounts in Georgia and they have

6  accounts in the Florida Panhandle.

7    Q.    You've got some accounts in

8  those areas too?

9    A.    I have some accounts in

10  Mississippi and I have some accounts in

11  the Florida Panhandle, yes.

12    Q.    In 2005?

13    A.    No, not in 2005.

14    Q.    We're talking about, and I

15  apologize if I'm confusing you.  We're

16  talking about 2005 right now.

17    A.    No; the answer is no, I

18  don't.

19    Q.    No?

20    A.    (Witness shakes head).

21    Q.    Okay.  But you have

22  accounts in other places?

23    A.    In 2005?

## FREEDOM COURT REPORTING

1    A.    Did I meet with them?

2    Q.    Uh-huh (nodding head).

3    A.    One of the representatives

4  walked by our booth and I talked to him

5  for a few minutes.

6    Q.    That's it?  You didn't have

7  lunch with them or anything like that?

8    A.    At the trade show, no.

9    Q.    Were you not threatening

10  U.S. Beverage that you would go to

11  Dispensing Systems?

12    A.    Was I threatening U.S.

13  Beverage?

14    Q.    Well, maybe threatening is

15  a bad word.  Were you not telling U.S.

16  Beverage that you would go to

17  Dispensing Systems if they did not up

18  their price to you?

19    A.    U.S. Beverage was aware

20  that we were talking to Dispensing

21  Systems but I did not, to use your

22  quote, "threaten" them with that.

23    Q.    Well, I took that back, and

# FREEDOM COURT REPORTING

1    I never said you threatened them.  I

2    said were you telling them that; were

3    they aware of it?

4         A.    Were they aware of what?

5         Q.    Were you making them aware

6    of the fact that you were negotiating

7    with Dispensing Systems at the same

8    time?

9         A.    Yes, they knew that.

10        Q.    All right.  Which would, of

11   course, be in direct competition to

12   U.S. Beverage, would it not?

13        A.    No, it would not.

14        Q.    You don't think Dispensing

15   Systems is a competitor of U.S.

16   Beverage?

17        A.    I think they are, but I

18   don't think that what we were doing is

19   -- when you say competing with U.S.

20   Beverage, again, U.S. Beverage was not

21   in the business of marketing products

22   and selling licensing agreements.

23        Q.    Are you going to make that

## FREEDOM COURT REPORTING

1   distinction all day?  Do you think that

2   helps you?

3          A.    I think that it's important

4   (nodding head).

5          Q.    All right.  Well, that's

6   not what I said.  I said did you -- was

7   Dispensing Systems a competitor, I

8   didn't say -- I was talking about

9   Dispensing Systems, and you agree with

10  me that Dispensing Systems is a

11  competitor; right?

12         A.    I would agree that they

13  have school accounts.  Now, I don't

14  know to what extent they compete with

15  U.S. Beverage in the frozen beverage

16  industry prior to the time frame that

17  you're talking about.

18         Q.    You had just told me you

19  would agree they were a competitor

20  before that last speech, but that's --

21         A.    Well, again --

22         MR. GILL:  Let's take a

23  five-minute break.

# FREEDOM COURT REPORTING

Page 291

1  a dollar twenty price increase per case

2  to be paid for Juice Alive?

3          A.      Yes, I do.

4          Q.      So that would be a dollar

5  twenty per case more than previously;

6  correct?

7          A.      That's correct.

8          Q.      At some point, did you

9  change this agreement?

10          A.      Did I change the agreement?

11          Q.      Uh-huh (nodding head).

12          A.      I told them that in order

13  for me to support them the way I felt

14  they needed to be supported, that a

15  dollar and twenty cents wasn't going to

16  be enough based on the movement that

17  they were doing.

18          Q.      So you told them that you

19  were going to raise the price on them;

20  right?

21          A.      I told them that was the

22  price that I needed to have to be able

23  to do the things that I felt that the

## FREEDOM COURT REPORTING

Page 306

1    this is from?

2           A.    I don't know the exact

3    date, no, but I do remember the

4    document.

5           Q.    Looking at the document, do

6    you agree with me that it's probably

7    sometime in late 2005?

8           A.    It appears to be, yes.

9           Q.    So this is once again U.S.

10   Beverage attempting to buy you out?

11          A.    They're making an offer

12   here; correct, or outlining what they

13   perceive to be an offer.

14          Q.    And you didn't accept that

15   offer, did you?

16          A.    No, I did not.

17          Q.    In fact, you never accepted

18   an offer, did you?

19          A.    No, I've never accepted an

20   offer.

21          Q.    And you never, in fact,

22   offered the company -- just made an

23   offer on your own to sell the shares to

## FREEDOM COURT REPORTING

1    them?

