**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **U.S. BEVERAGE, INC.** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Civil Action No. 2:06-CV-496-SRW** |
| | ) |
| **JOHN BUSTER WALKER, II; and** | ) |
| **TRIDENT MARKETING, INC.;** | ) |
| | ) |
| **Defendants.** | ) |
| ------------------------------------------------- | ) |
| **JOHN BUSTER WALKER, II; and** | ) |
| **TRIDENT MARKETING, INC.;** | ) |
| | ) |
| **Counterclaim Plaintiffs,** | ) |
| | ) |
| v. | ) |
| | ) |
| **U.S. BEVERAGE, INC.;** | ) |
| | ) |
| **Counterclaim Defendant,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **GRADY DOWLING KITTRELL; and** | ) |
| **THOMAS GOING CLARK, III;** | ) |
| | ) |
| **Third Party Defendants.** | ) |

**MEMORANDUM IN SUPPORT OF COUNTERCLAIM PLAINTIFF'S**
**MOTION FOR A PRELIMINARY INJUNCTION**

Counterclaim Plaintiffs John Buster Walker, II (hereinafter referred to as Walker)

and Trident Marketing, Inc.(hereinafter referred to as Trident) respectfully submit this

brief in support of their motion for a preliminary injunction enjoining Counterclaim

1

Defendants U.S. Beverage, Inc., Grady Kittrell  and Thomas Clark (hereinafter referred to effectively as U.S. Beverage) from: (1) asserting that U.S. Beverage, Inc. owns the trademark rights for Juice Alive®; and/or (2) asserting that other persons or customers should not do business with John Walker or Trident Marketing, Inc., because U.S. Beverage, Inc. owns the trademark for Juice Alive®. Counterclaim Plaintiffs ask this Court to enjoin the Counterclaim Defendants until such time as this Court makes its final determination as to the identity of the true owner of the trademark.

## STATEMENT OF THE CASE

Counterclaim Plaintiffs (hereinafter referred to effectively as Walker) request for a preliminary injunction arises in response to the original Complaint filed by the Counterclaim Defendants (hereinafter referred to collectively as U.S. Beverage).  In letters sent by U.S. Beverage to Walker's customers and/or potential customers and in the original Complaint, U.S. Beverage asserts that Walker fraudulently registered the trademark "Juice Alive" and that U.S. Beverage owns the trademark for Juice Alive. Based on these assertions, Walker requested this court to grant injunctive relief to enjoin U.S. Beverage from committing acts of trademark dilution, and also from misappropriating and/or using the brand name and trademark Juice Alive.

## STANDARD OF REVIEW

In the Eleventh Circuit, the plaintiff has the burden of proving four things in order to obtain a temporary restraining order and/or a preliminary injunction:

> (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant is greater than any damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, will not disserve the public interest.

*Carillon Importers v. Frank Pesce International*, 112 F.3d 1125, 1126 (11th Cir. 1997).

It is well established that "[t]he first element is generally regarded as the most important because the granting of a temporary restraining order would be inequitable if the movant has no chance of succeeding on the merits of the case." *A & M Enter., Inc.*, 2001 U.S. Dist. Lexis 12880 at *7 (quoting *Butler v. Alabama Jud'l Inq. Comm'n,* 111 F. Supp. 1224, 1229-30 (M.D. Ala. 2000)). "The last three elements require the court to balance the equities of the matter in dispute in order to 'choose the course of action that will minimize the costs of being mistaken.'" *Id.* (quoting *Amer. Hosp. Supply v. Hospital Products, Ltd.,* 780 F.2d 589, 593 (7th Cir. 1986)). As explained herein below, Walker and Trident Marketing, Inc. have satisfied all four requirements for obtaining a preliminary injunction.

## STATEMENT OF FACTS

John B. Walker, II, resides in Katy, Texas. (Walker Witness Statement, par. 1) Walker has been in the business of selling frozen fruit juice drink machines and products for approximately 11 years. (Walker Witness Statement, par. 2) In the business, frozen fruit juice drinks are referred to as "slush drinks." Id. On January 4, 2000, Walker formed an Alabama corporation known as Tropical Perfections, Inc., which sold frozen juice ("slush") machines and products to convenience stores and schools. (Id. at par. 3) Walker's company was based in Phenix City, Alabama, where he resided at that time. (Walker deposition, p. 16)

In January of 2002, Walker was approached by Grady Kittrell from U.S. Beverage, Inc. about becoming associated with U.S. Beverage, Inc. (Walker Witness Statement, par. 4) Up until the time of the merger of Walker's company into U.S. Beverage, Inc., U.S. Beverage, Inc. was primarily in the "bag in a box" business selling to bars and nightclubs. (Walker Witness Statement, par. 6) The "bag in a box" is a

method of dispensing soda drinks and fruit juices through dispensing guns for use in bars and nightclubs. Id. U.S. Beverage, Inc. also sold a few dispensing systems for draught beer and liquor to bars and nightclubs. Id. In addition, U.S. Beverage sold machines and mixes needed to make frozen margaritas and daiquiris for bars and nightclubs. Id. Prior to the merger, U.S. Beverage, Inc. did not sell frozen fruit juice machines or slush drinks (i.e., non-alcoholic frozen fruit juice drinks). Id. Before the merger, the vast majority of the revenues of U.S. Beverage, Inc. came from sales to bars and nightclubs. Id.

