## WITNESS STATEMENT OF JOHN B. WALKER, II

My name is John B. Walker, II, and I reside in Katy, Texas. I am over the age of nineteen years old, and I am legally competent to testify. I have personal knowledge of the following facts:

1. I am a party to the case of *U.S. Beverage, Inc. v. John Buster Walker, II, et al.*, Civil Action No. 2:06-CV-496-SRW (M.D. Ala.) in the United States Court for the Middle District of Alabama.

2. I have been in the business of selling frozen fruit juice drink machines and products for approximately 11 years. In the business, frozen fruit juice drinks are referred to as "slush drinks."

3. On January 4, 2000, I started an Alabama corporation known as Tropical Perfections, Inc., which sold frozen juice ("slush") machines and products to convenience stores and schools.

4. In January of 2002, I was approached by Grady Kittrell from U.S. Beverage, Inc. about becoming associated with U.S. Beverage, Inc.

5. On or about April 24, 2002, I signed several agreements, by which I agreed to merge my company Tropical Perfections, Inc. into U.S. Beverage, Inc. in exchange for 33% of the shares of U.S. Beverage, Inc. and an agreement to work for U.S. Beverage, Inc. as a salesman. (A true and accurate copy of the merger and shareholder agreements are attached as "Exhibit A" to the Answer and Counterclaim.) All of the agreements signed by me to execute the merger were drafted by U.S. Beverage, Inc. and/or its attorney.

6. Before merging with Tropical Perfections, Inc. and hiring me as a salesman, U.S. Beverage, Inc. was primarily in the "bag in a box" business selling to bars and nightclubs. The "bag in a box" is a method of dispensing soda drinks and fruit juices through dispensing guns for use in bars and nightclubs. U.S. Beverage, Inc. also sold a few dispensing systems for draught beer and liquor to bars and nightclubs. Lastly, U.S. Beverage also sold machines and mixes needed to make frozen margaritas and daiquiris for bars and nightclubs. U.S. Beverage, Inc. did not sell frozen fruit juice machines or products. Before the merger, the vast majority of the revenues of U.S. Beverage, Inc. came from sales to bars and nightclubs.

7. At no time before, during, or after the merger, did I sign any contract or otherwise agree to U.S. Beverage's ownership of any intellectual property that I developed using his own time and resources, while in the employ of U.S. Beverage, Inc. I never agreed to transfer all intellectual property created by me during my employment to U.S. Beverage, Inc. I would not have signed any such agreement.

8. Prior to the merger, I was concerned about whether I would be treated fairly as a minority shareholder in U.S. Beverage, Inc. In particular, I was concerned about whether my compensation could be changed without my consent. At the time of the merger, U.S. Beverage, Inc. and its two other shareholders Grady Kittrell and Thomas Clark agreed that my salary could not be reduced without my agreement.

9. At the time of the merger, all three shareholders in U.S. Beverage, Inc. were on an equal fixed salary, and we each received equal draws from the company.

10. In October of 2003, Grady Kittrell and Thomas Clark forced me to take a sizable salary cut, telling me that they (as owners of a majority of the company stock) would cut my salary with or without Walker's consent. At that time, Kittrell and Clark placed me on a commission-based salary, while Kittrell and Clark kept their fixed salaries.

11. At time of the merger, Tropical Perfections, Inc. was selling slush drinks and machines under the brand name "Cool Tropics." Cool Tropics is a brand name of frozen juice machines and products that was owned by a third party. After the merger, U.S. Beverage assumed and continued the former Tropical Perfections' business of selling slush drinks and machines under the brand name "Cool Tropics" to convenience stores and schools. U.S. Beverage did not add a significant new customer base to the pre-merger customer base for Cool Tropics.

12. Shortly after joining U.S. Beverage, Inc., I suggested to Kittrell and Clark that U.S. Beverage invest money and time in creating its own brand for slush drinks. Grady Kittrell and Thomas Clark rejected my idea of investing in the creation of a new brand.

13. With the full knowledge of Kittrell and Clark, I began working independently with Ryan Hamner to create a new brand for slush drinks through the company that Ryan Hamner and I formed Trident Marketing,

Inc. Ryan Hamner thought of or created the name "Juice Alive" and the initial logo designs for "Juice Alive". Ryan Hamner registered the domain name www.juicealive.com. U.S. Beverage, Inc. did not contribute toward the costs of developing the Juice Alive brand and/or the www.juicealive.com website.

14. U.S. Beverage, Inc. was aware in April of 2004 of the creation of the www.juicealive.com website by Ryan Hamner for Trident Marketing, Inc. After developing www.juicealive.com in April of 2004, Ryan Hamner offered to help U.S. Beverage, Inc. to develop its own website.

15. In October 2004, Trident Marketing, Inc. and U.S. Beverage, Inc. agreed to work together on a direct mail solicitation in order to sell juice under the Juice Alive brand to day care centers. Trident Marketing, Inc. paid the cost of obtaining a list of daycare centers in the southeast U.S. At that time, Trident Marketing, Inc. agreed to allow U.S. Beverage, Inc. to solicit and/or distribute "Juice Alive" juice to daycare centers located in Alabama, Arkansas, Mississippi, and small part of Texas. Trident Marketing, Inc. directly solicited and/or sold "Juice Alive" juice to daycare centers in Georgia, Florida, South Carolina, and the remaining part of Texas. During this time, I referred a number of sales leads to U.S. Beverage, Inc. from the www.juicealive.com website for customers from the sales area assigned by Trident Marketing, Inc. to U.S. Beverage, Inc.

16. Trident Marketing, Inc. applied to the U.S. Patent & Trademark Office for a federal trademark for Juice Alive, which was granted on December 13,

2005. (A true and correct copy of the U.S. Trademark Registration for Juice Alive is attached as "Exhibit B" to the Answer & Counterclaim.)

