EXHIBIT D – Kittrell deposition excerpts

```
 1              US BEVERAGE, INC.,
 2                  Plaintiff,
 3                     v.
 4      JOHN BUSTER WALKER, II, and TRIDENT MARKETING,
 5                     INC.,
 6                  Defendants.
 7      ---------------------------------------------
 8      JOHN BUSTER WALKER, II, and TRIDENT MARKETING,
 9                     INC.,
10             Counterclaim Defendants,
11                     and
12      GRADY DOWLING KITTRELL, THOMAS GOING CLARK,
13           III, and NORMAN "BUDDY" TODD,
14              Third Party Defendants.
15
16              CIVIL ACTION NO.
17                2:06-CV-496-SRW
18
19
20
21      DEPONENT:   Grady Dowling Kittrell
22      DATE:   September 15, 2006
23
```

---

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

US BEVERAGE, INC.,
    Plaintiff,
vs.
JOHN BUSTER WALKER,
II, and TRIDENT           CIVIL ACTION NO.
MARKETING, INC.,
    Defendants.           2:06-CV-496-SRW
-----------------------
JOHN BUSTER WALKER,
II, and TRIDENT
MARKETING, INC.,
    Counterclaim
    Plaintiffs,
vs.
US BEVERAGE, INC.,
    Counterclaim
    Defendant,
and
GRADY DOWLING
KITTRELL, THOMAS
GOING CLARK, III, and
NORMAN "BUDDY" TODD,
    Third Party
    Defendants.

* * * * * *

DEPOSITION OF GRADY DOWLING KITTRELL, taken pursuant to notice and stipulation on behalf of the Defendant/Counterclaim Plaintiffs, in the Law Offices of Copeland, Franco, Screws & Gill, 444 South Perry Street, Montgomery, Alabama, before Tiffany B. Beasley, Certified Court Reporter and Notary Public in and for the State of Alabama at Large, on September 15, 2006, commencing at 8:39 a.m.

---

APPEARANCES

FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT/THIRD
PARTY DEFENDANTS:

   **C. NELSON GILL, ESQUIRE**
   Copeland, Franco, Screws & Gill
   444 South Perry Street
   Montgomery, Alabama 36104

FOR THE DEFENDANTS/COUNTERCLAIM PLAINTIFFS:

   **RAYMOND L. JACKSON, JR., ESQUIRE**
   **CLIFF TUNNELL**
   660 North College Street
   Suite D
   Auburn, Alabama 36830

ALSO PRESENT:

   THOMAS GOING CLARK, III
   JOHN BUSTER WALKER, II

---

STIPULATIONS

It is stipulated and agreed by and between counsel representing the parties that the deposition of **GRADY DOWLING KITTRELL** may be taken before Tiffany B. Beasley, Certified Court Reporter and Notary Public in and for the State of Alabama at Large, without the formality of a commission; and all formality with respect to other procedural requirements is waived; that objections to questions, other than objections as to the form of the questions, need not be made at this time, but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose by either party as provided by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between the parties hereto and the witness, that the signature of the witness to this deposition is hereby waived.

---

INDEX

**EXAMINATION**                               **Page**
MR. JACKSON..........................            7

**EXHIBITS**                                  **Page**
1    Letter from James R. Cooper,             73
     Jr., to U.S. Beverage, dated
     February 11, 2002

2    Agreement to Purchase                    74
     Corporate Stock of Tropical
     Perfections, Inc., dated
     April 24, 2002

3    US Beverage Outline,                     153
     Bates-Stamped US Beverage 096
     through 097

4    Proposal for US Beverage Web             164
     Site, dated 10/14/04

5    Register4less Receipt, dated             165
     8/9/04

6    Various Labels                           185

7    Label                                    185

8    Letter from Ryan Hamner and              197
     John Walker to US Beverage,
     Inc., dated 5/24/04

9    Letter from US Beverage to               201
     John Walker, dated December
     20, 2004, Bates-Stamped US
     Beverage 093

10   Letter from Mr. Walker to                203

## Page 45

| | | |
|---|---|---|
| 1 | Q. | Okay. Anything else? |
| 2 | A. | Yeah. Sleepy Boys of Montgomery -- or, excuse |
| 3 | | me, Sleepy Boys of Zelda. And, again, my |
| | | involvement in G&W is an investor. |
| | Q. | Okay. And we'll get back to the specifics. |
| 6 | A. | Okay. |
| 7 | Q. | Go ahead and continue to list -- |
| 8 | A. | Sleepy Boys of Cornerstone, Sleepy Boys of |
| 9 | | Prattville. |
| 10 | Q. | Okay. |
| 11 | A. | The Mattress Source. |
| 12 | Q. | The Mattress Source? |
| 13 | A. | Uh-huh. |
| 14 | Q. | Okay. |
| 15 | A. | That's it. |
| 16 | Q. | Do you lease any property? Houses? |
| 17 | A. | What do you mean? |
| 18 | Q. | Do you lease houses, rent houses or -- |
| 19 | A. | Do I personally? No, I own my home. |
| 20 | Q. | I'm talking about to other people as a |
| 21 | | business, real estate. |
| 22 | A. | I personally don't. G&W does. |
| 23 | Q. | Okay. Well, tell us about G&W, then. Other |

## Page 46

| | | |
|---|---|---|
| | | than leasing houses, what does G&W do? |
| 2 | A. | That's pretty much it. |
| 3 | Q. | How many investors are there in G&W? |
| 4 | A. | There are two. |
| 5 | Q. | Okay. I assume you and one other? |
| 6 | A. | Uh-huh. |
| 7 | Q. | Who is the other person? |
| 8 | A. | My father, Wilson Kittrell. |
| 9 | Q. | Do you have a position with G&W? |
| 10 | A. | No. |
| 11 | Q. | Do you have any other employees for G&W? |
| 12 | A. | No. |
| 13 | Q. | What are your duties for G&W? What do you do |
| 14 | | for G&W? |
| 15 | A. | I co-sign on notes. |
| 16 | Q. | Anything else? |
| 17 | A. | No. Not currently. |
| 18 | Q. | What about any other time in the past? |
| 19 | A. | I formed -- I met with the attorneys to form |
| 20 | | the LLC for my father. |
| 21 | Q. | Have you ever dealt with the renters? |
| 22 | A. | Oh, sure. I get calls at midnight when a pipe |
| 23 | | is broken at my house. |

## Page 47

| | | |
|---|---|---|
| 1 | Q. | Are you the main contact for G&W? |
| 2 | A. | No. |
| 3 | Q. | Who's the main contact? |
| 4 | A. | My father. |
| 5 | Q. | Do you do any of the maintenance work? |
| 6 | A. | Me personally? |
| 7 | Q. | Yes. |
| 8 | A. | Oh, heavens no. |
| 9 | Q. | Okay. Have you ever taken calls at US |
| 10 | | Beverage from people that rent from you? |
| 11 | A. | Yes. |
| 12 | Q. | Is that frequent? |
| 13 | A. | No. |
| 14 | Q. | Have you ever had employees at US Beverage to |
| 15 | | take calls from your renters? |
| 16 | A. | If it came through the receptionist |
| 17 | | switchboard, yeah, I'm sure. |
| 18 | Q. | Do you ever give renters the number for US |
| 19 | | Beverage as a contact number for them to call |
| 20 | | you? |
| 21 | A. | There's an office number for G&W. Now, I have |
| 22 | | been chased down by various means by my |
| 23 | | tenants when they have problems, sure. |

