```
 1              IN THE MATTER OF:

 2         US BEVERAGE, INC., Plaintiff,

 3                    vs.

 4           JOHN BUSTER WALKER, II,

 5    and TRIDENT MARKETING, INC., Defendants.

 6    ----------------------------------------------

 7           JOHN BUSTER WALKER, II,

 8         and TRIDENT MARKETING, INC.,

 9            Counterclaim Plaintiffs,

10                    vs.

11             US BEVERAGE, INC.,

12            Counterclaim Defendant,

13                    and

14           GRADY DOWLING KITTRELL,

15           THOMAS GOIN CLARK, III,

16         and NORMAN "BUDDY" TODD,

17            Third Party Defendants.

18

19              CIVIL ACTION NO.

20               2:06-CV-496-SRW

21

22    DEPONENT:  THOMAS GOIN CLARK, III

23    DATE:  November 16, 2006
```

WORDCRAFT REPORTING, LLC
334.462.4665

```
                                                                    3
 1        IN THE UNITED STATES DISTRICT COURT       1              STIPULATIONS
          FOR THE MIDDLE DISTRICT OF ALABAMA        2      It is stipulated and agreed by and
 2                  NORTHERN DIVISION               3  between counsel representing the parties that
 3     US BEVERAGE, INC.,                           4  the deposition of THOMAS GOIN CLARK, III, may
          Plaintiff,                                5  be taken before Tiffany B. Beasley, Certified
 4     vs.                                          6  Court Reporter and Notary Public in and for
       JOHN BUSTER WALKER,                          7  the State of Alabama at Large, without the
 5     II, and TRIDENT         CIVIL ACTION NO.     8  formality of a commission; and all formality
       MARKETING, INC.,                             9  with respect to other procedural requirements
 6        Defendants.          2:06-CV-496-SRW     10  is waived; that objections to questions, other
       -----------------------                     11  than objections as to the form of the
 7     JOHN BUSTER WALKER,                         12  questions, need not be made at this time, but
       II, and TRIDENT                             13  may be reserved for a ruling at such time as
 8     MARKETING, INC.,                            14  the deposition may be offered in evidence or
          Counterclaim                             15  used for any other purpose by either party as
 9        Plaintiffs,                              16  provided by the Federal Rules of Civil
       vs.                                         17  Procedure.
10     US BEVERAGE, INC.,                          18      It is further stipulated and agreed by
          Counterclaim                             19  and between the parties hereto and the
11        Defendant,                               20  witness, that the signature of the witness to
       and                                         21  this deposition is hereby waived.
12     GRADY DOWLING                               22
       KITTRELL, THOMAS GOIN                       23
13     CLARK, III, and
       NORMAN "BUDDY" TODD,
14        Third Party
          Defendants.

16            * * * * * *
           DEPOSITION OF THOMAS GOIN CLARK, III,
17     taken pursuant to notice and stipulation on
       behalf of the Defendants/Counterclaim
18     Plaintiffs, in the Law Offices of Copeland,
       Franco, Screws & Gill, 444 South Perry Street,
19     Montgomery, Alabama, before Tiffany B.
       Beasley, Certified Court Reporter and Notary
20     Public in and for the State of Alabama at
       Large, on November 16, 2006, commencing at
21     8:57 a.m.
22
23
                                              2                                                  4
 1             APPEARANCES                          1                   INDEX
 2                                                  2
 3  FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT/THIRD  3  EXAMINATION                         Page
 4  PARTY DEFENDANTS:                               4  MR. JACKSON..........................   5
                                                    5
 5     C. NELSON GILL, ESQUIRE                      6  DEFENDANTS' EXHIBITS                Page
 6     Copeland, Franco, Screws & Gill              7
 7     444 South Perry Street                          1    Composite Exhibit               175
 8     Montgomery, Alabama 36104                    8
 9                                                  9
10  FOR THE DEFENDANTS/COUNTERCLAIM PLAINTIFFS:       (The following exhibits were
11     RAYMOND L. JACKSON, JR., ESQUIRE            10  previously marked in this case and
12     660 North College Street                        referred to at the following pages:)
13     Suite D                                     11
14     Auburn, Alabama 36830                       12  4................................   134
15                                                     5................................   132
16  ALSO PRESENT:                                  13  16...............................    92
17     GRADY DOWLING KITTRELL                          18...............................   143
18     JOHN BUSTER WALKER, II                      14  19...............................   148
                                                       20...............................   152
                                                   15  21...............................   160
                                                       22...............................   167
                                                   16  23...............................   169
