# FREEDOM COURT R

### Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT FOR
 2      THE NORTHERN DISTRICT OF ALABAMA
 3             MIDDLE DIVISION
 4
 5   CASE NUMBER:  CV2:06-CV-496-MEF
 6
 7   U.S. BEVERAGE, INC.,
 8       Plaintiff,
 9       vs.
10
11   JOHN BUSTER WALKER, II; et al.,
12       Defendants.
13
14       S T I P U L A T I O N
15       IT IS STIPULATED AND AGREED by
16   and between the parties through their
17   respective counsel, that the deposition
18   of RYAN HAMNER may be taken before
19   Leslie K. Hartsfield, at the offices of
20   Raymond L. Jackson, Jr., 600 N. College
21   Street, Suite D, Auburn, Alabama, 36830,
22       DEPOSITION OF RYAN HAMNER
23   taken on the 16th day of November, 2006.
```

### Page 2

```
 1       IT IS FURTHER STIPULATED AND
 2   AGREED that the signature to and the
 3   reading of the deposition by the witness
 4   is waived, the deposition to have the
 5   same force and effect as if full
 6   compliance had been had with all laws
 7   and rules of Court relating to the
 8   taking of the deposition.
 9       IT IS FURTHER STIPULATED AND
10   AGREED that it shall not be necessary
11   for any objections to be made by counsel
12   to any questions except as to the form
13   or leading questions, and that counsel
14   for the parties may make objections and
15   assign grounds at the time of the trial,
16   or at the time said deposition is
17   offered in evidence, or prior thereto.
18       IT IS FURTHER STIPULATED AND
19   AGREED that the notice of filing of the
20   deposition by the Commissioner is
21   waived.
22
23
```

### Page 3

```
 1             INDEX
 2   EXAMINATION BY:        PAGE NUMBER:
 3   Mr. Gill                 6
 4
 5
 6
 7
 8   PLAINTIFF'S EXHIBITS:
 9   1 - Mailer               54
10   2 - Juice label          56
11   3 - Mailer               59
12   4 - Agreement           104
13
14
15
16
17
18
19
20
21
22
23
```

### Page 4

```
 1   IN THE UNITED STATES DISTRICT COURT
 2   FOR THE NORTHERN DISTRICT OF ALABAMA
 3             MIDDLE DIVISION
 4
 5   CASE NUMBER:  CV2:06-CV-496-MEF
 6
 7   U.S. BEVERAGE, INC.,
 8       Plaintiff,
 9       vs.
10
11   JOHN BUSTER WALKER, II; et al.,
12       Defendants.
13
14   BEFORE:
15       LESLIE K. HARTSFIELD,
16       Commissioner.
17
18   APPEARANCES:
19       RAYMOND L. JACKSON, JR., ATTORNEY
20   & COUNSELOR AT LAW, P.C., 660 N. College
21   Street, Suite D, Auburn, Alabama, 36830,
22   appearing on behalf of the Defendants.
23       COPELAND, FRANCO, SCREWS & GILL,
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 5

1 P.A., by Mr. Nelson Gill, 444 S. Perry
2 Street, Montgomery, Alabama, 36104,
3 appearing on behalf of the Plaintiff.
4
5 ALSO PRESENT:
6    John Walker, II
7
8           ********
9
10    I, LESLIE K. HARTSFIELD, a Court
11 Reporter of Prattville, Alabama, acting
12 as Commissioner, certify that on this
13 date, as provided by the Federal Rules
14 of Civil Procedure and the foregoing
15 stipulation of counsel, there came
16 before me at the offices of Raymond L.
17 Jackson, Jr., 600 N. College Street,
18 Suite D, Auburn, Alabama, 36830,
19 beginning at 3:40 p.m., RYAN HAMNER,
20 witness in the above cause, for oral
21 examination, whereupon, the following
22 proceedings were had:
23

