**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **U.S. BEVERAGE, INC.** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 2:06-CV-496-SRW** |
| | ) |
| **JOHN BUSTER WALKER, II; and** | ) |
| **TRIDENT MARKETING, INC.;** | ) |
| | ) |
| **Defendants.** | ) |
| ------------------------------------------------- | ) |
| **JOHN BUSTER WALKER, II; and** | ) |
| **TRIDENT MARKETING, INC.;** | ) |
| | ) |
| **Counterclaim Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **U.S. BEVERAGE, INC.;** | ) |
| | ) |
| **Counterclaim Defendant,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **GRADY DOWLING KITTRELL; and** | ) |
| **THOMAS GOING CLARK, III;** | ) |
| | ) |
| **Third Party Defendants.** | ) |

**REPLY BRIEF IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR A PRELIMINARY INJUNCTION**

Comes now Counterclaim Plaintiffs John Buster Walker, II (hereinafter referred

to as Walker) and Trident Marketing, Inc.(hereinafter referred to as Trident) and herein

reply to the arguments made by Plaintiff U.S. Beverage, Inc., and Third Party Defendants

Grady Kittrell and Thomas Clark (hereinafter referred to collectively as Plaintiff or U.S. Beverage) in support of their motion for a preliminary injunction.

## FACTS

Defendants John Walker and Trident Marketing, Inc. attempted to summarize all of the relevant facts of this case in its original brief filed with this Court on March 16, 2007. For brevity, Defendants will not restate all of the facts of this case herein. Instead, Defendants will herein seek to clarify facts that have been misstated or mischaracterized by Plaintiff. It should also be noted that Plaintiff has made numerous factual allegations that are wholly unsupported by any evidentiary submissions.

**(a) Creation of North Carolina business.**

In particular, Plaintiff U.S. Beverage, Inc. has distorted the facts concerning John Walker's activities in North Carolina. Because Plaintiff bases a large portion of its argument on John Walker's decision to sell Juice Alive products in North Carolina, Defendants believe that it is worth while to provide a more detailed description of what led Walker to start selling in North Carolina. Patrick Walker – John Walker's younger brother— lives in Chapel Hill, North Carolina, where he attended the University of North Carolina. (3rd Witness Statement of John Walker – Exhibit A) In late 2004, Patrick Walker suggested selling juice in North Carolina to his brother in order to make money on a part-time basis while he was finishing his studies. Id. Because Tom Clark and Grady Kittrell—the other shareholders in U.S. Beverage, Inc.— decided to cut Walker's yearly salary by over $15,000.00 per year in October of 2003, over Walker's objections and in breach of the merger agreements, John Walker was also in need of making extra money to support his family and agreed to help his brother start selling Juice Alive in

2

North Carolina. Id. By November of 2004, John Walker was owed by U.S. Beverage over $35,000.00 in un-reimbursed expenses and unpaid sales commissions. Id. Walker had to make interest and principal payments on a personal credit card that held the un-reimbursed expenses. Id. John Walker was "an owner and officer of U.S. Beverage in name only" by November of 2004. Id. He did not even have the authority to insure that his expenses were reimbursed or that his sales commissions were paid. Id.

Before John Walker started selling products in North Carolina, there had not been any discussion of U.S. Beverage moving into the North Carolina market. (3rd Witness Statement of John Walker – Exhibit A) As such, Walker did not consider North Carolina to be part of the sales territory or potential sales territory of U.S. Beverages. Id. It was not until 2006, after this dispute arose that U.S. Beverage became interested in doing business in North Carolina. Id. According to Buddy Todd, the former director of sales for U.S. Beverage, Plaintiff decided to enter into the North Carolina and Tennessee markets in order "to put John Walker out of business." (Todd witness statement— Exhibit B)

Another key factor in John Walker's decision to start the North Carolina business with his brother was because of the business practices of the other shareholders in U.S. Beverage. Walker knew that Grady Kittrell had started a second business, a real estate business. (3rd Witness Statement of John Walker – Exhibit A) Walker also knew that Kittrell was using the employees and facilities of U.S. Beverage to further this real estate business. Id. In addition, Kittrell was using gas and cell phones paid for by U.S. Beverage to conduct real estate business. Id. Lastly, Walker believed in late 2004 that

U.S. Beverage was heading toward financial problems because it was being mismanaged by Tom Clark and Grady Kittrell. Id.

John Walker did not attempt to hide the fact that he and his brother had set up a business in North Carolina selling Juice Alive brand juice. Walker's business partners knew that Walker had done so very shortly after the decision to start the business was made. In its brief, Plaintiff acknowledges that as of the end of 2004 Tom Clark and Grady Kittrell knew that John Walker had started buying slushy drink machines and selling product in North Carolina. (Plaintiff's brief, p. 8) Plaintiff took no action regarding Walker's actions until nearly two years later.

Plaintiff's assertions that Walker did not perform his job while employed by U.S. Beverage are also false and not supported by any evidence. In the one-year period ending in November of 2004, John Walker had opened over 300 new accounts for U.S. Beverage, while also maintaining the accounts that he brought with him from his old company Tropical Perfections, Inc. (3rd Witness Statement of John Walker – Exhibit A) Walker traveled extensively while he was employed by U.S. Beverage in order to sell for that company. (Exhibit F—Walker Deposition, p. 59-60)

### (b) Plaintiff's Motivation for Bringing this Lawsuit and/or Unclean Hands.

After reviewing Plaintiff's brief, Defendants attorney interviewed Norman "Buddy" Todd, who formerly worked as director of sales for U.S. Beverage. In December of 2006, Todd quit his job with U.S. Beverage because it had failed to pay him approximately $20,000 in sales commission and expenses. (Todd witness statement— Exhibit B) Subsequently, Todd contacted Walker and asked him for a job. Id. In January

of 2007, Todd went to work for Walker's company. Id. Todd was able to shed light on many of the assertions made by Plaintiff.

In particular, the motivation behind Plaintiff's lawsuit originates from meetings that occurred between Clark, Walker, and Todd at the Alabama Child Nutrition trade show that occurred in March of 2006 in Birmingham, Alabama. (Todd witness statement— Exhibit B) Before the show, Clark complained to Todd that Walker was not bringing anything to the show or helping to pay for the booth at the trade show. Id. Acknowledging that John Walker's company owned the Juice Alive trademark, Clark told Todd that "we (U.S. Beverage) were representing his product" at the show and that Walker as the owner of Juice Alive should be contributing toward the costs associated with U.S. Beverage's participation in the show. Id.

On the last day of the show, Clark, Todd, and Walker had dinner together. (Todd witness statement— Exhibit B) At dinner, Walker told Clark that $1.20 per case was too low of a licensing fee for the Juice Alive brand name. Id. Walker explained that other distributors were paying a licensing fee at that time of $6.00 to $8.00 per case. Id. Walker said further that he could not afford to provide point of sale materials or marketing support, if U.S. Beverage continued to pay a licensing fee of only $1.20 per case. Id. When Tom objected to paying a higher licensing fee, Walker told Clark that U.S. Beverage could either pay a higher licensing fee or Walker would find other distributors in the Georgia market. Id. Tom objected to Walker stating that he could find other distributors in the Georgia market, pointing out that U.S. Beverage had a license to distribute the product in Alabama, Georgia, and Mississippi. Id.

5

After the trade show, Todd and Clark rode together back to Montgomery. (Todd witness statement— Exhibit B) During the drive back, Todd suggested that U.S. Beverage start its own brand name. Id. Clark agreed with the suggestion and stated that it would take some time to do so. Id. Tom then told Clark that U.S. Beverage was "declaring war on John" and that "John would fall." Id. Less than three months after this conversation, U.S. Beverage filed this lawsuit and associated request for preliminary injunction.

### (c) Plaintiff's bare allegations regarding Supreme Manufacturing Company.

Plaintiff U.S. Beverage has stated in its brief that John Walker colluded with Supreme Manufacturing Company (hereinafter "Supreme") to force Plaintiff into a Juice Alive licensing agreement and to cause unspecified harm to Plaintiff. (Plaintiff brief, p. 11) Supreme is not a party to this case. In response to Plaintiff's brief, Defendant's attorney contacted Cliff Krauss who is the owner of Supreme Manufacturing Company. Mr. Krauss agreed to give a witness statement in order to refute Plaintiff's accusations and/or clear up the misconceptions contained in Plaintiff's brief. Krauss categorically denies that his company has colluded with Walker. (Krauss witness statement—Exhibit C) He points out that Supreme sells generic juice products to customers who apply private labels to the product, such as Cool Tropics or Juice Alive. Id. Supreme does not own the brand names. Id. Instead, those names are owned by third parties or sometimes by the customer buying the juice products. Id. When Supreme began selling juice products to U.S. Beverage, the Cool Tropics brand was applied to the product, and U.S. Beverage paid a third party for the right to use the Cool Tropics brand. Id.

