## Witness Statement of Norman H. Todd

My name is Norman H. Todd, and I am over nineteen years of age. I reside in Elmore County, Alabama. I am competent to testify, and I have personal knowledge of the following facts.

I was originally hired by U.S. Beverage, Inc. on July 06, 2005. My first job with the company was as a route sales person. I was delivering juice/cola products to customers on a fixed route. At that time, I was delivering both 10% fruit juice, as well as 100% fruit juice 5 to 1 concentrate, which was all labeled with the Cool Tropics brand. I had numerous day care accounts, which were purchasing a 100% juice 7 to 1 concentrate labeled with the Juice Alive brand. On or about November 2005, I stopped delivering Cool Tropics product and started delivering only Juice Alive brand juice products. At that time, it was also decided that we would no longer offer a 10% juice product to customers and instead we would offer a 100% fruit juice concentrate at both the 5 to 1 and 7 to 1 mix ratios.

In December 2005, I was promoted from being a route sales person to being a full time sales person. My first assignment as a sales person was to develop business in the State of Mississippi. During my first two weeks in this new position, I met with Child Nutrition Directors for various Mississippi school systems. Tom Clark accompanied me on these sales meetings to train me on the presentation of the 100% Fruit Juice product. During these meetings, Tom would attempt to discredit the other companies selling the Cool Tropics brand. Tom Clark told the child nutrition directors that U.S. Beverage had been asked to develop 100% fruit juice slush by some schools in Alabama. Tom went further to state that he approached Cool Tropics and asked them if they would create a formula for 100% fruit juice slush and that the owner of the Cool Tropics brand had refused to do so. He said U.S. Beverage then created a formula and had Cool Tropics label it for them. As time past and Cool Tropics observed the popularity of the product, Tom stated they demanded a higher per case cost for the product. Tom stated he felt that the demand for a higher case cost was absurd because U.S. Beverage had developed the 100% fruit juice slush concentrate. For this reason, Tom told the child nutrition directors that U.S. Beverage decided to use the Juice Alive label for its 100% juice products.

In March 2006, Tom Clark, John Walker, and I attended the Alabama Child Nutrition Show in Birmingham. It was my understanding that John Walker was the owner of the Juice Alive brand, because Tom was complaining John was not bringing anything to the show or assisting in the cost incurred to secure the booth rental. Tom Clark stated that John as the owner of the Juice Alive brand should assist with some of the cost since "we were representing his product." On the last day of the show, Tom, John, and I went to dinner. While at dinner, John began to converse with Tom in reference to increasing the case cost for the Juice Alive label. He stated that he felt $1.20 was too low of a licensing fee for the product. John Walker said that other distributors are willing to pay a licensing fee of $6 to $8 dollars per case for use of the Juice Alive brand. Tom told John that they had agreed on the $1.20 per case, and he did not feel they should have to renegotiate the price. John said there was no option, either U.S. Beverage

would pay the increase, or he would allow other distributors to carry the product. John went further to tell Tom that he could not provide point of sale materials or the marketing support for the brand at $1.20 per case. John stated he would not seek distributors in the Alabama market, but he would be seeking distributors in the Georgia market. Tom told John Walker that he could not seek distributors in the Georgia market because they had originally agreed that U.S. Beverage would distribute Juice Alive in Georgia, Alabama and Mississippi. John told Tom he needed an answer within two weeks. On the way home, I asked Tom why U.S. Beverage did not created its own label for the product. Tom stated that we could do so, but it would take some time. Tom went further to state that U.S. Beverage was "declaring war on John" and that John would fall.

Shortly after the Alabama show, I attended a meeting with Tom Clark at BLR Agency, an advertising agency in Birmingham, AL. We attended a meeting with Cary Bynum in reference to developing a new label to be owned by U.S. Beverage Inc. Tom told Cary Bynum of the issues with John and his demands. Tom agreed to pay Cary $1.00 dollar per case sold for his development of the new label. Tom and I returned to visit Cary a couple of weeks later to preview the labels and proof them for final print. In the meantime, a generic Fruzers label was being placed by Supreme Manufacturing (the producer of the juice) on the containers of 100% fruit juice concentrate for both the 7 to 1 and 5 to 1 concentrates.

