```
 1              US BEVERAGE, INC.,
 2                  Plaintiff,
 3                      v.
 4     JOHN BUSTER WALKER, II, and TRIDENT MARKETING,
 5                     INC.,
 6                  Defendants.
 7     -------------------------------------------------
 8     JOHN BUSTER WALKER, II, and TRIDENT MARKETING,
 9                     INC.,
10             Counterclaim Defendants,
11                      and
12     GRADY DOWLING KITTRELL, THOMAS GOING CLARK,
13         III, and NORMAN "BUDDY" TODD,
14             Third Party Defendants.
15
16                CIVIL ACTION NO.
17                2:06-CV-496-SRW
18
19
20
21     DEPONENT:  Grady Dowling Kittrell
22     DATE:  September 15, 2006
23
```

WORDCRAFT REPORTING, LLC
334.462.4665

```
                                                      1
     1        IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF ALABAMA
     2                  NORTHERN DIVISION

     3    US BEVERAGE, INC.,
                 Plaintiff,
     4        vs.
          JOHN BUSTER WALKER,
     5    II, and TRIDENT         CIVIL ACTION NO.
          MARKETING, INC.,
     6          Defendants.       2:06-CV-496-SRW
          ----------------------
     7    JOHN BUSTER WALKER,
          II, and TRIDENT
     8    MARKETING, INC.,
                  Counterclaim
     9           Plaintiffs,
              vs.
    10    US BEVERAGE, INC.,
                  Counterclaim
    11            Defendant,
          and
    12    GRADY DOWLING
          KITTRELL, THOMAS
    13    GOING CLARK, III, and
          NORMAN "BUDDY" TODD,
    14            Third Party
                  Defendants.

    16            *  *  *  *  *  *

    17        DEPOSITION OF GRADY DOWLING KITTRELL,
          taken pursuant to notice and stipulation on
    18    behalf of the Defendant/Counterclaim
          Plaintiffs, in the Law Offices of Copeland,
    19    Franco, Screws & Gill, 444 South Perry Street,
          Montgomery, Alabama, before Tiffany B.
    20    Beasley, Certified Court Reporter and Notary
          Public in and for the State of Alabama at
    21    Large, on September 15, 2006, commencing at
          8:39 a.m.
    22

    23
```

```
                                                      2
                     APPEARANCES

     2
     3    FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT/THIRD
     4    PARTY DEFENDANTS:
     5        C. NELSON GILL, ESQUIRE
     6        Copeland, Franco, Screws & Gill
     7        444 South Perry Street
     8        Montgomery, Alabama 36104
     9
    10    FOR THE DEFENDANTS/COUNTERCLAIM PLAINTIFFS:
    11        RAYMOND L. JACKSON, JR., ESQUIRE
    12        CLIFF TUNNELL
    13        660 North College Street
    14        Suite D
    15        Auburn, Alabama 36830
    16
    17    ALSO PRESENT:
    18        THOMAS GOING CLARK, III
    19        JOHN BUSTER WALKER, II
```

```
                                                      3
     1                  STIPULATIONS
     2        It is stipulated and agreed by and
     3    between counsel representing the parties that
     4    the deposition of GRADY DOWLING KITTRELL may
     5    be taken before Tiffany B. Beasley, Certified
     6    Court Reporter and Notary Public in and for
     7    the State of Alabama at Large, without the
     8    formality of a commission; and all formality
     9    with respect to other procedural requirements
    10    is waived; that objections to questions, other
    11    than objections as to the form of the
    12    questions, need not be made at this time, but
    13    may be reserved for a ruling at such time as
    14    the deposition may be offered in evidence or
    15    used for any other purpose by either party as
    16    provided by the Federal Rules of Civil
    17    Procedure.
    18        It is further stipulated and agreed by
    19    and between the parties hereto and the
    20    witness, that the signature of the witness to
    21    this deposition is hereby waived.
```

```
                                                      4
     1                     INDEX
     2
     3    EXAMINATION                          Page
     4    MR. JACKSON..........................   7
     5
     6    EXHIBITS                             Page
     7    1    Letter from James R. Cooper,      73
              Jr., to U.S. Beverage, dated
     8        February 11, 2002

     9    2    Agreement to Purchase             74
              Corporate Stock of Tropical
    10        Perfections, Inc., dated
              April 24, 2002
    11
         3    US Beverage Outline,             153
    12        Bates-Stamped US Beverage 096
              through 097
    13
         4    Proposal for US Beverage Web    164
    14        Site, dated 10/14/04

    15   5    Register4less Receipt, dated    165
              8/9/04
    16
         6    Various Labels                   185
    17
         7    Label                            185
    18
         8    Letter from Ryan Hamner and     197
    19        John Walker to US Beverage,
              Inc., dated 5/24/04
    20
         9    Letter from US Beverage to      201
    21        John Walker, dated December
              20, 2004, Bates-Stamped US
    22        Beverage 093

    23   10   Letter from Mr. Walker to       203
```

