```
 1              IN THE MATTER OF:

 2         US BEVERAGE, INC., Plaintiff,

 3                     vs.

 4           JOHN BUSTER WALKER, II,

 5    and TRIDENT MARKETING, INC., Defendants.

 6    ---------------------------------------------

 7           JOHN BUSTER WALKER, II,

 8         and TRIDENT MARKETING, INC.,

 9             Counterclaim Plaintiffs,

10                     vs.

11             US BEVERAGE, INC.,

12             Counterclaim Defendant,

13                     and

14           GRADY DOWLING KITTRELL,

15          THOMAS GOIN CLARK, III,

16         and NORMAN "BUDDY" TODD,

17            Third Party Defendants.

18

19              CIVIL ACTION NO.

20               2:06-CV-496-SRW

21

22    DEPONENT:  THOMAS GOIN CLARK, III

23    DATE:  November 16, 2006
```

WORDCRAFT REPORTING, LLC
334.462.4665

```
                                                         1
            IN THE UNITED STATES DISTRICT COURT
   1         FOR THE MIDDLE DISTRICT OF ALABAMA
                      NORTHERN DIVISION
   2
   3    US BEVERAGE, INC.,
                Plaintiff,
   4    vs.
        JOHN BUSTER WALKER,
   5    II, and TRIDENT           CIVIL ACTION NO.
        MARKETING, INC.,
   6            Defendants.       2:06-CV-496-SRW
        ---------------------
   7    JOHN BUSTER WALKER,
        II, and TRIDENT
   8    MARKETING, INC.,
                Counterclaim
   9            Plaintiffs,
        vs.
  10    US BEVERAGE, INC.,
                Counterclaim
  11            Defendant,
        and
  12    GRADY DOWLING
        KITTRELL, THOMAS GOIN
  13    CLARK, III, and
        NORMAN "BUDDY" TODD,
  14            Third Party
                Defendants.

  16            *  *  *  *  *  *
              DEPOSITION OF THOMAS GOIN CLARK, III,
  17    taken pursuant to notice and stipulation on
        behalf of the Defendants/Counterclaim
  18    Plaintiffs, in the Law Offices of Copeland,
        Franco, Screws & Gill, 444 South Perry Street,
  19    Montgomery, Alabama, before Tiffany B.
        Beasley, Certified Court Reporter and Notary
  20    Public in and for the State of Alabama at
        Large, on November 16, 2006, commencing at
  21    8:57 a.m.
  22
  23
```

```
                                                         2
   1                    APPEARANCES
   2
   3    FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT/THIRD
   4    PARTY DEFENDANTS:
   5        C. NELSON GILL, ESQUIRE
   6        Copeland, Franco, Screws & Gill
   7        444 South Perry Street
   8        Montgomery, Alabama 36104
   9
  10    FOR THE DEFENDANTS/COUNTERCLAIM PLAINTIFFS:
  11        RAYMOND L. JACKSON, JR., ESQUIRE
  12        660 North College Street
  13        Suite D
  14        Auburn, Alabama 36830
  15
  16    ALSO PRESENT:
  17        GRADY DOWLING KITTRELL
  18        JOHN BUSTER WALKER, II
  21
  22
  23
```

```
                                                         3
   1                    STIPULATIONS
   2        It is stipulated and agreed by and
   3    between counsel representing the parties that
   4    the deposition of THOMAS GOIN CLARK, III, may
   5    be taken before Tiffany B. Beasley, Certified
   6    Court Reporter and Notary Public in and for
   7    the State of Alabama at Large, without the
   8    formality of a commission; and all formality
   9    with respect to other procedural requirements
  10    is waived; that objections to questions, other
  11    than objections as to the form of the
  12    questions, need not be made at this time, but
  13    may be reserved for a ruling at such time as
  14    the deposition may be offered in evidence or
  15    used for any other purpose by either party as
  16    provided by the Federal Rules of Civil
  17    Procedure.
  18        It is further stipulated and agreed by
  19    and between the parties hereto and the
  20    witness, that the signature of the witness to
  21    this deposition is hereby waived.
  22
  23
```

```
                                                         4
   1                        INDEX
   2
   3    EXAMINATION                            Page
   4    MR. JACKSON..........................    5
   5
   6    DEFENDANTS' EXHIBITS                   Page
   7
        1       Composite Exhibit              175
   8
   9
        (The following exhibits were
  10    previously marked in this case and
        referred to at the following pages:)
  11
  12    4......................................  134
        5......................................  132
  13    16.....................................   92
        18.....................................  143
  14    19.....................................  148
        20.....................................  152
  15    21.....................................  160
        22.....................................  167
  16    23.....................................  169
        24.....................................  172
  17    25.....................................  173
  18
  19
  20
  21
  22
  23
```

