# FREEDOM COURT

Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF ALABAMA
 3           MIDDLE DIVISION
 4
 5   CASE NUMBER:  CV 2:06-CV-496-MEF
 6   U.S. BEVERAGE, INC.,
 7         Plaintiff(s),
 8   vs.
 9   JOHN BUSTER WALKER, II; TRIDENT
10   MARKETING, INC; and A, B, C, and D,
11   fictitious defendants whose names are
12   otherwise unknown but which will be
13   supplemented by amendment,
14         Defendant(s).
15
16       S T I P U L A T I O N
17       IT IS STIPULATED AND AGREED
18   by and between the parties through
19   their respective counsel, that the
20   deposition of JOHN B. WALKER, II may
21   be taken before TAMIE J. STORY,
22   Commissioner, at the offices of Raymond
23   L. Jackson, Jr., 660 North College
```

Page 2

```
 1   Street, Suite D, Auburn, Alabama, on
 2   the 14th day of September, 2006.
 3       IT IS FURTHER STIPULATED AND
 4   AGREED that the signature to and the
 5   reading of the deposition by the witness
 6   is waived, the deposition to have the
 7   same force and effect as if full
 8   compliance had been had with all laws and
 9   rules of Court relating to the taking of
10   depositions.
11       IT IS FURTHER STIPULATED AND
12   AGREED that it shall not be necessary for
13   any objections to be made by counsel to
14   any questions except as to form or
15   leading questions, and that counsel for
16   the parties may make objections and
17   assign grounds at the time of the trial,
18   or at the time said deposition is offered
19   in evidence, or prior thereto.
20       IT IS FURTHER STIPULATED AND
21   AGREED that the notice of filing of the
22   deposition by the Commissioner is
23   waived.
```

Page 3

```
 1           INDEX
 2   EXAMINATION BY:        PAGE NUMBER:
 3   Mr. Gill           8
 4
 5   EXHIBITS:
 6   Plaintiff's 1 -    37
 7    Minutes
 8   Plaintiff's 2 -    39
 9    Minutes
10   Plaintiff's 3 -    41
11    Purchase Agreement
12   Plaintiff's 4 -    43
13    Buy/Sell Agreement
14   Plaintiff's 5 -    44
15    Non-compete Agreement
16   Plaintiff's 6 -    49
17    Tax Records
18   Plaintiff's 7 -    106
19    Outline
20   Plaintiff's 8 -    122
21    Bylaws
22   Plaintiff's 9 -    126
23    Resolution
```

Page 4

```
 1   EXHIBITS:
 2   Plaintiff's 10 -   139
 3    Advertisement
 4   Plaintiff's 11 -   151
 5    USPTO Search
 6   Plaintiff's 12 -   184
 7    Letter
 8   Plaintiff's 13 -   245
 9    E-mail
10   Plaintiff's 14 -   256
11    E-mail
12   Plaintiff's 15 -   290
13    Fax
14   Plaintiff's 16 -   305
15    Proposal
16   Plaintiff's 17 -   323
17    Letter
18   Plaintiff's 18 -   341
19    Letter
20   Plaintiff's 19 -   358
21    Letter
22   Plaintiff's 20 -   399
23    Statement
```

1 (Pages 1 to 4)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

```
1   EXHIBITS
2   Plaintiff's 21 -    409
3     Memo
4   Plaintiff's 22 -    417
5     Memo
```

Page 6

```
 1   IN THE UNITED STATES DISTRICT COURT
 2       NORTHERN DISTRICT OF ALABAMA
 3            MIDDLE DIVISION
 4
 5   CASE NUMBER:  CV 2:06-CV-496-MEF
 6
 7   U.S. BEVERAGE, INC.,
 8        Plaintiff(s),
 9        vs.
10   JOHN BUSTER WALKER, II; TRIDENT
11   MARKETING, INC; and A, B, C, and D,
12   fictitious defendants whose names are
13   otherwise unknown but which will be
14   supplemented by amendment,
15        Defendant(s).
16   BEFORE:
17        TAMIE J. STORY, Commissioner
18   APPEARANCES:
19        COPELAND, FRANCO, SCREWS &
20   GILL, P.A., by Mr. Nelson Gill, 444
21   South Perry Street, Montgomery, Alabama
22   36104, appearing on behalf of the
23   Plaintiff.
```

Page 7