2         A.    On my own?

3         Q.    Yeah.

4         A.    I responded to several

5    offers with the things that I felt were

6    important to my cause.  When they sent

7    me an offer, I responded with some

8    altercations (sic) to the offer, so I

9    think that could be construed as a

10   counteroffer.

11        Q.    Some alterations to?

12        A.    (Witness nodding head).

13        Q.    And you have -- Again, you

14   have never just tendered your shares to

15   the company?  Do you understand what I

16   mean by tender?

17        A.    I think I do, yes.

18        Q.    You've never just said

19   "Here, I'm going off on my own, I'm

20   sorry, here are my shares"?

21        A.    When you say "here," just

22   outright give them to them --

23        Q.    Yeah, outright give them to

## FREEDOM COURT REPORTING

Page 308

1  them.

2       A.     -- for no cost for --

3       Q.     Yeah.

4       A.     No, I've never offered them

5  that.

6       Q.     And you realize that you

7  are still on various loans and the

8  building?

9       A.     Yeah; I know that very

10  well, yes.

11       Q.     And you realize that most

12  people won't loan U.S. Beverage money

13  without all of the shareholders as

14  personal guarantors?

15       A.     Well, typically up to a

16  point, companies do require anyone who

17  owns twenty percent or more of a

18  business to sign as a personal

19  guarantor.  There is a certain point in

20  time where that's not required any

21  longer.

22       Q.     So you realize that U.S.

23  Beverage has a very difficult time

## FREEDOM COURT REPORTING

Page 333

1  West has never been an employee of

2  yours?

3         A.      An employee, no.

4         Q.      But you pay him; right?

5         A.      I do (nodding head).

6         Q.      You pay him to market your

7  product to schools in Mississippi?

8         A.      Correct.

9         Q.      Schools that U.S. Beverage

10  would also be attempting to gain their

11  business?

12              MR. JACKSON:   Object to the

13  form.

14     A.     Among other companies as

15  well (nodding head).

16     Q.      Well, I understand other

17  companies, but Scottie West is in

18  Mississippi to market your product in a

19  competitive environment with U.S.

20  Beverage in 2006?

21     A.      He is there to open up

22  accounts for Juice Alive.

23     Q.      Would that not be

## FREEDOM COURT REPORTING

1  competitive to U.S. Beverage?

2      A.    Not according to the terms

3  of the non-compete that we have in

4  place.

5      Q.    Well, I'm not talking about

6  the non-compete.  If you're both at the

7  same school and you're both bidding on

8  the same thing, are you not in

9  competition?

10      A.    I believe we are, yes.

11      Q.    So you agree that that has

12  occurred?

13      A.    That Juice Alive and U.S.

14  Beverage have bid on the same school

15  district?

16      Q.    Uh-huh (nodding head).

17      A.    Yes; to my knowledge that

18  has occurred, yes.

19      Q.    And Juice Alive is all that

20  Trident Marketing does; right?

21      A.    Yes; it is now, yes.

22      Q.    Now, what do you mean?

23      A.    When it was first formed,

## FREEDOM COURT REPORTING

Page 350

1            MR. JACKSON:   Object to the

2    form.

3        A.     I'm sorry?

4        Q.     You use Dispensing Systems?

5        A.     I don't use them, they're a

6    distributor of ours.

7        Q.     Well, I mean, if they're

8    distributing (sic) of yours -- I mean,

9    if they're a distributor --

10       A.     Uh-huh (nodding head).

11       Q.     -- well, then, they're

12   doing something to benefit you, are

13   they not?

14       A.     If they're buying product

15   and paying for it, that would be

16   benefitting Trident Marketing, correct.

17       Q.     Are they doing that in

18   Alabama?

19       A.     No, we have not sold to any

20   branch in Alabama, and I don't think

21   they've opened up any accounts in

22   Alabama.

23       Q.     What about in Georgia?

# FREEDOM COURT REPORTING

Page 351

1    A.    I think they have opened up

2  one account in Georgia.

3    Q.    They as Dispensing Systems?

4    A.    Correct, Dispensing

5  Systems.

6    Q.    And when you say "they have

7  opened up one account," you mean that

8  you think that they have got one

9  account in which they purchase product

10  under the Juice Alive label --

11    A.    That would be correct.

12    Q.    -- and distribute it to

13  somebody?

14    A.    That would be correct.

15    Q.    Has Dispensing Systems --

16  whether or not they've actually got any

17  accounts, have they bid on anything in

18  Alabama using Juice Alive?

19    A.    Yes, they have.

20    Q.    They just weren't

21  successful?