On or about April 24, 2002, Walker signed several agreements, by which he agreed to merge his company Tropical Perfections, Inc. into U.S. Beverage, Inc. in exchange for 33% of the shares of U.S. Beverage, Inc. and an agreement to work for U.S. Beverage, Inc. as a salesman. (Walker Witness Statement, par. 5) A copy of the merger and shareholder agreements are attached hereto as "Exhibit M." All of the agreements that were signed by Walker to effectuate the merger were drafted by U.S. Beverage, Inc. and/or its attorney. Id.

Prior to the merger, Walker was concerned about whether he would be treated fairly as a minority shareholder in U.S. Beverage, Inc. (Walker Witness Statement, par. 8) In particular, Walker was concerned about whether his compensation could be changed by the other two shareholders in U.S. Beverage, Inc. without Walker's consent. Id. As an express condition of the merger, U.S. Beverage, Inc. and its two other shareholders--Grady Kittrell and Thomas Clark--agreed that Walker's salary could not be reduced without his agreement. Id.

At the time of the merger, all three shareholders—Walker, Kittrell, and Clark— in U.S. Beverage, Inc. were on an equal fixed salary, and they each received equal draws

4

from the company. (Walker Witness Statement, par. 9) In October of 2003, Grady

Kittrell and Thomas Clark forced Walker to take a sizable salary cut, telling him that they

(as owners of a majority of the company stock) would cut his salary with or without

Walker's consent. (Walker Witness Statement, par. 10) At that time, Kittrell and Clark

placed Walker on a commission-based salary, while Kittrell and Clark kept their fixed

salaries. Id.

At time of the merger, Walker's company Tropical Perfections, Inc. was selling

slush drinks and machines under the brand name "Cool Tropics." (Walker Witness

Statement, par. 11) Cool Tropics is a brand name of frozen juice machines and products

that is owned by a third party. Id. After the merger, U.S. Beverage continued the former

Tropical Perfections' business of selling slush drinks and machines under the brand name

"Cool Tropics" to convenience stores and schools. Id. U.S. Beverage did not add a

significant new customer base to the pre-merger customer base for Cool Tropics. Id.

Shortly after joining U.S. Beverage, Inc., Walker suggested to Kittrell and Clark

that U.S. Beverage invest money and time in creating its own brand for slush drinks.

(Walker Witness Statement, par. 12) Grady Kittrell and Thomas Clark rejected Walker's

idea of investing in the creation of a new brand. Id. At that time, Walker proposed

spending approximately $5,000.00 to start a new brand. (Kittrell deposition, p. 177)

However, Kitrell and Clark thought that $5,000.00 was too much to spend on a new

brand. (Id.)

With the full knowledge of Kittrell and Clark, John Walker began working

independently with Ryan Hamner (who was not affiliated with U.S. Beverage, Inc.) to

create a new brand for slush drinks. (Walker Witness Statement, par. 13) In order to

create and market the new brand, Ryan Hamner and Walker formed Trident Marketing, Inc. Id. The name "Juice Alive" was solely thought of or created by Ryan Hamner. (Id., Hamner deposition, pp. 109-11, & Kittrell Deposition, p. 180) Hamner also solely created the initial logo designs for "Juice Alive". Id. Ryan Hamner registered the domain names: www.juicealive.net and www.juicealive.com. (Walker Witness Statement, par. 13; Hamner deposition, pp. 94-95) U.S. Beverage, Inc. did not contribute toward the costs of developing the Juice Alive logo or brand and/or the Juice Alive website. Id.

Walker did not at any time sign any contract or other document agreeing to or acknowledging U.S. Beverage, Inc.'s ownership of any intellectual property that Walker developed using his own time and resources, while in the employ of U.S. Beverage, Inc. (Walker Witness Statement, par. 7) Walker never agreed to transfer all intellectual property created by him during his employment and/or association with U.S. Beverage, Inc. (Id. & Kittrell deposition, p. 163) Walker attested to the fact that he would not have signed any such agreement. Id.

Trident Marketing, Inc. applied to the U.S. Patent & Trademark Office for a federal trademark for Juice Alive, which was granted on December 13, 2005. (Walker Witness Statement, par. 16) A copy of the U.S. Trademark Registration for Juice Alive® is attached hereto as "Exhibit K".

U.S. Beverage, Inc. was aware in April of 2004 of the creation of the www.juicealive.com website by Ryan Hamner for Trident Marketing, Inc. (Walker Witness Statement, par. 14) After developing www.juicealive.com in April of 2004; Ryan Hamner offered to help U.S. Beverage, Inc. to develop its own website. (Id. &

6

Hamner deposition pp. 29-30 & 52-53)  In October 2004, Trident Marketing, Inc. and

U.S. Beverage, Inc. agreed to work together on a direct mail solicitation in order to sell

juice under the Juice Alive brand to day care centers. (Walker Witness Statement, par.

15) Trident Marketing, Inc. paid the cost of obtaining a list of daycare centers in the

southeast U.S.  Id.  At that time, Trident Marketing, Inc. agreed to allow U.S. Beverage,

Inc. to solicit and/or distribute "Juice Alive" juice to daycare centers located in Alabama,

Arkansas, Mississippi, and small part of Texas. Id.  Trident Marketing, Inc. directly

solicited and/or sold "Juice Alive" juice to daycare centers in Georgia, Florida, South

Carolina, and the remaining part of Texas.  Id.   During this time, Walker referred a

number of sales leads to U.S. Beverage, Inc. from the www.juicealive.com website for

customers from the sales area assigned by Trident Marketing, Inc. to U.S. Beverage, Inc.