17. Sometime in 2005, U.S. Beverage, Inc. was given a cease and desist letter terminating its distributorship for the Cool Tropics brand. After U.S. Beverage lost its Cool Tropics distributorship, Trident Marketing, Inc. agreed to give U.S. Beverages a non-exclusive distributorship to sell the Juice Alive brand in its existing sales territories. At all times, the Juice Alive frozen juice concentrate product was manufactured by Supreme Manufacturing Company, Inc. Trident Marketing, Inc. provided the labels for the product. U.S. Beverage, Inc. agreed to its status as a distributor of Juice Alive, and it never claimed ownership of the Juice Alive trademark until this lawsuit was filed. On or about November 18, 2005, Tom Clark faxed a letter to Gary Dukes at Supreme Manufacturing Company, Inc. that stated:

> "We have reached an agreement with Juice Alive to start distribution of the Juice Alive brand in our 100% juice products. Please let the signed fax serve as official authorization for you to begin selling U S Beverages, Inc. the Juice Alive products with a $1.20 increase per case to be paid to Juice Alive."

(A true and correct copy of the faxed letter is attached as "Exhibit C" to the Answer & Counterclaim.)

18. In July 2005, U.S. Beverage, Inc. was having financial problems, and its three shareholders agreed to temporarily stop receiving any compensation from the company for 90 days. Subsequently, I was told by Grady Kittrell that I would not be going back on the payroll of U.S. Beverage, Inc.,

unless I agreed to a buy-out of my shares in the company <u>and</u> my company agreed to give U.S. Beverage, Inc. an exclusive distributorship for Juice Alive in seven southeastern states.

19. When I refused to agree to the buy-out and my company refused to give an exclusive distributorship for Juice Alive to U.S. Beverage, Inc., Kittrell and Clark retaliated against me by refusing (1) to reinstate my salary, (2) to pay me accrued sales commissions, and (3) to reimburse me for expenses associated with working as a salesman for U.S. Beverage, Inc.

20. During the time that I was attempting to negotiate with Juice Alive and its majority shareholders, my company Trident Marketing, Inc. paid an attorneys in Houston, Texas to prepare a formal distributorship agreement, which would have given exclusive distribution rights for Juice Alive to U.S. Beverage, Inc. for Alabama, Arkansas, Mississippi, and parts of Georgia. In February of 2006, U.S. Beverage rejected the proposed distributorship agreement because the sales area was not as large as Kittrell and Clark had demanded.

21. On or about April 20, 2006, an attorney for U.S. Beverage, Inc. sent a letter to me stating that U.S. Beverage would be terminating my employment and cancelling the healthcare insurance for my family and me. (A true and correct copy of the letter is attached as "Exhibit D" to the Answer & Counterclaim.) At the time of the April 20, 2004 letter, Kittrell and Clark knew that my spouse was eight month's pregnant. In response

to said letter, I had to purchase private health insurance for my family at significant cost.

22. In May of 2006, a representative from Supreme Manufacturing Company, Inc. told me that U.S. Beverage had notified Supreme Manufacturing that it would no longer be purchasing Juice Alive brand products and that it was switching to the "Fruzars" brand for slush and/or juice products. I responded to this news by terminating the distributorship rights of U.S. Beverage, Inc. to sell Juice Alive brand products. On May 15, 2006, Trident Marketing, Inc. sent via its attorney in Houston, Texas, a cease and desist letter to U.S. Beverage, Inc. demanding that it stop using the Juice Alive brand and/or trademark. (A true and correct copy of the cease and desist letter is attached as "Exhibit E" to the Answer & Counterclaim.) Since then, U.S. Beverage, Inc. has continued to use point of sale materials that bear the Juice Alive brand name on its frozen drink machines.

23. As further retaliation for my refusal to acquiesce to their demands, U.S. Beverage, Inc., Grady Kittrell, and Thomas Clark have falsely asserted that U.S. Beverage, Inc. owns the Juice Alive brand and trademark. U.S. Beverage, Inc., Grady Kittrell, Thomas Clark, and Norman "Buddy" Todd have sent e-mails and/or letters to prospective customers of Juice Alive in Mississippi falsely asserting that it owns the Juice Alive trademark and telling those prospective customers that they should not do business with

John Walker or Trident Marketing, Inc. (A true and correct copy of the e-mailed letter is attached as "Exhibit F" to the Answer & Counterclaim.)

24. My company Trident Marketing, Inc. has been in negotiations for several months with Dispensing Systems, Inc. of Tucker, Georgia. Dispensing Systems, Inc. is interested in becoming as a distributor of the Juice Alive brand for frozen fruit drink machines and products. Attorneys working for U.S. Beverage, Inc. have sent a letter to Dispensing Systems, Inc. in Tucker, Georgia, threatening to sue Dispensing Systems, Inc., if said company enters into a distributorship agreement for the Juice Alive brand with Trident Marketing, Inc.

25. U.S. Beverage, Inc., Grady Kittrell, Thomas Clark, and its other agents have intentionally exaggerated and misrepresented the nature of the non-competition agreement that I signed with U.S. Beverage, Inc. to customers, potential customers, and/or business associates of Trident Marketing, Inc. and me.

26. I have consulted with my attorneys and taken great care not to violate the non-competition agreement. My attorneys and I believe that the non-competition agreement is legally unenforceable. If the non-competition agreement is enforceable, we believe that it merely prohibits me from working as an employee for a company competing against U.S. Beverages, Inc, which has a physical office within 200 miles of Montgomery, Alabama. We do not believe that the non-competition

agreement bars Trident Marketing, Inc. from entering into a Juice Alive distributorship agreement with an independent distributor.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: June 26, 2006

John B. Walker, II