## Page 48

| | | |
|---|---|---|
| 1 | Q. | But you've never given the US Beverage number |
| 2 | | to any of your tenants as a contact number to |
| 3 | | call you? |
| 4 | A. | I may have. |
| 5 | Q. | Okay. Have you ever -- ever made leases on US |
| 6 | | Beverage premises with renters? |
| 7 | A. | Sure. |
| 8 | Q. | Is that regular? |
| 9 | A. | Our tenants -- once they're in, they stay, so |
| 10 | | I don't know what regular would be constituted |
| 11 | | as. |
| 12 | Q. | Is it often that you meet with renters there? |
| 13 | A. | No. |
| 14 | Q. | How often -- how many times a month would you |
| 15 | | meet with a renter there at US Beverage? |
| 16 | A. | To conduct leases? |
| 17 | Q. | Or any sort of business for G&W. |
| 18 | A. | It would be less than once a month at most. |
| 19 | Q. | How much of your time on a weekly basis, let's |
| 20 | | say percentage basis, roughly, is taken up |
| 21 | | dealing with G&W? |
| 22 | A. | Less than 1 percent. On a weekly basis? |
| 23 | Q. | Yes. Just an average week. |

| | | | | |
|---|---|---|---|---|
| 1 | A. | I'm not that involved in -- I spend two hours | 1 | A. At least once a week. And usually is |
| 2 | | a month doing the bookkeeping, and that's | 2 | around 7 o'clock p.m. |
| 3 | | about it. | 3 | Q. Any employees of US Beverage do anything to |
| 4 | Q. | How many homes are y'all leasing through G&W? | 4 | assist you with the business -- Sleepy Boys |
| 5 | A. | I believe it's 13. | 5 | business? |
| 6 | Q. | Do you have any apartments you lease? | 6 | A. Yes. |
| 7 | A. | No. | 7 | Q. Okay. What -- describe that. |
| 8 | Q. | Is there any other activities through G&W, | 8 | A. We have a -- a bookkeeper who has probably |
| 9 | | selling real estate, subdividing? | 9 | looked at information and done things, |
| 10 | A. | There has been a house sold. | 10 | entries, or stuff to help us out on that. |
| 11 | Q. | Okay. Tell us about the -- your association | 11 | Q. Anyone else? |
| 12 | | with Sleepy Boys. First, Sleepy Boys of | 12 | A. Tom Clark. |
| 13 | | Zelda. Are you the -- I assume you're one of | 13 | Q. What does Tom Clark do for Sleepy Boys? |
| 14 | | the owners of the company? | 14 | A. Nothing again. He reviews the financial |
| 15 | A. | Yeah. I'm a member of the LLCs. | 15 | information to make sure it's been coded |
| 16 | Q. | Okay. Are there any other members of the LLC? | 16 | correctly. |
| 17 | A. | Yeah. There's several. | 17 | Q. How much of your time on a weekly basis is |
| 18 | Q. | Okay. How many other -- just tell me how many | 18 | taken up with -- well, we'll just put all the |
| 19 | | members of the LLC -- I assume it's Sleepy | 19 | Sleepy Boys together. |
| 20 | | Boys of Zelda, LLC; is that -- | 20 | A. Yeah. Because it's all just -- |
| 21 | A. | Yeah. Correct. | 21 | Q. -- is taken up dealing with Sleepy Boys, |
| 22 | Q. | Okay. How many members are there of that | 22 | percentage-wise? |
| 23 | | company? | 23 | A. I can give you better than a percent. I |

50

52

| | | | | |
|---|---|---|---|---|
| 1 | A. | I think four. | 1 | spend -- once a week I meet with the managers, |
| 2 | Q. | Okay. Who are the other three? | 2 | and then on Saturday mornings, I go down to |
| 3 | A. | Norman Azar. | 3 | Auburn and meet with my chiropractor and get |
| 4 | Q. | Okay. | 4 | adjusted, and I stop in the store in Auburn |
| 5 | A. | Wilson Kittrell and Tom Clark. | 5 | for about an hour and a half and meet with the |
| 6 | Q. | Okay. Do you have a title with Sleepy Boys of | 6 | managers again. |
| 7 | | Zelda? | 7 | Q. And that's all you do for Sleepy Boys? |
| 8 | A. | Not that I'm aware of. | 8 | A. Is that all I do? That wouldn't be a fair |
| 9 | Q. | Okay. Do you perform any duties for Sleepy | 9 | assessment. I mean, with any investment that |
| 10 | | Boys of Zelda? | 10 | I have, even my IRA, I mean, I look at |
| 11 | A. | Yes. I was actively involved in one | 11 | financials, and I try to think about things |
| 12 | | negotiation for them, but I'm not -- we have | 12 | sometimes in mind share, I guess. But as far |
| 13 | | managers that run that business, and my father | 13 | as physical commitment, that's it. |
| 14 | | handles the maintenance and construction of | 14 | Q. And is it the Sleepy Boys of Cornerstone |
| 15 | | it. | 15 | that's in Auburn? Which one is in Auburn? |
| 16 | Q. | Have you ever conducted any business on US | 16 | A. The Mattress Source. |
| 17 | | Beverage premises related to Sleepy Boys? | 17 | Q. Mattress Source is in Auburn. Okay. It's |
| 18 | A. | Yes. | 18 | through Sleepy Boys, though, they all -- I |
| 19 | Q. | What sort of business have you conducted | 19 | know one is in Prattville. Are the other two |
| 20 | | there? | 20 | in Montgomery? |
| 21 | A. | I have met with the management team in the | 21 | A. Yes. |
| 22 | | conference room. | 22 | Q. Are they all owned by the same members? |
| 23 | Q. | How often do you do that? | 23 | A. Yes. |

| | | | | |
|---|---|---|---|---|
| 1 | Q. | What about The Mattress Source? Does it have | | |
| 2 | | the same members as the other -- | | |
| 3 | A. | Yes, sir. | | |
| | Q. | Any other businesses you're involved with that | | |
| | | we haven't discussed? | | |
| 6 | A. | (Shakes head.) | | |
| 7 | Q. | And you mentioned also GBD Holdings. Is that | | |
| 8 | | the LLC that owns the building that -- | | |
| 9 | A. | Yes. | | |
| 10 | Q. | -- US Beverage operates out of? | | |
| 11 | A. | Yes, sir. | | |
| 12 | Q. | Okay. Does GBD Holdings do any other business | | |
| 13 | | other than own the building that US Beverage | | |
| 14 | | operates out of? | | |
| 15 | A. | Any other business? GBD does rent one space | | |
| 16 | | to a tenant inside that building. | | |
| 17 | Q. | So that's a tenant other than US Beverage? | | |
| 18 | A. | Yes. | | |
| 19 | Q. | And I assume US Beverage is a tenant, too? | | |
| 20 | A. | Yes. | | |
| 21 | Q. | Why don't you tell us how you first became | | |
| 22 | | acquainted with Mr. Walker, my client? | | |
| 23 | A. | Best of my recollection, we called on John -- |