                                                       24...............................   172
21                                                 17  25...............................   173
22                                                 18
23                                                 19
                                                   20
                                                   21
                                                   22
                                                   23
```

```
                                                    77
 1  A.  I don't recall.
 2  Q.  What do you recall about the proposal to sell
 3      Juice Alive to day care centers?
    A.  I recall that -- there being some arrangement
        where John and Ryan Hamner would create a
 6      market for our day care product on the
 7      Internet.
 8  Q.  And what was the day care product?  Just
 9      describe it.
10  A.  It was a hundred percent seven-plus-one juice.
11      Hundred percent juice.  Mixed ratio was
12      seven-plus-one.
13  Q.  And this juice, would this be a frozen slush
14      or just a --
15  A.  It's the -- it's the same juice as the frozen
16      slush, but it was just juice for -- sold in a
17      juice -- I mean, sold the exact same way,
18      packed the exact -- the exact same -- or
19      similar way.  Just not frozen.  The end user
20      didn't freeze it.
21  Q.  Who brought up this proposal to sell the day
22      care juice under the Juice Alive name?
23  A.  I believe John and Ryan.

                                                    78
 1  Q.  Do you recall if there was any direct mail
 2      advertisements sent out to day care centers?
 3  A.  Yes, I do recall that there was, and it was a
 4      huge fiasco.
 5  Q.  How was it a huge fiasco?
 6  A.  Well, we didn't really have the money to do
 7      it, and our return on the investment was --
 8      was way, way, way lower than expectation.
 9  Q.  When you said you didn't have the -- the
10      company didn't have the money to do it, how
11      much money did US Beverage invest in this day
12      care project?
13  A.  I don't recall.  I just know that we didn't
14      have the money to do it.  It was a financial
15      strain to the business to do it, and it
16      really -- it was just another bad investment.
17  Q.  At that point in time, did US Beverage have
18      the financial wherewithal to start its own
19      brand?
20          MR. GILL:  Object to the form.
21  A.  Yes.
22  Q.  How so?
23  A.  Well, because you can start a brand with no

                                                    79
 1      money.  In Montgomery, Alabama, our largest
 2      competitor in the school business, his
 3      brand -- his name is Bill Givens, and -- well,
 4      he was required to come up with a brand.  He
 5      came up with Givens Juice, and he spent no
 6      money on it.  And up until recently, had the
 7      day care business with his brand, which he
 8      paid no money to call it Givens Juice.
 9  Q.  Can you develop and market a brand without any
10      money?
11  A.  Without cash?
12  Q.  Yes.
13  A.  Yes.
14  Q.  Do you recall what US Beverage would have
15      spent money on as regards this day care juice
16      business?
17  A.  What we would have spent money on in regards
18      to what exactly?
19  Q.  I mean, you said before it was a bad
20      investment; you didn't have the money to do
21      it.  I'm asking you what specifically US
22      Beverage would have spent money -- money on as
23      part of this day care juice venture.

                                                    80
 1  A.  I believe that we spent money on the -- but I
 2      can't say for sure, but I believe we spent
 3      money on the production -- of the printing of
 4      the flyer, or the mailer itself.  I believe we
 5      spent -- we paid for the postage, and I
 6      believe that we paid for a company to mail it
 7      for us, if I'm not mistaken.
 8  Q.  Anything else?
 9  A.  No.  But what I do recall is that we paid no
10      money for the Juice Alive name because we
11      believed it was ours.
12  Q.  Well, I didn't ask you that.
13  A.  Well, I'm trying to relate the out-of-pocket
14      expenses to do this and --
15  Q.  Okay.  Well -- okay.  Any other expenses that
16      you would have spent money on other than what
17      we've just discussed?
18  A.  Well, I think we -- we would -- I believe we
19      paid for some shipping costs of different
20      things.
21  Q.  Would that not have been reimbursed by the
22      purchasers of the juice?
23  A.  No.
```

81

1 Q. So I guess when you say "shipping costs,"
2 you're talking about, I guess, shipping the
3 product to US Beverage?
4 A. I believe we paid for the shipping of anything
5 involved in that, if I'm not mistaken.
6 Q. Okay. Well, you've already touched on it.
7 Why don't you describe for us in as much
8 detail as you can why you claim that US
9 Beverage owns the name Juice Alive?
10 A. The Juice Alive name was developed -- although
11 I don't recall the date that it was developed,
12 I do recall that it was a date when our
13 vice-president of sales, who was initially
14 given -- or given on the front end,
15 responsibility of marketing and developing our
16 sales program, and while John -- while
17 Mr. Walker was on our payroll, that that brand
18 was developed. I think I just -- mumbo jumbo
19 sentence. But -- and that it was -- and that
20 it's John's responsibility as the
21 vice-president of sales -- his job was to
22 develop our -- and market our products. And
23 at the time that he was developing Juice