Page 6

1           RYAN HAMNER
2 being first, duly sworn, was examined
3    and testified as follows:
4
5    THE REPORTER: Usual
6 stipulations?
7    MR. GILL: Yes.
8    MR. JACKSON: Yes.
9
10 EXAMINATION BY MR. GILL:
11    Q.  Ryan, I know we just met,
12 but my name is Nelson Gill. And let me
13 first ask you have you taken a
14 deposition -- have you had your
15 deposition taken before?
16    A.  No.
17    Q.  I'm going to give you just a
18 general outline of what we're going to
19 do. I'm going to ask you a few
20 questions, series of questions today.
21 And I'm going to try to keep this real
22 short because I know it's late in the
23 afternoon and everybody doesn't want to

Page 7

1 stay here. But if you don't understand
2 my question, please let me know because
3 otherwise I'm going to assume you do
4 understand it.
5    A.  Okay.
6    Q.  And if you want to take a
7 break, that's fine with me. I'm not
8 here to put you through a marathon or
9 anything. I just want to ask you a few
10 questions and hopefully we'll get
11 through with this real quick, all right.
12 One other thing, if you haven't given a
13 deposition, you have to speak up because
14 the court reporter although I can see
15 you and she can see you, the record
16 won't reflect it. You have to say yes
17 or no. You have to actually verbally
18 answer my questions, does that make any
19 sense?
20    A.  Okay. Yeah.
21    Q.  Can you state your full name
22 for the record, please?
23    A.  David Ryan Hamner.

Page 8

1    Q.  Can you tell me your current
2 address?
3    A.  1612 39th Street, Columbus,
4 Georgia, 31904.
5    Q.  How long have you lived
6 there?
7    A.  Going on two years.
8    Q.  Have you lived in the
9 Columbus area for a while now?
10    A.  Yeah, my life, whole life.
11    Q.  Your whole life?
12    A.  Yes.
13    Q.  Never lived anywhere else?
14    A.  (Shook head negatively.)
15    THE REPORTER: Answer.
16    A.  Yes. No. No. I'm sorry.
17 Never lived anywhere else.
18
19    (A discussion was held off the
20     record.)
21
22    Q.  (By Mr. Gill) How old are
23 you?

FREEDOM COURT REPORTING

Page 29

1  Q. Does Mr. Walker claim he was
2  responsible for that growth?
3  A. I don't think we made it to
4  that kind of detail. I mean, he would
5  ask me about my business when I'd see
6  him at the gym, and you know, I'd ask
7  him about his so.
8  Q. At some point in late 2003,
9  did you and Mr. Walker start talking
10 about the possibility of you having a
11 job at U.S. Beverage?
12 A. Of me having a job at U.S.
13 Beverage?
14 Q. Uh-huh (affirmative
15 response).
16 A. No.
17 Q. He never spoke to you about
18 that?
19 A. No. I was never going to
20 have a job at U.S. Beverage.
21 Q. You never wanted a job at
22 U.S. Beverage?
23 A. Never wanted a job at U.S.

Page 30

1  Beverage. Now, later I was going to do
2  a website for U.S. Beverage but I was
3  never going to be employed by U.S.
4  Beverage or wanted to be employed by
5  U.S. Beverage.
6  Q. You had no interest in
7  having full-time employment where you
8  might get full-time benefits at U.S.
9  Beverage?
10 A. No.
11 Q. No interest at all?
12 A. (Shook head negatively.)
13 Q. So you did not meet with
14 U.S. Beverage for the purpose of getting
15 a job at U.S. Beverage?
16 A. No.
17 Q. At no time?
18 A. I met with U.S. Beverage
19 about I guess our marketing plan,
20 building the website, seeing their
21 facility.
22 Q. Let's talk about that.
23 Explain to me when did this occur to the

Page 31

1  best of your recollection.
2  A. Okay. John and I talked
3  about he knew that I was doing the
4  online thing and we wanted to start a
5  day-care business selling juice to day
6  cares. And he knew that I did a lot of
7  online marketing so I started
8  brainstorming names. This is in short.
9  Called John, I said, hey, what do you
10 think about Juice Alive, the name. He
11 liked --
12 Q. Go ahead. Sorry. Excuse
13 me.
14 A. He liked the name so I went
15 with my personal credit card, I bought
16 the main names, developed our logo. I
17 even built the website probably within a
18 week.
19 Q. Let's try to -- I think
20 we're kind of -- maybe we jumped ahead a
21 little or kind of grouped a bunch of
22 things together. Let's go back to the
23 first thing you said about you and John