6

When U.S. Beverage was told to stop using the Cool Tropics brand in late 2005, U.S. Beverage did not have to agree to license the Juice Alive brand name in order to continue purchasing juice from Supreme. (Krauss witness statement—Exhibit C) In November of 2005, when Plaintiff agreed to license the Juice Alive brand name, Supreme would have sold juice to Plaintiff with a generic brand or with another brand name of Plaintiff's choosing if Plaintiff had so chosen. Id. Plaintiff U.S. Beverage was not forced into a licensing agreement for Juice Alive. Id. Instead, Plaintiff voluntarily chose to license the Juice Alive name from Walker and Trident Marketing, Inc. from November of 2005 until May of 2006, when Plaintiff chose to switch to the Fruzars name. (Id. & Todd witness statement – Exhibit B) As Todd's witness statement shows, Supreme immediately began putting a generic Fruzars label on the juice purchased by Plaintiff once it was instructed to do so by U.S. Beverage. (Todd witness statement – Exhibit B)

Plaintiff also alleges, without any evidentiary support, that Walker has received special deals from Supreme and other vendors because of Walker's relationship with U.S. Beverage. (Plaintiff's brief, p. 11) Plaintiff has failed to inform Defendant or the court as to specifics of these alleged special deals. Walker's company purchases juice products from Supreme. Krauss, the owner and President of Supreme, denies that Walker has received any preferential pricing or terms because of his former relationship with U.S. Beverage. (Krauss witness statement—Exhibit C) In fact, Krauss states that Walker pays the same price for juice as any other customer who is purchasing a similar volume of juice product from Supreme. Id.

**(d)    Plaintiff's bare allegations of damage.**

In its brief, Plaintiff U.S. Beverage asserts that Walker and his company have caused it hundreds of thousands of dollars in damages. However, Plaintiff fails to cite any evidentiary materials to support its entitlement to the alleged damages. While ignoring the fact that it has owed Walker approximately $60,000 in unpaid commissions and un-reimbursed expenses for at least two years now, U.S. Beverage claims that all monies paid to Walker for salary and to reimburse expenses are elements of damage. Plaintiff ignores all of the hard work and time that Walker devoted to working for U.S. Beverage. Just in the one-year period ending in November of 2004, Walker had opened over 300 new accounts for Plaintiff and serviced all of his pre-existing accounts as well. (3rd Witness Statement of John Walker—Exhibit A)

Plaintiff also asserts that it was damaged by paying the $1.20 per case licensing fee for Juice Alive. It asserts that it was damaged at least $10,500.00 in monies paid for this licensing fee. (Plaintiff's brief, p. 23) Currently, Plaintiff U.S. Beverage pays $1.00 per case to the marketing company that helped create the Fruzars name and logo. (Witness Statement of Todd—Exhibit B) Plaintiff has agreed to pay a third party, who does not own the Fruzars trademark, almost as much money as it agreed to pay the owner of Juice Alive brand name. How can it claim to be damaged? Furthermore, other companies that license the use of a brand name for juice products pay $6.00 or more per case for the right to use the brand name. (3rd Witness Statement of John Walker – Exhibit A)

Before signing a licensing agreement in November of 2005 agreeing to pay a licensing fee to Walker's company, U.S. Beverage paid a licensing fee per case to the owner of the Cool Tropics brand name. (Exhibit D—Kittrell deposition, p. 260)

8

However, Kittrell conveniently could not remember at deposition how much his company paid per case to the owner of the Cool Tropics brand. (Exhibit D—Kittrell deposition, p. 261) Since the deposition, Plaintiff has refused to produce documents showing the amount of the licensing fee paid per case to Cool Tropics. Therefore, it must be assumed that Plaintiff had been paying more than $1.20 per case to use the Cool Tropics brand name.

Plaintiff alleges that it lost $13,034.00 in Juice Alive branded product and "$90,000 in point of sales materials, lost sales, and time for development of a new brand" as the result of being issued a cease and desist letter to stop using the Juice Alive brand. (Plaintiff's brief, p. 23) As explained above, U.S. Beverage started using its own brand name "Fruzars" by early May of 2006. (Todd witness statement— Exhibit B & Krauss witness statement – Exhibit C) By the time that U.S. Beverage received John Walker's cease and desist letter on May 15, 2006, it had already begun selling the Fruzars brand. Id. U.S. Beverage did not start the Fruzars brand in response to Walker's cease and desist letter. (Todd witness statement— Exhibit B) It did so in response to being asked to pay a higher licensing fee by Walker. Id. After receiving the cease and desist letter, U.S. Beverage continued to sell all of its Juice Alive branded stock in its warehouse. Id. Todd—the former director of sales for U.S. Beverage—stated in his witness statement that that U.S. Beverage did not destroy its stock of Juice Alive branded product, and it did not lose any money as the result of being told by Walker to stop selling Juice Alive. Id. It continued selling Juice Alive branded product until at least August of 2006, when it exhausted its stock of the product. Id. Having chosen to start its own brand in March of

9

2006, Plaintiff also cannot assert that its other $90,000 in unspecified (and unsupported) losses were the result of any wrongdoing of Defendants.

Plaintiff also claims that it lost "$69,768.00 in profit margin because Walker has intentionally caused U.S. Beverage's bids to be lowered." (Plaintiff's brief, p. 23) Buddy Todd states in his witness statement that Clark directed him to attend trade shows in North Carolina and Tennessee in order to go into Walker's territory and put him out of business. (Todd Witness Statement—Exhibit B) Before the North Carolina trade show in the summer of 2006, Clark instructed Todd and his other sales people to quote their juice product at $59.95 per case. Id. Todd testified that they knew that this price was $25.00 per case less than what Walker was selling his Juice Alive product. Id. He stated further that it was Clark's decision to sell juice at the price of $59.95 per case which started a price war and drove down the price of juice product, especially in situations where public schools were soliciting bids for juice products. Id. In other words, Defendants did nothing to lower Plaintiff's profit margins. It was Tom Clark—one of the other shareholders in U.S. Beverage—who lowered the price of juice in order to try to harm John Walker. Id.

Plaintiff also alleges that it has been harmed because it cannot obtain new financing since Walker is still a shareholder in U.S. Beverage, Inc. and a member of the limited liability company that owns the building where U.S. Beverage is located. (Plaintiff's brief, p. 24) Again, Plaintiff cites no evidence to support this unusual assertion of unspecified damage. When Defendant's counsel asked Buddy Todd about this assertion, Todd stated that U.S. Beverage was able to finance the purchase of six new vehicles in 2006 and to finance approximately $1.4 million in equipment during 2006.

(Todd Witness Statement – Exhibit B)  Todd also stated that Clark and Kittrell transferred funds in 2006 from U.S. Beverage to a mattress store business owned by them (and not owned by Walker) to keep it afloat.  Id.  According to Todd, U.S. Beverage has been able to obtain this financing through listing a non-existent company as a credit reference.  Id.  It would appear that Plaintiff has not had trouble obtaining large amounts of financing despite Walker's continued ownership of shares in U.S. Beverage, Inc. and the limited liability company.

Without citing any evidence, Plaintiff alleges that Walker has failed to meet cash calls. (Plaintiff's brief, pp. 23-24)  Despite being asked to provide their corporate minutes and notes months ago, Plaintiff has not to date produced anything to support this assertion or to substantiate that Kittrell and Clark have infused hundreds of thousands of dollars into the company of their own money.  Defendants assert that an accounting will be necessary to test Plaintiff's assertions of damage, especially in light of the evidence showing mixing of funds between U.S. Beverage and the other businesses owned by Kittrell and Clark.

When asked during depositions to identify any customers lost due to Walker's alleged wrongful actions, neither Kittrell nor Clark could not identify one lost customer. ((Exhibit D—Kittrell deposition, p. 247-48 & 299; Exhibit E—Clark deposition, p. 127-130)  However, in their brief, Plaintiff claims that it lost $35,620 in business in Mississippi and $39,945 in business in Arkansas.  (Plaintiff's brief, p. 23)  If Kittrell and Clark could not identify any lost customers in Arkansas or Mississippi, how can they now assert losses in these states?  Again, Plaintiff does not cite any evidence to support these alleged losses.  In addition, Defendants have requested lists of lost customers and other

11

documents supporting U.S. Beverage's asserted losses, which have not to date been provided to Defendants.

**e) John Walker has Offered to Sell his Shares in U.S. Beverage.**

Plaintiff U.S. Beverage, citing page 215 of Walker's deposition, asserts in its brief that Walker has never offered to sell his shares in U.S. Beverage and leave the company. (Plaintiff's brief, pp. 9)  In so alleging, Plaintiff ignores Walker's testimony on page 214 of his deposition.  The complete quote of this section of testimony states:

> Q.  Did  you ever submit an offer in writing to U.S. Beverage stating that you wanted to sell your shares?
>
> A.  ... I don't know if I've got my hands on it or not, but I think that I can put my hands on an offer – on a response that I made to Grady one time. He sent me an offer, and I believe that I responded to him basically just some different ... terms of the buyout.
> ....
>
> Q. ... Other than responses, did you ever submit a letter to U.S. Beverage that says "I want to sell my shares of stock and I'm offering them up to the company"?
>
> A.  I don't believe that I did.
>
> Q.  ... And none of these negotiations ever resulted in your shares being purchased, did they?
>
> A.  No, sir, they did not.

(Exhibit F—Walker deposition, p. 213, line 23 thru page 215, line 15)  The record clearly establishes that Walker made at least one counter offer to the buy-out offer communicated to him by Grady Kittrell.  Id.  In fact, Exhibit 12 to Plaintiff's brief is a written counter-offer from Walker to Kittrell. No legal citation is needed for the contract law proposition that a counteroffer is an offer.