After the creation of the new label Fruzers, Tom stated that he wanted to put John Walker out of business. I was instructed to register for the North Carolina School Nutrition Show and the Tennessee Child Nutrition Show. Tom stated that if we go into John's territories at a lower case cost that U.S. Beverage could take enough business away from John Walker to put him out of business. During a pre-show meeting prior to the North Carolina show, Tom instructed the sales staff to quote $59.95 per case to all of the buyers at the show. This price was about $25 dollars per case less than what we knew John was selling the Juice Alive product for in the North Carolina and Tennessee markets. Tom's directions to sell our product for $59.95 per case started a price war and effectively drove the price of the slush product down especially in situations where bids were solicited by school systems.

On or about May 15, 2006, John Walker issued a cease and desist letter to U.S. Beverage demanding that it immediately stop using Juice Alive products and point of sale materials. At this time, U S Beverage had already started selling product labeled with the Fruzers logo. At no time did U S beverage stop selling the Juice Alive product it had in stock to its customers. All of the Juice Alive products were sold until it was depleted. U.S. Beverage did not lose money on Juice Alive products that were purchased prior to receiving the cease and desist letter. U.S. Beverage continued to use Juice Alive products until at least August 2007.

By the summer of 2006, I had sold around 400 new accounts for U.S. Beverage in the states of North Carolina, Tennessee, Alabama, Mississippi, Louisiana, and Oklahoma, which was a very large amount of growth for such a short period of time. I asked Grady Kittrell if I should slow down on adding new accounts to allow us to catch up and be able

to handle the volume. Kittrell instructed me to just worry about selling and that he would worry about the rest. I was unsure as to how U.S. Beverage was going to gain financing for all of the machines and product needed for all of its existing and new accounts. All of the employees at the company knew that the company was constantly struggling to avoid going out of business. It had got to the point that I was afraid to go on a long business trip, when I did not have personal cash to bring with me, because company gas cards sometimes would not work. When I asked Tom Clark about the company's ability to gain financing for all the needed items for the new accounts, he stated that he had it under control. Tom told me that he and Grady had created or made up a financial company as a reference on credit applications. It was set up where the financial institutions would call the fake company to get a credit reference and someone would actually answer the phone to give them the information they needed. This scheme enabled U S Beverage to gain financing of approximately $1.4 million during 2006, which it needed to service its customers. In 2006, U.S. Beverage also borrowed money to purchase six new vehicles, including two Chevy Tahoes for the personal use of Clark and Kittrell.

    Not only was U.S. Beverage able to find enough financing to fund its customer accounts, but it was also able to fund the operation of another business. During September 2006, Tom stated to me that U.S. Beverage had to financially assist the mattress store businesses, owned by him, Grady Kitrell and other persons, because of the lack of profits at the mattress stores. Tom went further to state that he did not think that U.S. Beverage should have to bail the mattress stores out of financial trouble. Lou, the secretary for U S Beverage, told me that U.S. Beverage had to fund the mattress stores, because the manufacturer Serta was demanding the stores to advertise more than the stores could afford.

    At the same time that, U.S. Beverage was buying hundreds of thousands of dollars worth of new products, equipment, and machines, as well as helping to fund a mattress store business, the company failed to pay me all of my sales commissions. I was supposed to be receiving a 4% commission on new accounts that I sold and a sales commission of 1.75% on all existing accounts. This commission agreement was entered into between Tom Clark and me. To date, I have not received all of my commission money owed me by U.S. Beverage. Currently, U.S. Beverage owes me approximately $20,000.00 in unpaid sales commissions and reimbursements.

    I decided to leave U.S. Beverage in December 2006 due to the company's failure to pay my commissions, which resulted from Clark and Kittrell's lack of concern for paying employees. I did not feel I should have to beg Clark and Kittrell for the money that I was owed. I am not the only employee that has experienced this with this company. The turnover rate is well over 100% per year with U.S. Beverage.

    After leaving U.S. Beverage, I wanted to stay in the juice and slushy drink sales business, because I have been very successful in selling such products. I contacted John Walker and sent my resume to Walker. Walker did not initiate contact with me. He did not know that I had left U.S. Beverage until I contacted him. I was hired by Walker's company in January of 2007. Since I have worked for Walker, I have not shared any

secret or proprietary information of U.S. Beverage, Inc. with John Walker or anyone at his company. I discussed the facts set forth above with Walker's attorney, when I was contacted by Walker's attorney. I have been told that this information will be used only in lawsuit between Walker and my former employer U.S. Beverage, Inc.

    I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: April 3, 2007

NORMAN H. TODD