177

1 one that we had all gone and met with. We had
2 agreed to allocate some resources but not
3 millions of dollars. We just didn't think
4 that was a necessary function. We just didn't
5 think that the brand development was going to
6 cost that much. The value of the brand is
7 based on the marketing and distribution of the
8 brand.
9 Q. Is it your testimony today that John Walker
10 asked the company to invest millions of
11 dollars toward the creation of a brand?
12 A. No. I said we did not feel that we needed to.
13 Q. Okay. Well, I'm asking you what your
14 recollection is of what Mr. Walker asked in
15 terms of financial resources from US Beverage
16 to help to create a brand.
17 A. I would say that the initial discussions were
18 in excess of $5,000.
19 Q. And you thought a $5,000 investment in a new
20 brand was excessive?
21 A. I thought that the way that he wanted to
22 allocate the funds could be perceived to be
23 excessive. I thought we could have come up

178

1 with several names to start exploring
2 development of, as opposed to paying a Ryan
3 Hamner or someone 5,000 just for a logo.
4 Q. And is that your testimony, that he proposed
5 to just spend $5,000 paying Ryan Hamner, and
6 that was the only thing he proposed to you in
7 terms of --
8    MR. GILL: Object to the form.
9 A. No. That would not be. I've misstated that.
10 Q. Okay. Well, and I misunderstood you, so you
11 can clarify that.
12 A. We did not feel that the amount of money was
13 necessarily the issue. We felt that the
14 amount of focus that John Walker wanted to
15 designate to that project was a little -- we
16 still felt he needed to be selling day to day
17 and working on that project in his spare time,
18 not that that became the focus; that those
19 resources were better used day to day making
20 sure that our accounts were taken care of;
21 that the cash flow of the business was secure
22 so that we could pay our bills and continue to
23 grow and then develop a brand through that.

179

1 Q. Okay. Just to make sure I understand, I guess
2 at some point there was a decision made that
3 US Beverage, first, doesn't want to spend the
4 money that Mr. Walker had proposed, or however
5 he had budgeted the money; and, secondly, that
6 the other members of the company wanted
7 Mr. Walker to spend his time on developing
8 customers rather than developing a new brand;
9 is that --
10    MR. GILL: Object to the form.
11 A. No, that's not accurate.
12 Q. Okay. Well --
13 A. We feel that the majority of his time should
14 have been spent on the day-to-day business
15 that US Beverage was engaged in. But that the
16 marketing is a very essential part of what we
17 do. We are nothing more than a marketing
18 company. That is what we do. We take a
19 product; we go to the streets and we market
20 and we sell; and then we distribute. It's all
21 a function of marketing. We felt that a brand
22 was important to us, but at the time when you
23 cannot pay your bills, the most important

180

1 thing -- not to lessen the importance of a
2 brand -- but the most important thing was to
3 continue the path that we had all signed off
4 on and to develop the brand as an addition to
5 the marketing plan, not that the sole function
6 of John Walker came to be a brand-development
7 manager. That was not the direction we wanted
8 to go.
9 Q. When did you first hear the name Juice Alive?
10 A. I would say the first recollection I have of
11 Juice Alive as a name would have been at the
12 time -- I could not give you a definite date
13 on that.
14 Q. Did you come up with the name Juice Alive?
15 A. No.
16 Q. What about Mr. Clark; do you think he -- are
17 you contending he came up with the name Juice
18 Alive?
19 A. I do not think he did.
20 Q. Well, do you think the first time you heard
21 about the name Juice Alive would have been
22 from John Walker?
23 A. Yes, I believe that.