49

1   included a salary plus commission.
2 Q. Were you or Grady placed on a salary plus
3   commission at that time?
4 A. No.
5 Q. Why not?
6 A. Well, the -- the sales model, we believed, was
7   based on -- the sales model that we were
8   trying to develop was the salary plus
9   commission, with also a portion of that
10   commission being based on relationships. And
11   we felt that was the best way of -- that was
12   the best incentive package for a salesperson,
13   or a person involved in sales.
14 Q. Were you and Grady put on a set salary at that
15   point in time?
16 A. We were put on salary. I mean, we were always
17   on salary.
18 Q. Did Mr. Walker consent to having a salary
19   based on commission?
20 A. Yes.
21 Q. Do you have any notes or minutes reflecting
22   that consent?
23 A. I don't know. I can look and see.

50

1 Q. Can you check?
2 A. Yeah.
3 Q. Do you recall what the amount of sales
4   Mr. Walker needed to reach in order to receive
5   his maximum salary?
6 A. No.
7 Q. After Mr. Walker was placed on commission, do
8   you know why the company did not pay any sales
9   commissions to him until August of 2004?
10   MR. GILL: Object to the form.
11 A. I don't recall that it was August 2004. I
12   don't know.
13 Q. Do you know when Mr. Walker started submitting
14   sales commission reports?
15 A. No.
16 Q. Do you know if it would have been in December
17   of 2003?
18 A. I don't know.
19 Q. Do you recall there being a gap between Mr. --
20   gap in time between Mr. Walker's submitting
21   sales commission reports and the company
22   paying sales commissions to Mr. Walker?
23 A. I don't recall that, Raymond -- or

51

1   Mr. Jackson. I'm sorry.
2 Q. That's fine.
3 A. -- however, I wasn't involved in payroll at
4   that time. That was one of the accounting
5   duties that -- or part that Grady was involved
6   in, and so -- and there's a lot of these
7   questions that you ask me, I just wasn't
8   involved in those. I was told at the last,
9   which was in accordance with the way that we
10   designed the company.
11 Q. Did you and Mr. Kittrell have to approve
12   Mr. Walker's commission request?
13 A. A formal commission -- or a formal approval?
14   I wasn't -- I didn't have to. I wasn't
15   involved in that.
16 Q. Who would have been in charge of that at that
17   time?
18 A. John and Grady would have been involved in
19   that aspect of it.
20 Q. At the time that Mr. Walker's compensation was
21   changed in October 2003, did he have any other
22   duties with the company other than sales?
23   MR. GILL: Object to the form.

52

1 A. Official -- we had no job descriptions, so was
2   there an official or unofficial duty? That, I
3   couldn't tell you. His -- I can only go back
4   to our original agreement, was that I would
5   handle everything so that he could totally be
6   involved in sales.
7 Q. Do you know if Mr. Walker's responsibilities
8   with US Beverage changed in October of 2003?
9 A. No, I don't know if they did or not. I
10   believe that they were more focused on sales.
11   And that was the point, that if he was to
12   operate as a commission salesperson, then he
13   should be given the freedom to sell and to
14   manage the sales effort.
15 Q. Okay. Did you have any role in the company --
16   and let's talk about the period October 2003
17   to roughly July of 2005 -- in determining
18   which expenses would be reimbursed by the
19   company?
20 A. Yes.
21 Q. And what was your role as -- as to that?
22 A. My role was to analyze what we could afford to
23   pay out and determine if we could pay

53

1  expenses.
2  Q.  Okay. Would -- as part of that role, would
3      you have reviewed expense requests that
4      Mr. Walker had submitted?
   A.  Yes. I reviewed them for all of us.
6  Q.  Would you have made the decision whether or
7      not an expense request is reimbursable by the
8      company?
9  A.  Ultimately, yes, it was dictated by the
10     balance of the checkbook.
11 Q.  So you're saying whether or not an expense was
12     a business-related expense, it could be
13     reimbursed by US Beverage determined by
14     whether or not there's money in the checkbook?
15 A.  Well --
16         MR. GILL: Object to the form.
17         THE WITNESS: I'm sorry.
18         MR. GILL: Go ahead.
19 A.  Not exactly. My job was to determine what
20     bills -- what order bills should be paid, and
21     an expense was treated as a bill. And so we
22     might have money in the checkbook; however, I
23     wanted to keep the rents paid, loans paid, and