```
 1        MR. RAYMOND L. JACKSON, JR.,
 2   Attorney at Law, 660 North College
 3   Street, Suite D, Auburn, Alabama 36830,
 4   appearing on behalf of the Defendants.
 5   ALSO PRESENT:
 6        Mr. Thomas Clark, Mr. Grady
 7   Kittrell, and Mr. Clifton Tunnell.
 8
 9        *************
10
11        I, TAMIE J. STORY, a Court
12   Reporter of Birmingham, Alabama, acting
13   as Commissioner, certify that on this
14   date, as provided by the Federal Rules
15   of Civil Procedure and the foregoing
16   stipulation of counsel, there came
17   before me at the offices of Raymond L.
18   Jackson, Jr., 660 North College Street,
19   Suite D, Auburn, Alabama, beginning at
20   9:00 a.m., JOHN B. WALKER, II, in the
21   above cause, for oral examination,
22   whereupon the following proceedings
23   were had:
```

Page 8

```
 1        JOHN B. WALKER, II,
 2   being first duly sworn, was examined
 3   and testified as follows:
 4
 5        THE REPORTER:  Usual
 6   stipulations?
 7        MR. GILL:  Yes.
 8        MR. JACKSON:  Yes.
 9
10   EXAMINATION BY MR. GILL:
11        Q.   Can you state your full
12   name for me, please?
13        A.   John Buster Walker, II.
14        Q.   Mr. Walker, my name is
15   Nelson Gill, and we just met briefly
16   beforehand.  And let me ask you first:
17   Have you ever had your deposition taken
18   before?
19        A.   No, I have not.
20        Q.   Well, just a brief
21   explanation of what's going to happen.
22   I'm going to ask you some questions and
23   if you don't understand, I want you to,
```

Page 57

1   A.  Yes, and there were some
2 accounts in Florida too, I think. And
3 there may have been accounts in other
4 areas, I'm just not familiar with them.
5   Q.  But we'll basically say
6 geographically around Alabama; I mean,
7 nearby Alabama at that point --
8   A.  Correct.
9   Q.  -- is that a fair
10 statement?
11   A.  I think so, yes.
12   Q.  That was, of course,
13 partly why you went into the non-
14 compete, the two hundred mile radius of
15 Montgomery, Alabama; is that not true?
16   A.  Say that question again.
17   Q.  That's partly why y'all
18 would have entered into the non-compete
19 agreement with a two hundred mile
20 radius of Montgomery, Alabama; correct?
21       MR. JACKSON:  Object to the
22 form.
23   A.  I don't really understand

Page 58

1 the --
2   Q.  Well, again, this is not --
3 I mean, you just said their business is
4 primarily in Alabama and the nearby
5 areas.
6   A.  Right.
7   Q.  What I'm saying is that
8 that would have been one of the reasons
9 that the non-compete said two hundred
10 miles of Montgomery, Alabama?
11   A.  I mean, they drafted the
12 non-compete. I can't tell you why they
13 wrote the language into the non-
14 compete.
15   Q.  I'm not asking you to tell
16 me that. I'm asking you in general
17 logic, does that not seem like a fair
18 reason?
19       MR. JACKSON:  Object to the
20 form.
21   A.  I still don't quite
22 understand the question. I'm not
23 trying to be difficult, I simply don't

Page 59

1 understand what you're asking me.
2   Q.  That's fine. We'll move
3 on.
4       In your job as vice
5 president, is it fair to call it vice
6 president of sales, because I've seen
7 that on documents?
8   A.  I think that's -- it was
9 called a couple of different things,
10 but I think it was titled as vice
11 president as far as the legal documents
12 go, I presume.
13   Q.  You would rather me to
14 refer to it as vice president?
15   A.  I don't know if I have a
16 preference.
17   Q.  All right. Well, in your
18 job as vice president, which you told
19 me was related to your job as sales,
20 you had to travel around to the various
21 accounts, did you not --
22   A.  Yes, I did.
23   Q.  -- in the Alabama area?

Page 60