22    A.    It doesn't appear they

23  were, no.

# FREEDOM COURT REPORTING

Page 352

1     Q.     So Dispensing Systems --

2   I'm calling that right?  Dispensing

3   Systems is their name; right?

4     A.     That's correct.

5     Q.     They've attempted to sell

6   the Juice Alive label in Alabama --

7     A.     That's correct.

8     Q.     -- which would be your

9   product?

10     A.     Correct.

11     Q.     And under your definition

12   of the non-compete agreement, you would

13   view that as not competing?

14     A.     That's correct.

15     Q.     Why is that?

16     A.     Because again, Trident

17   Marketing is the company that goes out

18   and licenses, engages in licensing

19   agreements or distributor agreements

20   with other companies, and U.S. Beverage

21   does not and did not do that at the

22   time of our merger.

23     Q.     When did you come up with

## FREEDOM COURT REPORTING

Page 353

1  that explanation?

2          MR. JACKSON:  Object to the

3  form.

4      A.    I just think it's -- I

5  mean, it's not an explanation, it's

6  just the answer to your question.

7      Q.    Well, Dispensing Systems is

8  at a school in Alabama bidding on the

9  same product -- I mean, bidding to that

10  school to attempt to sell the same

11  product that U.S. Beverage is --

12      A.    I don't think that's

13  correct.

14      Q.    -- or a similar product?

15      A.    A similar product.

16      Q.    A similar product --

17      A.    Uh-huh (nodding head).

18      Q.    -- with the Juice Alive

19  label; Dispensing Systems has the Juice

20  Alive label?

21      A.    Correct.

22      Q.    U.S. Beverage has something

23  else at this point?

# FREEDOM COURT REPORTING

Page 354

1        A.      Correct.

2        Q.      And you don't view that as

3   competition?

4        A.      I don't view that as me

5   competing with U.S. Beverage, no.

6        Q.      You just view it as

7   Dispensing Systems?

8        A.      Again, I don't view that as

9   John Walker competing with U.S.

10  Beverage.

11       Q.      But you would gain a

12  benefit from that if they won, would

13  you not?

14       A.      If they won the -- if they

15  won the bid and ordered product and

16  paid their bills to me, then at some

17  point in time I would hope to get a

18  benefit from it.

19       Q.      You'd get a benefit from

20  that any time it happens; right?

21       A.      If it happens.

22       Q.      So you would want them to

23  win the bid?

# FREEDOM COURT REPORTING

Page 355

1    A.    I give them an opportunity

2  to go out there and compete in the

3  market.  It's up to them whether or not

4  they are competitive.

5    Q.    That's not the question.

6  The question is:  You would want them

7  to win the bid in Alabama because you

8  would gain a benefit if they paid your

9  bill?

10    A.    If they ordered product

11  from us and paid our bill, yes, we

12  would get a benefit.

13    Q.    So you would want them to

14  win?

15    MR. JACKSON:  Object to the

16  form.

17    A.    I would want them to engage

18  in business that was profitable for

19  them (nodding head).

20    Q.    I mean, we're just

21  splitting hairs.

22    A.    If they bid a price that

23  wasn't profitable and it lead to the

# FREEDOM COURT REPORTING

Page 356

1  demise of the company, that wouldn't

2  benefit me.

3      Q.    I understand that, but if

4  they sell product to a school in

5  Alabama which bears the Juice Alive

6  label and they pay you for that -- the

7  use of that in that school, that would

8  benefit you, would it not?

9      A.    Again, if those certain

10 conditions were met; if they bought it,

11 paid for it, and I received the money

12 for it, that would benefit Trident

13 Marketing.

14      Q.    And you're the sole

15 shareholder of Trident Marketing; is

16 that correct?

17      A.    That is correct.

18      Q.    So you'd rather them win

19 than lose?

20      MR. JACKSON:  Asked and

21 answered.  You've already asked him

22 that three times.

23      MR. GILL:  Well, he won't

# FREEDOM COURT REPORTING

Page 357

1  answer it.

2           MR. JACKSON:  I think he

3  has answered it.

4           MR. GILL:  He hasn't

5  answered it.

6           MR. JACKSON:  He hasn't

7  answered it the way you want him to

8  answer it, but he's answered it.

9           MR. GILL:  The answer is as

10  simple --

11      Q.    Would you like them to win

12  the bid?

13      A.    I would like for Dispensing

14  Systems to sell our product (nodding

15  head).

16           MR. GILL:  Do you think

17  that's an answer to that question?

18      A.    If it's through winning the

19  bid or whatnot --

20           MR. JACKSON:  I think

21  you've asked it three or four times

22  now.

23           MR. GILL:  We'll leave it.