(Id. & Kittrell deposition, p. 185)

 Sometime in 2005, U.S. Beverage, Inc. was given a cease and desist letter

terminating its distributorship for the Cool Tropics brand. (Walker Witness Statement,

par. 17)  After U.S. Beverage lost its Cool Tropics distributorship, Trident Marketing,

Inc. agreed to give U.S. Beverages a non-exclusive distributorship to sell the Juice Alive

brand in its existing sales territories. Id.  At all times, the Juice Alive frozen juice

concentrate product was manufactured by Supreme Manufacturing Company, Inc. Id.

Trident Marketing, Inc. provided the labels for the product.  Id.  U.S. Beverage, Inc.

agreed to its status as a distributor of Juice Alive, and it never claimed ownership of the

Juice Alive trademark until this lawsuit was filed. Id.  On or about November 18, 2005,

Tom Clark faxed a letter (which was signed by Clark) to Gary Dukes at Supreme

Manufacturing Company, Inc. that stated:

> "We have reached an agreement with Juice Alive to start distribution of
> the Juice Alive brand in our 100% juice products. Please let the signed
> fax serve as official authorization for you to begin selling U S Beverages,
> Inc. the Juice Alive products with a $1.20 increase per case to be paid to
> Juice Alive."

(Id. & Clark deposition pp. 92-93) A copy of the faxed letter evidencing the licensing

agreement is attached hereto as "Exhibit N."

In July 2005, U.S. Beverage, Inc. was having financial problems, and its three

shareholders agreed to temporarily stop receiving any compensation from the company

for 90 days. (Walker Witness Statement, par. 18) Subsequently, Grady Kittrell told

Walker that he would not be going back on the payroll of U.S. Beverage, Inc., unless

Walker agreed to a buy-out of his shares in the company and Trident Beverage, Inc.

agreed to give U.S. Beverage, Inc. an exclusive distributorship to market "Juice Alive"

brand juice products in seven southeastern states. Id.

During the time that Walker was attempting to negotiate with U.S. Beverage and

its majority shareholders, Walker's company Trident Marketing, Inc. paid an attorney in

Houston, Texas to prepare a formal distributorship agreement, which would have given

exclusive distribution rights for Juice Alive to U.S. Beverage, Inc. for Alabama,

Arkansas, Mississippi, and parts of Georgia. (Walker Witness Statement, par. 20) In

April 2004, U.S. Beverage rejected the proposed distributorship agreement because the

sales area was not as large as Kittrell and Clark had demanded. Id.

In May of 2006, Walker learned from a representative from Supreme

Manufacturing Company, Inc. that U.S. Beverage had stopped purchasing Juice Alive

brand products and that U.S. Beverage was switching to the "Fruzars" brand for slush

and/or juice products. (Walker Witness Statement, par. 22) Walker responded to this

8

news by having the attorney for Trident Marketing, Inc. send a cease and desist letter dated May 15, 2006, to U.S. Beverage, Inc. demanding that it stop using the Juice Alive brand and/or trademark. Id. A copy of the cease and desist letter is attached hereto as "Exhibit O." Even after receiving this letter, U.S. Beverage, Inc. has continued to sell Juice Alive products and to use point of sale materials that bear the Juice Alive brand name on its frozen drink machines. (Patrick Walker Witness Statement, par. 7)

When John Walker refused to agree to the buy-out and refused to give an exclusive distributorship for Juice Alive in seven states to U.S. Beverage, Inc., Kittrell and Clark retaliated against Walker by refusing to reinstate Walker's salary, by refusing to pay Walker accrued sales commissions, and by refusing to reimburse Walker for expenses associated with working as a salesman for U.S. Beverage, Inc. Id. Currently, U.S. Beverage, Inc. owes Walker in excess of $60,000.00 in sales commissions and un-reimbursed expenses, and U.S. Beverage owes Trident Beverage, Inc. over $3,300.00 in brand licensing fees. (2nd Witness Statement of John Walker, par. 2-4) On or about April 20, 2006, an attorney for U.S. Beverage, Inc. sent a letter to Walker stating that U.S. Beverage would be terminating his employment and cancelling the healthcare insurance for his family. (Walker Witness Statement, par. 21) A copy of the letter is attached hereto as "Exhibit P." At that time, Kittrell and Clark knew that Walker's spouse was eight month's pregnant. (Id. & Kittrell deposition, p 257) In response to said letter, Walker had to purchase private health insurance for his family at significant cost. (Walker Witness Statement, par. 21)

As further retaliation for Walker's to acquiesce to their demands, U.S. Beverage, Inc., Grady Kittrell, and Thomas Clark have falsely asserted that U.S. Beverage, Inc.

owns the Juice Alive brand and trademark. (Walker Witness Statement, par. 23)  U.S. Beverage, Inc., Grady Kittrell, Thomas Clark, and their agents have sent e-mails and/or letters to prospective customers of Juice Alive in Mississippi falsely asserting that U.S. Beverage owns the Juice Alive trademark and telling those prospective customers that they should not do business with John Walker or Trident Marketing, Inc. Id.  A copy of the e-mailed letter is attached hereto as "Exhibit L."   Furthermore, U.S. Beverage, Inc., Grady Kittrell, Thomas Clark, and its other agents have intentionally exaggerated and misrepresented the nature of the non-competition agreement that Walker signed with U.S. Beverage, Inc. to customers, potential customers, and/or business associates of Trident Marketing, Inc. and Walker.  (Walker Witness Statement, par. 25)

During the summer of 2006, Trident Marketing, Inc. was in negotiations with Dispensing Systems, Inc. of Tucker, Georgia to become a distributor of Juice Alive brand juice products. (Walker Witness Statement, par. 24)  Dispensing Systems, Inc. was interested in becoming as a distributor of the Juice Alive brand for frozen fruit drink machines and products. Id.  During this time, attorneys working for U.S. Beverage, Inc. sent a letter to Dispensing Systems, Inc. in Tucker, Georgia, threatening to sue Dispensing Systems, Inc., if it entered into a distributorship agreement for the Juice Alive brand with Trident Marketing, Inc. Id.