54

| | | |
|---|---|---|
| | | or I personally called on John to sell him |
| 2 | | Granita machines and parts. |
| 3 | Q. | And where would you have called on John at? |
| 4 | | Do you recall? |
| 5 | A. | I believe at the time it was his office in |
| 6 | | Phenix City. |
| 7 | Q. | Did you sell any machines or parts to John at |
| 8 | | that point? |
| 9 | A. | No, there was no transaction. |
| 10 | Q. | Okay. How did you -- how did it come that you |
| 11 | | went from trying to sell John parts for his |
| 12 | | Granita machines to actually bringing John in |
| 13 | | your company? Will you just describe how |
| 14 | | that -- |
| 15 | A. | Well, we were buying product -- the juice |
| 16 | | concentrates at considerably less cost than he |
| 17 | | was. We were buying machines and parts at |
| 18 | | considerably less cost than his company was. |
| 19 | | So we were trying to acquire him as a customer |
| | | because we felt there was margin there. At |
| 21 | | some point, John came to us and talked about a |
| 22 | | distribution arrangement, which we had no |
| 23 | | interest in. So then the discussions |

| | | |
|---|---|---|
| 1 | | progressed. John and I met on several |
| 2 | | occasions and discussed a buyout situation. |
| 3 | Q. | Okay. When did those discussions begin? |
| 4 | A. | I believe that the transaction occurred in the |
| 5 | | spring of 2002, so it would have been probably |
| 6 | | six months prior to that. It was from |
| 7 | | probably October -- September or October of |
| 8 | | the preceding year leading up into the |
| 9 | | transaction actually being closed. We had |
| 10 | | shot for a January 1 target date and couldn't |
| 11 | | make it happen. But we started working |
| 12 | | throughout that time to get some particulars, |
| 13 | | logistics, things like that worked out through |
| 14 | | that 90-day period prior to us closing. So we |
| 15 | | actually started operating together sometime |
| 16 | | just after the 1st of January. We started |
| 17 | | working together towards making some decisions |
| 18 | | on things. And it may have been prior -- it |
| 19 | | may have been earlier in August. |
| 20 | Q. | Well, what caused you to be interested in |
| 21 | | bringing Mr. Walker and his company into US |
| 22 | | Beverage? |
| 23 | A. | Oh, there were several facets. We had already |

56

| | | |
|---|---|---|
| 1 | | done two acquisitions at the time -- excuse |
| 2 | | me, one acquisition at the time. We had |
| 3 | | acquired Gulf Coast Beverage, which was a very |
| 4 | | similar business to both of our businesses, |
| 5 | | again, selling juice concentrates. They were |
| 6 | | primarily just product. No equipment. We had |
| 7 | | completed that transaction, and we saw that |
| 8 | | one of the ways to grow our business was to |
| 9 | | acquire other companies. So there was an |
| 10 | | interest there. His distribution routes were |
| 11 | | within our footprint. We saw some expansion |
| 12 | | possibilities. We thought it was good |
| 13 | | business to acquire it. |
| 14 | Q. | Okay. You said you saw some expansion |
| 15 | | possibilities. What -- describe that more |
| 16 | | fully for us. |
| 17 | A. | Well, he had utilized those same concentrates |
| 18 | | successfully with some chain accounts. He had |
| 19 | | some business on his books that we wanted to |
| 20 | | put into our portfolio. Sometimes it's less |
| 21 | | expensive to acquire through a purchase than |
| 22 | | it is to go out and beat the streets to get |
| 23 | | it. |

### Page 77

```
 1   could not complete objectives and make
 2   decisions effectively with him being absent on
 3   a daily basis.  Now, true, he would still need
 4   to travel and do the things he'd need to do,
 5   but he would need to be subservient to the
 6   corporate needs, as all of us should be as
 7   corporate officers.  Those discussions
 8   happened often.
 9   Q.  Was there any minutes at the board of
10       directors' meetings to reflect any of those
11       discussions?
12   A.  If I'm not mistaken, there may be some minutes
13       from one where John Walker did agree and gave
14       a designated time line that he would move
15       back.
16   Q.  Okay.  Could you search your records and --
17   A.  Be glad to.
18   Q.  -- produce those to your attorney so he can
19       produce those to us?  And I think you also
20       indicated that at one point, you said,
21       Mr. Walker -- at least one point, Mr. Walker
22       agreed to move back to Alabama.  Would you
23       describe to us when this disagreement occurred
```

### Page 78

```
 1       and what you recall about that?
 2   A.  I recall early on Mr. Walker engaging in these
 3       conversations that he recognized that there
 4       was being -- problems being caused by his
 5       absence; that we could not have the synergies
 6       needed to run the company; and that we were
 7       off sync on what the company felt -- or the
 8       quorum felt was the objectives of sales versus
 9       what he felt because of his personal needs.
10       And he even at that time had addressed that he
11       felt if he was here with us every day, it
12       would benefit him because he felt like he
13       wasn't a part of the company at times.  Both
14       sides of the table felt it was imperative for
15       him to come back and be active in the
16       business.
17   Q.  And when did these discussions occur?
18   A.  These discussions occurred pretty early on.
19   Q.  Well, how long after the acquisition?  Are you
20       talking months or years or --
21   A.  No.  No.  It was within -- I would say it was
22       within months.  We had discussions on several
23       occasions based on the welfare of Mr. Walker's
```

### Page 79

```
 1       family what was going to be best as well.
 2       Tough position for the company to be in to
 3       elevate a humanistic need over the company's
 4       need, and I feel we made a mistake in allowing
 5       that to happen at the time.  But then we came
 6       back after the purchase of his home, discussed
 7       it at length, and had even made a proposal to
 8       offset the losses he may incur in selling his
 9       house in a down market if he would agree to
10       move.
11   Q.  Any of those discussions in writing?
12   A.  I'll have to check.
13   Q.  Specifically the offer to offset the sale of
14       his house.  Was that in writing?
15   A.  Again, I'll have to look and see.  We had so
16       many discussions there.  I mean, it was almost
17       an on-and-on on the phone type of discussion,
18       because, again, he was in Texas.
19   Q.  Did Mr. Walker discuss with you what prompted
20       him and his wife to move to Texas, why they
21       were in Texas?
22   A.  The only knowledge that I had of why he was in
23       Texas was because of a job that Tiffany
```