82

1 Alive, he was being paid full salary; he was
2 using our time, our phone, our contacts, US
3 Beverage contacts; he was using our gas card;
4 he was using US Beverage's knowledge of the
5 industry to develop these things, and he was
6 paid to develop those things; and that the --
7 certainly, the principal area of -- the areas
8 of distribution encompassed those areas that
9 we distributed -- that we distributed as a --
10 that US Beverage distributes as a company.
11 Q. Anything else? I want to make sure that
12 there's anything else that you claim shows
13 ownership of the trademark.
14 A. For US Beverage?
15 Q. Yes.
16 A. I believe that we told John when he
17 presented -- when it was presented to each of
18 us, that we told John that we didn't -- that
19 he didn't have the authority to do this
20 outside the parameters; he didn't have the
21 authority to compete against us; he didn't
22 have the authority to develop something using
23 US Beverage for his own personal use, and

83

1 certainly not to compete against us. And this
2 was said to John by me the minute I heard that
3 there was another brand, or that he had
4 developed that brand and was planning on using
5 it against us. And in my conversations with
6 Grady, Grady said the same thing. So John was
7 notified on the -- on the front end by both of
8 us, and we were adamant about it in every
9 conversation, that the brand was ours. When
10 we started using the brand, we didn't pay for
11 it. It wasn't until later on, when we agreed
12 to pay for it as part of a buyout plan, that
13 we would give John the brand and pay for it,
14 that we ever started paying for it, and the
15 whole thing got out of control and, you know,
16 became a weapon. Our own tool became a weapon
17 to be used against us.
18 Q. Okay. Like I said, I want to give you a
19 chance. If there's anything else, I want to
20 get it fully on the record, any facts or
21 evidence that you're aware of that supports
22 your allegation that US Beverage owns Juice
23 Alive.

84

1     MR. GILL: Object to the form.
2 A. Those are the things that I can think of right
3 now. But I would not want to be held that
4 this is the complete sum of everything that I
5 think, or we'd be here past 1 o'clock. Just
6 want to -- but that's a summary of things.
7 Q. Okay. Well, if there's any other facts or --
8 that you're aware of --
9 A. I'd have to --
10 Q. We can stay here as long as we need to. We
11 can reconvene the deposition if we have to.
12 A. I didn't bring my notes with me. If there's
13 anything pertinent, I'll submit it. I
14 apologize for that.
15 Q. Well, that's fine. I will ask you, if there
16 is anything that is pertinent that you haven't
17 told us today, when you review your notes
18 later, or whatever, if you'll provide that to
19 your attorney.
20 A. And I would.
21 Q. What money did US Beverage spend in creating
22 the Juice Alive name?
23 A. Well, we were paying -- we were paying John a

```
 1    salary that -- I believe at the time,
 2    salary plus -- and I don't remember if it was
 3    salary or salary plus commissions, but
 4    certainly had the potential of somewhere
 5    between a hundred and -- a hundred thousand
 6    plus to develop this brand.  We paid his
 7    travel expenses to develop this brand; we paid
 8    for his cell phone to develop this brand; we
 9    paid for his life insurance to develop this
10    brand; we paid for his health insurance to
11    develop this brand; we paid for the
12    advertising marketing scheme to help develop
13    this brand.  You know, this mailer thing
14    that -- you know, that did not work out --
15    that did not work for us.  And so those were
16    the monies paid and -- for the development of
17    this brand.
18  Q.  Before John Walker became associated with US
19      Beverage, wasn't he already in the juice
20      industry?
21  A.  Yeah.
22  Q.  What was he doing at the time he became
23      associated with US Beverage?  What was
 1    Mr. Walker doing?  What was he doing for a
 2    living at the time he became -- merged into
 3    and became a shareholder of US Beverage?
 4  A.  Well, the only thing that I know he was doing
 5    is he was the president of -- I believe he was
 6    the president of Tropical Perfections.
 7  Q.  And what did Tropical Perfections sell?
 8  A.  They sold juice and some powders, some
 9    equipment and parts, and service, and things
10    like that.
11  Q.  Prior to the acquisition of Tropical
12      Perfections, why don't you describe the lines
13      of business that US Beverage was in?
14  A.  We were involved in just -- we were involved
15    in just about every facet of the beverage
16    industry.  If you could dispense it, we were
17    doing it.  We distributed juice to day cares,
18    restaurants, bars, hotels, military bases,
19    country clubs, concession stands, water parks,
20    convention facilities, schools, military -- I
21    may have said it -- military bases.  Any
22    venues that -- that could use products like
23    ours, we distributed -- we attempted to
 1    distribute to.  And, in fact, distributed to
 2    each of those.
 3  Q.  Is there any particular block of business that
 4      you wanted to acquire when you bought Tropical
 5      Perfections?
 6  A.  We thought we wanted -- at the time, we
 7    thought we wanted to acquire the convenience
 8    store business.
 9  Q.  Why do you say you thought you wanted to?
10  A.  Well, it looked profitable on the front end,
11    but, you know, some discovery of the way that
12    John had used the money for the -- in the
13    convenience store monies, the -- particularly
14    the warranty -- monies for warranties gave me
15    a false reading of the profitability, and we
16    just saw that it wasn't -- it just wasn't a
17    great business for us.  And I think we all
18    agreed to that; that it was just not our fit.
19  Q.  Do you still have convenience store customers
20      now?
21  A.  We have a few.  We are acquiring no new ones.
22    We've got a short handful of convenience
23    stores that we are -- we evaluate every day.
 1    And as we lose one for whatever reason, we're
 2    not renewing -- not making an attempt to
 3    acquire new ones.
 4  Q.  So there's been a decision to get out of the
 5      convenience store business?
 6          MR. GILL:  Object to the form.
 7  A.  No.  Not to get out of it but to change the
 8    way that we do it, change the way that our
 9    company does business with the convenience
10    stores.
11  Q.  Okay.  And how are you changing the way you do
12      business with convenience stores?
13  A.  Well, we're requiring the -- first of all the
14    onus of -- or the burden of the business to be
15    placed on them as opposed to placed on us.  In
16    the past, we would install equipment mostly at
17    for -- at no charge, distribute -- distribute
18    to them.  When we acquired John's company, a
19    preponderance of the customers were charge
20    accounts, and they didn't pay very well.  They
21    abused the equipment.  Repairs were costly,
22    service -- if you serviced them properly, you
23    couldn't make any money.  And so we just --
```