Page 32

1  getting together to sell juice to day
2  cares. Do you remember telling me
3  that?
4  A. Uh-huh (affirmative
5  response).
6  Q. When was that?
7  A. I saw him at the gym and I
8  don't know -- don't know -- have a month
9  or a day or anything like that. But I
10 just remember we were talking.
11 Q. Did John approach you about
12 this?
13 A. I -- I don't remember the
14 details of it. I just remember that we
15 were talking like we always did if I saw
16 him in the gym.
17 Q. Would you have approached
18 him about a juice business at this
19 time?
20 A. Well, with my -- doing the
21 marketing stuff if I could make money
22 doing it, probably.
23 Q. Probably, but do you have

FREEDOM COURT REPORTING

Page 49

1  A. Because we were starting the
2  Juice Alive business.
3  Q. Because you were starting
4  the business?
5  A. Yeah.
6  Q. Did John tell you to come up
7  with a name --
8  A. No.
9  Q. -- and a logo?
10  A. No. Actually, when we left
11  the gym, I said, well, from -- our next
12  step should be to try to come up with a
13  name so be brainstorming on that.
14  Q. Did he agree with that?
15  A. To brainstorm on a name?
16  Q. Uh-huh (affirmative
17  response).
18  A. Yeah. I went home and, you
19  know, that was my, I wouldn't say
20  specialty, but that's what I like to do
21  is come up with names and do graphic
22  design. So I went through a bunch of
23  names and started messing with the logo

Page 50

1  and colors and I called John and I was
2  excited about the name Juice Alive. And
3  he asked his wife about it I believe and
4  said let's do it, blah, blah, blah. And
5  so I don't know if it was that day or
6  was -- it was really soon. I know that
7  I registered the Juice Alive. I think
8  it was dot net at that time. And then I
9  created the logo, the website.
10  Q. You just said you called up
11  John and your words were he said let's
12  do it?
13  A. Not --
14  Q. I mean, okay. Was that not
15  literal?
16  A. Not literal. I'll just say
17  this: When I called up John, he liked
18  the name Juice Alive. He agreed it was
19  a good name. So that's when I said all
20  right and I went forward with it, which
21  when I say forward, I mean finishing the
22  logo, registering the main name.
23  Q. Whatever the actual language

Page 51

1  of what he said was, I mean, did you
2  understand him to mean let's go forward
3  with our business to sell juice?
4  A. Yes.
5  Q. Did John ever tell you
6  that -- excuse me. Mr. Walker ever tell
7  you that he was an officer and a
8  shareholder of U.S. Beverage and he
9  probably shouldn't be doing this?
10  MR. JACKSON: Object to
11  form. Go ahead.
12  A. No.
13  Q. Did he ever mention his
14  position at U.S. Beverage?
15  A. Probably, but you know.
16  Q. Do you have any memory of
17  that?
18  A. I guess I just remember it
19  not being an issue because it was
20  just -- there'd been so much talk with
21  everybody about how it was going to
22  work, and we were going to market their
23  newsletter -- not their newsletter, but

Page 52

1  their letter, their mailers, stuff like
2  that. So it was just -- plus, I was --
3  I don't know how this plays in but I
4  spent a lot of my money too coming up --
5  getting into this company, help start
6  this company.
7  Q. When you say they, are you
8  saying U.S. Beverage?
9  A. I'm saying U.S. Beverage,
10  me, John, we all had an understanding of
11  how it was going to work.
12  Q. What was that understanding
13  in your mind?
14  A. In my mind, they were going
15  to use -- we were going to market the
16  juice for them. That's where the
17  website came into play. Eventually they
18  wanted me to build a website for them.
19  We were going to market the juice and
20  juice that came from whatever specific
21  states that we had in this document they
22  would be U.S. Beverage's clients. And
23  the others, whatever states we had

13 (Pages 49 to 52)