A buy-out has not occurred because Kittrell and Clark have refused to make a fair offer to Walker to buy out his shares in U.S. Beverage, Inc. or his membership interest in the limited liability company that owns the building where U.S. Beverage is located. In fact, U.S. Beverage has conditioned its participation in a mediation of this case on Walker's agreement that he is to receive *no value* on his shares in both companies. If Plaintiff did not attempt to make an issue of Walker's current ownership of such shares in this case, Defendants would not mention such correspondence. However, should Plaintiff continue to insist upon this line of reasoning, Plaintiff will thereby open the door to this line of evidence. If necessary, Defendants can produce correspondence from Plaintiff's counsel supporting the fact that Clark and Kittrell have refused to discuss paying Walker any money for his shares at the preliminary injunction hearing.

Defendants John Walker and Trident Marketing, Inc. attach hereto the following documents as evidence in support of Defendants' Response and Opposition to Plaintiff's Motion for a Preliminary Injunction: (1) Exhibit A – 3rd Witness Statement of John Walker; (2) Exhibit B –Witness Statement of Norman Todd; (3) Exhibit C – Witness Statement of Cliff Krauss; (4) Exhibit D – Grady Kittrell deposition excerpts; (5) Exhibit E – Tom Clark deposition excerpts; (6) Exhibit F–Walker deposition excerpts; and (7) Exhibit G – Map of 200 mile radius from Montgomery, Alabama.

## LEGAL ARGUMENT

In its brief, the Plaintiff notified this Court that it is willing to address the preliminary injunction hearing as a final hearing, if this Court so directed. Defendants share U.S. Beverage's enthusiasm to resolve this matter swiftly. However, as of the time of filing this brief, Plaintiffs have failed, despite numerous requests, to produce discovery

materials requested by the Defendants related to material issues in this case, particularly as to the matter of their alleged damages[1]. As such, Defendants have not had an opportunity to review these essential documents or to take necessary depositions related to these matters. Therefore, Defendants respectfully requests that this Court restrict this hearing only to matters pertaining to both parties requests for preliminary injunctions.

By seeking a preliminary injunction and/or declaratory relief, Plaintiff, U.S. Beverage,  has the burden of establishing a substantial likelihood of success on the merits. As explained herein below, U.S. Beverage's arguments fail to establish a likelihood of success on the merits and their request for a preliminary injunction should be denied.

## I. Plaintiff is Not Likely to Succeed on the Merits in their Claims of Breach of Fiduciary Duty.

U.S. Beverage makes numerous claims of breach of fiduciary duty on the part of Walker. It basically claims that every business decision Walker made in a two-year period was an act of unforgivable disloyalty to U.S. Beverage. However, Plaintiff, due to the actions of it and it's controlling shareholders, is not likely to succeed on these claims. All of these claims are based on Walker's creation of Trident Marketing, Inc. and the subsequent development of the Juice Alive brand. The opportunity for growth, represented by the opportunity to develop a brand, such as Juice Alive, was presented by Walker to Kittrell and Clark of U.S. Beverage in 2003. (1st Witness Statement of John Walker—Exhibit A to Defendants' brief filed on 3/17/07; Exhibit D---Kittrell deposition, pp 177-180) In their capacities as both officers and controlling shareholders and the

---

[1] The Plaintiffs failure to produce evidence to support their claims is a reoccurring issue throughout this brief.

majority of voting board members, Kittrell and Clark specifically rejected the proposal at that time. (Id.)

The presentation to and rejection by the other officers/shareholders/board members of U.S. Beverage, a closely held corporation, of the opportunity to create a brand and/or trademark puts Walker's creation of the Juice Alive brand in a "safe harbor" against claims of usurpation of a corporate opportunity. *Telxon Corp. v. Meyerson*, 802 A.2d 257, 263 (Del.Supr. 2002), citing *Broz v. Cellular Information Systems, Inc.*, 673 A.2d 148, 157 (Del. 1996). Further, U.S. Beverage's inability to finance the venture and its overall insolvency when the opportunity arose is clear proof that this opportunity was not one that U.S. Beverage was fiscally able to take for itself, thereby exempting Walker's actions from claims of usurpation of corporate opportunity. *See Cox & Perry, Inc. v. Perry,* 334 So.2d 867 (Ala. 1976); *Broz v. Cellular Information Systems, Inc.*, 673 A.2d 148, 157 (Del. 1996).

In addition, Plaintiff is not likely to win on its claims of a continuing breach of fiduciary duty because Walker's status as an employee and officer of U.S. Beverage was terminated by at least April 20, 2006, if not before. At the point of termination, Walker's fiduciary obligations to U.S. Beverage ceased, thereby discontinuing his duty of loyalty. *James A. Head & Co. v. Rolling*, 265 Ala. 328, 90 So.2d 828 (Ala. 1956) As argued fully below, U.S. Beverage must overcome significant legal hurdles to win on their claims of breach of fiduciary duty. Therefore, Plaintiff U.S. Beverage is not entitled to a preliminary injunction on this issue.

A.  **U.S. Beverage Rejected the Idea of Creating the Juice Alive Brand, Allowing Walker to Safely Assume the Opportunity Without Breaching his Fiduciary Duty as an Officer.**

The seminal case in Alabama on the doctrine of usurpation of a corporate

opportunity is *Morad v. Coupounas*, 361 So.2d 6, 9 (Ala. 1978). In this case, the

Alabama Supreme Court laid out the factors that determine whether an officer has

usurped his employer's opportunity:

> (n)umerous factors are to be weighed, including the manner in which the offer was communicated to the officer; the good faith of the officer; the use of corporate assets to acquire the opportunity; the financial ability of the corporation to acquire the opportunity; **the degree of disclosure made to the corporation; the action taken by the corporation with reference thereto**; and the need or interest of the corporation in the opportunity. These, as well as numerous other factors, are weighed in a given case. The presence or absence of any single factor is not determinative of the issue of corporate opportunity. (emphasis added)

(Citing, *Paulman v. Kritzer*, 74 Ill.App.2d 284, 219 N.E.2d 541 (1966)). Disclosure of the

opportunity by the officer to the board, accompanied by the board's rejection of the

opportunity, has long been an exception to the corporate opportunity doctrine under

Delaware law. The Delaware Supreme Court has held, "presenting the opportunity to the

board creates a kind of 'safe harbor' for the director, which removes the specter of a *post

hoc* judicial determination that the director or officer has improperly usurped a corporate

opportunity." *Broz v. Cellular Information Systems, Inc.*, 673 A.2d 148, 157 (Del. 1996);

*see also, McGowan v. Ferro*, 859 A.2d 1012, 1039 (Del.Ch. 2004) ("...once the

[plaintiff's] board had rejected a corporate opportunity [...] its fiduciaries generally could

pursue that opportunity in their own interest."); *Kaplan v. Fenton*, 278 A.2d 834 (Del.

1971). A search of Alabama precedent has not shown a clear adoption of this safe harbor

provision; however, the Court in *Morad v. Coupounas* clearly indicated that presentation

16

to the governing body of a corporation and their actions pursuant to the presentation are factors in the decision. Clearly, the law in Alabama favors an exemption of opportunities that have been presented to and rejected by the governing body of a corporation.

It is clear that creating the Juice Alive trademark and forming Trident Marketing to develop the mark was not a breach of Walker's duty of loyalty to U.S. Beverage. This opportunity was presented to the governing body of the corporation and soundly rejected. Under *Morad v. Coupounas*, 361 So.2d 6, and the above-cited Delaware cases, when a corporate opportunity is rejected by the corporation, the fiduciaries are free to pursue that opportunity in their own self-interest.

U.S. Beverage may claim that because Walker was an officer and a shareholder of U.S. Beverage, that he breached his fiduciary duty by charging for the use of the Juice Alive trademark; however, this was a perfectly legal act of a fiduciary. Corporate officers or directors are not precluded from dealing or contracting with their principal merely because they are its officers or directors. *C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47 (Utah App.1995) The rule is stated as follows:

> There is no sound principle of law or equity which prohibits one or more of the directors of a corporation from entering into contracts and dealings with the corporation, provided they act in good faith, and provided there is a quorum of directors on the other side of the contract, so that the vote of the interested director is not necessary to the adoption of the measure; and even in the latter case the contract is good in law.