245

1 whole list. I thought you said when I was
2 first made aware.
3 Q. Well, I asked when you -- I asked for the
4 first instance, and we're trying to work our
5 way forward. And then you said you couldn't
6 put it in a timeline form. So I just asked
7 you generally to list for us.
8 A. The Mississippi trade show was a big incident
9 we felt of competition. John Walker, in fact,
10 brought his agents down for the sole purpose
11 of competing directly with us at that trade
12 show. Had secured their own booth. And we
13 were advised to that by the trade show people,
14 and I contacted Mr. Walker about that. I
15 said, John, you know, in the middle of these
16 negotiations, this would be a bad time for you
17 to create a wedge between our negotiations
18 that way by blatantly competing with us at an
19 open trade show.
20 Q. When did that occur?
21 A. It was the Mississippi trade show for last
22 year. Probably last -- last fall sometime.
23 Q. Did you lose any sales as a result of this

246

1 alleged competition?
2 A. On that date?
3 Q. Just as a result of what happened --
4 A. Oh, yes. We feel that our price point has
5 been driven down by the threat of Mr. Walker
6 bidding; the information that he has passed to
7 competitors of ours based on what he calls the
8 Trident Marketing association with Dispensing
9 Systems; we feel that our bids have been
10 damaged tremendously. We have lost pieces of
11 business due to him creating a competitive
12 entity. So, yes, we do feel that we've lost
13 business and lost revenues, an enormous amount
14 of revenues due to this competition.
15 Q. Could you put a dollar figure on this enormous
16 amount of revenues?
17 A. I could not today.
18 Q. What would it take for you to be able to
19 quantify this?
20 A. I would need time to go through an account
21 list.
22 Q. Did Mr. Walker give you leads that occurred
23 during the Mississippi trade show or give US

247

1 Beverage leads?
2 A. At that point, when we -- when we had let
3 Mr. Walker know that we saw this as an act of
4 aggression. And we sat down at that trade
5 show in a conference room at a hotel to try to
6 work some things out. And, again, it has
7 always been our intention to put the business
8 first and protect it, US Beverage, because it
9 can't speak for itself. So we as corporate
10 officers have to speak for it, and sometimes
11 we do have to put the needs of the company
12 ahead of our personal needs. And in doing so,
13 we did agree to some things that we felt we
14 were coerced into for the protection of the
15 greater good of US Beverage.
16      On that date we made what we
17 felt was an amicable good-faith arrangement,
18 which he breached on many occasions. Did he
19 give us leads? We were there are at the show
20 and got the leads alongside him because he was
21 in the booth with us. So did he give us
22 leads? No. He went out and actively bid
23 against us during that school year and this

248

1 school year through his agents.
2 Q. Okay. Now, which school years are we talking
3 about? You said "that school year." Are you
4 referring to 2005/2006?
5 A. Correct.
6 Q. Which schools did he bid against you in
7 2005/2006?
8 A. And, again, I'll have to -- I'll have to
9 look -- he may not have bid actively in 2005,
10 but he was making contact in 2006 to create a
11 path for him to sell to these accounts, which
12 would have been the 2005/2006 school year. So
13 spring of '06 he was out actively trying to
14 create a distributor network, and agents for
15 John Walker doing business as Juice Alive and
16 Trident Marketing to infiltrate territories
17 that US Beverage currently distributed in and
18 compete with us.
19 Q. What was your response or your company's
20 response to these perceived instances of
21 competition that you've listed a few minutes
22 ago?
23 A. What was our response?

257

1  Q.  As of April 20, 2006, were you aware that
2      Tiffany Walker was pregnant at that time?
3  A.  Yes, I was.
   Q.  Did you authorize Mr. Edmondson to send this
       letter?
6  A.  Yes, I did.
7  Q.  Did it not concern you to terminate health
8      benefits for someone who's pregnant?
9          MR. GILL: Object to form.
10 A.  It concerned me that US Beverage, which my
11     responsibility as a corporate officer to
12     protect, was under attack, and, yes, it does
13     concern me that she's a human and may have
14     health rights.
15 Q.  Let's move on. And just to finish up what we
16     had asked a few minutes ago, after Mr. Walker
17     told you that, no, he was not going to turn
18     the accounts in North Carolina, the schools,
19     over to you -- and I've asked you before, but
20     is it your testimony today that you didn't
21     take any legal action -- and, again, I'm not
22     talking about talking to your attorney; I'm
23     talking about some sort of legal action toward