54

1  the lights and power and the -- and the fuel
2  for utilities and payroll paid first, always
3  came first to me.
4  Q.  Were you aware that Mr. Walker's expenses for
5      the period between October 2003 and July 2005
6      were not reimbursed by US Beverage?
7          MR. GILL: Object to the form.
8  A.  I realize that nobody's expenses were
9      reimbursed between those periods.
10 Q.  And when you say "nobody," who are you
11     including in that?
12 A.  The three officers.
13 Q.  And that would have been you and Mr. Kittrell
14     and John Walker?
15 A.  Yes.
16 Q.  What about other employees that work for your
17     company; were their -- their expenses
18     reimbursed during that period?
19 A.  I don't know if they had expenses during that
20     period. We would have reimbursed them if they
21     had had some.
22 Q.  Okay. And the expenses, again, that
23     Mr. Walker's -- that made it from October of

55

1  2003 until July of 2005, has US Beverage ever
2  reimbursed Mr. Walker for these expenses?
3          MR. GILL: Object to the form.
4  A.  Some, I think.
5  Q.  When would those reimbursements have been
6      made?
7  A.  The specific dates, I don't know.
8  Q.  After July of 2005 -- or specifically,
9      July 19th, 2005, are you aware of any payments
10     being made by US Beverage to Mr. Walker?
11 A.  Payments for what?
12 Q.  Or any money being -- payments, money, checks,
13     anything, any funds being transferred from US
14     Beverage to --
15 A.  After July of 2005?
16 Q.  Yes.
17 A.  I'm not aware of any.
18 Q.  Between October 2003 and July of 2005, was
19     there any time period in which you or
20     Mr. Kittrell did not receive your full salary
21     from US Beverage?
22 A.  Yes.
23 Q.  First I'll ask you, was there one instance or

56

1  more than one instances of you or Mr. Kittrell
2  not receiving your full salary during that
3  period?
4  A.  I -- I don't recall that. I'm not sure. I
5      think there was -- I can think of one for
6      sure, but I can't remember if there were other
7      times.
8  Q.  And tell us about the one instance for sure
9      that you can think of.
10 A.  The one instance -- and I don't remember the
11     details on it -- but it was after the
12     arrangement of the new salaries -- or the new
13     salary arrangement between the partners and
14     the company. John was paid his new salary,
15     and I know that I wasn't paid a salary for
16     either two or three weeks, and I don't think
17     Mr. Kittrell was paid one for two or three
18     weeks. But I do remember that John was paid
19     his full new salary at that point in time.
20 Q.  And going back to talking about the
21     compensation scheme Mr. Walker was put on in
22     October 2003, was it, basically, like a base
23     salary plus commission?

| | | |
|---|---|---|
| 1 | A. | It was a -- yes, it was a base. It was |
| 2 | | weighted because of his position with the |
| 3 | | company. It wouldn't be something that we |
| 4 | | would give somebody else that high. |
| 5 | Q. | Do you recall what the base salary was? |
| 6 | A. | No. I think there's some records. |
| 7 | Q. | How would it compare to your salary? |
| 8 | A. | Well, I don't know. Because he had -- |
| 9 | | because -- I do know that with his base plus |
| 10 | | commissions, he had the potential to actually |
| 11 | | earn more commissions than I could possibly |
| 12 | | make as a base -- or as my total salary |
| 13 | | package. I know that it was less than mine. |
| 14 | | But it was designed to incentivize (phonetic) |
| 15 | | the sales, and -- as we do with all salesmen, |
| 16 | | and not designed, you know, for any other |
| 17 | | reason like punishment. It was set -- this is |
| 18 | | the direction that we wanted to take the |
| 19 | | company, and we wanted to make sure that |
| 20 | | John's salary was based on a weighted factor |
| 21 | | so that he could make or exceed what Grady and |
| 22 | | I could make as our -- with our salaries. |
| 23 | Q. | When you said that during that two- to |