1   A.  Among other areas (nodding
2 head).
3   Q.  Well, do you remember any
4 other areas at that point?
5   A.  Sure. I traveled quite
6 extensively through Alabama. I lived
7 in Texas, so I had to drive back and
8 forth every time I came back over here,
9 so I traveled through Louisiana, Texas,
10 Arkansas, Mississippi.
11   Q.  Well, let's go back a
12 little bit.
13   A.  Okay.
14   Q.  You were living in Phenix
15 City when they purchased this company;
16 correct --
17   A.  Uh-huh (nodding head).
18   Q.  -- because your company is
19 in Phenix City?
20   A.  That's correct.
21   Q.  And all of your business
22 and U.S. Beverage's business is nearby;
23 correct?

15 (Pages 57 to 60)

Page 137

1  couple of hours, but, I mean, you know
2  it's in their business. I understand
3  what you're trying to say in that you
4  say you're marketing it and selling it
5  on the computer, or the Internet, I
6  apologize, but this is specifically for
7  the product that U.S. Beverage is
8  selling, distributing, anything you
9  want to call it?
10     A.  Specifically for? I mean,
11 you will have to -- I'm not quite sure
12 what you're saying there. I mean,
13 we're not coming after U.S. Beverage's
14 accounts with this product.
15     Q.  It's your testimony that
16 you're not coming after U.S. Beverage's
17 accounts?
18     A.  When this product was
19 created, it was not to sell to accounts
20 that U.S. Beverage was currently
21 selling to, it was to help them.
22     Q.  It was designed to sell to
23 different accounts?

Page 138

1      A.  It was created -- we were
2  marketing a product via the Internet to
3  daycare centers, something that U.S.
4  Beverage could not or did not do at
5  that point in time.
6      Q.  In the same location as
7  U.S. Beverage?
8      A.  In the same location?
9      Q.  In the same geographical
10 region as U.S. Beverage.
11     A.  We were going to provide
12 services to U.S. Beverage in -- If
13 you'll look at Plaintiff's Exhibit 7,
14 it outlines a specific area where we
15 were going to provide those services to
16 U.S. Beverage.
17     Q.  Right. So you would do it
18 for U.S. Beverage in their region for a
19 commission?
20     A.  (Witness nodding head).
21     Q.  And you were going to do it
22 elsewhere on your own; is that fair?
23     A.  Correct, yes.

Page 139

1      Q.  And all the while, you're
2  still an officer and a shareholder of
3  U.S. Beverage?
4      A.  That's correct.
5
6      (Whereupon, Plaintiff's Exhibit 10
7      was marked for identification and
8      same is attached hereto.)
9
10     Q.  I'm going to mark this as
11 Plaintiff's Exhibit 10. Now, this is
12 actually a copy of a card?
13     A.  Uh-huh (nodding head).
14     Q.  I can show you the actual
15 card if you're not familiar with it.
16     A.  I'm familiar with it.
17     Q.  When did this come out? Do
18 you have any memory or recollection of
19 when this came out?
20     A.  It was produced sometime in
21 2004.
22     Q.  Would this have been the
23 first --

Page 140

1      A.  The first?
2      Q.  -- Juice Alive thing that
3  came out or advertisement?
4      A.  I believe that it was one
5  of the first, yes. There was another
6  one made in conjunction with this.
7      Q.  What is that telephone
8  number at the bottom?
9      A.  It's 1-800-337-5202.
10     Q.  Is that your number?
11     A.  Huh-uh, it's U.S.
12 Beverage's number.
13     Q.  It's U.S. Beverage's
14 number?
15     A.  That's correct.
16     Q.  I may have jumped ahead a
17 little bit here, but we were talking
18 about Trident Marketing, and you were
19 talking about marketing a brand or
20 whatever.
21     A.  Uh-huh (nodding head).
22     Q.  I understand from this
23 lawsuit it's your contention that you

35 (Pages 137 to 140)

FREEDOM COURT REPORTING

Page 213