Walker and Trident attach hereto the following documents as evidence in support of their request for a preliminary injunction:  (1) Exhibit A – Witness Statement of John Walker; (2) Exhibit B – Second Witness Statement of John Walker; (3) Exhibit C – Witness Statement of Patrick Walker; (4) Exhibit D – Grady Kittrell deposition excerpts; (5) Exhibit E – Tom Clark deposition excerpts; (6) Exhibit F – Ryan Hamner deposition

excerpts; (7) Exhibit G – John Walker deposition excerpts; (8) Exhibit H – Walker e-mail from May of 2004; (9) Exhibit I – Buddy Todd deposition excerpts; (10) Exhibit J – Trident proposed licensing agreement; (11) Exhibit K – Juice Alive® Trademark Registration; (12) Exhibit L – U.S. Beverage letter to Walker's customers and potential customers; (13) Exhibit M – Merger and Shareholder Agreements; (14) Exhibit N – Clark letter evidencing licensing agreement; (15) Exhibit O – cease and desist letter sent by Walker; and (16) Exhibit P – Letter from U.S. Beverage attorney officially terminating Walker's status as an officer and employee.

## LEGAL ARGUMENT

In its complaint, U.S. Beverage alleges that Walker and/or Trident fraudulently registered the trademark "Juice Alive". Further, U.S. Beverage alleges that the Juice Alive trademark was developed for and by U.S. Beverage. U.S. Beverage bases its assertion that that it should automatically own the Juice Alive trademark solely on the fact that because Walker was an employee, officer, and shareholder of U.S. Beverage at the time he developed the Juice Alive trademark. Therefore, U.S. Beverage has requested this court to declare that the Juice Alive trademark is property of U.S. Beverage and to enjoin Walker and/or Trident from any further use of the Juice Alive trademark. U.S. Beverage ignores the fact that a third party Ryan Hamner created the trademark and that Hamner and Walker used their personal money and spare time to develop the Juice Alive brand through a separate company Trident Marketing, Inc.

In response to the false assertions made by U.S. Beverage and two of its shareholders, Walker and/or Trident has requested this Court to settle the issue of trademark ownership and to grant injunctive relief to enjoin U.S. Beverage from

11

misappropriating and/or using the brand name and trademark Juice Alive and from any

further acts of dilution while the parties litigate these issues.

In order for either party to receive a preliminary injunction, the moving party has

the burden of proving four things:

> (1) a substantial likelihood of success on the merits; (2) irreparable injury will
> be suffered unless the injunction issues; (3) the threatened injury to the
> movant is greater than any damage the proposed injunction may cause the
> opposing party; and (4) the injunction, if issued, will not disserve the public
> interest.

*Carillon Importers v. Frank Pesce International*, 112 F.3d 1125, 1126 (11th Cir. 1997).

Presented below, Walker and/or Trident will prove that it has met all elements of the test

necessary to receive a preliminary injunction enjoining U.S. Beverage from any further

claim to the ownership of the Juice Alive trademark, pending the final outcome of this

case.

**I.     Walker and Trident have shown a substantial likelihood of success on the
ultimate merits of this case.**

**A. Trident Marketing, Inc. is the legally presumed owner of the Trademark.**

Neither party disputes that Trident Marketing, Inc. registered the "Juice Alive"

trademark with the United States Patent Office. Trident's registration of the "Juice Alive"

trademarks is significant because registration is *prima facie* proof of the legal ownership

of a trademark. *See, Lanham Trade-Mark Act, § 7(b), 15 U.S.C.A. § 1057(b)*, *Hurricane*

*Fence Co. v. A-1 Hurricane Fence Co., Inc.* 468 F.Supp. 975, 986 (S.D.Ala.1979.)

Although Trident's registration does not establish substantive legal rights, it does "create

a presumption that [the registered owner has] the exclusive right to the use of the

Trademark." *Id.* This presumption of ownership may be rebutted by a party claiming and

proving adverse ownership. However, the presumption "shifts both the burdens of proof

and of persuasion to the adverse party." *See, Lanham Trade-Mark Act, § 7(b), 15 U.S.C.A. § 1057(b), Hurricane at 986.*

In the instant case, as the owner of federal trademark registration, Trident Marketing, Inc. is legally presumed to be the owner of the Juice Alive trademark. Therefore, the burden is clearly upon U.S. Beverage to persuade the court that it has sufficient evidence to contradict the Trident's status as legal owner of the Juice Alive trademark.