### Page 80

```
 1       possessed.
 2   Q.  And is Tiffany Mr. Walker's wife?
 3   A.  Yes.
 4   Q.  What did you know about that job?
 5   A.  That her father-in-law was the -- excuse me,
 6       her step-father had a position that had given
 7       her title to a position through nepotism.
 8   Q.  When you say "nepotism," is this your opinion
 9       or is this what Mr. Walker --
10   A.  That was the way it was described to me.
11   Q.  Do you recall Mr. Walker using the term
12       "nepotism" to refer to his wife's job?
13   A.  Oh, I think he probably used -- I cannot
14       remember the gentleman's name, but because
15       so-and-so was her step-father, you know, he
16       set her up with this.  She may be qualified.
17       I can't answer that.
18   Q.  Okay.  And normally and when you use --
19       someone throws out the term "nepotism,"
20       usually it's inferring someone is not
21       qualified to do their job, isn't it?
22   A.  It can be.  It can also be using the
23       relationship status of family ties.
```

| | | | | |
|---|---|---|---|---|
| 1 | Q. | Well, Mr. Clark had other business interests, | 1 | A. | Yeah. That was -- that's my first endeavor as |
| 2 | | too, didn't he? | 2 | | an investor. |
| 3 | A. | No. Not at the time. | 3 | Q. | Did US Beverage ever ask Mr. Walker to sign an |
| 4 | Q. | Is he not involved in Sleepy Boys or mattress | 4 | | intellectual property agreement? |
| 5 | | company? | 5 | A. | I brought to Mr. Walker's attention |
| 6 | A. | Those came into existence about 90 days ago. | 6 | | intellectual property. |
| 7 | | Maybe 180. | 7 | Q. | Well, and I'm not talking about -- we'll talk |
| 8 | Q. | Did your association with those businesses | 8 | | about that in a minute. But I'm talking about |
| 9 | | come -- are you saying your association with | 9 | | a written agreement. Let's just -- let's just |
| 10 | | those businesses is just 90 days ago? | 10 | | talk about a written contract involving |
| 11 | A. | Yes. Those companies were formed April of -- | 11 | | intellectual property. |
| 12 | | April or May -- may have even been filed in | 12 | | MR. GILL: I object to form. |
| 13 | | June of this year. | 13 | A. | No. We haven't presented him with a contract. |
| 14 | Q. | Were there other entities before those | 14 | Q. | What about a written confidentiality |
| 15 | | companies -- | 15 | | agreement? Did you ever... |
| 16 | A. | Just The Mattress Source. | 16 | | MR. GILL: Object to the form. |
| 17 | Q. | How long had The Mattress Source been in | 17 | A. | I would say I don't recall ever presenting him |
| 18 | | existence? | 18 | | with a written confidentiality agreement. |
| 19 | A. | The Mattress Source was opened August or -- | 19 | Q. | When did you first become aware of Trident |
| 20 | | August of last year, I believe, which was just | 20 | | Marketing? |
| 21 | | an investment for me. | 21 | A. | I could not give a clear answer on that. |
| 22 | Q. | When did Mr. Clark become associated with | 22 | Q. | You don't have any idea? |
| 23 | | Mattress Source? | 23 | A. | I do not recall when I first became aware of |

162
164

| | | | | | |
|---|---|---|---|---|---|
| 1 | A. | He became associated by me giving him shares | 1 | | Trident Marketing. |
| 2 | | in the -- or membership interest in the | 2 | Q. | What about Ryan Hamner, when did you first |
| 3 | | company as a reward for some of the things | 3 | | become acquainted with Ryan Hamner? |
| 4 | | that he and I have worked towards as far as | 4 | A. | John Walker introduced us to Ryan Hamner. |
| 5 | | developing. He was working hard; he was | 5 | Q. | Do you recall when? |
| 6 | | putting out the effort for US Beverage. As a | 6 | A. | We were wanting to launch an Internet site to |
| 7 | | gesture, I rewarded him with some shares. | 7 | | do e-commerce, and he had brought Mr. Hamner |
| 8 | Q. | When did that occur? | 8 | | to us as a contractor to develop that Web |
| 9 | A. | That would have been August. | 9 | | site. |
| 10 | Q. | Of last year? | 10 | Q. | Okay. We'll mark this as Defendants' 4 now. |
| 11 | A. | Yeah. | 11 | | Okay. Defendants' 4. And ask you if you can |
| 12 | Q. | August 2005? | 12 | | identify that document for me, if you |
| 13 | A. | 2005, yes, sir. | 13 | | recognize it. |
| 14 | Q. | And it's your testimony that you first became | 14 | | (The referred-to document was |
| 15 | | associated with the mattress business -- or | 15 | | marked for identification as |
| 16 | | the business of selling mattresses roughly | 16 | | Defendants' Exhibit No. 4.) |
| 17 | | August 2005? | 17 | A. | I believe I've seen this document. |
| 18 | A. | I believe that the store opened July 27th | 18 | Q. | Was that a proposal from Ryan Hamner to |
| 19 | | of -- the business became engaged July 27th of | 19 | | provide Web site services for US Beverage? |
| 20 | | '05, and I could be off on the date. | 20 | A. | It appears to be so. |
| 21 | Q. | That's your first involvement with the | 21 | Q. | Did US Beverage ever retain Ryan Hamner to do |
| 22 | | business of selling mattresses or bedding | 22 | | Web site work? |
| 23 | | or -- | 23 | A. | No. Two things were requested by us at this |

| | | |
|---|---|---|
| 1 | | sales and marketing manager. He went off and |
| 2 | | did that, we feel, with our resources and |
| 3 | | created a brand that we feel is intellectual |
| 4 | | property of ours and is an asset of US |
| 5 | | Beverage, though it may be registered |
| 6 | | somewhere else, and then came to us and |
| 7 | | declared that if we did not pay him for the |
| 8 | | use of that brand, he would take our business |
| 9 | | from us and those relationships that he had |
| 10 | | personal contact with and destroy us. So we |
| 11 | | engaged in buying that brand from him. |
| 12 | Q. | And, again, let me ask you -- you know, when |
| 13 | | you said that he said he would -- are you |
| 14 | | saying that's a direct quote from Mr. Walker, |
| 15 | | that he would destroy US Beverage? |
| 16 | A. | I've had several discussions with Mr. Walker |
| 17 | | where he has described either I pay him what |
| 18 | | he asks or he will seek to put us out of |
| 19 | | business. |
| 20 | Q. | On how many occasions has he said that? |
| 21 | A. | I would say more than four to five. |
| 22 | Q. | Has he ever said that in front of anybody |
| 23 | | else? |

174

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Who? |
| 3 | A. | Tom Clark, Buddy Todd. |
| 4 | Q. | Who else? |
| 5 | A. | I couldn't describe the other people that he |
| 6 | | may have said that in front of. He may have |
| 7 | | said that in front of his wife, possibly. I |
| 8 | | don't know. |
| 9 | Q. | Well, being a person that's residing in Texas |
| 10 | | and you said he's not here in Alabama that |
| 11 | | much, how could he destroy your company? |
| 12 | A. | Well, because he has proprietary accounting |
| 13 | | information to assist competitors in bids |
| 14 | | against us. He knows our purchasing price |
| 15 | | because he has our books. He has our customer |
| 16 | | list, which is in our books. And he can |
| 17 | | distribute that information to competitors so |
| 18 | | that they can seek to harm us in a vendetta. |
| 19 | Q. | Well, but you earlier talked about him being |
| 20 | | set up to be the face of US Beverage to your |
| 21 | | customers, but you also testified that he's |
| 22 | | not here; he's in Texas. |
| 23 | A. | That is true. |

| | | |
|---|---|---|
| 1 | Q. | How does he harm you as being the face of US |
| 2 | | Beverage when you -- I think part of your |
| 3 | | allegations is that he's not here? |
| 4 | A. | Correct. |
| 5 | Q. | He's not seeing your customers according to |
| 6 | | you; correct? |
| 7 | A. | To us, it's still amazing how active he could |
| 8 | | get when he saw personal gain only and not the |
| 9 | | gain for the corporation. He became very |
| 10 | | active in trying to hurt the company. But, |
| 11 | | again, to have those books, that proprietary |
| 12 | | knowledge, to have our vendor contacts and our |
| 13 | | vendor pricing to pass to other competitors so |
| 14 | | that they may buy at the same price we had |
| 15 | | already negotiated and worked many years to |
| 16 | | obtain, that's very damaging to us. |
| 17 | Q. | Let's talk about the creation of a brand. |
| 18 | | When do you first recall -- and you and John |
| 19 | | Walker -- talking about US Beverage creating |
| 20 | | its own brand for slush products? |
| 21 | A. | I would say that the discussion probably arose |
| 22 | | the minute that he came onboard with us. |
| 23 | Q. | Who brought up that discussion? |