89

1 and we would -- as we would acquire a
2 convenience store, we would -- under that
3 fashion, somebody said they wanted to do
4 business with us, we just -- we'd slap a
5 machine in there and start losing money with
6 them. And we do some business -- we have
7 other products that we can sell to convenience
8 stores, and we still -- and we'll sell them
9 something if they'll pay for it up front. But
10 to do business like we did before, we are --
11 we made a decision to get out of the
12 convenience store business in that fashion.
13 Q. Do you know what role Ryan Hamner had in the
14 creation of the Juice Alive name?
15 A. I was told that he was a expert on Internet
16 marketing.
17 Q. Is Ryan Hamner an employee of US Beverage?
18 A. No.
19 Q. Has he ever been an employee of US Beverage?
20 A. No.
21 Q. Just one quick follow-up as to the day care
22 juice promotion that we talked about earlier.
23 Was US Beverage assigned a specific territory

90

1 to sell day care -- to sell to day cares?
2 A. Assigned a specific territory?
3 Q. Yes.
4 A. By whom? By Juice Alive?
5 Q. By anyone.
6 A. Well, we sold -- no.
7 Q. In terms of sending out these flyers and
8 selling the Juice Alive product, was US
9 Beverage assigned three states?
10 A. I don't recall that. I don't even actually
11 know where we sent the fliers to. I wouldn't
12 have -- I -- I don't recall that.
13 Q. Do you recall if Trident Marketing sent the
14 flyers out?
15 A. I'm not trying to bounce around the question.
16 I don't recall. I don't know where the fliers
17 were sent to, actually.
18 Q. Is it your contention that US Beverage paid
19 for the flyers that were sent out by Trident
20 Marketing to day care centers to sell day care
21 juice?
22 A. Yes. I'm sorry. Would you ask me that
23 question again?

91

1 Q. Is it your contention that US Beverage paid
2 for the flyers that were sent out by Trident
3 Marketing outside of the three states?
4    MR. GILL: Object to the form.
5 A. It's my contention that US Beverage paid for
6 the materials involved in this experiment that
7 we were doing.
8 Q. I think you touched on it before, but did US
9 Beverage enter into a licensing agreement with
10 Trident Marketing to distribute Juice Alive?
11 A. When did we touch on that?
12 Q. You mentioned it a few minutes ago. You said
13 it was a part of a buyout, I think is what you
14 said.
15 A. Well, we -- no. We proposed -- I think it's
16 two different issues there. We proposed as a
17 part of a buyout to give the Juice Alive to
18 John as part of the buyout plan. Not to just
19 simply give it to him.
20 Q. And I'm going to show you what was marked as
21 Defendant's Exhibit 16 in the deposition of
22 Grady Kittrell.
23 A. Uh-huh.