FREEDOM COURT REPORTING

Page 53

1 specified would be ours. And then I
2 remember we had some kind of deal
3 with -- setup with -- I don't know how
4 this worked, but for every case they
5 sold or every bottle they sold with our
6 label on it we made -- they paid us so
7 much or something like that.
8     Q.   Was that at some point
9 later?
10     A.   No. This was -- this was
11 before we -- this was going into the two
12 mailers as I recall.
13     Q.   So you're saying you charged
14 them a fee at the beginning for --
15     A.   We charged them a fee?
16     Q.   Uh-huh (affirmative
17 response). Or did you not charge them a
18 fee?
19     A.   No. No. I developed their
20 mailers and I think they paid for their
21 postage or however that went. I don't
22 know. No, I did not charge them a fee
23 for their mailer.

Page 54

1     Q.   So you were essentially
2 doing this for them --
3         MR. JACKSON: Object to
4 form. Go ahead.
5     Q.   -- the mailer?
6     A.   Doing this for them?
7     Q.   The mailer.
8     A.   I don't know if it was part
9 of some, you know, there's more to the
10 agreement, but yeah, I did them a
11 mailer.
12     Q.   With Juice Alive on it?
13     A.   Yes.
14     Q.   Well, I think this may have
15 been marked in another deposition but
16 I'm not as organized as you, Raymond.
17 I'm just going to mark this as
18 Plaintiff's 1 for the deposition of Ryan
19 Hamner.
20
21     (Plaintiff's Exhibit No. 1 was
22      marked for identification.)
23

Page 55

1     Q.   We've been talking about a
2 mailer. Does this look like the mailer
3 that you were talking about?
4     A.   Yeah. I probably had a
5 couple mock-ups that I did.
6     Q.   Does this look like the one
7 you sent out?
8     A.   This is definitely one of
9 the mock-ups. If it's the exact one I
10 sent out, I don't -- yeah, it looks like
11 it. Just roughly it looks like it. On
12 the back of theirs, they had something
13 different so I know that.
14     Q.   The actual card exists
15 somewhere, but I don't have it with me.
16 But we'll move on from there. Will
17 you -- do you agree with me that the
18 card says U.S. Beverage presents Juice
19 Alive?
20     A.   Yeah, I see that.
21     Q.   Will you look at the top and
22 tell me what the date is.
23     A.   9/27/04.

Page 56

1     Q.   When do you think that you
2 started a trademark application for
3 Juice Alive?
4     A.   I didn't handle any of that
5 so.
6     Q.   Who handled it?
7     A.   That was -- that was John.
8     Q.   John handled all of it?
9     A.   John handled all of it. I
10 did the graphic design. I did the
11 websites. I did, you know, some other
12 things but that wasn't me.
13     Q.   I'm going to mark this as
14 Plaintiff's 2.
15
16     (Plaintiff's Exhibit No. 2 was
17      marked for identification.)
18
19     Q.   Does Plaintiff's 2 look
20 familiar to you?
21     A.   Yeah.
22     Q.   Is that a drawing that you
23 did for the trademark application?

14 (Pages 53 to 56)

FREEDOM COURT REPORTING

Page 61

```
 1  with --
 2     A.  Yeah.
 3     Q.  -- 132 on the front and 133
 4  on the back?
 5     A.  Like this right here
 6  (indicated).
 7     Q.  Do you agree with me --
 8     A.  Yes.
 9     Q.  -- that that's probably the
10  way it was?
11     A.  Yes.
12     Q.  So would you think that
13  9/27/04 was the first time that a mailer
14  went out?
15     A.  No.
16     Q.  You would think it was
17  before that?
18     A.  (Nodded head affirmatively.)
19     Q.  How long before that?  I
20  apologize.  I start talking -- let's
21  take one minute.  Actually, there's a
22  question pending.  Let me finish.  When
23  do you believe a mailer was first sent
```