When Walker first licensed U.S. Beverage to use the Juice Alive brand on its slush drinks, U.S. Beverage had just received a cease and desist letter from the owner of the "Cool Tropics" brand that U.S. Beverage had been using. Kittrell and Clark voluntarily entered into a licensing agreement with Trident, declining the opportunity to purchase juice from Supreme with a generic label. Later, when Walker entered into a

written licensing agreement with U.S. Beverage to formalize their status as licensees, he charged the corporation a reasonable fee for the use of the brand. This fee allowed U.S. Beverage to use the Juice Alive trademark, point of sale materials, and marketing support. As discussed above, the fee, which was substantially less than what Walker charged to similar distributors in the same market, was too small and unfair to Trident. Although, U.S. Beverage acknowledges that a licensing fee or "case up charge" is standard in the industry for the use of a brand, it claims that "any price" charged by Walker for the use of his Juice Alive brand would be too much. (Exhibit D---Kitrell Depostion, p. 262-265)

Although U.S. Beverage argues that a case up charge of $1.20 was too much for the use of the Juice Alive brand, when asked to provide what a reasonable amount for a case up charge would be, it could not provide an example. *Id.* Currently, Walker charges his licensees of the Juice Alive brand between $6.00 - $10.00 per case for the use of the Juice Alive brand. (Exhibit A--3[rd] Witness Statement of John Walker) Presently, U.S. Beverage is paying $1.00 per case fee to the creators of the Fruzars brand name and logo. (Exhibit B--Todd Witness Statement) From the facts, it is apparent that Walker acted in good faith with U.S. Beverage by providing valuable intellectual property and services to U.S. Beverage at a reasonable rate.

Kittrell and Grady, the controlling shareholders of U.S. Beverage, who also constitute a quorum of disinterested directors/officers of the company, ratified the licensing agreement as evidenced by a signed letter to Supreme dated November 18th, 2005. (Exhibit E---Clark deposition, p. 92-93) They cannot now claim that Walker breached a fiduciary duty to the corporation when they agreed to the very actions that

they, after the fact, now claim are wrongful. *See, C & Y Corp,* 896 P.2d 47, at 57. Since

Walker's dealings with the corporation and the creation of the Juice Alive brand are not

breaches of fiduciary duty, Plaintiffs cannot succeed on the merits of their claims and

their motion for a preliminary injunction must be denied.

B. **U.S. Beverage was Financially Unable to Create the Juice Alive Brand.**

The Court in *Morad v. Coupounas,* 361 So.2d 6, at 9, cites the "financial ability of

the corporation to acquire the opportunity" as another factor to be examined in

determining whether an officer has usurped a corporate opportunity that rightfully

belonged to his employer. This factor had been cited prior to *Morad,* in *Cox & Perry, Inc.*

*v. Perry,* 334 So.2d 867, 869 (Ala. 1976). In *Perry,* a corporation's president, bid on a

contract to provide mobile homes to the federal government to be used for disaster relief,

after he determined that the corporation was financially unable to bid on said contract.

*Perry,* 334 So.2d 867, at 868. The corporation claimed that the president breached his

fiduciary duty and frustrated a corporate opportunity because the corporation had

performed similar contract work in the past. *Id.* At the time that the president made the

bid, the corporation was in dire financial straits, and the president was not drawing a

salary. *Id.,* at 869-870. In holding that the president did not usurp a corporate opportunity,

the Court cited the corporation's insolvency as a strong factor in its decision. *Id. See also*

*Broz v. Cellular Information Systems, Inc.,* 673 A.2d 148, 157 (Del. 1996) ("...a director

or officer is free to take a business opportunity for himself once the corporation has

rejected it *or* **if it can be shown that the corporation is not in a position to take the**

**opportunity.**")

19

U.S. Beverage's corporate officers provide contradicting testimony in regards to U.S. Beverage's financial ability to develop a brand. According to Clark, U.S. Beverage did have the financial wherewithal to develop a brand. Clark bases this assertion on his contention that a brand costs absolutely nothing to create. [Exhibit E--Clark Deposition, p. 79-80.] Mr. Kitrell's deposition testimony paints a different story. Kitrell testified that U.S. Beverage was unwilling invest $5000 to develop a brand because at that time U.S. Beverage could not "pay its bills." [Exhibit D--Kitrell Deposition, p. 177-179] An admission by the chief financial officer (Kittrell) alone should be proof enough that U.S. Beverage could not afford this opportunity. However, when combined with plaintiffs' well-documented suspension of salaries and failure to reimburse its employees for expenses, and the testimony of former employees, there is plenty of evidence that U.S. Beverage was insolvent, and thus financially unable to take this opportunity.  Id. and Exhibit B--Todd Witness Statement.

Because U.S. Beverage was financially unable to take advantage of Walker's suggestion to create a brand name, Walker did not breach his fiduciary duty, and Plaintiff's motion for a preliminary injunction must be denied

### C. Walker is No Longer an Officer of U.S. Beverage, so Plaintiffs' Claims of an Ongoing Breach of Duty are not likely to Succeed.

U.S. Beverage has little chance of winning on the merits of their claim that Walker's breach of fiduciary duty is ongoing to this day. Without an ongoing breach of fiduciary duty, an injunction is inappropriate since there is no wrongful conduct to enjoin. To argue that Walker currently owes U.S. Beverage a duty of loyalty, the Plaintiff must first prove that he is currently an officer of the corporation. Without his officer status, Walker is only a minority shareholder in U.S. Beverage. Minority shareholders owe no

duty of loyalty to a corporation. The reporters are replete with cases documenting a majority shareholder's oppression or breach of fiduciary duty, *see e.g., Robbins v. Sanders*, 927 So.2d 777 (Ala. 2005), but a search of precedent reveals no cause of action for oppression or breach of duty against a minority shareholder. While the exact time of termination of Walker's officer status is not certain, it is impossible to argue that he is currently an employee of U.S. Beverage.

There are several times when U.S. Beverages actions could be considered a constructive termination of Walker. A constructive termination occurs when an employer deliberately makes the employee's working conditions intolerable. *N.L.R.B. v. Century Broadcasting Corp.*, 419 F.2d 771 (8th Cir. 1969) U.S. Beverage began making Walker's employment intolerable not long after he began his employment. In October 2003, when, despite Walker's objections, Clark and Kittrell unilaterally altered and effectively lowered his salary by over $15,000.00 per year in breach of the written merger agreements. (1st Witness Statement of John Walker—Exhibit A to Defendants' brief filed on 3/16/07) A cut in an employee's salary can be the basis for a finding of constructive discharge. *Id.* Adding injury to insult, U.S. Beverage failed to pay Walker sales commissions or to reimburse his expenses. By November 2004, U.S. Beverage owed Walker over $35,000.00 in un-reimbursed expenses and unpaid sales commissions. These facts present strong evidence of intolerable working conditions lending support to a finding that Walker was constructively discharged, thereby ending his fiduciary duties. At the same time, it was apparent that Walker had no authority as an officer of the company in that he couldn't even get his expenses and commissions paid.

If not before, a finding that Walker was constructively discharged must have occurred in July 2005 when the company completely suspended Walker's salary. (1st Witness Statement of John Walker—Exhibit A to Defendants' brief filed on 3/16/07)  In fact, Walker was told at that time that he would not be going back on the company pay roll and that Kittrell and Clark intended to buy out his interest. In their brief, U.S. Beverage stated that it was aware that John Walker was no longer "acting on U.S. Beverage's behalf" after the termination of his salary. U.S. Beverages knowledge that Walker was no longer acting as an officer or as an employee of the corporation counters their argument that Walker owes U.S. Beverage a fiduciary duty  because when a "corporate officer or director ceases to act as such, because of his resignation or removal, fiduciary relationship between officer or director and corporation ceases." *C & Y Corp. v. General Biometrics, Inc, .*896 P.2d 47 (Utah App.1995)  Furthermore, Plaintiff cannot possibly argue that its letter to Walker on April 20, 2006, which stated that the U.S. Beverage was terminating his employment as well as terminating his position as an officer and canceling his family's health insurance, did not end his employment and officer status. (1st Witness Statement of John Walker—Exhibit A to Defendants' brief filed on 3/16/07)  The letter is clear evidence of not just a constructive termination but of an actual termination.

Plaintiff's brief also undermines its claim for breach of fiduciary duty. Plaintiff has brought claims for breach of the covenant not to compete as well as for breach of fiduciary duty. By its own terms, the covenant not to compete applies when Walker "leaves the employ of U.S. Beverage." ('Agreement Not To Compete', para. 3—Exhibit M to Defendants' brief filed on 3/16/07)  Plaintiff cannot have it both ways.  Either

Walker is currently an employee of U.S. Beverage and must abide by his duty of loyalty, or he is no longer in the employ of U.S. Beverage and must abide by the restrictions in the covenant not to compete. The fact that Plaintiff makes these two contradictory claims is clear evidence that it is not likely to succeed on the merits of either claim.

## II. Plaintiffs Are Not Likely to Succeed on the Merits of Their Claim for Breach of the "Agreement Not To Compete."

Defendants are, quite frankly, puzzled by Plaintiff's arguments in the portion of its brief related to the non-competition agreement. It is largely devoted to a rehash of their bald assertions about Walker's alleged breach of fiduciary duty. As argued supra, if Plaintiff intends on proving that Walker is in violation of his fiduciary duty to this day, then *ipso facto* he cannot be in violation of the 'Agreement Not To Compete.' Yet, despite devoting most of their argument to breach of fiduciary duty, they end this section by requesting the court immediately award plaintiffs $75,000 in liquidated damages or order Defendants to stop competing in business relationships that Plaintiff asserts violates the non-competition agreement in the large area encompassed by the non-competition clause. (Id., at p. 19)

It should first be noted that the plain language of the substantive provisions of this non-competition agreement do not support Plaintiff's case. The pertinent language of the agreement is as follows:

> In the event a stockholder of U.S. Beverage for any reason leaves the employ of U.S. Beverage, then that person shall not work in a competing business for a period of three years from the date they left U.S. Beverage employment, within 200 miles of Montgomery, Alabama.