258

1      Mr. Walker -- until 2006?
2          MR. GILL: Object to the form. I
3              mean, I think that the legal
4              action speaks for itself.
5              But go ahead and answer
6              it.
7  A.  I'm not sure -- when you say "took legal
8      action" --
9  Q.  Well, I'm talking about -- and let me define
10     that. In terms of legal action, I'm talking
11     about any sort of action directed toward
12     Mr. Walker legally, whether it's a
13     cease-and-desist letter; a lawsuit filed in
14     any state; there's an attempt to get a court
15     order, any type of action legally toward
16     Mr. Walker. And, again, I'm not talking about
17     talking to your attorney. I don't care what
18     you and your attorney said to each other.
19         MR. GILL: Object to the form.
20 A.  Well, again, we sought advice of counsel as to
21     how to proceed and formulated a strategy to
22     act on so that we would be judicious and that
23     we would try to protect the company in every

259

1      means possible in that strategy.
2  Q.  In 2004 did you send a cease-and-desist letter
3      to Mr. Walker telling him to stop doing
4      business in North Carolina?
5  A.  I do not believe I did.
6  Q.  In 2005 did you send a cease-and-desist letter
7      or have anyone else send a cease-and-desist
8      letter to Mr. Walker asking him to stop doing
9      business in the state of North Carolina?
10 A.  I do not believe we did.
11 Q.  Okay. What about in 2006? Prior to the
12     filing of this lawsuit, do you recall a
13     cease-and-desist letter, any cease-and-desist
14     letter being sent by any attorney or by you or
15     anyone else on behalf of US Beverage?
16 A.  I do not recall.
17 Q.  Okay. What about prior to this lawsuit? Was
18     there any other litigation filed anywhere, you
19     know, whether it's by this attorney or
20     Mr. Edmondson or anyone else, involving John
21     Walker and US Beverage?
22         MR. GILL: Is the question, had he
23             filed a prior lawsuit?

260

1  Q.  Yeah. Or US Beverage. Had US Beverage filed
2      a prior lawsuit or any action, request for
3      injunction, anything -- any legal filing in
4      any state anywhere with any attorney?
5  A.  No.
6  Q.  Move on. Let me ask you a little bit about
7      Cool Tropics. When you were selling Cool
8      Tropics' products, did you pay a case
9      up-charge to the owner of the Cool Tropics
10     brand?
11 A.  We paid a fee to use the Cool Tropics.
12 Q.  Brand? Yes?
13 A.  Yes. To use that label.
14 Q.  Okay. And was that in addition to the cost of
15     the actual product itself?
16 A.  Correct.
17 Q.  Do you recall what that case up-charge or what
18     the charge would have been to use the Cool
19     Tropics label?
20 A.  No. When we bought Tropical Perfections,
21     there was a case price of -- if I'm not
22     mistaken, it was around 32 or $34 a case.
23     After we acquired Tropical Perfections, we

261

1   dropped that case price actually down to
2   around 16 or $17, is my recollection. And I
3   may be off a little bit.
4 Q. How much of the 16 or $17 per case went to the
5   owner of the Cool Tropics' brand?
6 A. I think at the time, we agreed to pay -- we
7   paid it in the form of a margin, like, a
8   certain percentage. And I do not recall that
9   percentage. And, again, it was agreed upon
10  because when we had taken over Tropical
11  Perfections, some of that distribution was
12  already in place. We felt it was prudent to
13  keep those customers using that same product
14  brand name.
15 Q. So you can't today tell us what -- what was
16  the charge for using the brand?
17 A. No. Not right now I couldn't.
18 Q. When you say it was a margin, was it margin
19  over and above the 16 or $17 a case?
20 A. I think that was inclusive, but, again, I'm
21  not sure.
22 Q. And did Supreme Beverage make the product for
23  Cool Tropics you were selling?

262

1 A. Well, actually Supreme Beverage manufactured
2   that product for us, and Cool Tropics agreed
3   to move their business over there with us at
4   the same time.
5 Q. Okay.
6 A. So Supreme and Tom Clark worked on those
7   products, getting them right, and then Cool
8   Tropics actually in its own distribution
9   followed suit and moved to Supreme with us in
10  order to gain the same pricing we were
11  getting, which was better than what they were
12  getting.
13 Q. Okay. And we saw earlier Defendants'
14  Exhibit 16, which is -- we talked about
15  before, which, basically, informed Gary Dukes
16  of the 1.20 increase or the case up-charge.
17  Would there have been a similar document sent
18  earlier regarding your relationship with Cool
19  Tropics?
20 A. I could not state that. I'm not sure.
21 Q. Is it possible there was a document that was
22  sent to Supreme informing them of what the
23  case up-charge would be?