58

| | | |
|---|---|---|
| 1 | | three-week period you paid Mr. Walker's |
| 2 | | salary, are you referring to his base salary? |
| 3 | A. | Uh-huh, yes. |
| 4 | Q. | Why did US Beverage stop paying Mr. Walker |
| 5 | | in -- July 19th, 2005? |
| 6 | A. | We determined that -- the partnership |
| 7 | | determined that we couldn't afford to pay the |
| 8 | | officers at that time. |
| 9 | Q. | And was there a vote of the shareholders as to |
| 10 | | that issue? |
| 11 | A. | Yes. |
| 12 | Q. | Was there a decision made to suspend officers' |
| 13 | | salaries for 90 days? |
| 14 | A. | A decision made to suspend the salaries for a |
| 15 | | period of at least 90 days. |
| 16 | Q. | Who voted in favor of that decision? |
| 17 | A. | Well, Grady and I. We were the only two |
| 18 | | there. |
| 19 | Q. | Was Mr. Walker consulted? |
| 20 | A. | Was he consulted? He was invited to the |
| 21 | | meeting and didn't come to it. I mean... |
| 22 | Q. | How was Mr. Walker informed of this decision |
| 23 | | by you and Grady? |

59

| | | |
|---|---|---|
| 1 | A. | The same way we informed him of everything, in |
| 2 | | daily conversation -- or a conversation by |
| 3 | | phone, I mean. |
| 4 | Q. | Had you taken any pay cuts before this |
| 5 | | decision to suspend salary? |
| 6 | A. | No. |
| 7 | Q. | When was your salary restored after July 19th, |
| 8 | | 2005? |
| 9 | A. | I don't recall the exact date, but I believe |
| 10 | | it was towards the end of November. |
| 11 | Q. | Since then, have you been paid back for any of |
| 12 | | the lost wages? |
| 13 | A. | No. |
| 14 | Q. | Do you know when Grady Kittrell's salary was |
| 15 | | restored? |
| 16 | A. | No. Sometime after that. I believe the |
| 17 | | following year, but I'm not sure. |
| 18 | Q. | Has John Walker's salary ever been restored? |
| 19 | A. | No. |
| 20 | Q. | Why not? |
| 21 | A. | Well, we received an opinion that John had |
| 22 | | abandoned the business and that was no |
| 23 | | longer -- we held out as long as we could, |

60

| | | |
|---|---|---|
| 1 | | and -- but at that time, John had abandoned |
| 2 | | the business. |
| 3 | Q. | When did you receive that opinion? |
| 4 | A. | Sometime in the fall. |
| 5 | Q. | Who did that opinion come from? |
| 6 | A. | One of our corporate attorneys, I believe. |
| 7 | Q. | Is that opinion in written form? |
| 8 | A. | I don't think so. |
| 9 | Q. | Was that opinion ever shared with John Walker? |
| 10 | A. | Yes. |
| 11 | Q. | When -- |
| 12 | A. | I believe it was -- |
| 13 | Q. | -- was that? |
| 14 | A. | -- I'm quite sure. |
| 15 | Q. | Did you share it with him? |
| 16 | A. | I don't recall that. |
| 17 | Q. | Do you recall ever discussing with John Walker |
| 18 | | the fact that his salary wasn't going to be |
| 19 | | restored? |
| 20 | A. | I did not do that, no. |
| 21 | Q. | Have you had any conversations with John |
| 22 | | Walker since July 19th, 2005, about his salary |
| 23 | | or compensation? |

| | | |
|---|---|---|
| 1 | A. | I don't recall. |
| 2 | Q. | What do you recall about the proposal to sell |
| 3 | | Juice Alive to day care centers? |
| | A. | I recall that -- there being some arrangement |
| 5 | | where John and Ryan Hamner would create a |
| 6 | | market for our day care product on the |
| 7 | | Internet. |
| 8 | Q. | And what was the day care product? Just |
| 9 | | describe it. |
| 10 | A. | It was a hundred percent seven-plus-one juice. |
| 11 | | Hundred percent juice. Mixed ratio was |
| 12 | | seven-plus-one. |
| 13 | Q. | And this juice, would this be a frozen slush |
| 14 | | or just a -- |
| 15 | A. | It's the -- it's the same juice as the frozen |
| 16 | | slush, but it was just juice for -- sold in a |
| 17 | | juice -- I mean, sold the exact same way, |
| 18 | | packed the exact -- the exact same -- or |
| 19 | | similar way. Just not frozen. The end user |
| 20 | | didn't freeze it. |
| 21 | Q. | Who brought up this proposal to sell the day |
| 22 | | care juice under the Juice Alive name? |
| 23 | A. | I believe John and Ryan. |