```
 1     A.   Concerning Item Number 7?
 2     Q.   No, on all seven of them.
 3  Did we not go through them?
 4     A.   Yes, we did.
 5     Q.   Can you think of any other
 6  reasons that you disagree with all of
 7  these?
 8     A.   Can I think of any reasons
 9  why I disagree with Items 1 through 7?
10     Q.   One through 6, yeah.
11     A.   One through 6.
12     Q.   We will give you 7 if you
13  say --
14     A.   I can't right now.
15     Q.   Did you agree to allow U.S.
16  Beverage to buy out your shares?
17     A.   Did I agree? No, I did
18  not.
19     Q.   You didn't. Did you
20  continue negotiating with U.S.
21  Beverage?
22     A.   Yes, we did.
23     Q.   Did you ever submit an
```

Page 214

```
 1  offer in writing to U.S. Beverage
 2  stating that you wanted to sell your
 3  shares?
 4     A.   I think I -- I think that
 5  I -- I don't know if I've got my hands
 6  on it or not, but I think I can put my
 7  hands on an offer -- on a response that
 8  I made to Grady one time. He sent me
 9  an offer, and I believe I responded to
10  him with basically just some different,
11  you know, terms of the buyout.
12     Q.   Right. Well, look at the
13  third page. I don't -- I'm not -- Do
14  you think that's a response by you?
15     A.   Well, I mean, I didn't make
16  all these marks on here.
17     Q.   Well, I don't know who made
18  the marks.
19     A.   I mean, it looks like to me
20  this is something that --
21     Q.   Well, do you think you made
22  the typewritten writing?
23     A.   It appears that I did, yes.
```

Page 215

```
 1     Q.   Okay. Well, other than
 2  responses -- going back to my original
 3  question, other than -- I mean, this
 4  would clearly be a response, like you
 5  said.
 6          Other than responses, did
 7  you ever submit a letter to U.S.
 8  Beverage that says "I want to sell my
 9  shares of stock and I'm offering them
10  up to the company"?
11     A.   I don't believe I did.
12     Q.   All right. And none of
13  these negotiations ever resulted in
14  your shares being purchased, did they?
15     A.   No, sir, they did not.
16          MR. JACKSON: Can we take a
17  brief break?
18          MR. GILL: Sure.
19
20          (Whereupon, a brief recess was
21          taken.)
22
23     Q.   Moving on into 2005, let's
```

Page 216