**B. U.S. Beverage's claims of false or fraudulent registration of a trademark are unsupported by the facts.**

In their complaint, U.S. Beverage claims that the "Juice Alive" Trademark was developed by and for U.S. Beverage. As such, U.S. Beverage has charged Walker with the false or fraudulent registration of the trademark "Juice Alive." Generally, in order to prevail on a claim of "fraud in the procurement of a registration, a proponent must plead and prove: "(1) a false representation regarding a material fact; (2) knowledge or belief that the representation is false ('scienter'); (3) an intention to induce the listener to act or refrain from acting in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; (5) damage proximately resulting from such reliance." *King Size, Inc. v. Frank's King Size Clothes, Inc.,* 547 F.Supp. 1138, 1166 (S.D.Tex.1982). In order to prevail on a claim that the registration was obtained fraudulently, a plaintiff must establish through evidence that the defendant knowingly registered the mark with knowledge that others had a right to ownership of the mark. The Lanham Act requires an applicant to state that no other person, to the best of his knowledge, has the right to use the mark. It "does not require (an) applicant to disclose anyone who may be in fact using the mark, but does not possess the right to use the mark." *King Size, Inc. v. Frank's King Size Clothes, Inc.,* 547 F.Supp. at 1167. In this regard, it is not sufficient to prove that a

13

registrant failed to disclose that others were using the mark if the registrant did not believe that the third-parties had any rights in the trademark.

At the time Trident registered the Juice Alive trademark with the USPTO, only Trident had use of the trademark. However, shortly thereafter, both Trident and U.S. Beverage were using the trademark in their mailers. Nevertheless, Trident never granted any ownership rights to U.S. Beverage. At this time, U.S. Beverage was operating under an oral agreement as a permissive licensee of the Juice Alive trademark. Later, U.S. Beverage signed a formal licensing agreement with Trident. (Kittrell Deposition, pp 229-232) These licensing agreements never granted any ownership rights to U.S. Beverage. In fact, these agreements provide a presumptive inference that U.S. Beverage recognized Trident's exclusive rights to the ownership of the "Juice Alive" trademark. As such, Trident had no duty to list anyone else as having rights to the trademark at the time of registration.

### C. Trident has established legal ownership of the "Juice Alive" trademark through priority of use of the trademark in commerce.

Not only does Trident have the procedural presumption of ownership, but it will also be found to be the legal owner of the "Juice Alive" trademark because it meets the first commercial use test. As between conflicting claimants to the right to use the same mark, the general rule is that "priority of appropriation determines the question." *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 100, (1918). In establishing ownership of a trademark, it is a basic tenet that trademark ownership depends on whether a party had "first use of the mark in commerce" *General Business Services, Inc. v. Rouse,* 495 F.Supp. 526, 533 (E.D.Pa.1980). The United States Supreme Court has held that courts must construe the phrase "in commerce" liberally, because the Lanham Act "confers

14

broad jurisdictional powers upon the courts of the United States." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 283, 73 S.Ct. 252, 97 L.Ed. 319 (1952). A person's "use of the Internet satisfies the 'in commerce' requirement of Section 43(c)." *Intermatic, Inc. v. Toeppen,* 947 F.Supp. 1227, 1239 (N.D.Ill.1996); *see also Bronstein v. Bronstein,* 2007 WL 646965 *13 (S.D.Fla. Feb. 27, 2007). Trident first began using the Juice Alive trademark in commerce in April, 2004 through its website www.juicealive.net. This "use in commerce" by Trident predates any claim that U.S. Beverage can make to the "Juice Alive" trademark. Subsequent to setting up the www.juicealive.net website, Trident sent out a flyer to potential customers containing the Juice Alive Trademark. (Hamner Deposition, p. 61-62)

The first time that U.S. Beverage can make any claim to use of the Juice Alive trademark in commerce is on September 27, 2004. On this date, two sets of mailers were sent out bearing the Juice Alive Trademark. One mailer referred a potential customer to visit the www.juicealive.com website and contained a telephone number that directed the customer to Trident marketing. The other mailer contained the language "US Beverage presents Juice Alive" and contained a telephone number that directed the customer to the office of U.S. Beverage. U.S. Beverage will likely try to argue that these mailers were the first "use in commerce" that would establish ownership rights. However, regardless of whether or not Trident had prior use through either its website or its previous mailer, U.S. Beverage's argument will still fail because Section 5 of the Lanham Act "definitely contemplates that a trade or service mark may be acquired through its use by controlled licensees, even though the registrant itself may not have used the mark." *Turner v. HMH Publishing Co.,* 380 F.2d 224, 229 (5th Cir.1967), *discussing 15 U.S.C.A. § 1055.*

15

As evidenced by the document Walker sent to U.S. Beverage on May 24, 2004, U.S. Beverage was a licensee of Trident. (Exhibit H – originally attached as exhibit 8 to Kittrell deposition)  Trident was willing to grant US Beverage a license to use its Trademark in specific geographical areas. The mailers that contained the language "U.S. Beverage presents Juice Alive" were sent only to those specific geographical areas proposed in USB's license agreement with Trident. Id.  As such, any use by US Beverage of the Juice Alive trademark would inure to the benefit of Trident regardless of whether or not this was the first "use in commerce."

D. **U.S. Beverage incorrectly assumes that the creation of a Trademark by an employee automatically vests trademark rights to the employer.**

In its complaint in this case, U.S. Beverage claims that the Juice Alive trademark was created by and for U.S. Beverage. It further claims that it was created with U.S. Beverage resources. (Kitrell deposition, p. 173; Clark deposition 84-85)  However, it is undisputed that Ryan Hamner, a former shareholder of Trident Marketing, Inc., solely conceived of the Juice Alive concept and design. (Hamner deposition, pp. 109-11; Kittrell Deposition, p. 180)  U.S. Beverage also admits that it did not provide creative input, direct financial support, or any other form of aid in the creation of the "Juice Alive" trademark. (Kittrell deposition, p 80, 176;  Clark deposition, pp 84-85) Walker and Trident have records proving all funds that were independently spent on the development of the Juice Alive trademark.