176

| | | |
|---|---|---|
| 1 | A. | Well, that discussion had been going on |
| 2 | | between Tom Clark and myself for a long time |
| 3 | | about developing a blanketed brand for all of |
| 4 | | our products. This was not a new discussion |
| 5 | | to US Beverage. |
| 6 | Q. | Did John Walker ever approach you and ask |
| 7 | | you -- or ask you and Mr. Clark to invest |
| 8 | | resources toward creating an in-house brand? |
| 9 | A. | We felt he asked us to invest excessive |
| 10 | | resources. |
| 11 | Q. | What did he ask you specifically? Did he ask |
| 12 | | for a particular amount of money toward that? |
| 13 | A. | Again, part of it was in the Ryan Hamner |
| 14 | | discussions, he was bringing friends or |
| 15 | | associates of his, not shopping the best price |
| 16 | | for us, we felt. And all we asked for was, |
| 17 | | please, get us several quotes on these type of |
| 18 | | things. We actually set up a marketing |
| 19 | | company to meet with Mr. Walker to assist him |
| 20 | | in this project, which Mr. Walker just |
| 21 | | wouldn't even engage in the conversations, was |
| 22 | | not eager to engage this other company to help |
| 23 | | us in the development of that brand, which was |

## Page 177

one that we had all gone and met with. We had
agreed to allocate some resources but not
millions of dollars. We just didn't think
that was a necessary function. We just didn't
think that the brand development was going to
cost that much. The value of the brand is
based on the marketing and distribution of the
brand.

Q. Is it your testimony today that John Walker asked the company to invest millions of dollars toward the creation of a brand?

A. No. I said we did not feel that we needed to.

Q. Okay. Well, I'm asking you what your recollection is of what Mr. Walker asked in terms of financial resources from US Beverage to help to create a brand.

A. I would say that the initial discussions were in excess of $5,000.

Q. And you thought a $5,000 investment in a new brand was excessive?

A. I thought that the way that he wanted to allocate the funds could be perceived to be excessive. I thought we could have come up

## Page 178

with several names to start exploring development of, as opposed to paying a Ryan Hamner or someone 5,000 just for a logo.

Q. And is that your testimony, that he proposed to just spend $5,000 paying Ryan Hamner, and that was the only thing he proposed to you in terms of --

MR. GILL: Object to the form.

A. No. That would not be. I've misstated that.

Q. Okay. Well, and I misunderstood you, so you can clarify that.

A. We did not feel that the amount of money was necessarily the issue. We felt that the amount of focus that John Walker wanted to designate to that project was a little -- we still felt he needed to be selling day to day and working on that project in his spare time, not that that became the focus; that those resources were better used day to day making sure that our accounts were taken care of; that the cash flow of the business was secure so that we could pay our bills and continue to grow and then develop a brand through that.

## Page 179

Q. Okay. Just to make sure I understand, I guess at some point there was a decision made that US Beverage, first, doesn't want to spend the money that Mr. Walker had proposed, or however he had budgeted the money; and, secondly, that the other members of the company wanted Mr. Walker to spend his time on developing customers rather than developing a new brand; is that --

MR. GILL: Object to the form.

A. No, that's not accurate.

Q. Okay. Well --

A. We feel that the majority of his time should have been spent on the day-to-day business that US Beverage was engaged in. But that the marketing is a very essential part of what we do. We are nothing more than a marketing company. That is what we do. We take a product; we go to the streets and we market and we sell; and then we distribute. It's all a function of marketing. We felt that a brand was important to us, but at the time when you cannot pay your bills, the most important

## Page 180

thing -- not to lessen the importance of a brand -- but the most important thing was to continue the path that we had all signed off on and to develop the brand as an addition to the marketing plan, not that the sole function of John Walker came to be a brand-development manager. That was not the direction we wanted to go.

Q. When did you first hear the name Juice Alive?

A. I would say the first recollection I have of Juice Alive as a name would have been at the time -- I could not give you a definite date on that.

Q. Did you come up with the name Juice Alive?

A. No.

Q. What about Mr. Clark; do you think he -- are you contending he came up with the name Juice Alive?

A. I do not think he did.

Q. Well, do you think the first time you heard about the name Juice Alive would have been from John Walker?

A. Yes, I believe that.

## Page 185

1  Q.  Are you aware of a Web site being created for
2      that purpose?
3  A.  Yes, I am.
4  Q.  Are you aware of US Beverage obtaining
5      referrals from that Web site for customers
6      within this designated area that US Beverage
7      was to sell the Juice Alive brand day care
8      juice?
9  A.  Yes, I am.
10 Q.  I'm going to ask you to look at some materials
11     here, and I'm going to mark these Defendants'
12     6 and 7 -- and, actually, 7 is a
13     black-and-white reproduction of the first page
14     of 6, but -- and I've done that because the
15     originals are in color, and they're hard to
16     reproduce so -- and they're hard to read, too,
17     so...
18         (The referred-to document was
19          marked for identification as
20          Defendants' Exhibit No. 6.)
21         (The referred-to document was
22          marked for identification as
23          Defendants' Exhibit No. 7.)

## Page 186

        MR. JACKSON:  We'll go another five
                  or ten minutes, and we'll
                  stop.
4  A.  Those are two different --
5  Q.  Yeah -- well, the -- like I said before,
6      Defendants' 7 is a black-and-white
7      reproduction of the first page of 6.
8  A.  Okay.
9  Q.  And it's just a different reproduction
10     because this is quite -- the color one is
11     quite hard to read, and we had another version
12     that was in black and white.  Can you identify
13     those documents -- the first -- the first
14     page, can you identify that?
15 A.  Yeah.
16 Q.  What was that?
17 A.  It is a -- appears to be a label for product.
18 Q.  Would it have been a label for the day care
19     product, day care juice product we talked
20     about?
21 A.  It could possibly be a label for that, yes.
22 Q.  Have you seen this label before?
23 A.  I've seen similar labels for sure.