92

1 Q. And rather than reproduce all these exhibits
2 again, I'm just going to use --
3    MR. JACKSON: If it's okay with you,
4    Nelson.
5 Q. -- use exhibits from the first deposition.
6    (Defendants' Exhibit 16 was
7    previously marked and is not
8    attached hereto.)
9    MR. GILL: Well, as long as we
10    reference it and we're clear.
11 Q. I ask you to read the first sentence under the
12 word "Gary" --
13 A. Uh-huh.
14 Q. -- from that document.
15 A. (As read:) We have reached an agreement with
16 Juice Alive to start distribution of the Juice
17 Alive brand in our 100 percent juice products.
18 Q. Okay. And who is that document signed by?
19 A. Tom Clark.
20 Q. And that's you; right?
21 A. Uh-huh.
22 Q. Is that your signature?
23 A. Yes.

93

1 Q. Do you remember creating that document?
2 A. Yes.
3 Q. Why don't you read the next sentence?
   A. (As read:) Please let this signed fax serve as
      official authorization for you to begin
6     selling US Beverage, Inc., the Juice Alive
7     products with 1.20 increase per case to be
8     paid to Juice Alive.
9 Q. Does that fax -- strike that question. I'm
10    sorry.
11              If US Beverage owned the name
12    Juice Alive, why did US Beverage, pursuant to
13    this fax, agree to pay a case up-charge to
14    Juice Alive?
15              MR. GILL: Object to the form.
16 A. It was done as a -- under coercion, under the
17    most stressful circumstances possible. It was
18    done in a good faith on the part of US
19    Beverage to attempt to bring back the original
20    proposal, or assembleance of the original
21    proposal, of August, and it was our show of
22    good faith that we believed that at that point
23    in time, if we handed over Juice Alive to John

94

1     under the circumstances in which this
2     agreement was made, that we could finish our
3     separation.
4 Q. Did US Beverage purchase any Juice Alive
5     products pursuant to this agreement?
6 A. Yes.
7 Q. Did US Beverage pay the case up-charge for
8     those --
9 A. Yes.
10 Q. -- products?
11 A. Yes.
12 Q. For how long did US Beverage continue
13    purchasing Juice Alive products pursuant to
14    this agreement?
15 A. Through May of the following year.
16 Q. And this agreement was dated -- I think it's
17    dated November 18th, 2005; is that correct?
18 A. Yes.
   Q. And would the fax have been sent on the same
      day?
21 A. It would have been sent around that time for
22    sure.
23 Q. And who's Gary that it's made out to?

95

1 A. Gary is the -- our representative with Supreme
2     Manufacturing.
3 Q. And you mentioned that this was signed under
4     coercion.
5 A. Yes.
6 Q. Can you describe that for us?
7 A. Yes. John contacted -- we were -- this was
8     signed at the Mississippi -- or this agreement
9     was made at the Mississippi trade show, if I'm
10    not mistaken. And Grady and John met and
11    discussed some things, then I was brought in
12    at the end of the deal, I think. When they
13    laid out the solution for -- for logical
14    separation, prior to that arrangement, or
15    prior to that meeting, Mr. Walker had called
16    me and notified me that he had a booth at the
17    Mississippi show and was going to be selling
18    his Juice Alive product individually unless --
19    and we also had a booth there -- and that
20    unless we agreed to -- to start selling his
21    product, that he would compete against us. We
22    were already in extreme financial trouble. We
23    had no sales force. Our -- John had

96

1     abandoned -- or John had not been selling in
2     our business for quite some time, and we were
3     essentially on our last leg financially.
4              And we had -- we felt like we
5     had no choice at this point in time but to
6     cooperate with John so that we could join
7     forces and sell -- it was the only chance we
8     were going to have to -- only chance we had of
9     making it financially, we felt like at the
10    time, was to submit to this coercive behavior.
11             You know, either you -- which
12    was presented to us, either you buy our
13    product, or I'm competing against you, and
14    I'll put you out of business. Because as John
15    is our salesperson to all of our contacts at
16    that time, John was still -- John was all our
17    contacts knew of US Beverage. And our -- like
18    any other sales thing, it's a relationship.
19    There's not necessarily a loyalty to the
20    company; there's a loyalty to the
21    relationship. And we had absolutely no choice
22    at the time but to sign it or go out of
23    business.