Page 62

```
 1  out if this was not the first one?
 2     A.  I have no idea.  I just
 3  really --
 4     Q.  You just generally believe
 5  there was another one prior to 9/27?
 6     A.  I pretty much know.  It
 7  seems like we did a mailer earlier just
 8  us because I remember some money coming
 9  off my credit card and then I don't
10  remember why we did a second one.  But I
11  remember we did a second one and this is
12  the one where we did one and then U.S.
13  Beverage did one.
14         MR. GILL:  Let's stop for
15  one minute.
16
17         (A brief recess was taken.)
18
19     Q.  (By Mr. Gill) We were just
20  talking about your opinion that you were
21  pretty sure that another mailer had been
22  put out before this 9/27/04 U.S.
23  Beverage mailer.
```

Page 63

```
 1     A.  That I was pretty sure?
 2     Q.  Yeah.
 3     A.  I just -- I can't recall.  I
 4  just -- it seems like there was
 5  something.  Here's the thing, I did so
 6  many proofs of mailers, you know, I
 7  mean, what you see here is just one.
 8  But I worked so many different ones, I
 9  mean, I don't -- my brain is just
10  jogged.  I mean, I can't --
11     Q.  Well, would any prior mailer
12  had been for U.S. Beverage?
13     A.  No, definitely not.
14     Q.  Who would it have been
15  for?
16     A.  Trident Marketing.
17     Q.  So just for the company
18  itself, for Trident?
19     A.  (Nodded head affirmatively.)
20     Q.  And who would you have sent
21  it to?
22     A.  Day cares.
23     Q.  Where?
```

Page 64

```
 1     A.  I have no idea.  I didn't --
 2  I didn't handle buying the mailing list.
 3  I, of course, paid for it, for half of
 4  it.
 5     Q.  So John handled --
 6  Mr. Walker handled the mailing list?
 7     A.  Yeah.
 8     Q.  Do you know where he'd
 9  gotten the mailing list from?
10     A.  Seems like it was -- I don't
11  know.  They're pretty well known.  U.S.
12  something.  I can't remember the name.
13  It's just pretty general.  You could go
14  pick a topic, or you know, demographics,
15  select your list.
16     Q.  Would some of it have been
17  from his work at U.S. Beverage?
18     A.  I don't think so.  No.
19  Would some of the customers?
20     Q.  Uh-huh (affirmative
21  response).
22     A.  No.  No.
23     Q.  How do you know that?
```

16 (Pages 61 to 64)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 93

1  what's your distinction, what does
2  slushy mean to up?
3      A.  Well, I mean, slushy was --
4  it would be -- the slushy would be in
5  bars or to be in convenience stores.
6  Juice Alive, we weren't going to market
7  it to bars or convenience stores. It's
8  strictly for little kids. That's why we
9  had kids on the website. Our phrase
10 was, What are your kids drinking, that's
11 what was on the mailer. It was day-care
12 juice.
13     Q.  But slush is juice, is it
14 not? It's juice. Maybe it's in a
15 different form in terms of maybe it's
16 frozen, maybe it's not, but it's still
17 juice, isn't it?
18     A.  Yeah. I mean, it's just
19 different markets.
20     Q.  But it's still juice that
21 would have come from Supreme
22 Manufacturing; right?
23     A.  Yeah.

Page 94

1      Q.  This website that you
2  started, would there be some record of
3  you starting it, I mean, in terms a
4  payment or a record of when it first
5  existed?
6      A.  Juice Alive dot net, you
7  should have that in our history. I
8  might actually have an e-mail receipt.
9  I sent all the receipts to John so John
10 would probably have that. Yeah, that
11 was way back there, so yeah there would
12 be a record of that.
13     MR. JACKSON: I think we
14 produced to you the main name
15 registration, would have a date when it
16 was registered. I don't want to go back
17 through what we produced to --
18     MR. GILL: I apologize. I
19 don't have everything.
20     A.  The tricky thing is the
21 original name was -- was that always in
22 our name, Juice Alive dot com?
23     MR. WALKER: It was dot net

Page 95

1  to start with, then you registered dot
2  com after that.
3      A.  So yeah there was a dot net
4  so it'll give you two different dates
5  for -- because they're registered
6  individually.
7      MR. GILL: I'll review the
8  documents, but if I have further
9  request, I --
10     MR. JACKSON: Let me know if
11 you don't have it.
12     MR. GILL: I will.
13     You told me earlier that
14 John did everything with the trademark;
15 is that right?
16     A.  Yeah. The paperwork,
17 sending it off, stuff like that.
18     Q.  (By Mr. Gill) Whose idea
19 was it to trademark it?
20     A.  I had asked him about things
21 like that, but I didn't know much about
22 them. But it was kind of both of
23 ours.