> A competing business shall encompass any business similar to or which might be competing with U.S. Beverage. Reasonable standards shall be the basis for

23

determination of whether or not a business is competing with U.S. Beverage. (Agreement Not To Compete—Exhibit M to Defendants' brief filed on 3/16/07)

By the strict language of the agreement, Walker actually has not violated any of the restrictions. Plaintiff seems to be arguing that Walker "works for" Trident Marketing and that Trident Marketing is a competing business. However, Trident Marketing is not located "within a geographical range of 200 miles of Montgomery, Alabama." If read properly, the phrase "within a geographical range of 200 miles of Montgomery, Alabama" modifies and describes the word "business," not the word "competing." No part of Trident Marketing is located within 200 hundred miles of Montgomery, Alabama. As alleged in Plaintiff's own Complaint, "Trident Marketing is a Georgia corporation with its principal place of business in Katy, Texas." Even if Plaintiff could prove that Trident Marketing was competing with it in Alabama, that still does not show a breach of the non-competition agreement. According to the plain language of the agreement, the *business* must be within the geographical limits imposed, not the *competition*. Plaintiff has presented no evidence that Trident Marketing is located within the geographical limitations.

Of course, it is a primary rule of contract interpretation that a court must "give the terms of the contract their clear and plain meaning and should presume that the parties intended to do what the terms of the agreement clearly state." *Medical Services, LLC v. GMW & Co., Inc.*, 2006 WL 3692430 (Ala. Dec. 15, 2006). In addition, courts must ascribe a word's ordinary or plain meaning unless there is some indication that the words are used in a technical sense. *Stockton v. CKPD Development Co., LLC*, 936 So.2d 1065, 1076 (Ala. Civ. App. 2005) Further, should this court find that there is any ambiguity as

to which term the geographical limitation applies, because U.S. Beverage and/or it's agents drafted the noncompetition agreement, it must follow the general rule that any ambiguity must be construed against the party that framed the contract. *G.F.A. Peanut Ass'n v. W.F. Covington Planter Co.,* 238 Ala. 562, 192 So. 502 (Ala. 1939)

Non-competition agreements are statutorily disfavored in Alabama. *See Ala. Code (1975)* §8-1-1(a) ("Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void.") Alabama courts have cautioned that they review such restraints with disfavor "because they tend not only to deprive the public of efficient service, but tend to impoverish the individual." *Sheffield v. Stoudenmire*, 553 So.2d 125, 126 (Ala. 1989) (quoting *Robinson v. Computer Servicenters, Inc.*, 346 So.2d at 943).

As the Alabama Supreme Court declared in *Calhoun v. Brendle, Inc.*, 502 So.2d 689, 693 (Ala. 1986), "One does not have an unfettered right to be free of competition in this country, and contracts which seek to restrain one in the exercise of his right to practice a lawful trade or profession are disfavored." There is a limited exception in §8-1-1(b) that allows the agreements in some circumstances. Alabama courts have developed a test for whether an agreement meets the exception of §8-1-1(b). The party seeking enforcement has the burden to prove four things: "(1) the employer has a protectable interest; (2) the restriction is reasonably related to that interest; (3) the restriction is reasonable in time and place; (4) the restriction imposes no undue hardship." *DeVoe v. Cheatham,* 413 So.2d 1141, 1142 (Ala.1982)

Determining whether a non-competition agreement satisfies the exception is a highly fact-intensive question. Here, the non-competition agreement which has a

three year duration and an immense 200 mile radius is unreasonable in its restrictions on the time and place where Walker can compete. It also imposes an undue hardship on Walker. This area includes all of Alabama and a large part of four other states. (*See*, Exhibit G---Map of 200 mile radius from Montgomery, Alabama.) This geographic area is unreasonable, especially in light of the long 3 year duration of the agreement. Plaintiff has presented no evidence or argument as to the reasonableness of the restrictions, and the burden is on the Plaintiff to do so. *See, DeVoe* at 1142.

U.S. Beverage has asserted that "John Walker admitted to colluding with Dispensing Systems in an Alabama bid, for Dispensing Systems to bid Juice Alive against U.S. Beverage." However, at no time does Walker "admit" to colluding with Dispensing Systems. In their Brief, U.S. Beverage cites Walker's Deposition at page 352, lines 5-10; and pages 354 -357, in support of this claim. (Exhibit F—John Walker Deposition Excerpts) Yet, in no way does Walker's statement support U.S. Beverages assertion. Colluding is defined as: "To plot secretly with someone, especially with a view to committing fraud." As Walker states in his Deposition, he only licensed the use of Juice Alive trademark to Dispensing Systems. Walker's licensing a brand name to Dispensing Systems in not working in a competing company. Walker is completely uninvolved in any decision by Dispensing Systems in regard to who or where they decide to sell Juice. If selling Juice Alive under a licensing agreement is "colluding", then U.S. Beverage is guilty of this very crime.

Defendants note that Plaintiff has provided inadequate factual evidence or legal argument to support the burden of proving its claims of breach and reasonableness of the agreement not to compete. With these significant hurdles of proof, U.S. Beverage is not

likely to succeed on the merits of its claims, and therefore its motion and all relief requested pursuant to this claim must be denied.

### III. Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims of Intentional Interference with Business Relations.

Plaintiffs make various uncited and unsupported claims that Walker is stealing U.S. Beverage's customer base and/or interfering with its ongoing business relations. As argued below, in the few instances when it is possible to identify what actions Plaintiffs are referring to, Walker's actions do not constitute tortious interference. Plaintiffs also make the unusual (to say the least) claim that Walker is interfering with "*all of U.S. Beverage's business relationships because he will not relinquish his shares, or relinquish his interest in U.S. Beverage's building, so as to allow U.S. Beverage to restructure its financing or seek further financing.*" (Plaintiffs' Brief, p. 16-17) They are essentially arguing that Walker's simple ownership of his lawfully purchased shares is *itself* tortuous interference. As argued below, this is entirely unsupported in precedent and would effectively eliminate any ability of a minority shareholder to dissent from the majority.

The first example of intentional interference offered by Plaintiff is that Walker possesses U.S. Beverage's customer lists and its bid information. They apparently feel that that this is intentional interference, in and of itself. However, it is, at best, evidence of the knowledge component of intentional interference presuming that this is somehow privileged and secret information. However, it is unlikely that this information will be considered proprietary. In *Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 392-93 (1972), the Court noted that "where customers are readily ascertainable outside employers' business as prospective users of employers' services or products, trade secret protection will not

attach and courts will not enjoin former employee from soliciting employers' customers."

See also, *Renpak, Inc. v. Oppenheimer,* 104 So.2d 642 (Fla.App. 1958) (Generally, where

a former employer is engaged in business as a manufacturer or wholesaler dealing

primarily with retail merchants or sells to members of a readily ascertainable class,

knowledge of names of customers of employer which a former employee has is not the

property of employer which equity will protect through injunction.)  As was shown

during depositions, U.S. Beverage's customers and potential customers were primarily

public schools that are easily identified online or via the telephone book. In addition, it

makes public bids for such work, which are publicly available. See, *Arkansas*

*Department of Finance and Admin. v. Pharmacy Associates, Inc.,* 970 S.W.2d 217 (Ark.

1998).

Next, they claim it is "undisputed" that Walker is interfering with their business

relations. Walker's supposed admission to intentional interference is, of course, not cited,

and Defendant is unable to find any support for this assertion. What their factual

summary and Walker's deposition *does* contain are some instances where Trident

Marketing bid against U.S. Beverage for some customers.[2] It almost goes without saying

that market competition cannot be tortious interference. *Restatement (Second) of Torts,* §

768 (1979) describes the situations in which competition can become intentional

interference:

> (1) One who intentionally causes a third person not to enter into a prospective
> contractual relation with another who is his competitor or not to continue an
> existing contract terminable at will *does not interfere improperly with the other's*
> *relation if*
> *(a) the relation concerns a matter involved in the competition between the actor*
> *and the other and*

---

[2]Plaintiff, however, have been unable to identify any specific customers that it lost to due to the alleged
wrongful conduct of Defendants.

> (b) the actor does not employ wrongful means and
> (c) his action does not create or continue an unlawful restraint of trade and
> (d) his purpose is at least in part to advance his interest in competing with the other.

(emphasis added) This exception has been labeled the "competitor's privilege" and has been adopted by Alabama courts. *See Tom's Foods, Inc. v. Carn*, 896 So.2d 443, 457 (Ala. 2004). The Alabama Supreme Court has even gone further and recognized,

> Competitors and their allies are not necessarily gentlemen-or even scholars. Competition may be rough and tumble and even-within reasonable bounds-involve economic factors extraneous to the main competition itself. We do not believe a searching analysis only of motive is in most instances enough to send these cases to the jury. There must still under the Indiana cases be something "illegal" about the means employed.

*Soap Co. v. Ecolab, Inc.,* 646 So.2d 1366, 1370 (Ala. 1994) (quoting with approval *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 543 (7th Cir.1986)).