263

1 A. I'm just unaware of it.
2 Q. This case up-charge of $1.20 per case for
3   Juice Alive, do you contend that's not a fair
4   case up-charge? And I'm not talking about the
5   ownership of the IP, but I'm talking about in
6   terms of buying a product in the marketplace.
7   You know, whether you're buying Cool Tropics
8   or you're buying Juice Alive or some other --
9   some other product in the marketplace that's a
10  slush product that you're paying a case
11  up-charge to use a brand. Do you contend that
12  $1.20 case up-charge for a case of this juice
13  product is unreasonable?
14      MR. GILL: Object to form.
15 A. I contend it's unreasonable when that brand
16  should be an internal issue.
17 Q. Again, I'm not asking you -- I'm not asking
18  you to agree with us as the ownership of the
19  brand. I'm just asking you in terms of if you
20  were negotiating a case up-charge for Cool
21  Tropics or -- or, you know --
22 A. I would find it to be excessive for the
23  services provided, yes.

264

1 Q. So if Cool Tropics was charging you $1.20, a
2   case up-charge --
3 A. We left Cool Tropics because they were
4   charging us for the up-charge in giving their
5   service.
6 Q. Okay. And you don't recall how much they were
7   charging. Was it more or less than $1.20 per
8   case?
9 A. I don't recall.
10 Q. Okay. What about for this other internal
11  brand you were talking about, the Harvest
12  Pure; is that the brand?
13 A. Correct.
14 Q. Did you pay a case up-charge for Harvest Pure?
15 A. I'm going to say, yes, we probably did. I
16  could not tell you the amount at this time.
17 Q. Do you have any idea?
18 A. I do not.
19 Q. Do you think $1.20 case up-charge for the
20  Harvest Pure brand, would that be excessive?
21 A. I think at the level that US Beverage has
22  obtained, that that is an internal issue and
23  that almost any price that we would pay for

265

1  just a name -- I can't really answer that, to
2  be honest.
3  Q. But you're aware of the market, aren't you?
4  You've been involved with the juice product
5  business for many years, you say?
6  A. Yes.
7  Q. And is there not, like, a common price for a
8  case up-charge in the marketplace?
9  A. Not to my knowledge.
10 Q. In your complaint you allege that Mr. Walker
11 shirked his duties between May and
12 August 2005?
13      MR. GILL: Object to the form. Is
14           that the exact language?
15 Q. I believe it's a quote from the complaint.
16      MR. GILL: It may be, but I have no
17           memory of it.
18 Q. Are you -- do you remember that? Do you have
19 any allegations that Mr. -- do you allege that
20 Mr. Walker shirked his duties as an officer of
21 the corporation, US Beverage?
22 A. I need for you to define shirked for me.
23 Q. That's fine. We'll go on, then. Do you

266

1  allege that Mr. Walker failed to perform his
2  duties as an employee of the company, US
3  Beverage? Again, let's talk about prior to
4  July of 2005, prior to the salary dispute.
5  Let's just talk from the point he became
6  associated as an employee of the company up
7  until July of 2005.
8  A. I think I've stated previously that we were
9  very dissatisfied with his performance as an
10 officer and an employee of the company.
11 Q. Prior to July of 2005, do you know if
12 Mr. Walker was reimbursed for expenses that he
13 turned in to the company?
14 A. Without having any documentation on which
15 specific expenses, I couldn't answer.
16 Q. Do you have any records showing customers lost
17 by US Beverage as a result of any alleged
18 competition from -- from Mr. Walker or from
19 Trident Marketing?
20 A. I mean, how would that be documented?
21 Q. Well, I'm just asking you.
22 A. Do we have any records?
23 Q. I'm just trying to find -- you know, identify

267

1  documents or anything you have that would be
2  evidence in this case.
3  A. I would think that any -- you know, obviously,
4  any business that we -- that we did have that
5  they now possess would be evidence of that or
6  any bid that Juice Alive, its representatives
7  or distributors competed in would obviously
8  indicate loss of revenues and business based
9  on that.
10 Q. Let me show you a document I'm going to label
11 as Defendants' Exhibit 18. And this is part
12 of the production that we received from your
13 attorney. And ask you if you can first
14 identify it.
15      (The referred-to document was
16           marked for identification as
17           Defendants' Exhibit No. 18.)
18 A. It looks like a QuickBooks production of some
19 sort of account list.
20 Q. Okay. Did you produce this for your
21 attorneys?
22 A. This would have been produced by myself or Tom
23 Clark, I would imagine. I did not personally