                                                              78

| | | |
|---|---|---|
| 1 | Q. | Do you recall if there was any direct mail |
| 2 | | advertisements sent out to day care centers? |
| 3 | A. | Yes, I do recall that there was, and it was a |
| 4 | | huge fiasco. |
| 5 | Q. | How was it a huge fiasco? |
| 6 | A. | Well, we didn't really have the money to do |
| 7 | | it, and our return on the investment was -- |
| 8 | | was way, way, way lower than expectation. |
| 9 | Q. | When you said you didn't have the -- the |
| 10 | | company didn't have the money to do it, how |
| 11 | | much money did US Beverage invest in this day |
| 12 | | care project? |
| 13 | A. | I don't recall. I just know that we didn't |
| 14 | | have the money to do it. It was a financial |
| 15 | | strain to the business to do it, and it |
| 16 | | really -- it was just another bad investment. |
| 17 | Q. | At that point in time, did US Beverage have |
| 18 | | the financial wherewithal to start its own |
| 19 | | brand? |
| 20 | | MR. GILL: Object to the form. |
| 21 | A. | Yes. |
| 22 | Q. | How so? |
| 23 | A. | Well, because you can start a brand with no |

| | | |
|---|---|---|
| 1 | | money. In Montgomery, Alabama, our largest |
| 2 | | competitor in the school business, his |
| 3 | | brand -- his name is Bill Givens, and -- well, |
| 4 | | he was required to come up with a brand. He |
| 5 | | came up with Givens Juice, and he spent no |
| 6 | | money on it. And up until recently, had the |
| 7 | | day care business with his brand, which he |
| 8 | | paid no money to call it Givens Juice. |
| 9 | Q. | Can you develop and market a brand without any |
| 10 | | money? |
| 11 | A. | Without cash? |
| 12 | Q. | Yes. |
| 13 | A. | Yes. |
| 14 | Q. | Do you recall what US Beverage would have |
| 15 | | spent money on as regards this day care juice |
| 16 | | business? |
| 17 | A. | What we would have spent money on in regards |
| 18 | | to what exactly? |
| 19 | Q. | I mean, you said before it was a bad |
| 20 | | investment; you didn't have the money to do |
| 21 | | it. I'm asking you what specifically US |
| 22 | | Beverage would have spent money -- money on as |
| 23 | | part of this day care juice venture. |

                                                              80

| | | |
|---|---|---|
| 1 | A. | I believe that we spent money on the -- but I |
| 2 | | can't say for sure, but I believe we spent |
| 3 | | money on the production -- of the printing of |
| 4 | | the flyer, or the mailer itself. I believe we |
| 5 | | spent -- we paid for the postage, and I |
| 6 | | believe that we paid for a company to mail it |
| 7 | | for us, if I'm not mistaken. |
| 8 | Q. | Anything else? |
| 9 | A. | No. But what I do recall is that we paid no |
| 10 | | money for the Juice Alive name because we |
| 11 | | believed it was ours. |
| 12 | Q. | Well, I didn't ask you that. |
| 13 | A. | Well, I'm trying to relate the out-of-pocket |
| 14 | | expenses to do this and -- |
| 15 | Q. | Okay. Well -- okay. Any other expenses that |
| 16 | | you would have spent money on other than what |
| 17 | | we've just discussed? |
| 18 | A. | Well, I think we -- we would -- I believe we |
| 19 | | paid for some shipping costs of different |
| 20 | | things. |
| 21 | Q. | Would that not have been reimbursed by the |
| 22 | | purchasers of the juice? |
| 23 | A. | No. |

```
 1         and we would -- as we would acquire a
 2         convenience store, we would -- under that
 3         fashion, somebody said they wanted to do
 4         business with us, we just -- we'd slap a
 5         machine in there and start losing money with
 6         them.  And we do some business -- we have
 7         other products that we can sell to convenience
 8         stores, and we still -- and we'll sell them
 9         something if they'll pay for it up front.  But
10         to do business like we did before, we are --
11         we made a decision to get out of the
12         convenience store business in that fashion.
13   Q.    Do you know what role Ryan Hamner had in the
14         creation of the Juice Alive name?
15   A.    I was told that he was a expert on Internet
16         marketing.
17   Q.    Is Ryan Hamner an employee of US Beverage?
18   A.    No.
19   Q.    Has he ever been an employee of US Beverage?
20   A.    No.
21   Q.    Just one quick follow-up as to the day care
22         juice promotion that we talked about earlier.
23         Was US Beverage assigned a specific territory
```