```
 1  say the spring of 2005, are you still
 2  continuing your job as vice president
 3  of sales or vice president in charge of
 4  sales?
 5     A.   Yes, I think there's still
 6  -- I still continued to open accounts
 7  into 2005.
 8     Q.   For U.S. Beverage; right?
 9     A.   That's correct.
10     Q.   Trident Marketing is still
11  going on alongside; right?
12     A.   At that point in time, in
13  2005, U.S. Beverage was -- Trident
14  Marketing was still in existence, if
15  that's what you're asking me, or --
16     Q.   We're talking about the
17  spring of 2005.
18     A.   Okay.
19     Q.   Trident Marketing is still
20  selling Juice Alive; right?
21     A.   I don't know if we had sold
22  and continued to sell the brand to any
23  more daycares. I think we actually
```

54 (Pages 213 to 216)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 349

1  Q.  And you're not doing
2  anything -- you're saying you have
3  nothing to do with Alabama at all?
4     A.  I'm not selling to any
5  school systems in Alabama.
6     Q.  Are you selling to anybody
7  in Alabama?
8     A.  No, I haven't sold anything
9  to anybody in Alabama.
10    Q.  What about -- Are you
11 having Dispensing Systems sell
12 something for you in Alabama?
13       MR. JACKSON:  Object to the
14 form.  Go ahead.
15    A.  The question again.
16    Q.  Are you having Dispensing
17 Systems sell anything for you in
18 Alabama?
19    A.  I don't think they've sold
20 any accounts in Alabama that I'm aware
21 of.
22    Q.  But you use Dispensing
23 Systems, don't you?

Page 350

1        MR. JACKSON:  Object to the
2  form.
3     A.  I'm sorry?
4     Q.  You use Dispensing Systems?
5     A.  I don't use them, they're a
6  distributor of ours.
7     Q.  Well, I mean, if they're
8  distributing (sic) of yours -- I mean,
9  if they're a distributor --
10    A.  Uh-huh (nodding head).
11    Q.  -- well, then, they're
12 doing something to benefit you, are
13 they not?
14    A.  If they're buying product
15 and paying for it, that would be
16 benefitting Trident Marketing, correct.
17    Q.  Are they doing that in
18 Alabama?
19    A.  No, we have not sold to any
20 branch in Alabama, and I don't think
21 they've opened up any accounts in
22 Alabama.
23    Q.  What about in Georgia?

Page 351

1     A.  I think they have opened up
2  one account in Georgia.
3     Q.  They as Dispensing Systems?
4     A.  Correct, Dispensing
5  Systems.
6     Q.  And when you say "they have
7  opened up one account," you mean that
8  you think that they have got one
9  account in which they purchase product
10 under the Juice Alive label --
11    A.  That would be correct.
12    Q.  -- and distribute it to
13 somebody?
14    A.  That would be correct.
15    Q.  Has Dispensing Systems --
16 whether or not they've actually got any
17 accounts, have they bid on anything in
18 Alabama using Juice Alive?
19    A.  Yes, they have.
20    Q.  They just weren't
21 successful?
22    A.  It doesn't appear they
23 were, no.

Page 352

1     Q.  So Dispensing Systems --
2  I'm calling that right?  Dispensing
3  Systems is their name; right?
4     A.  That's correct.
5     Q.  They've attempted to sell
6  the Juice Alive label in Alabama --
7     A.  That's correct.
8     Q.  -- which would be your
9  product?
10    A.  Correct.
11    Q.  And under your definition
12 of the non-compete agreement, you would
13 view that as not competing?
14    A.  That's correct.
15    Q.  Why is that?
16    A.  Because again, Trident
17 Marketing is the company that goes out
18 and licenses, engages in licensing
19 agreements or distributor agreements
20 with other companies, and U.S. Beverage
21 does not and did not do that at the
22 time of our merger.
23    Q.  When did you come up with

88 (Pages 349 to 352)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 353

1  that explanation?
2       MR. JACKSON: Object to the
3  form.
4       A.  I just think it's -- I
5  mean, it's not an explanation, it's
6  just the answer to your question.
7       Q.  Well, Dispensing Systems is
8  at a school in Alabama bidding on the
9  same product -- I mean, bidding to that
10 school to attempt to sell the same
11 product that U.S. Beverage is --
12      A.  I don't think that's
13 correct.
14      Q.  -- or a similar product?
15      A.  A similar product.
16      Q.  A similar product --
17      A.  Uh-huh (nodding head).
18      Q.  -- with the Juice Alive
19 label; Dispensing Systems has the Juice
20 Alive label?
21      A.  Correct.
22      Q.  U.S. Beverage has something
23 else at this point?

Page 354

1       A.  Correct.
2       Q.  And you don't view that as
3  competition?
4       A.  I don't view that as me
5  competing with U.S. Beverage, no.
6       Q.  You just view it as
7  Dispensing Systems?
8       A.  Again, I don't view that as