The crux of U.S. Beverages' claim of ownership of the "Juice Alive" trademark relies on it's contention that Walker's status as an employee, officer, and/or shareholder of U.S. Beverage at the time of the trademark's creation, requires that the ownership rights of any intellectual property that he develops, whether independently or as a

member of another corporation, should automatically inure to the benefit of U.S. Beverage. Admittedly, if an employee creates a trademark under direction from an employer, the employer will retain ownership of the trademark if it makes exclusive use of the trademark in commerce; however, "[i]t is well settled that an employee may have a trade-mark or symbol of his own, and use the same while so employed … or in attracting business for the mutual benefit of himself and his employer." *Lowell Lamb & Co., Inc. v. Herskovits*, 204 App.Div. 407, 198 N.Y.S. 55 (1st Dep't 1923)

In *In re New York City Shoes, Inc.* 84 B.R. 947 (Bkrtcy.E.D. Pa.1988), the Court considered whether a consultant's status as an employee and shareholder in a shoe company prevented him from legally developing trademarks for shoes in an individual capacity or as agent for unrelated corporation. In that case, the employer argued that the consultant's status as an employee and shareholder of the employer's corporation barred him from legally developing trademarks in his individual capacity or as the agent of another corporation. However, the Court found that because the consultant and his unrelated corporation established independent first use of the marks, and the other principals in his company had knowledge of his activities outside the corporation, the consultant was legally entitled to ownership of the trademarks. *In re New York City Shoes, Inc.* 84 B.R. at 956. The Court's holding in *In re New York City Shoes* contradicts U.S. Beverage's contention that the ownership of the intellectual property developed by an employee or shareholder should automatically flow to the corporation.

U.S. Beverage further contends that Walker breached his fiduciary duty to U.S. Beverage by forming Trident Marketing, Inc. and developing the "Juice Alive" brand and trademark. U.S. Beverage cannot claim that Walker's formation of an independent

corporation is a fiduciary breach, as the other officers of U.S. Beverage have also formed

and been members of independent corporations. (Kittrell deposition, pp 45-46, 50 ) In

fact, the other officers of U.S. Beverage have admittedly used U.S. Beverage's staff,

resources, and facilities to further the financial gains of their independent corporations.

(Kittrell deposition, pp 47– 53)

Further, before Walker began the development of Trident or "Juice Alive", he

proposed the idea of developing a brand and trademark to the other officer's of U.S.

Beverage at a corporate meeting. At the time of this proposal, U.S. Beverage had the

financial resources to start their own brand. (Clark deposition, pp 78-79) However, the

other owners of U.S. Beverage *rejected* Walker's proposal. (Kittrell deposition, pp 177-

180)  Even though U.S. Beverage was unwilling to spend corporate resources to finance a

brand, it contends that anything Walker develops with his personal money and spare time

should also be owned by U.S. Beverage. (Clark deposition, pp 84-85)  U.S. Beverage

cannot now claim that Walker breached his fiduciary duty to U.S. Beverage by pursuing

an opportunity he presented to the corporation, which it knowingly and willingly rejected.

*See Telxon Corp. v. Meyerson,* 802 A.2d 257, 263 (Del. 2002) (presentation of a

purported corporate opportunity to a board of directors, and the board's refusal thereof,

creates a safe harbor for an interested director).

E. **U.S. Beverage's claim that it was unaware of Trident's registration of the Juice Alive trademark is barred by Laches.**

In support of their complaint, U.S. Beverage claims that it had no knowledge of Trident's registration of the Juice Alive trademark. U.S. Beverage maintains that its lack of knowledge of the trademark application is the reason that it did not fight Trident's registration of the trademark with the USPTO. However, regardless of its alleged ignorance of the trademark application, U.S. Beverages clearly knew that Trident claimed exclusive ownership of the trademark rights for Juice Alive and that Trident expected U.S. Beverage to pay licensing fee to Trident for the use of the Juice Alive brand.

U.S. Beverage's claim to a preliminary injunction based upon its alleged trademark right to the Juice Alive name is clearly disqualified under the defense of laches. On May 24, 2004, Walker sent an email to U.S. Beverage that proposed Trident's intention to develop an "image and brand" for juice concentrate. (Exhibit H) Over three months later, on September 6, 2004, Trident submitted an application to the USPTO for Trademark registration of the "Juice Alive" brand. On or about September 27, 2004, U.S. Beverage participated with Trident in sending out mailers that contained the "Juice Alive" trademark. Over a year later, on December 13th, 2005, the USPTO granted the official registration of the "Juice Alive" trademark. (Exhibit K) Furthermore, Kitrell and Clark knew in early 2005 that John Walker and his brother Patrick Walker had started a business in North Carolina selling Juice Alive brand slush drinks and machines to schools and convenience stores, and yet U.S. Beverage took no action to legally challenge Walker's use of the Juice Alive trademark until June of 2006—after the negotiations between the parties to buy out Walker and obtain a license to use the Juice Alive name had failed. (Kittrell depo., p. 242 & 250-52)

At no time prior to filing this lawsuit did U.S. Beverage ever try to register the "Juice Alive" trademark or dispute Trident's claim of ownership. During this time, U.S. Beverage was aware that Trident had exclusive use of the "Juice Alive" trademark in conjunction with its sales of slush drink products to territories outside of the territories reserved for U.S. Beverage to sell juice to day care and/or to subsequently sell slush drinks pursuant to the written licensing agreement entered into between the parties in November of 2005. It wasn't until June 2006 -- nearly two years after U.S. Beverage became aware that Trident was using the "Juice Alive" trademark-- before U.S. Beverage first claimed legal ownership of the Juice Alive trademark by filing the Complaint that commenced this case and by sending out letters to Walker's customers and potential customers.