## Page 187

1  Q.  Do you know who created the label or who
2      designed it?
3  A.  I would assume that Ryan Hamner had actually
4      done the design work.
5  Q.  And is that based on your conversations with
6      Mr. Walker?
7  A.  Correct.
8  Q.  Did you ever talk to Mr. Hamner about the
9      Juice Alive arrangement we've been talking
10     about?
11 A.  No.  I never had any discussions with
12     Mr. Hamner about it.  I expected the
13     vice-president of sales and marketing to
14     handle his responsibility for the company on
15     behalf of the company, is what I had done.
16 Q.  Okay.  Just a second.  Let me look at
17     Defendants' 7 and see if I can keep my copies.
18     Did Ryan Hamner ever meet with you and Tom in
19     Montgomery at the US Beverage offices?
20 A.  Yes.  With John Walker present.
21 Q.  During those meetings, did you discuss Juice
22     Alive?
23 A.  Juice Alive specifically, no.  What I was

## Page 188

1      involved in discussion that I was a
2      participant to was the discussion where I had
3      said, John, can we not please get Mr. Hamner
4      to give us some sort of prototype of what he's
5      talking about on this Web site development.
6      And Mr. Walker just kept informing me, we need
7      to pay him up front, and I just didn't think
8      that was prudent for the company.
9  Q.  Well, let's look at Defendants' 7, which is a
10     black-and-white reproduction of the label you
11     have there in color.  Read the last two lines
12     of that.
13         MR. GILL:  Can I have one?
14         MR. JACKSON:  Oh, I'm sorry.
15 A.  I'll be honest with you, I can barely make it
16     out.  It looks like juicealive.com.
17 Q.  Do you see the next line?  Does it say MFG?
18 A.  Uh-huh.
19 Q.  Next word "for"?
20 A.  Yeah.
21 Q.  Juice Alive, comma?
22 A.  Yes, sir.
23 Q.  Columbus, Georgia?

| | | |
|---|---|---|
| 1 | | intention -- at least the documents produced |
| 2 | | by -- or created by US Beverage or you, the |
| 3 | | intention of which was to create an exclusive |
| 4 | | distributorship everywhere? |
| 5 | A. | That was our intention, was to be the sole |
| 6 | | distributor for that product. We felt it was |
| 7 | | our product brand. |
| 8 | Q. | In the entire US? |
| 9 | A. | In the entire US that we could set up |
| 10 | | sub-distributors through us and things like |
| 11 | | that for other means of distribution, but that |
| 12 | | it would all flow through US Beverage. The |
| 13 | | references were to direct distribution, that |
| 14 | | we would handle directly, not as a support |
| 15 | | agent coming through us. We never intended to |
| 16 | | give our company away. That was not the |
| 17 | | intention of our documents. |
| 18 | Q. | I guess as we said before, the documents will |
| 19 | | speak for themselves. But let's go to the |
| 20 | | next document, then. Mark this Defendants' |
| 21 | | Exhibit No. 16 and ask you if you can identify |
| 22 | | it. Have you seen this document before? |
| 23 | | (The referred-to document was |

| | | |
|---|---|---|
| 1 | | marked for identification as |
| 2 | | Defendants' Exhibit No. 16.) |
| 3 | A. | Yes, I have. |
| 4 | Q. | Can you identify it for the record? |
| 5 | A. | It is a correspondence between Gary Dukes and |
| 6 | | Tom Clark. |
| 7 | Q. | Does that appear to be Tom Clark's signature |
| 8 | | at the bottom? |
| 9 | A. | Yes, it does. |
| 10 | Q. | Do you have any reason to believe that this |
| 11 | | did not come from Tom Clark? |
| 12 | A. | No, I do not. |
| 13 | Q. | If you'll read the first line -- just read the |
| 14 | | first sentence of the -- underneath "Gary." |
| 15 | | Read it aloud for the record. |
| 16 | A. | You need me to read it out loud? |
| 17 | Q. | Yes, sir. |
| 18 | A. | Okay. (As read:) We have reached an agreement |
| 19 | | with Juice Alive to start distribution of the |
| 20 | | Juice Alive brand in our 100 percent juice |
| 21 | | products. |
| 22 | Q. | Just keep reading. Read the second sentence, |
| 23 | | too. |

| | | |
|---|---|---|
| 1 | A. | (As read:) Please let this signed fax serve as |
| 2 | | official authorization for you to begin |
| 3 | | selling to US Beverage, Inc., the Juice Alive |
| 4 | | product with $1.20 increase per case to be |
| 5 | | paid to Juice Alive. |
| 6 | Q. | Okay. And this document is US Beverage |
| 7 | | agreeing to pay Juice Alive for the right to |
| 8 | | distribute the Juice Alive product? |
| 9 | A. | This document is authorizing that, under |
| 10 | | duress, US Beverage, for fear of losing |
| 11 | | accounts based on proprietary information, we |
| 12 | | were willing to engage in a contract that we |
| 13 | | were being coerced into to protect the |
| 14 | | business at hand, which was the distribution |
| 15 | | of 100 percent juice products through the |
| 16 | | vehicle US Beverage. |
| 17 | Q. | Let me ask you, you mentioned the word of |
| 18 | | "duress." There's different forms of duress. |
| 19 | | And your attorney can -- I'm sure has told you |
| 20 | | that. Are we talking about physical duress? |
| 21 | A. | I'm talking physical, emotional, financial. |
| 22 | Q. | Well, I'm just asking about physical. What |
| 23 | | sort of physical duress were you or Tom Clark |

| | | |
|---|---|---|
| 1 | | under when you signed this document? |
| 2 | A. | The financial pressures revolving around which |
| 3 | | causes -- |
| 4 | Q. | And let's -- |
| 5 | A. | That's physical duress to me. I can't sleep; |
| 6 | | I can't eat; I'm sick all the time. I have |
| 7 | | physical duress over the financial stability |
| 8 | | of my company. |
| 9 | Q. | Okay. At any point did Mr. Walker threaten |
| 10 | | violence against you or your person if you |
| 11 | | didn't sign this agreement? |
| 12 | A. | On several occasions Mr. Walker has threatened |
| 13 | | violence by threatening that he was an ex-navy |
| 14 | | SEAL, and he could kill us at will. Not this |
| 15 | | document, but we have been threatened on many |
| 16 | | occasions. |
| 17 | Q. | Okay. Now, let me make sure I understand. |
| 18 | | Are you testifying today that Mr. Clark signed |
| 19 | | this document on behalf of US Beverage because |
| 20 | | he had been threatened physically? |
| 21 | | MR. GILL: Object to the form. |
| 22 | A. | I believe that any human who has been |
| 23 | | threatened with physical violence will always |

## Page 241

1      learning of or are alleging?
2 A. Well, and again, that was when I was aware
3      that -- I thought he was looking to create a
4      competitive situation. You know, again,
5      unfortunately, as I think I became aware of
6      these things, as we started discovering them,
7      looking into them, we felt already that our
8      business was in jeopardy with the knowledge
9      that John Walker possessed, so I cannot give
10      you an exact incident, again, that would be
11      next in the time line.
12 Q. Okay. Well, why don't we just kind of, if you
13      can, any -- just state for the record any
14      instances of competition that you allege
15      Mr. Walker has engaged in?
16 A. Well, we -- we allege that -- or I personally
17      would allege that any time that he would hold
18      a personal guarantee after we had voted to
19      seek financing or funding, that he used that
20      to restrain the corporation. The fact that he
21      was not out selling on our behalf actively, I
22      saw as a restraint of our trade. The fact
23      that he would come to us with accounts and

## Page 242

1      say, if you don't do the Juice Alive, I'm not
2      going to give you -- you know, I'm not going
3      to turn in these customer profiles; I'm not
4      going to let you know where I've been calling
5      on; the fact that we were alerted to the
6      schools that he was doing business with in
7      North Carolina.
8 Q. When were you alerted of that?
9 A. Again, I do not have a -- I would have to sit
10      down and try to create a time line.
11 Q. Was it before or after you cut off
12      Mr. Walker's salary?
13 A. It was prior. It was a -- maybe even a year
14      prior. And, again, let me state for the
15      record, we did not just cut off Mr. Walker's
16      salary. We all agreed to take no pay until
17      the company became financially able to
18      maintain that again. Mr. Walker chose not to
19      work.
20 Q. Didn't you tell Mr. Walker that -- that you
21      weren't going to pay him unless he entered
22      into a buyout agreement with the company?
23      MR. GILL: Object to the form.