Page 96

1      Q.  Did you have any discussions
2  with U.S. Beverage about anything
3  regarding the trademark, you
4  personally?
5      A.  I don't think I personally
6  did, no.
7      Q.  Do you think John did,
8  Mr. Walker?
9      A.  Yes.
10     Q.  What do you think that
11 was?
12     A.  What do I think that was?
13     Q.  Uh-huh (affirmative
14 response). Sorry.
15     A.  I think that in -- like I
16 said, this goes back to the document or
17 documents where we just kind of laid it
18 out that Juice Alive was going to be
19 owned by Trident Marketing and they were
20 basically going to pay us per case or
21 per bottle, whatever, of every juice
22 bottle that they sold that had the Juice
23 Alive label on it.

24 (Pages 93 to 96)

FREEDOM COURT REPORTING

Page 109

1   welcomed to read any other portion of
2   that you want to, but I mean, do you
3   think U.S. Beverage was not doing that
4   at this time, doing day-care industry at
5   that time frame?
6       MR. JACKSON: Object to
7   form.
8       A.  No, I don't think they were
9   because they were looking to me to
10  create their website. They were looking
11  to Trident Marketing to do -- send out
12  their mailer. They're looking to us to
13  use our Juice Alive logo, label.
14      Q.  Is that your name on the
15  bottom of Plaintiff's Exhibit 4?
16      A.  Yeah. I didn't -- I didn't
17  put my name there.
18      Q.  Who put your name there?
19      A.  John Walker, I guess.
20      Q.  Do you not think -- I mean,
21  I don't know --
22      A.  I know I wouldn't have paid
23  my money to create this logo and gone

Page 110

1   through all this stuff without getting
2   some kind of reimbursement from U.S.
3   Beverage if it was their label.
4       Q.  John didn't tell you
5   anything about what he was doing at U.S.
6   Beverage, did he?
7       MR. JACKSON: Object to the
8   form.
9       Q.  You stated he didn't tell
10  you anything but --
11      A.  I didn't say he did not tell
12  me anything. I said through talking
13  with John that I basically understood
14  what he did.
15      Q.  Which you told me earlier
16  was just nothing more than selling
17  slushy is what you said to me earlier?
18      A.  Selling slush, slush
19  machines.
20      Q.  Did he tell you anything
21  further than that, did he?
22      A.  Not that I'm aware of, no.
23      Q.  But yet he got you to help

Page 111

1   him with this trademark; correct?
2       MR. JACKSON: Object to
3   form.
4       A.  Got me to help --
5       Q.  Uh-huh (affirmative
6   response).
7       A.  -- you mean with creating
8   this?
9       Q.  Yeah.
10      A.  Yeah, I created the Juice
11  Alive logo.
12      Q.  With John Walker?
13      A.  With John Walker. I mean, I
14  did the whole -- he -- he -- I came up
15  with the name and did this all on my
16  computer. I designed it.
17      Q.  I understand that you might
18  have physically done it.
19      A.  Okay. Yeah.
20      Q.  But with John Walker?
21      A.  With John Walker.
22      MR. JACKSON: Object to
23  form. Go ahead.

Page 112

1       MR. GILL: You going to have
2   a bunch of questions?
3       MR. JACKSON: No.
4       MR. GILL: I assume I've
5   overlooked something, the late
6   afternoon, but thank you for coming.
7   That's it for right now. Mr. Jackson
8   may have some questions.
9       MR. JACKSON: I don't have
10  any questions.
11
12
13
14
15  FURTHER DEPONENT SAITH NOT
16
17
18
19
20
21
22
23

28 (Pages 109 to 112)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**