Plaintiffs' assertions amount to nothing more than their dissatisfaction that Trident Marketing and/or Walker was directly bidding against U.S. Beverage. However, for competition to rise to a tort, they must also prove one of the above-described exceptions. As Alabama courts have recognized, competition, in itself, is not wrongful. Plaintiffs offer no evidence that Walker or Trident's competitive behavior amounted to wrongful conduct.

Plaintiff then describes more unsupported instances of interference. One, where Walker allegedly misrepresented himself as a U.S. Beverage employee to gain a contact, and another where he allegedly contacted its clients in Mississippi to entice them to leave U.S. Beverage. Defendants can find no support or citation for either assertion in Plaintiff's statement of facts. A search of the record for these asserted facts does not show any instance where Walker misrepresented his employment or directly contacted

Plaintiff's clients in Mississippi. Plaintiff has also failed to respond to discovery requests to produce any evidence in support of these claims. Defendants cannot respond to an assertion that they cannot locate in the record. Regardless, neither of these claims, in and of itself, satisfies the elements of tortious interference. In the first, they do not claim that they suffered any harm from Walker's alleged actions, and in the second, they have alleged no wrongful conduct. *See Restatement (Second) of Torts §768, at comment (b)* ("One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors.")

Finally, Plaintiff makes the outrageous claim that, by not selling his shares, Walker is in constant interference with all of U.S. Beverage's business relationships. This assertion simply flies in the face the law and common sense. First, their buy-out "offers" were more in the vein of demands with unacceptable conditions, like giving U.S. Beverage an exclusive distributorship of Juice Alive for seven states, attached to the deal. (Walker's First Witness statement, par. 18—Exhibit A to Defendants' brief filed on 3/16/07) Walker would gladly sell his shares if he were given fair value for them. Second, this claim is completely antithetical to established Alabama precedent in the area of intentional interference. Walker's refusal to accept the terms of their "offers," by itself, can never legally rise to intentional interference. *Barber v. Business Products Center, Inc.,* 677 So.2d 223, 228 (Ala. 1996) ("This Court has consistently held that a mere refusal to deal is not an intentional interference with contractual relations.); *See also, (Bear Creek Enterprises, Inc. v. Warrior & Gulf Navigation Co.,* 529 So.2d 959, at 969 (Ala.1988) ("Deliberately and at his pleasure, one may ordinarily refuse to deal with another, and the conduct is not regarded as improper, subjecting the action to liability.")

30

(quoting, *Restatement (Second) of Torts*, § 766 (1979)). Therefore, Plaintiffs' claim that holding onto his shares is intentional interference is entirely without merit. Third, this claim flies in the face of common sense. Walker is a minority shareholder in a company who has a business disagreement with the majority shareholders. Are all dissenting minority shareholders committing torts by not immediately accepting any buy-out offer? This cannot be.

For all these reasons, Plaintiff U.S. Beverage is highly unlikely to succeed on their claims of intentional interference with business relations. As such, its motion for a preliminary injunction and all relief requested pursuant to this claim should be denied.

### IV. U.S. Beverage is Not Likely to Succeed on the Merits in It's Claims of Fraudulent Registration of a Trademark.

In their brief, U.S. Beverage makes a very passionate argument regarding Walker and Trident's fraudulent registration of the Juice Alive trademark; however it neglected to base these claims upon either a sound factual or legal analysis. In support of its claim for fraudulent registration, U.S. Beverage provides the text of 15 U.S.C. § 1120, which discusses the cause of action and the ensuing liability for the fraudulent registration of a trademark. Plaintiff neglects to provide any specific actions by Walker or Trident, that would breach the behavior that is prohibited by the statute. Instead, U.S. Beverage provides only self-serving and conclusory statements related to Walker's status as an officer and shareholder of U.S. Beverage to bolster its claims.

### A. Trident and/or Walker, not U.S. Beverage, was the first to use the Juice Alive Trademark in commerce.

U.S. Beverage alleges that the first use of the Juice Alive trademark in commerce was the flyer sent out with the heading "U.S. Beverage presents". U.S. Beverage bases

this assertion on Walker's deposition testimony. Walker testified that this flyer was "one of the first" uses in commerce; *not the first.* (Exhibit F—Walker Deposition, p. 140, line 14)  On the same date this flyer was sent out, Trident mailed out a similar flyer promoting the Juice Alive website. This website, of course, was in existence prior to the mailing of the flyers. The use of the trademark Juice Alive on the website, as explained in Walker's Brief in Support of Preliminary Injunction, was the first use in commerce. *See General Business Services, Inc. v. Rouse,* 495 F.Supp. 526, 533 (E.D.Pa.1980) (In establishing ownership of a trademark, it is a basic tenet that trademark ownership depends on whether a party had the first use of the mark in commerce.)  As such, Walker and/or Trident have both the presumption of ownership of the trademark through registration and legal ownership of the trademark by obtaining the first use in commerce.

**B. U.S. Beverage rejected the opportunity to develop a Brand, and it cannot now claim ownership of a brand that it was unwilling to expend resources to create.**

U.S. Beverage argues that under no circumstance can the creation of a brand ever be considered a corporate opportunity. It bases this assertion on a vague argument on the distinction between a brand and a product. Apparently a product can be a corporate opportunity, whereas a brand must be the "property of the corporation." A search of relevant case law did not find any precedent to support this argument, nor does the application of common sense.

At the time Walker brought forth the idea that U.S. Beverage should create a brand, U.S. Beverage was paying another corporation a licensing fee for the use of their trademark "Cool Tropics." Walker suggested that if U.S. Beverage was willing to spend the money to create their own brand, then they would no longer have to pay another corporation a licensing fee for their trademark. U.S. Beverage *rejected* this opportunity. If

U.S. Beverage was willing to pay another corporation a fee for the use of a brand, how does it not recognize that a brand created by Trident, independent of any financial or creative support by U.S. Beverage, is an opportunity separate from the business of U.S. Beverage? It appears that U.S. Beverage is arguing that despite rejecting this opportunity, refusing to contribute any funds to the creation a brand , and admitting that the brand was conceived and developed completely independent of U.S. Beverage, it must nonetheless be their property.

A long understood principle of corporate law is that property bought with corporate assets becomes the property of the corporation. Whereas property bought by an officer using his own finances is solely the officer's property. *See, In re International Resorts, Inc.,* 46 B.R. 405(D.C.Ala.,1984) (Under Alabama law, a corporation is a distinct entity, to be considered separate and apart from individuals who compose it, and is not to be affected by the personal rights, obligations and transactions of its stockholders).

Apparently, U.S. Beverage feels that there is a vast distinction between the ownership rights of intellectual property versus physical property. Consider how unreasonable U.S. Beverage's argument would appear if this dispute revolved around physical property as opposed to the ownership of a trademark. For example, consider if U.S. Beverage needed a new truck to deliver its juice products and therefore asked Walker to find a suitable vehicle for the corporation to purchase. Walker then locates a reasonably priced truck and brings it to the attention of the board. Despite requesting Walker to find a truck, the Board rejects the opportunity to purchase the vehicle. Thinking that the truck was a good investment, Walker then decides to buy the vehicle

33

using only his personal finances. Following U.S. Beverage's argument, because Walker

was a board member when he purchased the truck, it must now be the property of U.S.

Beverage. Admittedly there are distinctions between the ownership rights of physical

property versus intellectual property. However, as stated above, Walker and/or Trident

have met both the legal and factual tests necessary to establish ownership of the Juice

Alive Trademark.

### C. U.S. Beverage cannot claim that Walker and/or Trident usurped a corporate opportunity based upon the very nature of a trademark.

In support of it motion for preliminary injunction, U.S. Beverage makes numerous

allegations that Walker and/or Trident tried to ruin U.S. Beverage. For example, in

reference to the licensing agreement that it willingly signed, U.S. Beverage states that

"[Walker] under threat of destroying U.S. Beverage, placed a 'surtax' on the juice that

U.S. Beverage was selling to customers." (Plaintiff's brief, p. 7) U.S. Beverage supports

this claim stating that: "As Supreme Manufacturing was essentially the only

manufacturer of the juice product, and U.S. Beverage had to make sales to stay in

existence, there was *nothing that U.S. Beverage could do* in regards to Mr. Walker's

demands." Id. Although these allegations of duress and impending financial ruin

provide excellent shock value, they are unsupported by U.S. Beverage's own actions.

The crux of these claims is that without access to the "Juice Alive" trademark,

U.S. Beverage would be financially ruined. However, the very nature of a trademark

contradicts this theory. Unlike physical property, there is a potentially inexhaustible

supply of potential trademarks for labeling juice products. If Walker's demands were so

unreasonable, all U.S. Beverage needed to do was to develop its own brand. In his

affidavit, the owner of Supreme Manufacturing has stated that U.S. Beverage could have

directed Supreme to place any label that it desired on the generic juice product that it ordered. (Exhibit C---Witness Statement of Cliff Krauss) Thus, all that U.S. Beverage needed to do to be free of Walker's alleged ruinous intentions was to request that Supreme place a brand on their product called "U.S. Juice[3]" U.S. Beverage even admits that this was an available solution: "[Y]ou can start a brand with no money. In Montgomery, Alabama, our largest competitor in the school business, his brand – his name is Bill Givens, and – well, he was required to come up with a brand. He came up with Givens Juice, and he spent no money on it. And up until recently, had the day care business with this brand, which paid no money to call it Givens Juice." (Exhibit E---Clark Deposition, p. 78-79)

Currently, U.S. Beverage has developed its own brand. Despite U.S. Beverage's contention that a brand costs nothing, it paid a marketing company to develop the brand "Fruzars." It pays a marketing company $1.00 per case for its help in creating the Fruzars name and logo. (Exhibit B---Todd Witness Statement) Thus, in direct contradiction to their earlier assertion that "there was nothing that U.S. Beverage could do," ironically, it appears that the very solution to U.S. Beverage's alleged claims of duress by Walker and/or Trident was to seize the opportunity that Walker first suggested: create a brand.