268

1  produce this.
2  Q. Okay. And I notice on here there's some names
3  that are struck through. Do you know why
4  those names were --
5  A. No. I did not generate this document, so I
6  could not answer that.
7  Q. Do you know the significance of this document?
8  A. I'm unaware of it.
9       MR. GILL: Do you think the name is
10           actually struck through,
11           Raymond?
12      MR. JACKSON: Well, the document I
13           received looked just like
14           this. There are names that
15           were -- maybe they were
16           highlighted. I don't know.
17           It looked to me like it was an
18           attempt to totally strike
19           through them.
20 Q. For instance, Booneville-Anderson Elementary
21 School, do you have any idea why that would be
22 either highlighted or struck through?
23 A. I have no knowledge of this document at all.

297

1 A. You know, at one time, Slush Puppie, back when
2    I first got started with this, had 100 percent
3    product, I believe. Then they went to a
4    50 percent product. So were they perceived to
5    be 100 percent juice? I think it depends on
6    the market and what particular line that
7    distributor really focused on.
8 Q. Okay. Well, let's keep -- any other -- I
9    think you mentioned, is it Ice Makers; is
10   that --
11 A. Ice Makers.
12 Q. Dispensing Systems. You've talked about
13   various incarnations of Juice Alive?
14 A. Yeah. Buffalo Rock.
15 Q. Buffalo Rock?
16 A. Uh-huh.
17 Q. Is that the company that also distributes
18   Pepsi?
19 A. Yeah. They do distribute Pepsi.
20 Q. Okay. And you mentioned Slush Puppie?
21 A. Correct.
22 Q. Any other competitors or major competitors in
23   the marketplace?

298

1 A. There's several others, Sunshine Beverage.
2    There's several other competitors that may be
3    much of a smaller scale. There's another one
4    out of Pensacola, Florida, Damon's, which
5    touts 100 percent all natural. There's
6    several others that we -- you know,
7    different -- different markets we've -- we see
8    different competitors.
9 Q. Do you bid against these competitors?
10 A. It depends on the market and depends on the
11   product.
12 Q. What about for the school segment of your
13   business?
14 A. Again, depends on the market. Different
15   markets require bids. Some require just a
16   sales call or a pilot program or different
17   things. So there's obvious ways -- I'm aware
18   of some markets where they can put multiple
19   vendors in.
20 Q. What about the Mississippi market? Is that a
21   market that's bid for schools?
22 A. And off the top of my head, I would have to
23   look at data. Some do require a bid, it's my

299

1    understanding. Some do not.
2 Q. Have you recently lost any bids to any of
3    these competitors we've just listed?
4 A. I would have to go through some notes and talk
5    to some salespeople to find out which markets,
6    which competitors, which bids. I'm not -- my
7    head is a small attic.
8 Q. Okay. In your complaint you allege that
9    Mr. Walker has caused and continues to cause
10   you to lose customer sales. How is Mr. Walker
11   continuing to cause you to lose customer
12   sales?
13 A. Well, you know, we view that any reduction in
14   price per case on a bid that we won would be a
15   continual loss. We also contend that any
16   business that Mr. Walker created using the
17   Juice Alive name, which we feel is
18   intellectual property of ours, is business
19   that we should have had, and it's an ongoing
20   loss. Then any place that he's created a
21   competitive situation that has taken business
22   would obviously be considered a loss. And,
23   again, I would have to go case-by-case through

300

1    a lot of documentation to -- you know, to give
2    you specific examples.
3 Q. Are you alleging that Mr. Walker, in the
4    various incarnations of Juice Alive, is able
5    to manipulate the market price for fruit juice
6    products?
7 A. When you say "manipulate the price," I think
8    I'm understanding, but I want to make sure.
9 Q. Okay. You said a few minutes ago any instance
10   where you allege your competition from
11   Mr. Walker you get paid less from a
12   customer --
13 A. Uh-huh.
14 Q. -- you think that's damage. And what I'm
15   asking is in terms of doing business in the
16   marketplace, is Mr. Walker's company, is it
17   able to set the market price for your product,
18   for the juice product.
19 A. I think of -- if we're in a situation and we
20   have a relationship with a customer, we have a
21   price that we've gone in at and he sends a
22   flyer or a letter stating that he can deliver
23   that product at a lower price, that would