                                                              90

```
 1         to sell day care -- to sell to day cares?
 2   A.    Assigned a specific territory?
 3   Q.    Yes.
 4   A.    By whom?  By Juice Alive?
 5   Q.    By anyone.
 6   A.    Well, we sold -- no.
 7   Q.    In terms of sending out these flyers and
 8         selling the Juice Alive product, was US
 9         Beverage assigned three states?
10   A.    I don't recall that.  I don't even actually
11         know where we sent the fliers to.  I wouldn't
12         have -- I -- I don't recall that.
13   Q.    Do you recall if Trident Marketing sent the
14         flyers out?
15   A.    I'm not trying to bounce around the question.
16         I don't recall.  I don't know where the fliers
17         were sent to, actually.
18   Q.    Is it your contention that US Beverage paid
19         for the flyers that were sent out by Trident
20         Marketing to day care centers to sell day care
21         juice?
22   A.    Yes.  I'm sorry.  Would you ask me that
23         question again?
```

```
 1   Q.    Is it your contention that US Beverage paid
 2         for the flyers that were sent out by Trident
 3         Marketing outside of the three states?
 4              MR. GILL:  Object to the form.
 5   A.    It's my contention that US Beverage paid for
 6         the materials involved in this experiment that
 7         we were doing.
 8   Q.    I think you touched on it before, but did US
 9         Beverage enter into a licensing agreement with
10         Trident Marketing to distribute Juice Alive?
11   A.    When did we touch on that?
12   Q.    You mentioned it a few minutes ago.  You said
13         it was a part of a buyout, I think is what you
14         said.
15   A.    Well, we -- no.  We proposed -- I think it's
16         two different issues there.  We proposed as a
17         part of a buyout to give the Juice Alive to
18         John as part of the buyout plan.  Not to just
19         simply give it to him.
20   Q.    And I'm going to show you what was marked as
21         Defendant's Exhibit 16 in the deposition of
22         Grady Kittrell.
23   A.    Uh-huh.
```

                                                              92

```
 1   Q.    And rather than reproduce all these exhibits
 2         again, I'm just going to use --
 3              MR. JACKSON:  If it's okay with you,
 4         Nelson.
 5   Q.    -- use exhibits from the first deposition.
 6              (Defendants' Exhibit 16 was
 7         previously marked and is not
 8         attached hereto.)
 9              MR. GILL:  Well, as long as we
10         reference it and we're clear.
11   Q.    I ask you to read the first sentence under the
12         word "Gary" --
13   A.    Uh-huh.
14   Q.    -- from that document.
15   A.    (As read:)  We have reached an agreement with
16         Juice Alive to start distribution of the Juice
17         Alive brand in our 100 percent juice products.
18   Q.    Okay.  And who is that document signed by?
19   A.    Tom Clark.
20   Q.    And that's you; right?
21   A.    Uh-huh.
22   Q.    Is that your signature?
23   A.    Yes.
```

93

1  Q. Do you remember creating that document?
2  A. Yes.
3  Q. Why don't you read the next sentence?
   A. (As read:) Please let this signed fax serve as official authorization for you to begin
6     selling US Beverage, Inc., the Juice Alive
7     products with 1.20 increase per case to be
8     paid to Juice Alive.
9  Q. Does that fax -- strike that question. I'm
10    sorry.
11             If US Beverage owned the name
12    Juice Alive, why did US Beverage, pursuant to
13    this fax, agree to pay a case up-charge to
14    Juice Alive?
15             MR. GILL: Object to the form.
16 A. It was done as a -- under coercion, under the
17    most stressful circumstances possible. It was
18    done in a good faith on the part of US
19    Beverage to attempt to bring back the original
20    proposal, or assembleance of the original
21    proposal, of August, and it was our show of
22    good faith that we believed that at that point
23    in time, if we handed over Juice Alive to John

94

1     under the circumstances in which this
2     agreement was made, that we could finish our
3     separation.
4  Q. Did US Beverage purchase any Juice Alive
5     products pursuant to this agreement?
6  A. Yes.
7  Q. Did US Beverage pay the case up-charge for
8     those --
9  A. Yes.
10 Q. -- products?
11 A. Yes.
12 Q. For how long did US Beverage continue
13    purchasing Juice Alive products pursuant to
14    this agreement?
15 A. Through May of the following year.
16 Q. And this agreement was dated -- I think it's
17    dated November 18th, 2005; is that correct?
18 A. Yes.
   Q. And would the fax have been sent on the same
      day?
21 A. It would have been sent around that time for
22    sure.
23 Q. And who's Gary that it's made out to?