9  John Walker competing with U.S.
10 Beverage.
11      Q.  But you would gain a
12 benefit from that if they won, would
13 you not?
14      A.  If they won the -- if they
15 won the bid and ordered product and
16 paid their bills to me, then at some
17 point in time I would hope to get a
18 benefit from it.
19      Q.  You'd get a benefit from
20 that any time it happens; right?
21      A.  If it happens.
22      Q.  So you would want them to
23 win the bid?

Page 355

1       A.  I give them an opportunity
2  to go out there and compete in the
3  market. It's up to them whether or not
4  they are competitive.
5       Q.  That's not the question.
6  The question is: You would want them
7  to win the bid in Alabama because you
8  would gain a benefit if they paid your
9  bill?
10      A.  If they ordered product
11 from us and paid our bill, yes, we
12 would get a benefit.
13      Q.  So you would want them to
14 win?
15      MR. JACKSON: Object to the
16 form.
17      A.  I would want them to engage
18 in business that was profitable for
19 them (nodding head).
20      Q.  I mean, we're just
21 splitting hairs.
22      A.  If they bid a price that
23 wasn't profitable and it lead to the

Page 356

1  demise of the company, that wouldn't
2  benefit me.
3       Q.  I understand that, but if
4  they sell product to a school in
5  Alabama which bears the Juice Alive
6  label and they pay you for that -- the
7  use of that in that school, that would
8  benefit you, would it not?
9       A.  Again, if those certain
10 conditions were met; if they bought it,
11 paid for it, and I received the money
12 for it, that would benefit Trident
13 Marketing.
14      Q.  And you're the sole
15 shareholder of Trident Marketing; is
16 that correct?
17      A.  That is correct.
18      Q.  So you'd rather them win
19 than lose?
20      MR. JACKSON: Asked and
21 answered. You've already asked him
22 that three times.
23      MR. GILL: Well, he won't

**FREEDOM COURT REPORTING**

Page 357

1  answer it.
2      MR. JACKSON: I think he
3  has answered it.
4      MR. GILL: He hasn't
5  answered it.
6      MR. JACKSON: He hasn't
7  answered it the way you want him to
8  answer it, but he's answered it.
9      MR. GILL: The answer is as
10 simple --
11     Q.  Would you like them to win
12 the bid?
13     A.  I would like for Dispensing
14 Systems to sell our product (nodding
15 head).
16     MR. GILL: Do you think
17 that's an answer to that question?
18     A.  If it's through winning the
19 bid or whatnot --
20     MR. JACKSON: I think
21 you've asked it three or four times
22 now.
23     MR. GILL: We'll leave it.

Page 358

1  That's fine. But, I mean, it's not
2  that difficult.
3      Q.  Let's look at this letter,
4  since we've already discussed it a
5  couple of times.
6
7      (Whereupon, Plaintiff's Exhibit 19
8      was marked for identification and
9      same is attached hereto.)
10
11     Q.  I'm going to let you look
12 at this.
13     A.  Okay.
14     Q.  You keep referring to a
15 Mississippi Child Nutrition Director
16 letter.
17     A.  Uh-huh (nodding head).
18     Q.  Is this the letter that
19 you've been referring to?
20     A.  It appears to be, yes.
21     Q.  And you claim that you're
22 suing Buddy Todd because he sent this
23 letter; he forwarded this letter?

Page 359

1      A.  That appears -- that's the
2  impression that I'm under.
3      Q.  Do you have any other
4  grounds to sue Buddy Todd?
5      A.  Not that I can think of.
6      MR. JACKSON: And Mr.
7  Walker hasn't seen the other letter
8  y'all produced to us yesterday.
9  There's one where his signature -- that
10 Buddy Todd signed that's similar to
11 this (indicating).
12     MR. GILL: That's true.
13     MR. JACKSON: And I haven't
14 had a chance to discuss it with the
15 client yet, but just for clarification
16 of the record, there is another letter.
17     MR. GILL: I'll show him
18 that letter.
19     MR. JACKSON: Okay.
20     Q.  At the point you filed your
21 complaint, this was your knowledge as
22 to what Buddy Todd had done to you?
23     A.  That's correct.

Page 360

1      Q.  Let's look at this
2  letter -- Well, I'll ask you one more
3  question. You know Buddy Todd is an
4  employee of U.S. Beverage, do you not?
5      A.  That's the impression that
6  I'm under, yes.
7      Q.  You know he's not a
8  shareholder?
9      A.  Right.
10     Q.  You know he's not an
11 officer of the company?
12     A.  Right.
13     Q.  You know he's just an
14 employee --
15     A.  Correct.
16     Q.  -- which would be different
17 from your position as a shareholder and
18 an officer?
19     A.  I do believe it's a
20 different position, yes.
21     Q.  I mean, you agree that
22 those are different?
23     A.  I do, yes.

90 (Pages 357 to 360)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**