F. **Because U.S. Beverage entered into a valid licensing agreement, it is equitably estopped from challenging Trident's ownership of the "Juice Alive" trademark.**

Finally and most conclusively, the Courts in *In re New York City Shoes* held that a trademark licensee is estopped by its prior recognition of a trademark's validity from making subsequent claims against its licensor. *In re New York City Shoes, Inc.* 84 B.R. at 956. *See also, Professional Golfers Ass'n v. Bankers Life & Casualty Co.,* 514 F.2d 665 (5th Cir.1975); *Beer Nuts, Inc. v. King Nut Co.,* 477 F.2d 326 (6th Cir.1973); *Pacific Supply Cooperative v. Farmer's Union National Exchange, Inc.,* 318 F.2d 894 (9th Cir.1963); and *E.F. Prichard Co. v. Consumers Brewing Co.,* 136 F.2d 512 (6th Cir.1943) (holding that a licensee is equitably estopped from setting up a subsequent adverse claim against its licensor). In this case, there is no dispute that U.S. Beverage entered into a licensing agreement with Trident for the use of "Juice Alive" trademark.

(Kittrell deposition, p. 230) Therefore, the Court's holding in *In re New York City Shoes* mandates a finding that U.S. Beverage is equitably estopped from later challenging Trident's ownership of the trademark because it entered into a valid licensing agreement with Trident.

### G. U.S. Beverage has made false or misleading representations of fact in violation of § 43(a) of the Lanham Act.

In *Pearson Industries, Inc. v. Pet Friendly, Inc.* 33 F.Supp.2d 1322 (M.D. Ala 1999), the plaintiff sued to enjoin the defendant's false and misleading practices in connection with marketing its competing product. The defendant had sent protest letters, which stated that plaintiff was violating the defendant's alleged trademark, in order to discourage customers and/or prospective customers from purchasing the plaintiff's products. The Court in *Pearson* reasoned that the plaintiff was likely to establish that the protest letters' repeated references to trademark infringement would constitute misleading representations of fact within the meaning of Section 43(a) of the Lanham Act.

Section 43(a) of the Lanham Act provides in pertinent part as follows:

> "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

15 U.S.C.A. § 1125(a)(1).

Therefore, the Court held that the plaintiff had established a likelihood of success and granted a preliminary injunction to prevent the defendant from claiming rights to the plaintiff's trademark. *Id.* at 1325.

Similar to the defendants actions in *Pearson*, U.S. Beverage and/or its agents have sent e-mails and/or letters to prospective customers of Juice Alive in Mississippi falsely asserting that it owns the Juice Alive trademark and telling those prospective customers that they should not do business with Walker or Trident Marketing, Inc. (Exhibit L)  U.S. Beverage has also sent a letter to Dispensing Systems, Inc. in Tucker, Georgia, threatening to sue Dispensing Systems, Inc., if said company enters into a distributorship agreement for the Juice Alive brand with Trident Marketing, Inc. Following the reasoning in *Pearson*, this Court should find that U.S. Beverage's actions constitute misleading representations of fact within the meaning of Section 43(a) of the Lanham Act. Therefore, this Court should grant a preliminary injunction enjoining U.S. Beverage from any further claim to the ownership of the Juice Alive trademark while this case is pending.

## II.    Walker and Trident Marketing, Inc. have shown that there is a substantial threat that they will suffer irreparable harm if the injunction is not granted

As shown in the Complaint and herein, Walker will suffer severe and irreparable harm if a preliminary injunction is not entered against U.S. Beverage, Inc., Grady Kittrell, and Thomas Clark barring them from: (1) asserting outside of this litigation that U.S. Beverage, Inc. owns the trademark rights for Juice Alive; and/or (2) asserting that other persons or customers should not do business with John Walker or Trident Marketing, Inc., because of their assertions that U.S. Beverage, Inc. owns the trademark for Juice Alive.

In *Pearson v. Pet Friendly*, the Defendant made misleading statements regarding the ownership of the Plaintiff's trademark in letters it sent to the Plaintiff's customers

22

and/or potential customers. *Pearson v. Pet Friendly*, 33 F. Supp. 2d 1322, 1325 (M.D. Ala 1999). The Plaintiff alleged that the Defendant's false or misleading statements had caused injury to its goodwill and reputation and that these statements had and would continue to harm its market share and customer base. The Court held that injuries such as these "by their very nature, are not easily measured or redressed by money damages" and are thus "common venues for the issuance of a preliminary injunction." *Id.*

U.S. Beverages' actions have harmed Walker's existing business relationships as well as the integrity of his reputation in the marketplace. U.S. Beverage's actions have also harmed the public by creating confusion regarding the ownership of the Juice Alive Trademark. Unless enjoined, U.S. Beverages' actions will continue to cause damage to the business and reputation of Trident Marketing, Inc., which will cause it to face the prospect of losing potential business relationships. Because future profits are difficult to calculate, Walker may have no adequate remedy at law to mend the damage being done to the business. Therefore, the ruling in *Pearson* warrants granting a preliminary injunction to Walker and Trident Marketing, Inc. to stop any further harm.