## Page 243

1      MR. JACKSON: Just asking the
2      question.
3 A. No.
4      MR. GILL: Well, that's not what he
5      said.
6      MR. JACKSON: I'm not saying that's
7      what he said. I'm just
8      asking --
9 A. No, that is not what I --
10      MR. JACKSON: That's what my client
11      said.
12 A. And I'm saying, no, I did not.
13      MR. GILL: No. But you were
14      representing it as his prior
15      testimony.
16      MR. JACKSON: No. I'm representing
17      it as a statement he made.
18      Not here today.
19      MR. GILL: All right. That's fine.
20      But I just don't want you to
21      represent it as testimony that
22      was made earlier today if he
23      hasn't made it.

## Page 244

1 Q. Okay. Any other instances of competition
2      other than what we've talked about?
3 A. We did -- we were alerted to -- I think
4      Mr. Walker described or you had described to
5      me via Mr. Walker's testimony yesterday, that
6      he had handed over some Web site leads. One
7      of the things I think we found was that he and
8      Ryan Hamner, under Trident Marketing, were
9      trying to sell to these people or were
10      selling, and we actually found that out and
11      said, you need to turn those over to us; those
12      are rightfully ours.
13 Q. Okay. Anything else?
14      MR. GILL: What are you talking
15      about? Are you talking
16      globally?
17      MR. JACKSON: I'm talking about
18      you're suing my client for
19      competing with the company.
20      I'm just asking him to list
21      any instances of competition
22      with US Beverage.
23 A. Oh, you want me to go through the whole -- the

| | | | | |
|---|---|---|---|---|
| 1 | Q. | Response, yes. | 1 | no longer hurt us. And, again, I think we |
| 2 | A. | And, again, I'll have to confer with my | 2 | acted very judiciously by making sure that we |
| 3 | | attorney to see if some of that is | 3 | had our facts in order; we tried to move in a |
| 4 | | client-counsel privilege. | 4 | judicious manner and not just let our emotions |
| 5 | Q. | And, again, I'm not asking you to tell me | 5 | overrun us; and we took a long methodical |
| 6 | | anything you told your attorney or your | 6 | strategy to put US Beverage first, maintain |
| 7 | | attorney told you. | 7 | the growth and the financial stability of the |
| 8 | | MR. GILL: I mean, are you just only | 8 | company so that we could endure what we |
| 9 | | asking him what -- | 9 | perceived to be an aggressive act by a |
| 10 | | MR. JACKSON: How did they respond? | 10 | corporate officer and shareholder and former |
| 11 | | What's the response? He | 11 | partner -- or current partner that had |
| 12 | | mentioned there was instances | 12 | proprietary knowledge of what we did on a |
| 13 | | of competition there at least | 13 | day-to-day basis and also utilized the |
| 14 | | going back to 2004, and I'm | 14 | contacts and relationships and price points |
| 15 | | just asking how the company | 15 | that we had negotiated on behalf of US |
| 16 | | responded. | 16 | Beverage to harm us. |
| 17 | A. | I'm not asking you to tell me anything your | 17 | Q. This emergency shareholder meeting you |
| 18 | | attorney said or you said to your attorney. | 18 | mentioned, is that the one that occurred in |
| 19 | | MR. GILL: I mean, that's a pretty | 19 | May of 2006? |
| 20 | | vague question in terms of -- | 20 | A. If that was the -- if that was the day of the |
| 21 | | I mean, are you talking two | 21 | one conducted at Charles Edmondson's office. |
| 22 | | years, how the company | 22 | Q. The one -- was the result of a line of letters |
| 23 | | responded? | 23 | sent by Mr. Edmondson to John Walker? |

| | | | | |
|---|---|---|---|---|
| 1 | | MR. JACKSON: Yes. Yes, I am. | 1 | A. Correct. |
| 2 | | MR. GILL: I mean, today we've got a | 2 | Q. When you found out that Mr. Walker was selling |
| 3 | | lawsuit here. I mean -- | 3 | juice products in North Carolina schools in |
| 4 | | MR. JACKSON: Well, again, today -- | 4 | 2004, did you ask him to stop? |
| 5 | | it was filed in June 2006. | 5 | A. We asked him to turn the accounts over to US |
| 6 | | But we've got instances of | 6 | Beverage. We felt that they were done on |
| 7 | | alleged competition that go | 7 | behalf of US Beverage and that they should be |
| 8 | | back to 2004. I'm asking how | 8 | part of US Beverage's business. |
| 9 | | the company responded. The | 9 | Q. When did you ask him to turn them over? |
| 10 | | timeliness of the response is | 10 | A. I would say within two days of being notified, |
| 11 | | as important as this lawsuit. | 11 | I contacted John Walker and asked him if that |
| 12 | A. | Well, again, we sought to find amicable | 12 | had really happened, and he said, yeah. And I |
| 13 | | resolution and were stone -- we feel | 13 | said, why did you do that? And he said, |
| 14 | | stonewalled at every turn. No matter what we | 14 | because I have to protect myself against you |
| 15 | | tried to put out there to get an amicable | 15 | and Tom. And I said, John, at this point, I |
| 16 | | solution, the ante was upped every time | 16 | feel it's your fiduciary responsibility; you |
| 17 | | excessive -- excessive requests on the part of | 17 | were charged with development of that state |
| 18 | | Mr. Walker, well above and beyond any | 18 | and the growth of this company; that is |
| 19 | | valuations. We also got our strategies in | 19 | business that is directly in competition with |
| 20 | | place to be a formidable competitor. We did | 20 | us, and it's deserved to US Beverage. |
| 21 | | put Mr. Walker on notice. We did have an | 21 | Q. So it's your testimony that John refused to |
| 22 | | emergency shareholders meeting to relieve him | 22 | turn the accounts over? |
| 23 | | of some corporate privileges so that he could | 23 | A. Absolutely. |