### V. Plaintiff is Unlikely to Overcome Defendants' General Equitable Defenses of Laches, Unclean Hands and Estoppel.

As pled in Defendants' Answer, the facts in this case give rise to a number of overarching equitable defenses. These defenses are not boilerplate language in Defendants' Answer but general defenses to the entirety of Plaintiff's claims and its request for a preliminary injunction. All of these affirmative defenses are based on

---

[3] U.S. Beverage options for a brand name were limited only by the their own creativity or the creativity of any marketing company that the could have hired to create a brand.

Plaintiff's own conduct before and during the time that the alleged wrongful conduct of Walker occurred. The decision by U.S. Beverage's controlling shareholders to sit on their rights for such a long period of time gives rise to the defense of laches. Further, Defendant can show significant wrongful conduct of by U.S. Beverage and its controlling shareholders during the time in question, giving rise to the defense of unclean hands. This same wrongful conduct is also proof of the defense of equitable estoppel.

**(a) Laches.**

Alabama law recognizes the doctrine of laches as a complete defense to a request for equitable relief. See, e.g., *Ballenger v. Liberty Nat. Life Ins. Co.*, 266 Ala. 407, 410, 96 So.2d 728, 731 - 732 (Ala.1957):

> We quote from that case [*Gover's Adm'r v. Dunagan*, 299 Ky. 38, 184 S.W.2d 226]:
>
> "The doctrine of laches has been defined to be such neglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less extensive, and other circumstances causing the adverse party to be prejudiced, operates as a bar to the petitioner's right to recover in a court of equity. In respect to issues of which courts of equity have exclusive jurisdiction, where the enforcement of the claim depends upon the conscience of the chancellor, equity may refuse relief by applying the doctrine of laches, even though the claim be not barred by the statute of limitations."

(Emphasis added)  See, also, *Duncan v. Johnson,* 338 So.2d 1243, 1264 (Ala. 1976) ("Laches is … in part, defined as an 'implied waiver arising from knowledge of existing condition.'") (emphasis added) (quoting, *Meeks v. Meeks*, 245 Ala. 559, 18 So. 2d 260 (1944). Federal courts have similarly defined the doctrine of laches. See, e.g., *Kason Industries, Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997):

> The equitable defense of estoppel by laches may be applied to bar claims
> for trade dress or trademark infringement brought under the Lanham Act.
> *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1517 (11th Cir.1984). Though
> the doctrine is an equitable doctrine that should be applied flexibly, <u>a
> defendant must demonstrate the presence of three elements in order to
> successfully assert laches as a defense: (1) a delay in asserting a right or a
> claim; (2) that the delay was not excusable; and (3) that there was undue
> prejudice to the party against whom the claim is asserted.</u> *AmBrit, Inc. v.
> Kraft, Inc.,* 812 F.2d 1531, 1545 (11th Cir.1986).

(Emphasis Added) Defendants clearly can satisfy the standard for laches under Alabama

law and the federal three-part standard for laches.

Defendants included a discussion of the doctrine of laches in their first brief to

this Court.  Defendants will not restate those arguments.  It is sufficient to say that

Defendants have pointed out previously and herein that Plaintiff U.S. Beverage waited

two years to bring this case after its controlling shareholders Kittrell and Clark learned

that Walker and Ryan Hamner had developed the Juice Alive brand name and that

Walker and Hamner had started Trident Marketing.  Kittrell and Clark waited at least one

and one half years after it learned that Walker and his younger brother had started a

business selling Juice Alive in North Carolina before they brought this lawsuit (or sent

any cease and desist letter).  Furthermore, U.S. Beverage participated in a daycare juice

campaign with Walker and Trident Marketing, Inc. beginning sometime between May

and September of 2004.  In 2005, U.S. Beverage signed a licensing agreement and agreed

to pay to use the Juice Alive brand name, after it was forced to stop selling the Cool

Tropics brand.  It is only after Walker asked for an increase in the licensing fee in March

of 2006 that Tom Clark becomes angry and "declared war on John Walker" which led to

the filing of this case in June of 2006.  Defendants relied to their detriment upon the

apparent acquiescence and approval of the controlling shareholders of U.S. Beverage.  For

two years, Kittrell and Clark allowed Walker to invest his personal time and money into the Juice Alive business without objection. They cannot now ask this Court to enjoin Walker or Trident from continuing to do business.

Plaintiff's proffered excuse for its delay in challenging Walker's activities and/or in bringing this lawsuit put forth by Plaintiff is that Kittrell and Clark were trying to negotiate a buy out with John Walker. This excuse is undercut by the Witness Statement of Norman Todd who states that it was Walker's decision in March of 2006 to ask for a higher licensing fee for Juice Alive that precipitated this case. He testified that Tom Clark became angry after this meeting and "declared war on John Walker." Furthermore, Plaintiff's recent pronouncements that Walker is entitled to nothing for his shares in U.S. Beverage, Inc. or the limited liability company also shows that Kittrell and Clark have not negotiated in good faith with Walker as to the possible buyout of his shares. Also, Plaintiff's excuse of economic duress for signing the Juice Alive licensing agreement is also undercut by the witness statement of the owner of Supreme Manufacturing who states that Plaintiff could have bought juice products without entering into a licensing agreement for Juice Alive. The evidence shows that as long as the price for the Juice Alive brand was very cheap and Walker didn't complain about the tens of thousands of dollars owed to him by U.S. Beverage that Kittrell and Clark were content not to challenge Walker's actions. This conduct clearly establishes the defense of laches and defeats Plaintiff's request for a preliminary injunction.

### (b) Unclean Hands and Equitable Estoppel.

The facts in this case also give a clear showing that the Plaintiff and its controlling shareholders have acted with little regard to the equity of their actions before

bringing suit against Defendants. The long-held, equitable principle of clean hands has

been stated in various ways. Simply put, "One who seeks equity must do equity." *Neal v.*

*Neal,* 856 So.2d 766, 786 (Ala. 2002). The purpose of the clean hands doctrine is to

prevent a party from asserting his rights under the law when the party's own wrongful

conduct renders the assertion of such legal rights contrary to equity and good conscience.

*J & M Bail Bonding Co. v. Hayes,* 748 So.2d 198, 199 (Ala.1999). Evidence of unclean

hands is proper where there are allegations of breach of fiduciary duty by an officer. *See*

*American Family Care, Inc. v. Irwin*, 571 So.2d 1053, 1058 (Ala. 1990)

Likewise, the doctrine of equitable estoppel is designed to promote equity and

justice in a case by "preventing a party from asserting rights under a general rule of law

when his own conduct renders the assertion of such rights contrary to equity and good

conscience." *Robinson v. Boohaker, Schillaci & Co., P.C.,* 767 So.2d 1092, 1094 (Ala.

2000) The principle is eloquently stated by the Alabama Supreme Court in *Dunn v.*

*Fletcher,* 266 Ala. 273, 277-278, 96 So.2d 257, 261 (Ala. 1957):

> The doctrine of estoppel is founded upon the primary and ultimate aims of the
> law-the redress of wrong, the prevention of fraud, and the promotion of the ends
> of justice. Having its origin in good morals and in consideration of good faith, its
> operation and effect are useful and beneficent, when its application is confined to
> cases, where it is manifest that the acts or statements on which another has relied
> and acted cannot be retracted 'without a breach of faith on the one hand, and
> injury on the other.'

Plaintiff and its controlling shareholders have committed many acts that are

'contrary to equity and good conscience.' Less than a year after they purchased Walker's

business and made him an officer and a one-third shareholder, they unilaterally reduced

his total salary to less than their own. (Walker's First Witness Statement, par. 9-10—

Exhibit A to Defendants' brief filed on 3/16/07; Exhibit E--Clark deposition. p 49, line

12- p. 50, line 17) His compensation became much more dependent on sales commissions rather than a fixed salary. (Id.) Even after reducing Walker's salary through the change in compensation, Kittrell and Clark have not paid him his full sales commission nor have they reimbursed him for expenses incurred. (Exhibit A---Walker's Third Witness Statement) Between October 2003 (when the salary change occurred) and November 2004, these unpaid expenses and commissions amounted to approximately $35,000. (Id.) Much of this remains unpaid to this day. (Exhibit E—Clark depo., p. 55 line 22-p.56 line 4) They suspended his salary entirely in July of 2005, citing financial problems as the reason. (Walker's First Witness Statement, par.18—Exhibit A to Defendants' brief filed on 3/16/07; Exhibit E---Clark deposition. p. 56 line 8-17) Walker's salary was never reinstated, but the salaries of Clark and Kittrell were reinstated in November 2005. (Exhibit E---Clark deposition. p. 60, line 7-19) Essentially, Plaintiff has paid Walker little to nothing for his services to the company, yet they expect an absolute duty of loyalty to themselves and their company. Plaintiffs also sent a letter to many, if not all, of the Mississippi Nutrition Directors that contained complete falsehoods about Walker and Juice Alive. (See Defendant's Exhibit L to Defendant's brief file on 3/16/07) In said letter, they explain that Walker is still an officer of U.S. Beverage but has basically gone rogue, selling for his own company. (Id.) This statement, however, is in direct contradiction of their letter to him, dated April 20, 2006, whereby they terminated him as an officer of the company and cancelled his insurance.