95

1  A. Gary is the -- our representative with Supreme
2     Manufacturing.
3  Q. And you mentioned that this was signed under
4     coercion.
5  A. Yes.
6  Q. Can you describe that for us?
7  A. Yes. John contacted -- we were -- this was
8     signed at the Mississippi -- or this agreement
9     was made at the Mississippi trade show, if I'm
10    not mistaken. And Grady and John met and
11    discussed some things, then I was brought in
12    at the end of the deal, I think. When they
13    laid out the solution for -- for logical
14    separation, prior to that arrangement, or
15    prior to that meeting, Mr. Walker had called
16    me and notified me that he had a booth at the
17    Mississippi show and was going to be selling
18    his Juice Alive product individually unless --
19    and we also had a booth there -- and that
20    unless we agreed to -- to start selling his
21    product, that he would compete against us. We
22    were already in extreme financial trouble. We
23    had no sales force. Our -- John had

96

1     abandoned -- or John had not been selling in
2     our business for quite some time, and we were
3     essentially on our last leg financially.
4              And we had -- we felt like we
5     had no choice at this point in time but to
6     cooperate with John so that we could join
7     forces and sell -- it was the only chance we
8     were going to have to -- only chance we had of
9     making it financially, we felt like at the
10    time, was to submit to this coercive behavior.
11             You know, either you -- which
12    was presented to us, either you buy our
13    product, or I'm competing against you, and
14    I'll put you out of business. Because as John
15    is our salesperson to all of our contacts at
16    that time, John was still -- John was all our
17    contacts knew of US Beverage. And our -- like
18    any other sales thing, it's a relationship.
19    There's not necessarily a loyalty to the
20    company; there's a loyalty to the
21    relationship. And we had absolutely no choice
22    at the time but to sign it or go out of
23    business.

125

1 MR. GILL: Well, he is not a lawyer.
2 A. I'm the dumb one. I don't even know what a
3    TRO is. I mean, what --
4 MR. GILL: We didn't serve a TRO in
5    this case.
6 A. What is a TRO?
7 MR. JACKSON: I asked him if -- in
8    response to -- rather than
9    signing this, and he says,
10    well, you're the attorney; you
11    know we couldn't get that done
12    in two or three days. Well,
13    damn, you know. But we'll go
14    forward. Let's take a brief
15    break, and we'll...
16 (Brief recess taken.)
17 Q. Who manufactures the Fruzers brand product?
18 A. Supreme Beverage.
19 Q. Okay. And who owns the -- I guess, the
20    formulas for the product?
21 A. I don't know.
22 Q. Do you know if Supreme claims ownership to the
23    formulas for the juice product?

126

1 A. I don't know if they do or not.
2 Q. What business do you claim that Mr. Walker has
3    competed for or taken from US Beverage within
4    200 miles of Montgomery?
5 A. I'd have to look at that and -- I know -- the
6    only -- the only things I can say for sure is
7    all of the Alabama business that's within
8    200 miles -- or I shouldn't say all of the
9    Alabama business. I know that Mr. Walker or
10    his representatives have competed against us
11    in Alabama territories within 200 miles, and I
12    would have to look at a geographic map to --
13    or a map of a compass, I guess, to -- to give
14    you some specifics on that.
15 Q. You mentioned Mr. Walker's representatives.
16    Who are his representatives you're referring
17    to?
18 A. In the -- are you -- I'm referring to in
19    Alabama as several -- I think we've competed
20    against Dispensing Systems of Florida, maybe
21    Dispensing Systems of Georgia, and Dispensing
22    Systems of Alabama.
23 Q. And is it your contention that those companies

127

1    are the representative of Mr. Walker?
2 A. Yes.
3 Q. How so?
4 A. Well, on one of the brands, they -- or on one
5    of the bids, they bid Juice Alive. After
6    the -- there was a period of time after we
7    sent a letter to Dispensing Systems, they quit
8    putting that on the bid. But I also contend
9    that -- at the Alabama trade show, I contend
10    that just based on what John Walker told me
11    was that he was working with Dispensing
12    Systems at the trade show while he was
13    representing us; that he had set a tentative
14    arrangement contingent on us succumbing to his
15    demands that he would start selling to them,
16    and then they did start bidding Juice Alive on
17    one of the bids -- at least one of the bids.
18    I think several of the bids, but...
19 Q. You've referred to one bid in particular.
20    Which bid was that?
21 A. I'm not sure.
22 Q. Are you aware of any customers that US
23    Beverage has lost within 200 miles of

128

1    Montgomery due to Mr. Walker's activities?
2 A. I would have to -- once again, I think we've
3    lost some in that 200-mile radius, but I would
4    have -- have to look at a map of that, really,
5    and with a -- some sort of measurement device.
6    I do think that we've had to drop our price on
7    a lot of business due to the competing against
8    our own partner with our own brand.
9 Q. Well, let's limit it to the state of Alabama.
10    Are you aware of any customers that you've
11    lost in the state of Alabama due to the
12    activities of Mr. Walker?
13 A. Dispensing Systems didn't do very well against
14    us. We don't think they -- I think their plan
15    to put us out of business there hasn't worked
16    so far, although we have lowered our price
17    many, many times on a Dispensing Systems bid,
18    thousands of -- tens of thousands of dollars
19    worth.
20 Q. What about any customers in the state of
21    Mississippi that US Beverage claims it's lost
22    due to the activities of Mr. Walker?
23 A. That's where I would have to look at the map.