**III.    The threatened injury to Walker and Trident Marketing, Inc. outweighs the threatened harm the injunction may cause U.S. Beverages.**

In its complaint, U.S. Beverage claims that sales from products bearing the Juice Alive trademark constitute a large percentage of its sales. However, if U.S. Beverage was truly honest in its assessment of the facts of this case, it would acknowledge that no harm would result from a preliminary injunction enjoining their use of the "Juice Alive" trademark. No harm would result to U.S. Beverage because it voluntarily stopped using the Juice Alive trademark in May or June of 2006. At this time, U.S. Beverage began actively marketing its own juice themed brand called "Fruzars."

The owners of U.S. Beverage have admitted that the "Fruzars" and "Juice Alive" trademark are basically fungible. (Kittrell deposition, pp 333-334) They do not contend that "Juice Alive" has any beneficial artistic or literary merits that make the "Fruzars" brand an inadequate substitute for the use of the "Juice Alive" brand name. (Kittrell deposition, pp 333-334) Buddy Todd, the former sales manager of sales for U.S. Beverage testified that Fruzars was a more appealing brand than Juice Alive. (Todd Deposition, p. 32) In fact, it is likely that it would impose additional costs on U.S. Beverage to change its current marketing scheme and Juice labels from "Fruzars" to "Juice Alive."

As argued above, the entry of a preliminary injunction will greatly benefit Trident.  The entry of the preliminary injunction will allow Walker and Trident to continue doing business using their current marketing materials and Juice Alive labels. Should Walker and his company suddenly be stripped of their only trademark, they would likely be forced out of business or at the very least required to spend a significant

amount of money to quickly develop a new trademark. This could cause a delay in supplying their customers, including schools, which could cause Walker and Trident to lose their clientele, resulting in possible financial ruin.

It is possible for this Court to fashion an interim remedy that will ensure that neither party suffers any economic injury while the parties litigate this case.  A preliminary injunction would preserve the status quo.  With this simple arrangement, both parties would be able to continue to operate their businesses without any change or interruption.

**IV.    The public's interest will be served by the entry of a temporary restraining order and a preliminary injunction**

As discussed hereinabove and in this subsection, the public will benefit in many ways from an injunction.  The Eleventh Circuit has observed that "the public interest in preventing confusion around the marketplace is paramount." *SunAmerica Corp. v. Sun Life Assurance Co. of Canada,* 77 F.3d 1325, 1336 (11th Cir.1996) (quoting *Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.,* 934 F.2d 1551, 1564 (11th Cir.1991)). Injunctive relief here will prevent further confusion in the marketplace as a result of U.S. Beverage's unsubstantiated trademark claims. The entry of a preliminary injunction will allow the customers of both parties to continue to receive their products without any changes or delays. Because public schools make a substantial percentage of the customers of both parties, they would benefit from the continued low prices caused by the added competition in the frozen fruit drink market.  The public would also benefit from the resolution of the trademark dispute, because having two opposing entities claiming the same brand name creates confusion in the market place.   The equities of

this case weigh heavily in favor of granting the preliminary injunction and eventually granting a permanent injunction. This Court should act quickly to limit the uncertainty and potential grave harm faced by the parties, and the entire community caused by this dispute. The course laid out herein by Walker and Trident, which calls for preservation of the status quo pending the final resolution of the issues involved in this case, is consistent with the "equities of the matter" and "will minimize the costs [to all parties] of being mistaken." *Butler v. Alabama Jud'l Inq. Comm'n,* 111 F. Supp. 2d 1224, 1229-30 (M.D. Ala. 2000).

## CONCLUSION

For the foregoing reasons and the reasons stated in the Counterclaim, Walker and Trident Marketing, Inc. respectfully request that this Court enter a preliminary injunction enjoining U.S. Beverage and its owners from further use or claims of ownership of the "Juice Alive" trademark. Walker and Trident have put forward sound cogent arguments based upon the Lanham Act, as well as case law supporting the rights that employees and/or shareholders have to the individual ownership of intellectual property created by them through their personal resources. Having done so, Walker and Trident Marketing, Inc. have shown that there is a substantial likelihood that they will succeed on the merits of this case. As pointed out above, this first element is "generally regarded as the most important" of the four requirements for obtaining preliminary injunctive relief. *Butler v. Alabama Jud'l Inq. Comm'n,* 111 F. Supp. 1224, 1229-30 (M.D. Ala. 2000). As shown above, Walker and Trident have satisfied the four requirements for the granting of a preliminary injunction.

**RESPECTFULLY SUBMITTED** this the 16th day of March 2007.

Raymond L. Jackson, Jr. (JAC054)
Attorney for John B. Walker, II and
Trident Marketing, Inc.

**OF COUNSEL:**
Raymond L. Jackson, Jr.
Jackson Law Group, P.C.
P.O. Box 3575
Auburn, Alabama 36831-3575
(334) 821-0600
(334) 821-1950 (FAX)
rjackson@auburnattorney.com

## CERTIFICATE OF SERVICE

I certify that on this the 16th day of March 2007 a copy of the foregoing pleading was served upon all counsel of record through the EMCS electronic filing system and by placing said copy in First Class U.S. Mail with postage prepaid to the following addresses:

> Richard H. Gill, Esq.
> C. Nelson Gill, Esq.
> Copeland, Franco, Screws & Gill, P.A.
> P.O. Box 347
> Montgomery, AL 36101-0347

OF COUNSEL