257

1  Q. As of April 20, 2006, were you aware that
2     Tiffany Walker was pregnant at that time?
3  A. Yes, I was.
   Q. Did you authorize Mr. Edmondson to send this
      letter?
6  A. Yes, I did.
7  Q. Did it not concern you to terminate health
8     benefits for someone who's pregnant?
9         MR. GILL: Object to form.
10 A. It concerned me that US Beverage, which my
11    responsibility as a corporate officer to
12    protect, was under attack, and, yes, it does
13    concern me that she's a human and may have
14    health rights.
15 Q. Let's move on. And just to finish up what we
16    had asked a few minutes ago, after Mr. Walker
17    told you that, no, he was not going to turn
18    the accounts in North Carolina, the schools,
19    over to you -- and I've asked you before, but
20    is it your testimony today that you didn't
21    take any legal action -- and, again, I'm not
22    talking about talking to your attorney; I'm
23    talking about some sort of legal action toward

258

1     Mr. Walker -- until 2006?
2         MR. GILL: Object to the form. I
3         mean, I think that the legal
4         action speaks for itself.
5         But go ahead and answer
6         it.
7  A. I'm not sure -- when you say "took legal
8     action" --
9  Q. Well, I'm talking about -- and let me define
10    that. In terms of legal action, I'm talking
11    about any sort of action directed toward
12    Mr. Walker legally, whether it's a
13    cease-and-desist letter; a lawsuit filed in
14    any state; there's an attempt to get a court
15    order, any type of action legally toward
16    Mr. Walker. And, again, I'm not talking about
17    talking to your attorney. I don't care what
18    you and your attorney said to each other.
19        MR. GILL: Object to the form.
20 A. Well, again, we sought advice of counsel as to
21    how to proceed and formulated a strategy to
22    act on so that we would be judicious and that
23    we would try to protect the company in every

259

1     means possible in that strategy.
2  Q. In 2004 did you send a cease-and-desist letter
3     to Mr. Walker telling him to stop doing
4     business in North Carolina?
5  A. I do not believe I did.
6  Q. In 2005 did you send a cease-and-desist letter
7     or have anyone else send a cease-and-desist
8     letter to Mr. Walker asking him to stop doing
9     business in the state of North Carolina?
10 A. I do not believe we did.
11 Q. Okay. What about in 2006? Prior to the
12    filing of this lawsuit, do you recall a
13    cease-and-desist letter, any cease-and-desist
14    letter being sent by any attorney or by you or
15    anyone else on behalf of US Beverage?
16 A. I do not recall.
17 Q. Okay. What about prior to this lawsuit? Was
18    there any other litigation filed anywhere, you
19    know, whether it's by this attorney or
20    Mr. Edmondson or anyone else, involving John
21    Walker and US Beverage?
22        MR. GILL: Is the question, had he
23        filed a prior lawsuit?

260

1  Q. Yeah. Or US Beverage. Had US Beverage filed
2     a prior lawsuit or any action, request for
3     injunction, anything -- any legal filing in
4     any state anywhere with any attorney?
5  A. No.
6  Q. Move on. Let me ask you a little bit about
7     Cool Tropics. When you were selling Cool
8     Tropics' products, did you pay a case
9     up-charge to the owner of the Cool Tropics
10    brand?
11 A. We paid a fee to use the Cool Tropics.
12 Q. Brand? Yes?
13 A. Yes. To use that label.
14 Q. Okay. And was that in addition to the cost of
15    the actual product itself?
16 A. Correct.
17 Q. Do you recall what that case up-charge or what
18    the charge would have been to use the Cool
19    Tropics label?
20 A. No. When we bought Tropical Perfections,
21    there was a case price of -- if I'm not
22    mistaken, it was around 32 or $34 a case.
23    After we acquired Tropical Perfections, we

333

| | | |
|---|---|---|
| 1 | | been paid to BLR? |
| 2 | A. | I would say Tom Clark would know. |
| 3 | Q. | Okay. Why did your company decide to create the Fruzers brand? |
| | A. | We felt that with the Juice Alive situation, that there was market confusion, and we felt that the behavior of an officer and employee of ours in misrepresenting that brand was causing damages. |
| 10 | Q. | Well, has the Fruzers brand been successful? |
| 11 | A. | We feel it's been very successful. |
| 12 | Q. | Are you happy with the Fruzers brand? |
| 13 | A. | We're happy with the distribution and sale of the products that we sell. |
| 15 | Q. | Do you plan to continue using Fruzers as the brand. |
| 17 | A. | I would say at this point that is our marketing strategy. |
| 19 | Q. | If you were to be successful in this case and be awarded Juice Alive, do you plan to stop using Fruzers and start using the Juice Alive name? |
| 23 | | MR. GILL: Object to form. |

334

| | | |
|---|---|---|
| 1 | A. | I would have to -- again, that would be a meeting that our team as a marketing team and sales-driven team would have to meet on at that time and juncture. If it's 20 years from now, if it's two days from now -- there would be too many variables for me to even speculate. |
| 8 | Q. | Do you think Juice Alive is a better brand name than Fruzers? |
| 10 | | MR. GILL: Object to the form. |
| 11 | A. | I feel that we have put an intense amount of effort into whatever it is that we represent. |
| 13 | Q. | I'm just asking your opinion. |
| 14 | A. | In my opinion do I think -- |
| 15 | Q. | You've been in this business a long time. In your opinion, what's a better brand name for a juice product, Fruzers or Juice Alive? |
| 18 | A. | I think it's subjective. I could say that I prefer some of the -- the marketing appeal that Fruzers brings. |
| 21 | Q. | Let me show you another document I'm going to mark as Defendants' 28 and ask if you can identify that document for me. |

335

| | | |
|---|---|---|
| 1 | | (The referred-to document was marked for identification as Defendants' Exhibit No. 28.) |
| 4 | A. | Okay. |
| 5 | Q. | Okay. Would you characterize this as a cease-and-desist letter? |
| 7 | A. | Not being an attorney, I wouldn't know how to characterize it, to be honest. |
| 9 | Q. | Let's look at the fourth paragraph of that letter and ask you to read that sentence starting with the word "accordingly." |
| 12 | A. | Okay. |
| 13 | Q. | Read it aloud, please, for the record. |
| 14 | A. | (As read:) Accordingly, US Beverage asks that Trident Marketing and John Walker cease and desist from using the brand name Juice Alive, as it is property of US Beverage. |
| 18 | Q. | And having read that sentence, would you consider this to be a cease-and-desist letter that was sent by attorneys for US Beverage to John Walker and his company, Trident Marketing? |
| 23 | A. | Yes. |

336

| | | |
|---|---|---|
| 1 | Q. | And, again, did you ask -- did your attorneys ask on behalf of US Beverage that Trident Marketing and John Walker cease using the name Juice Alive? |
| 5 | A. | Yes. |
| 6 | Q. | Did they have direction -- did your attorneys have direction and authority from your company to issue this cease-and-desist letter? |
| 9 | A. | Yes. |
| 10 | Q. | Is this the first cease-and-desist letter that would have been issued on behalf of US Beverage to John Walker or Trident Marketing? |
| 13 | A. | I would have to say yes. |
| 14 | Q. | And what's the date of this letter? |
| 15 | A. | June 19, 2006. |
| 16 | Q. | Okay. Thank you. |
| 17 | | MR. GILL: I would guess you're going to produce this now, and I don't have to produce it? |
| 20 | | MR. JACKSON: I'm sorry. |
| 21 | | MR. GILL: Since you marked this with your Bates number. I mean, this is what I gave you |