There is further evidence of Plaintiffs' disingenuous and inequitable behavior in regards to their business practices. There is evidence that Clark and Kittrell have used funds of U.S. Beverage to fund other ventures that they are involved in, specifically a

mattress company and a real estate business (Exhibit B---Todd Witness Statement;

Exhibit D – Grady Kittrell deposition, p. 51) Further, there is evidence that Plaintiff

purposefully moved into North Carolina and undercut Walker and Trident Marketing for

the express purpose of causing Walker to go out of business. (Exhibit B---Todd Witness

Statement)

This undisputed evidence is more than enough to prove a prima facie case of

unclean hands or equitable estoppel. Plaintiff and its controlling shareholders have fallen

far short in their duties to Walker, yet they expect Walker to remain completely loyal to

U.S. Beverage. By selling Juice Alive in North Carolina, Walker was merely trying to

supplement his insufficient income from U.S. Beverage. (Exhibit A--Walker's Third

Witness Statement)  Walker would not have had to seek other avenues of income if

Plaintiffs had paid him fully for his services. *See, Risser v. Mellott et al.,* 45 Pa. D. & C.

432, 1943 WL 2587 (Pa.Com.Pl 1942) ("[P]laintiff, who set the forces of tumult in

motion, is not entitled to the protection of the equity court against conduct of defendants

which at its worst was merely retaliation."). It also shows that they are applying a double

standard to their concept of loyalty. While charging Walker with breaches of fiduciary

duty, Kittrell and Clark are subsidizing other businesses of theirs with U.S. Beverage

money and property. All at the detriment of minority shareholder Walker and to the

detriment of the employees of U.S. Beverage, such as Norman Todd, who is currently

owed $20,000 by U.S. Beverage.  (Exhibit B--Todd Witness Statement)  More

importantly, Kittrell and Clark participated in a Juice Alive daycare juice campaign and

later licensed the Juice Alive brand for its slush drink product for over five months. Yet,

Kittrell and Clark now claim that the creation of Juice Alive and Trident Marketing, Inc.

by Walker was wrongful and that they should own the Juice Alive brand. All of this is clear evidence that Plaintiff and its controlling shareholders Clark and Kittrell did not act in equity, and therefore Plaintiff cannot receive equity from the court. *See, Van Antwerp v. Van Antwerp*, 242 Ala. 92, 5 So.2d 73 (Ala. 1941) ("If parties are not in pari delicto, a court of equity will aid the one who is comparatively more innocent and grant him full affirmative relief such as where the more innocent party was induced by imposition, oppression, duress, threats, undue influence, and active and actual fraud").

Therefore, this Court must deny Plaintiff's request for equitable relief in the form of a preliminary injunction, because there is strong evidence that Plaintiff's own inequitable conduct gave rise to this dispute and/or that their conduct satisfies the requirements for the above-argued defenses.

### VI. Plaintiff Improperly Requests Final Relief Which Cannot be Granted at the Preliminary Injunction Stage of the Proceedings.

Two items of Plaintiff's requested relief are entirely inappropriate at the preliminary injunction phase of this trial. Plaintiff asks for two forms of final relief: (1) a request this Court to cancel John Walker's shares in U.S. Beverage, Inc. and a limited liability company; and (2) a request that this Court award Plaintiff $75,000 in "liquidated damages."[4] The purpose of a preliminary injunction is to preserve the status quo, *TFT,*

---

[4] The liquidated damages provision found in the Agreement Not to Compete is an unenforceable penalty, because the contract calls for $75,000.00 in "liquidated damages" in addition to actual damages. See, e.g., *Milton Const. Co., Inc. v. State Highway Dept.*, 568 So.2d 784, 790 (Ala.,1990):

> In *Camelot Music, Inc.*, supra, we cited three criteria by which a stipulated damages clause may be characterized as liquidated damages as opposed to a penalty:

"First, the injury caused by the breach must be difficult or impossible to accurately estimate; second, the parties must intend to provide for the damages rather than for a penalty; and, third, the sum stipulated must be a reasonable pre-breach estimate of the probable loss."

514 So.2d at 990, citing C. Gamble and D. Corley, *Alabama Law of Damages* § 5-4 (1982).

*Inc. v. Warning Systems, Inc.,* 751 So.2d 1238, 1242 (Ala. 1999), yet Plaintiff U.S.
Beverage has asked for final relief and even damages in their relief requested.

Plaintiff asks that Walker's ownership interest in U.S. Beverage, Inc and in the
limited liability company that owns U.S. Beverage's headquarters building be
'cancelled.' Besides being relief that is not requested anywhere in its Complaint,
cancelling Walker's shares is final relief. It is also a type of final relief that is unheard of
in this type of case. Judicial cancellation of shares in a company is only appropriate when
the shares are issued illegally, or the shares were issued by an officer fraudulently or
without authority, and the circumstances are such that the shares are either void or
voidable. *See, Crow v. Florence Ice & Coal Co.,* 39 So. 401 (Ala. 1905). Nothing in the
evidence suggests this is such a case. Walker legally acquired his shares in the company
when his former company was acquired by U.S. Beverage. Plaintiff seeks this relief
simply because Walker will not accept their unreasonable terms for purchase of his
stock.[5] This relief is also far from preliminary injunction type of relief that will 'preserve
the status quo.' Such final relief is inappropriate at the preliminary injunction phase.

In the same vein, Plaintiff requests that this Court at the preliminary injunction
stage give it "liquidated damages" of $75,000, presumably under the damages clause of
the 'Agreement Not to Compete.' It is also counter to the whole point of seeking a
preliminary injunction. Preliminary injunctions are only attainable when there is no
adequate remedy at law. *Baldwin County Elec. Membership Corp. v. Catrett,* 942 So.2d
337, 344 (Ala. 2006). If Plaintiff believes that its damages under the non-competition

---

[5] As explained above, Walker has offered to sell his shares in counteroffers to proposals made by Clark and
Kittrell. However, Walker is unwilling to give away his shares for nothing as demanded by Clark and
Kittrell in recent correspondence.

clause can be valued at $75,000, then, *ipso facto*, Plaintiff is not entitled to equitable relief on that claim. Plaintiff cannot have it both ways.

Final relief is also inappropriate at this stage of the case, because discovery in this case has not been completed. The parties have conducted discovery only as to the preliminary injunction issues. Defendants anticipate taking at least five more depositions before the final trial of this case, as well as issuing additional requests for production of documents and interrogatories to Plaintiff and Third Party Defendants. More importantly, Defendant has requested a jury trial in this case. Defendants will not waive their rights to have a jury decide the many factual issues in this case.

Since these requests for final relief are inappropriate at this preliminary stage, Defendants request that the Court deny these requests.

## CONCLUSION

As shown above, Plaintiff U.S. Beverage has little chance of winning on the merits of any of its claims. Its brief is rife with non-existent 'facts' and unsubstantiated conclusions. In their previous brief, Defendants John Walker and Trident Marketing, Inc. have argued that a preliminary injunction barring Defendants' participation in the fruit juice drink market would be contrary to public policy, because it would limit competition and drive up the price paid by public schools (and tax payers) for fruit juice drinks. Defendants have also shown that an injunction in favor of Plaintiff U.S. Beverage is not necessary to protect the interests of Plaintiff. As such Defendants respectfully request this Court deny Plaintiff's request for a preliminary injunction.

In addition, Defendants reiterate herein the facts and legal arguments that dictate that this Court should grant Defendants' a preliminary injunction against Plaintiff's acts of trademark infringement and/or trademark dilution. Therefore, Defendants respectfully request that their motion for preliminary injunction be granted by this Court.

**RESPECTFULLY SUBMITTED** this the 5th day of APRIL 2007.

Raymond L. Jackson, Jr. (JAC054)
Attorney for John B. Walker, II and
Trident Marketing, Inc.

**OF COUNSEL:**
Raymond L. Jackson, Jr.
Jackson Law Group, P.C.
P.O. Box 3575
Auburn, Alabama 36831-3575
(334) 821-0600
(334) 821-1950 (FAX)
rjackson@auburnattorney.com

## CERTIFICATE OF SERVICE

I certify that on this the 5th day of APRIL 2007 a copy of the foregoing pleading was served upon all counsel of record through the EMCS electronic filing system and/or by placing said copy in First Class U.S. Mail with postage prepaid to the following addresses:

    Richard H. Gill, Esq.
    C. Nelson Gill, Esq.
    Copeland, Franco, Screws & Gill, P.A.
    P.O. Box 347
    Montgomery, AL 36101-0347

OF COUNSEL