129

```
 1      I think we've lost a few, but I'm not sure who
 2      they might be.  Once again, passing out
 3      flyers, I was told that passing out flyers,
 4      making calls that said $60 a case when we were
 5      at 74.52, we lost some business.  I don't know
 6      exactly who they are, but we certainly have
 7      had to lower our prices, and it's cost us tens
 8      of thousands of dollars.
 9  Q.  Would your records reflect which customers in
10      Mississippi you claim you've lost due to the
11      activities of Mr. Walker?
12  A.  Yeah.  And if I saw a map, I could tell you,
13      but I -- or if I saw -- if I looked at a map
14      and took my little measuring device, figured
15      out what the radius was -- would it show us --
16      I already know -- I don't know that our
17      records would actually -- there's nothing that
18      says, lost due to John Walker or lost due to
19      Juice Alive or anything like that, but we know
20      who we do business with and who we don't do
21      business with.  And, once again, we've got
22      about 1200 accounts.  Not all schools.  But I
23      just don't -- I don't know everybody and
```

130

```
 1      everybody's geography.
 2  Q.  And make sure I understand.  So what you're
 3      saying is if you -- are you saying it is
 4      possible or not possible that if you looked at
 5      your records that you could --
 6  A.  If I look at the records, I could tell you,
 7      yes.
 8  Q.  Is that something you could look at later and
 9      provide that information to your attorney?
10  A.  Yes.
11  Q.  Thank you.  Have you made any statements
12      regarding John Walker or Juice Alive to any --
13      I guess start with anyone.
14  A.  I've made millions of statements.
15  Q.  Okay.  Well, what about since this lawsuit has
16      been filed?
17  A.  I've made lots of statements.
18  Q.  Okay.  Who do you recall having made
19      statements to regarding -- and I'm not talking
20      about your attorney or anybody associated with
21      your attorney or me or anything in this
22      litigation; I'm talking about third parties
23      not involved -- not involved with US Beverage
```

131

```
 1      or involved in this dispute.
 2  A.  My statements -- I -- my statements concerning
 3      John have all been very favorable to John.
 4      Any statement I've made -- and I've made many
 5      of those frequently -- to customers, to
 6      friends, to people who are outside the
 7      business that are just -- that are wondering
 8      what's going on, I have oftentimes said that
 9      John is one of the nicest fellows you'll ever
10      meet; he's a darn good salesperson, and I do
11      not criticize John to our customers, to
12      anybody.  This isn't a personal matter.  But I
13      do not say bad things about John to anybody.
14  Q.  What about statements you've made regarding
15      Juice Alive or the Juice Alive brand to any
16      third party?  Again, not talking about
17      anybody -- any of your attorneys or anybody
18      inside US Beverage, but to third parties.
19  A.  The only thing that I've said about the Juice
20      Alive brand, I wrote a letter to the child
21      nutrition directors of Mississippi who were --
22      after receiving a lot of complaints, they
23      didn't understand what was going on and that
```

132

```
 1      it might cost us some business just born out
 2      of confusion.  I wrote a letter to them trying
 3      to clarify my position on the whole issue.
 4  Q.  And is that the letter that's been discussed
 5      in the other depositions?
 6  A.  Which -- which letter is that?
 7          (Off-the-record discussion.)
 8  Q.  And I'll show you what's marked as Defendants'
 9      Exhibit 5 to the deposition of Norman Todd.
10      Ask him if he can identify the document.
11          (Defendants' Exhibit 5 was
12           previously marked and is not
13           attached hereto.)
14  A.  Yeah.  And this is the one that I thought you
15      might be asking about.  No, I did not
16      authorize this.  Did not produce this letter.
17          MR. GILL:  Look at it closely.
18  A.  It says it's Buddy Todd's.  Sales manager.  I
19      didn't do it.
20          MR. GILL:  Well, I understand but
21              look at the -- all the pages.
22  Q.  I believe there was an attachment to that
23      e-mail that you have.
```