1           IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
2                     NORTHERN DIVISION

3    US BEVERAGE, INC.,
              Plaintiff,
4    vs.
     JOHN BUSTER WALKER,
5    II, and TRIDENT            CIVIL ACTION NO.
     MARKETING, INC.,
6             Defendants.       2:06-CV-496-SRW
     ---------------------
7    JOHN BUSTER WALKER,
     II, and TRIDENT
8    MARKETING, INC.,
              Counterclaim
9             Plaintiffs,
     vs.
10   US BEVERAGE, INC.,
              Counterclaim
11            Defendant,
     and
12   GRADY DOWLING
     KITTRELL, THOMAS
13   GOING CLARK, III, and
     NORMAN "BUDDY" TODD,
14            Third Party
              Defendants.


16            *    *    *    *    *    *

17            **DEPOSITION OF NORMAN TODD,**
     taken pursuant to notice and stipulation on
18   behalf of the Defendant/Counterclaim
     Plaintiff, in the Law Offices of Copeland,
19   Franco, Screws & Gill, 444 South Perry Street,
     Montgomery, Alabama, before Tiffany B.
20   Beasley, Certified Court Reporter and Notary
     Public in and for the State of Alabama at
21   Large, on September 15, 2006, commencing at
     4:23 p.m.

22

23

                WORDCRAFT REPORTING, LLC
                     334.462.4665

EXHIBIT
2

```
 1                    APPEARANCES

 2

 3     FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT/THIRD

 4     PARTY DEFENDANTS:

 5              C. NELSON GILL, ESQUIRE

 6              Copeland, Franco, Screws & Gill

 7              444 South Perry Street

 8              Montgomery, Alabama 36104

 9

10     FOR THE DEFENDANT/COUNTERCLAIM PLAINTIFF:

11              RAYMOND L. JACKSON, JR., ESQUIRE

12              CLIFF TUNNELL

13              660 North College Street

14              Suite D

15              Auburn, Alabama 36830

16

17     ALSO PRESENT:

18              THOMAS GOING CLARK, III

19              JOHN BUSTER WALKER, II

20

21

22

23
```

*NORMAN TODD -- September 15, 2006*

```
1                    STIPULATIONS

2              It is stipulated and agreed by and

3       between counsel representing the parties that

4       the deposition of NORMAN TODD may be taken

5       before Tiffany B. Beasley, Certified Court

6       Reporter and Notary Public in and for the

7       State of Alabama at Large, without the

8       formality of a commission; and all formality

9       with respect to other procedural requirements

10      is waived; that objections to questions, other

11      than objections as to the form of the

12      questions, need not be made at this time, but

13      may be reserved for a ruling at such time as

14      the deposition may be offered in evidence or

15      used for any other purpose by either party as

16      provided by the Federal Rules of Civil

17      Procedure.

18              It is further stipulated and agreed by

19      and between the parties hereto and the

20      witness, that the signature of the witness to

21      this deposition is hereby waived.

22

23
```

*NORMAN TODD - September 15, 2006*

1                              INDEX

2

3        **EXAMINATION**                              **Page**

4         MR. JACKSON.......................     5

5

6        **EXHIBITS**                               **Page**

7         1        E-mails between Amy Murphy         37
                   and Buddy Todd, various
8                  dates, Bates-Stamped US
                   Beverage 138
9
          2        E-mails between Amy Murphy         41
10                 and Buddy Todd, various
                   dates, Bates-Stamped US
11                 Beverage 140

12        3        Typewritten Notes of Mr.           45
                   Todd, dated 7/11/2006,
13                 Bates-Stamped US Beverage 141

14        4        Memo from Buddy Todd to Child      56
                   Nutrition Directors, undated,
15                 Bates-Stamped US Beverage 137

16        5        E-mail with Attached Letter        68
                   between Amy Murphy and John
17                 Walker, dated June 9, 2006

18

19

20

21

22

23

WORDCRAFT REPORTING, LLC
334.462.4665

```
 1              NORMAN TODD, of lawful age, having

 2       first been duly sworn, testified as follows:

 3                        EXAMINATION

 4    BY MR. JACKSON:

 5              THE REPORTER:  Usual stipulations?

 6              MR. GILL:  Yes.

 7              MR. JACKSON:  Yes.

 8 Q.   Okay.  Mr. Todd, I'm Raymond Jackson, and I'm

 9       the attorney that represents John Walker and

10       his company Trident Marketing in the lawsuit

11       that was brought by your employer, US

12       Beverage.  Have you ever had your deposition

13       taken before?

14 A.   Yes, sir.

15 Q.   You have?  How many times?

16 A.   Once.

17 Q.   In what sort of case was that?

18 A.   It was a lawsuit that I had brought upon

19       someone else.

20 Q.   Okay.  And just generally, just real quickly,

21       what type of -- a car wreck or --

22 A.   No, sir.  It was a wrongful termination suit.

23 Q.   Okay.  It didn't involve anybody at US
```

*NORMAN TODD -- September 13, 2006*

1           Beverage?

2    A.     No.

3    Q.     Okay.  How did that case resolve?

4    A.     It was settled that day.

5    Q.     Okay.  All right.  Well, since you've taken a

6           deposition before, you're going to know this

7           anyway, but let me just give me spiel anyway.

8           Most important thing here today when you're

9           answering questions is just to understand the

10          question I ask you.  If at any point I talk

11          too fast or I ask a question you don't

12          understand, stop me and tell me.  This isn't

13          an inquisition.  We're just here to get

14          information from you.  And, again, the most

15          important thing, just listen to the question,

16          and I'll be glad to at any point restate a

17          question.  If you need a break, at any point,

18          let us know.  We'll try to be as brief as

19          possible because I know you have places to go,

20          and my client and everyone else does too.

21          Let's just start off by just giving your full

22          name for the record.

23   A.     It's Norman Hopkins Todd.

*NORMAN TODD -- September 15, 2006*

```
 1                    THE REPORTER:  Hopkins?

 2                    THE WITNESS:  That's correct.

 3                    MR. GILL:  Try to speak up a little

 4                       bit.

 5                    THE WITNESS:  Okay.

 6       Q.     Do you go by any other names?

 7       A.     Buddy.

 8       Q.     Okay.  And that's the only nickname you have?

 9       A.     Yes, sir.

10       Q.     Okay.  What's your address, Mr. Todd?

11       A.     It's 200 Whitley Drive, Deatsville, Alabama

12              36022.

13       Q.     Is Deatsville Elmore County?

14       A.     Yes, sir.

15       Q.     When were you born?

16       A.     May 21st, 1974.

17       Q.     Okay.  And are you currently employed by US

18              Beverage?

19       A.     Yes, sir.

20       Q.     What's your job title at US Beverage?

21       A.     Sales manager.

22       Q.     How long have you been with US Beverage?

23       A.     Since July the 6th of '05.
```

| | | |
|---|---|---|
| 1 | Q. | Have you had the same job title? |
| 2 | A. | No, sir. |
| 3 | Q. | Okay.  How long have you been sales manager? |
| 4 | A. | I would say since January -- since around mid |
| 5 | | part of December of '05. |
| 6 | Q. | What were you doing for them before that? |
| 7 | A. | Route sales. |
| 8 | Q. | Is that the only other job you've had with US |
| 9 | | Beverage? |
| 10 | A. | Yes, sir. |
| 11 | Q. | Just briefly tell us what sort of educational |
| 12 | | background you have. |
| 13 | A. | Some college.  Just high school.  Graduated |
| 14 | | high school. |
| 15 | Q. | Did you go to Deatsville? |
| 16 | A. | No, sir.  Jeff Davis. |
| 17 | Q. | Jeff Davis.  Okay.  Here in Montgomery? |
| 18 | A. | Yes, sir. |
| 19 | Q. | What year did you graduate? |
| 20 | A. | '93. |
| 21 | Q. | Okay.  And you said you had some college. |
| 22 | | Which colleges did you attend? |
| 23 | A. | Just AUM.  Didn't complete. |

*NORMAN TODD - September 15, 2006*

```
 1   Q.   Okay.  After AUM, were there any other
 2        employers you had other than US Beverage?  I'm
 3        not asking about jobs while you were in high
 4        school or part-time jobs while you were in
 5        college, but can you list your employers since
 6        stopping school at AUM?
 7   A.   I worked for Montgomery Police Department
 8        for -- then left there and went to Millbrook
 9        Police Department.
10   Q.   Okay.  Any other?
11   A.   Trying to think.  I was in management for
12        Applebee's for a while.
13   Q.   Okay.  Well, how long were you with Montgomery
14        Police Department?
15   A.   About two years.
16   Q.   Okay.  And did you go straight from there to
17        Millbrook Police Department?
18   A.   Yes, sir.
19   Q.   How long were you with Millbrook?
20   A.   Till '98.
21   Q.   Okay.  And go back the years from Montgomery
22        Police Department, would that have been '93 to
23        '95, '96?
```

```
 1   A.    Roughly '94 to '96, and then I went to

 2         Millbrook in '96.

 3   Q.    Okay.  How long did you stay with Millbrook?

 4   A.    Till '98.

 5   Q.    Okay.  And then did you go to work for

 6         Applebee's then?

 7   A.    Not immediately, sir.  I went to work for an

 8         ambulance company called Moody's Ambulance

 9         because I'm also an EMT.

10   Q.    Okay.  How long were you with Moody's

11         Ambulance?

12   A.    Off and on.  I can't recall how many years.

13   Q.    Okay.

14   A.    I was working there while I was in management

15         for Applebee's as well.

16   Q.    Okay.  And what years were you working for

17         Applebee's?

18   A.    I don't recall what years.

19   Q.    Okay.  Was it the Applebee's here in

20         Montgomery you worked at?

21   A.    Prattville.

22   Q.    Prattville.  Okay.

23               MR. GILL:  Speak up just a little
```

```
 1                           bit for the court reporter.  I
 2                           can hear you, but she has a
 3                           harder time hearing you.
 4      Q.      Okay.  Did you go to work for US Beverage --
 5              did you go straight from Applebee's to US
 6              Beverage?
 7      A.      No, sir, I was unemployed for about two years.
 8      Q.      Okay.
 9      A.      Actually, not quite that long, but I went into
10              business for myself as -- doing lawn and
11              landscaping work along with my father-in-law.
12      Q.      And were you doing lawn and landscaping work
13              when you were hired by US Beverage?
14      A.      No, sir.
15      Q.      Okay.  What were you doing --
16      A.      I was working for Still Waters Resort.
17                      (Brief interruption.)
18      Q.      Okay.  What were you doing for Still Waters
19              Resort?
20      A.      I was a cook.  Kitchen manager, cook.
21      Q.      How long had you been with Still Waters before
22              you left them?
23      A.      It was about a year.
```

1    Q.    Okay.  Prior to going to work for US Beverage,

2          had you been involved in the sale of fruit

3          juice concentrate or slush drinks or --

4    A.    No, sir.

5    Q.    What's the duties of your current position

6          with US Beverage as sales manager?

7    A.    To maintain current accounts and to develop

8          new territories.

9    Q.    Does your job involve travelling?

10   A.    Yes, sir.

11   Q.    On an average week, how much time do you spend

12         out of the office travelling?

13   A.    Five days.

14   Q.    Five days.  How often are you actually in the

15         office there at US Beverage?

16   A.    About one day a week.

17   Q.    Okay.  And how far do you travel, just like

18         your geographic range.  I'm not asking for

19         everywhere you go to, but what -- roughly

20         how -- what's the furthest customer you have

21         from Montgomery?

22   A.    The furthest customer I have from Montgomery

23         that I deal with would probably be -- probably

```
1              be in Shreveport.
2     Q.       Okay.
3     A.       And that's Louisiana.
4     Q.       Okay.  Do you have customers in Mississippi
5              you deal with?
6     A.       Yes, sir.
7     Q.       What about Arkansas?
8     A.       Not personally, no, sir.
9     Q.       Okay.
10    A.       I just recently acquired that territory.
11    Q.       What about Florida; do you have customers in
12             Florida you deal with?
13    A.       No, sir.
14    Q.       What about the state of Georgia?
15    A.       Yes, sir.  We do have accounts there that I'm
16             responsible for.
17    Q.       Where in Georgia?  What parts of Georgia?
18    A.       All over the state.
19    Q.       All over the state of Georgia.  What about the
20             state of Tennessee; do you have any accounts
21             you're responsible --
22    A.       Yes, sir.
23    Q.       What parts of the state?
```

```
 1    A.    All over the state.

 2    Q.    Okay.  So basically from Memphis to Knoxville?

 3    A.    Uh-huh.

 4    Q.    Okay.  What about South Carolina; do you have

 5          any accounts in South Carolina that you're

 6          personally responsible for dealing with?

 7    A.    Not at the present moment.

 8    Q.    What about North Carolina?

 9    A.    Yes, sir.

10    Q.    What accounts are those?

11    A.    What accounts, or where do they range from,

12          or --

13    Q.    Well -- and sorry to confuse you.  Where do

14          they range from?  Let's start with that.

15    A.    All over.

16    Q.    All over North Carolina?

17    A.    Yes, sir.

18    Q.    Well, give us some examples of some accounts

19          in North Carolina.

20    A.    Wilkes County, Rockingham County, Northampton,

21          Craven, Carteret, Jones.

22    Q.    Are these school accounts?

23    A.    Those are counties, yes, sir.
```

```
 1    Q.      County schools.  Are there any accounts in

 2            North Carolina that aren't related to schools

 3            that you handle?

 4    A.      No, sir.

 5    Q.      How long are these accounts you're talking

 6            about in North Carolina been open?

 7    A.      How long?

 8    Q.      Yes.

 9    A.      Say about a month.  A little over.

10    Q.      Who is your immediate supervisor at US

11            Beverage?

12    A.      Tom Clark.

13    Q.      How did you come about applying to go to work

14            for US Beverage?

15    A.      Through my roommate.

16    Q.      Who is your roommate?

17    A.      At the time my roommate was Sheree Dozier.

18            She was the warehouse manager for US Beverage.

19    Q.      Okay.  Who made the decision to hire you at US

20            Beverage?

21    A.      Tom Clark.

22    Q.      Do you know John Walker, my client?

23    A.      Yes, sir, I do.
```

1   Q.    How do you know him?

2   A.    Through several different -- I mean, meetings.

3         I've never spent a lot of time with him, but

4         I've seen him in passing several times.

5   Q.    Okay.  Prior to going to work for US Beverage,

6         did you know John Walker?

7   A.    No, sir.

8   Q.    Have you ever had a chance to get to know John

9         Walker outside of the business?

10  A.    No, sir.

11  Q.    Have you ever reported to John Walker?

12  A.    No, sir.

13  Q.    Do you know anything about John Walker's

14        performance as an employee of US Beverage?

15  A.    No, sir.

16  Q.    Have you ever talked about John Walker with

17        other people at US Beverage?

18  A.    No, sir.

19  Q.    Anyone at US Beverage ever say things to you

20        about John Walker?

21  A.    I've heard conservation between Tom and Grady,

22        but as far as it sinking in and me paying

23        attention to it, no, I've never been involved

```
 1            in a conversation until this lawsuit came up.
 2    Q.      Do you recall any conversations involving John
 3            Walker's name?
 4    A.      Not specifics, no, sir.
 5    Q.      Any generalities?
 6    A.      Other than what's going on with this lawsuit,
 7            as far as me sending the letter that I was
 8            instructed to send, That's the only -- the
 9            only specifics that I can recall.
10    Q.      Have you had any special training or education
11            related to this position as sales manager with
12            US Beverage?
13    A.      No, sir.
14    Q.      What's the nature of your relationship with
15            Grady Kittrell?
16    A.      He's the president of the company that I work
17            for.
18    Q.      How long have you known him?
19    A.      Since July 6th of '05.
20    Q.      So you didn't know him before you went to work
21            for US Beverage?
22    A.      No, sir, I did not.
23    Q.      You ever socialize with Mr. Kittrell outside
```

```
 1           of the office?
 2    A.     No, sir.
 3    Q.     What about with Tom Clark; how long have you
 4           known Tom Clark?
 5    A.     Since July of '05.
 6    Q.     And, again, you didn't know him prior to going
 7           to work for US Beverage?
 8    A.     No, sir.
 9    Q.     You ever socialize with Mr. Clark?
10    A.     Not outside of business, no, sir.
11    Q.     Do you have any ownership interest in US
12           Beverage?
13    A.     No, sir.
14    Q.     Has anyone ever discussed bringing you in to
15           US Beverage as a partner or an owner?
16    A.     No, sir.
17    Q.     How are you paid as an employee of US
18           Beverage?
19    A.     I make salary plus commissions.
20    Q.     Do you have any idea what your annual salary
21           and commissions are?
22    A.     No, sir.
23    Q.     Under which brands have you sold slush or
```

1        juice drinks while working at US Beverage?

2   A.      Which -- would be Cool Tropics.

3                MR. GILL:  I'm sorry.  Is that when

4                     he was sales manager?

5                MR. JACKSON:  Any time while he's

6                     been working for US Beverage,

7                     whether as a sales manager or

8                     as a route driver, you know,

9                     in terms of delivering or

10                    distributing or selling slush

11                    or juice drinks.

12  A.      Cool Tropics, Juice Alive, and now Fruzers.

13  Q.      Does the company still sell any Cool Tropics

14          products?

15  A.      No, sir.

16  Q.      When was the last time that you recall selling

17          or distributing any Cool Tropics products?

18  A.      I can't recall.  It was back right after I

19          started, sir.

20  Q.      Okay.  So sometime after July of 2005?

21  A.      Yes, sir.

22  Q.      Okay.  What about Fruzers; when did you first

23          start selling or distributing Fruzers brand

WORDCRAFT REPORTING, LLC
334.462.4665

```
1            product?

2    A.      I can't recall the exact date.

3    Q.      Well, just roughly.  I'm not asking for a

4            specific date.  Was it 2005?

5    A.      No.  It was 2006.

6    Q.      Can you recall a month in 2006?

7    A.      All I remember is it was sometime after the

8            Alabama show, sir.  I don't know the date.

9    Q.      Okay.  Do you recall when the Alabama show

10           was?

11   A.      Not without -- I've been to several shows this

12           year.

13   Q.      Okay.  What about Juice Alive; do you recall

14           selling or distributing products with the

15           Juice Alive brand?

16   A.      Yes, sir.  I've already spoken of that brand.

17           That was one of the three I mentioned.

18   Q.      Has your company stopped selling product

19           bearing the Juice Alive brand?

20   A.      Yes, sir.

21   Q.      When did that occur?  When did they stop

22           selling products bearing the Juice Alive name?

23   A.      I don't know of a specific date.  I just know
```

```
 1              that it went away because the new label came

 2              in, and that's all I know about that.

 3    Q.        Okay.  When you're talking about the new

 4              label, you're talking about Fruzers?

 5    A.        Yes, sir.

 6    Q.        To whom was your company selling Cool Tropics

 7              when you first -- you mentioned you sold some

 8              Cool Tropics' beverages.

 9    A.        Well, the only thing -- I mean, I distributed

10              Cool Tropics to, like, the service stations,

11              and I had one school route.  Most of my

12              accounts were bar accounts.

13    Q.        Okay.  What about Juice Alive?  To whom have

14              y'all sold Juice Alive products to or

15              distributed to?

16    A.        To slush customers.

17    Q.        Are those the same type slush customers we

18              just talked about --

19    A.        Yes, sir.

20    Q.        And I guess the same thing with Fruzers?

21    A.        Yes, sir.

22    Q.        When did you first learn about the Juice Alive

23              name?  When did you first hear the name Juice
```

1          Alive?

2     A.    When we started implementing or we started --

3          stopped using the Cool Tropics and started

4          using Juice Alive.

5     Q.    And that would have been after you were hired

6          on to the company?

7     A.    That's correct.

8     Q.    Do you recall how long after you were hired on

9          the company you stopped using Cool Tropics --

10    A.    No, sir, I don't.

11    Q.    What were you told about the Juice Alive

12         brand?

13    A.    I was told that we were -- we were changing to

14         the Juice Alive brand because Cool Tropics --

15         let me back up.  I was told that the Juice

16         Alive brand was being implemented because

17         tropical -- Cool Tropics wanted more royalties

18         for the product for their labels for

19         distributing that label to us.  And since we

20         were responsible for the development of

21         that -- or that since US Beverage was

22         responsible for the development of that

23         product, they felt that -- they didn't feel

```
 1        necessary to pay the extra royalties, so they
 2        were developing -- US Beverage was developing
 3        Juice Alive brand.
 4   Q.   Okay.  So is it -- basically, you were told
 5        that the -- the royalties for Cool Tropics
 6        were more than the royalties that were going
 7        to be paid for Juice Alive?
 8   A.   I didn't even know there were going to be any
 9        royalties paid, sir.  I'm not privy to that.
10   Q.   Okay.  What did you think about the Juice
11        Alive brand?
12   A.   As far as?
13             MR. GILL:  Object to form.
14   Q.   I'm just asking as a salesperson or someone
15        out there in the marketplace trying to sell a
16        brand, what did you think about the Juice
17        Alive brand?
18   A.   Specifically --
19             MR. GILL:  Object to the form.
20   A.   To be honest with you, sir, the product in
21        itself is all the same.  As far as the label
22        goes, you're not selling the label; you're
23        selling the product.  All three of those
```

```
 1            labels that I've mentioned to you are all the
 2            same -- the same product, just three different
 3            labels.
 4    Q.      And the customers you're dealing with in the
 5            marketplace, did it not make a difference to
 6            them which label was put on the product?
 7    A.      No, sir.
 8    Q.      Is part of your job distributing point-of-sale
 9            materials?  Are you familiar with
10            point-of-sale materials, POS materials?
11    A.      Yes, sir.  At this point, it is, yes, sir.
12    Q.      Okay.  What sort of point-of-sale materials
13            does US Beverage distribute?
14    A.      We would distribute a flyer, nutritional
15            information, handouts, flavor sheets.
16    Q.      Is there any point-of-sale materials that go
17            on the machines?
18    A.      Yes, sir.
19    Q.      And what -- what would those materials look
20            like?
21    A.      They would just be a sticker with the brand of
22            the product on the front of the sticker.
23    Q.      Is that a sticker that the consumer -- if I
```

```
 1            went into a Quick Stop or some service

 2            station, if I was going to buy a slush product

 3            from your company, would there be a sticker on

 4            the slush machine that says -- would say

 5            Fruzers or whatever brand --

 6    A.      Yes, sir.

 7    Q.      Any other point-of-sale materials other than

 8            what we've talked about, the flyers, the

 9            flavor sheets, the materials on the machine

10            that you distribute?

11    A.      As of this point, that's all.

12    Q.      Okay.  What about with Juice Alive?  Did you

13            have the same type of point-of-sale materials

14            for Juice Alive that we just discussed?

15    A.      I was -- yes, as far as the machine posters,

16            yes, the machine stickers, yes, sir.  But as

17            far as the other stuff, it was stuff that was

18            having to be make-shifted until -- until, I

19            believe, he had provided us some at one time.

20            But we were told -- I was told by him while I

21            was standing with Mr. Clark that we were not

22            privy to the POS material until we agreed to

23            pay more for the product, that he was holding
```

```
 1              back on that.

 2     Q.       And when was that statement made?

 3     A.       The evening of the Alabama show.

 4     Q.       How do you think the Juice Alive brand was

 5              received by customers?

 6     A.       Once again, I would have to reiterate, sir,

 7              that it's my standing that the customers

 8              aren't really buying the label.

 9     Q.       Okay.

10     A.       They're buying the product.

11     Q.       What about -- how -- how have customers

12              responded to the Fruzers brand?

13     A.       They like -- they have responded as far as the

14              colorfulness of the machine POS and also the

15              flyers.

16                      MR. GILL:  Do y'all want us to

17                           leave -- we can step outside

18                           for one second?

19                      MR. JACKSON:  Yeah.  Just give us

20                           one second.

21              (Brief recess taken.)

22     Q.       And you had mentioned the Alabama trade show.

23              Did US Beverage have POS -- I'm sorry, Juice
```

```
 1           Alive POS on its machines prior to the Alabama
 2           trade show?
 3    A.     Yes, sir.
 4    Q.     And so the POS that you say that Mr. Walker
 5           told y'all that y'all weren't privy to, was
 6           that some sort of POS other than the labels on
 7           the machine?
 8    A.     Yes, sir.
 9    Q.     Do any stores, schools, or other customers
10           still have Juice Alive POS materials on their
11           machines?
12    A.     Not to my knowledge, sir.
13    Q.     Have you personally removed any of the POS
14           materials from machines for any customers for
15           US Beverage?
16    A.     Have I personally done it?
17    Q.     Yes, sir.
18    A.     No, sir.
19    Q.     Do you know if anybody at US Beverage is in
20           charge of removing the old POS for Juice
21           Alive?
22    A.     The route sales people are responsible for
23           taking care of the removal and replacement of
```

```
 1        the POS.

 2   Q.   Do you know if anybody is checking behind the

 3        route salespeople to make sure that's

 4        happening?

 5   A.   The territory managers are supposed to, sir.

 6   Q.   Okay.  Do the territory managers report to

 7        you?

 8   A.   Yes, sir.

 9   Q.   Have you asked the territory managers about

10        that?

11   A.   Yes, sir, I have.

12   Q.   Have they indicated the POS materials have

13        been removed for Juice Alive?

14   A.   That are indicating that it has been removed,

15        yes, sir.

16   Q.   Is there any checklist or record showing the

17        removal of this material?

18   A.   No, sir.

19   Q.   What's happened to the Juice Alive POS

20        materials that have been removed?

21   A.   I don't know.

22   Q.   Is US Beverage destroying them, returning

23        them?  Do you know?
```

1   A.   Not returning them, because once you take them

2        off the machine, they're not any good anymore.

3   Q.   Okay.  Do you know if those materials have

4        been thrown away or destroyed?

5   A.   I would assume they were thrown away.  I mean,

6        that would be -- that would be my guess.  I

7        don't know.  I'm not there when it's

8        happening.

9   Q.   But you're aware that your company received a

10       cease-and-desist notice requiring the removal

11       of Juice Alive point-of-sale materials;

12       correct?

13            MR. GILL:  Object to the form.

14  A.   I never seen this letter until I received my

15       lawsuit.  But I was instructed to change out

16       the POS on the machines, sir, have it done.

17  Q.   When were you instructed to do that?

18  A.   Sometime after the Alabama show, sir.  I don't

19       know the exact dates.

20  Q.   What were you told about why US Beverage chose

21       to change to the Fruzer brand?

22            MR. GILL:  Object to the form.

23  A.   Basically, I wasn't told anything about it.

```
 1            The only thing -- the only knowledge that I
 2            have about it was the knowledge that I
 3            obtained listening to the conversation between
 4            the two of them the night at dinner after the
 5            Alabama show was over.
 6    Q.      What do you recall about them discussing the
 7            Fruzer brand or implementing --
 8    A.      The Fruzer brand wasn't discussed at that
 9            moment.  That wasn't even in existence.
10    Q.      Okay.  Well, what conversation are you
11            referring to at dinner between -- I guess, you
12            were talking about John Walker --
13    A.      I'm confused -- what was the question again?
14    Q.      I was asking you about what -- what you heard
15            or understood was the -- I guess, the
16            reasoning behind shifting to the Fruzer brand
17            for US Beverage.
18    A.      Well, it started, like I said, at the dinner
19            table between -- the conversation between John
20            Walker and Tom Clark, when John Walker
21            expressed to Tom that he had outside companies
22            that were willing to pay him more for the
23            product than what US Beverage had agreed to
```

```
 1              pay him for the product, and if US Beverage

 2              didn't compromise or come to some kind of

 3              medium on a higher paying price per label for

 4              the boxes, that he was going to have to go

 5              with these other companies so that he could

 6              make more money.

 7    Q.        Anything else you remember being told or

 8              learning about, you know, the shift from Juice

 9              Alive to Fruzers by your company?

10    A.        No, sir.

11    Q.        Who introduced you to the Fruzers brand?

12    A.        Who introduced me to the Fruzers brand?

13    Q.        Yes.

14    A.        Tom Clark.

15    Q.        How did he do that?

16    A.        I went with Tom Clark to the BLR agency and

17              went over the artwork with...

18    Q.        When did that occur?

19    A.        I'm not sure what month, sir.  I just know it

20              was sometime after that -- the Alabama show.

21    Q.        Did the BLR agency prepare the POS materials

22              for Fruzers?

23    A.        They created the artwork for it, sir.  I'm not
```

```
 1         sure who actually prepared it.

 2   Q.    And, I guess, the artwork would have been sent

 3         to a printer?

 4   A.    Yes, sir.

 5   Q.    What sort of POS materials does US Beverage

 6         have for Fruzers?

 7   A.    Same as I've already depicted for you.

 8   Q.    How do you think the Fruzers brand compares in

 9         success in the marketplace to the Juice Alive

10         brand?

11              MR. GILL:  Object to form.

12   A.    I think that the label itself is more

13         appealing to the children because it's more of

14         a child -- I mean, it's more of a -- it's more

15         attractive to me for a child than what --

16         Juice Alive.  I mean, that's my opinion.

17   Q.    So you're happy with the Fruzers brand as a

18         sales manager for US Beverage?

19              MR. GILL:  Object to the form.

20   A.    I would say at the present moment, yes.

21   Q.    Do you think the Fruzers brand is a better

22         brand name than Juice Alive?

23              MR. GILL:  Object to the form.
```

NORMAN TODD - September 15, 2006                    33

```
 1   A.    I can't speculate.  I'm not going to make a
 2         speculation on that.
 3   Q.    But you're in the business, aren't you?
 4   A.    I'm in the business, but I've just answered
 5         that same question.
 6   Q.    Are you personally aware of any customers that
 7         US Beverage has lost because of John Walker?
 8   A.    Yes, sir.
 9   Q.    Okay.  Can you list those?
10   A.    Lincoln County, Mississippi.
11                   THE REPORTER:  I'm sorry.  Repeat.
12                   THE WITNESS:  Lincoln.
13   Q.    Okay.
14   A.    Oxford, Mississippi.
15   Q.    Okay.
16   A.    The Choctaw Indian Tribal School in
17         Philadelphia, Mississippi.
18   Q.    Okay.
19   A.    Pontotoc County School System in Mississippi.
20   Q.    Okay.
21   A.    That's all I can think of, sir.
22   Q.    Okay.  When did US Beverage lose Lincoln
23         County as a customer?
```

1    A.        In August '06.

2    Q.        Okay.  Why did US Beverage lose Lincoln County

3              as a customer?

4    A.        Because a -- an agent of John Walker's -- I'm

5              not sure if it was Scotty West or if it was

6              actually Mr. Walker himself, went to

7              Beau Simonson, which is the CND director for

8              the school system there, and attempted to sell

9              Juice Alive product to Mr. Simonson, at which

10             time they instructed Mr. Simonson that he was

11             going to have to bid the product out because

12             of his expenditures on the -- on the

13             particular product.  And Mr. Simonson didn't

14             notify US Beverage that there was a bid

15             situation.  So when I -- I received a phone

16             call a week after I had called to check on

17             Mr. Simonson and see how everything was going,

18             and his secretary expressed to me that

19             everything was fine.

20                        I received a phone call the

21             week after that from him telling us that he

22             had changed companies, that he had went with

23             Juice Alive, and that we needed to pick up our

```
 1              machines.  So two days later, I picked the

 2              machines up.

 3   Q.         Is it you understanding that there was a bid

 4              process for Lincoln County school?

 5   A.         According to Mr. Simonson, after he rechecked

 6              and called me back the third time, he told me

 7              that there was a bid process and that all he

 8              had to do was put it into the local paper, I

 9              think he said, two weeks prior to the bid

10              opening.  I'm not sure of the exact time

11              frame, but that was all he had to do.  That

12              was -- and that's what he said he did.

13   Q.         And you blame John Walker for US Beverage not

14              bidding on the Lincoln County --

15   A.         I don't blame him for US Beverage not bidding

16              on the contract, but my personal opinion, I

17              feel that he shouldn't be competing against US

18              Beverage in known US Beverage accounts when

19              he's -- as far as I'm told, is still an

20              officer of this corporation.

21   Q.         Do you know if Lincoln County is within

22              200 miles of Montgomery, Alabama?

23   A.         Sir, I don't know how many miles it is from
```

*NORMAN TODD -- September 15, 2006*

36

```
 1         here to there.
 2    Q.   Do you know what part of Mississippi Lincoln
 3         County is?
 4    A.   It's close to the Louisiana line.
 5    Q.   Would that be roughly southwest?
 6    A.   Yes, sir.
 7    Q.   Okay.  What about Oxford, Mississippi,
 8         schools?  Is that the school system we're
 9         talking about, Oxford, Mississippi?
10    A.   Yes, sir.  Oxford City schools -- Separate
11         School District.
12    Q.   Why did US Beverage lose the -- Oxford as a
13         customer?
14    A.   Because either -- once again, either John
15         Walker or Scotty West approached Amy Murphy,
16         which is the CND at Oxford Separate School
17         District, told her that they could promise her
18         POS material, a lower price on the product,
19         new machines, and if she would transfer to --
20         to use their product, to use Juice Alive
21         product, and she chose to do so.  She didn't
22         put it out for bid; she just swapped.  I got
23         an e-mail from her, which you have that
```

1        e-mail.  And...

2  Q.    Did Amy Murphy ask US Beverage for a quote?

3  A.    She sent me an e-mail requesting for me to

4        give her a price quote, and before I could

5        respond to that e-mail, I received a second

6        e-mail from her in regards that she had

7        already chosen to go with another company, so

8        I never sent her one.

9  Q.    And I think you produced some e-mails from Amy

10       Murphy.  Let me get those, and we'll talk

11       about those for a second.  Okay.  Mark this

12       Defendants' Exhibit 1 to this deposition.

13       Take a look at this e-mail.  Thank you.

14             (The referred-to document was

15               marked for identification as

16               Defendants' Exhibit No. 1.)

17  Q.    And this is an e-mail that you would have, I

18       guess, produced to the attorneys for US

19       Beverage; is that correct?

20  A.    Yes, sir.

21  Q.    Okay.  The middle of the page, do you mind

22       reading for the record the message -- I guess,

23       that would have been from Amy Murphy and to

38

```
 1          you.  And it looks like there's some other

 2          people that it was copied to.  It starts with

 3          "Mr. Todd."

 4   A.     (As read:) It says, Mr. Todd, I have

 5          repeatedly asked for promotional materials

 6          throughout the school year.  I'm not sure if

 7          other directors have had problems with lack of

 8          promotional pamphlets, brochures, posters,

 9          etc.; however, in our field, it is necessary

10          that our teachers, administrative staff, and

11          parents are reminded that we are not feeding

12          our children junk food for extra sales.  This

13          next school year we would like to promote your

14          healthy product in a positive way, and

15          promotional materials would be extremely

16          helpful.  Thanks, Amy.

17   Q.     Okay.  Is this -- this isn't the e-mail that

18          she sent you asking for a quote; correct?

19   A.     No, sir.

20   Q.     Would that e-mail have been subsequent to this

21          e-mail?

22   A.     It was after this, yes, sir.

23   Q.     Okay.  Had you received any complaints about
```

```
 1          the lack of promotional materials from Amy

 2          Murphy before this e-mail?

 3    A.    I did have an opportunity to speak with

 4          Ms. Amy Murphy on an occasion prior to that,

 5          but it was my understanding from her that

 6          Mr. Walker had promised her, in the original

 7          sale of this account, promotional material

 8          for -- for her schools.  So, in fact, she was

 9          already perturbed with US Beverage due to the

10          lack of the follow-through from him in the

11          original sale in promising of promotional

12          material.  Because I acquired this account,

13          like I said, in the latter part of December,

14          1st part of January.

15    Q.    At some point during the school year, did US

16          Beverage switch from Juice Alive to Fruzers

17          for this account?

18    A.    At some point during the school year?

19    Q.    Yes.

20    A.    The school year ended in May, sir.  This was

21          in May.

22    Q.    I know.

23    A.    No, sir, we didn't.
```

*NORMAN TODD -- September 13, 2006*

1    Q.    Okay.  So your testimony, for the entire

2          school year, you were selling Juice Alive at

3          this school district?

4    A.    To the best of my knowledge.

5    Q.    When do you recall first putting out Fruzer

6          point-of-sale materials in Mississippi

7          schools?

8    A.    I can't recall the exact time, sir.

9    Q.    Do you recall any Mississippi schools

10         receiving Fruzers point-of-sale materials

11         prior to the end of last school year,

12         2005/2006?

13   A.    I don't recall anybody getting any POS

14         material prior to this school year being in.

15   Q.    When Ms. Murphy asked for point-of-sale

16         materials, did you inform her she'd be getting

17         new Fruzers point-of-sale materials for the

18         next school year?

19   A.    It's right there in front of you.

20   Q.    Okay --

21   A.    (As read:)  I will have the POS material for

22         the brand -- new brand Fruzers by June 1st,

23         2006.  I will assure you that you will receive

*NORMAN TODD -- September 15, 2006*

```
 1          the POS necessary for the healthy promotion of

 2          this item prior to use in the upcoming school

 3          year.  I apologize for the lack of cooperation

 4          you have received and assure that it will

 5          take -- be taken care of promptly.  If I can

 6          be of other assistance, feel free to contact

 7          me at any time.

 8    Q.    And did you provide her point-of-sale

 9          materials by June 1st, 2006, for Fruzers?

10    A.    I don't believe that -- no, sir, it was not

11          provided for her by June 1st, because what I

12          stated there was I will have it by June 1st. I

13          told her that I would have it to her by --

14          prior to the next school year beginning.

15    Q.    Let's look at the second e-mail that was

16          provided to us.  I'm going to mark this

17          Defendants' Exhibit 2.

18                     (The referred-to document was

19                      marked for identification as

20                      Defendants' Exhibit No. 2.)

21                     THE WITNESS:  Do you want to see

22                        this?

23                     MR. GILL:  He usually gives me one.
```

*NORMAN TODD -- September 15, 2006*

42

```
 1                         That's okay.

 2   Q.     Oh, I'm sorry.  I have another one right here.

 3          Okay.  At the bottom of this page, it looks

 4          like there was an e-mail from you to

 5          Ms. Murphy dated June 30th?

 6   A.     Yes, sir.

 7   Q.     Okay.  Let's start by -- we won't read all of

 8          this, but the e-mail from you to her dated

 9          June 30th, if you'll start by reading the

10          third sentence aloud.  It starts, "I was just

11          wondering if."

12   A.     (As read:)  I was just wondering if you were

13          still considering a change in companies for

14          your 100 percent frozen fruit juice needs.

15   Q.     Okay.  Continue.

16   A.     (As read:) If so, as I requested in our

17          previous conversation on June 6th, 2006, US

18          Beverage, Inc., would respectfully request to

19          offer a quote bid on the 100 percent frozen

20          fruit juice product.  As your present supplier

21          of the 100 percent frozen fruit juice, we

22          would thank you for your consideration in the

23          upcoming school year.
```

```
 1   Q.    Okay.  And then there's the response at the
 2         top of the page.
 3   A.    (As read:)  It says, we will be going with
 4         another company this year.  You may pick up
 5         your machines on the 3rd, 4th, or 7th of
 6         August.  Thank you for working with us, Amy.
 7   Q.    Okay.  Is there another e-mail we don't have
 8         here that -- in which she notified you that
 9         she wanted a quote from US Beverage?
10               MR. GILL:  Object to the form.
11   Q.    And maybe I misunderstood your testimony
12         earlier.
13   A.    I received an e-mail from her.
14   Q.    Okay.
15   A.    But I don't -- it looks to me like these two
16         have been pieced together.
17   Q.    Okay.  And who would they have been pieced
18         together by?
19   A.    I have no idea, sir.
20   Q.    And this June 6th, 2006, conversation --
21   A.    Sir?
22   Q.    In your e-mail to her, you referred to a
23         June 6th, 2006, conversation.  Do you recall
```

```
1              what you talked to her about.

2    A.        No, sir.  All of the e-mails -- if that one

3              from her about the quote is not in there, then

4              I can provide that to him, but I don't know

5              why it wouldn't be in between these.  It might

6              have been prior to.

7    Q.        Okay.  So this is your e-mail on June 30th

8              telling Ms. Murphy that you'd like to submit a

9              quote for the next school year; is that

10             correct?

11   A.        Yes, sir.

12   Q.        Do you know if there was any other

13             communication from you to Ms. Murphy prior to

14             June 30th in which you told her you would like

15             to submit a quote for the next school year?

16   A.        I'm not sure, sir.

17   Q.        Do you blame Mr. Walker or his company for

18             your company's inability to submit a quote to

19             Ms. Murphy for the 2006, 2007 school year?

20                       MR. GILL:  Object to the form.

21   A.        I don't blame him for that, no, sir.

22   Q.        Okay.  Let's look at one more document about

23             this particular contract, and we'll move on.
```

NORMAN TODD -- September 15, 2006

```
 1          Here's -- we're going to mark this Defendants'
 2          Exhibit 3.  And first I ask you to identify
 3          this.  Are these notes or typewritten notes
 4          your notes, Mr. Todd?
 5                   (The referred-to document was
 6                    marked for identification as
 7                    Defendants' Exhibit No. 3.)
 8    A.    Yes, sir.
 9    Q.    And this would have been a note made by you on
10          June 11th, 2006?
11    A.    July 11th.
12    Q.    I'm sorry.  July 11th.  It's been a long day.
13          Correct.  Okay.  Why don't you read this for
14          the record rather than me trying to read it,
15          just the whole note.
16    A.    (As read:)  It says, on this date I was
17          contacted by Kenny Coker, Child Nutrition
18          Director, at Itawamba County, Mississippi, in
19          reference to a conversation he had with Amy
20          Murphy, Child Nutrition Director of Oxford
21          Separate School District.  He stated to me
22          that Amy Murphy told him she had elected to
23          change to Juice Alive for the upcoming school
```

*NORMAN TODD -- September 15, 2006*

```
 1          year, 2006/2007.  She stated to him that he
 2          had been told by -- she had been told by
 3          Scotty West, representative of Juice Alive,
 4          that US Beverage was in financial trouble and
 5          would not survive as a company much longer.
 6     Q.   Okay.  And who was Kenny Coker again?
 7     A.   Child nutrition director for Itawamba County.
 8     Q.   Is he a customer?
 9     A.   Yes.
10     Q.   Is he currently a customer, his school
11          district?
12     A.   Yes, sir, he is.
13     Q.   Do you know if Mr. Coker told you he was
14          present during any of these conversations
15          between Scotty West and Amy Murphy?
16     A.   No, sir.
17     Q.   If Amy Murphy denies that this conversation
18          occurred, do you have any reason to think Amy
19          Murphy would be lying?
20     A.   I don't know that she would deny it, because I
21          don't know why he would have a reason to lie
22          to me in reference to it either.  So, no, sir,
23          I don't, no.  I don't think she would have any
```

NORMAN TODD -- September 15, 2006    47

```
 1        reason to lie about it.

 2   Q.   Okay.  Are you aware -- are you alleging that

 3        Amy Murphy or the Oxford school district

 4        stopped doing business with US Beverage

 5        because of this alleged statement of Scotty

 6        West?

 7   A.   I think it had something to do with it, yes,

 8        sir.

 9   Q.   Are there any other school districts that

10        you -- that you take the position that they've

11        stopped doing business with US Beverage

12        because of any statements by Scotty West or

13        others that US Beverage is in financial

14        problems?

15   A.   Not that I've heard, sir, no, sir.

16   Q.   Okay.  Let's go to the Choctaw -- I guess it's

17        Choctaw Tribe Schools in Philadelphia,

18        Mississippi; is that what you --

19   A.   Yes, sir.

20   Q.   Why did US Beverage lose Choctaw schools?

21   A.   Lack of follow-up.

22   Q.   Lack of follow-up?  Can you describe --

23   A.   Well, the machine and the -- the product was
```

*NORMAN TODD -- September 15, 2006*

```
1         delivered, and we were waiting on machines to

2         come in.  And by the time we got -- we got to

3         put the machine in, we were notified by the

4         child nutrition director that they had went

5         with another company, and we needed to pick up

6         our product.

7    Q.   Okay.  Do you blame Mr. Walker or his company

8         for this lack of follow-up?

9              MR. GILL:  Object to the form.

10   Q.   Well, I mean, that was your words, wasn't it,

11        lack of follow-up?

12   A.   Do I blame him for that?  No, sir.  But the

13        follow-up, meaning that we didn't have the

14        equipment at that moment to put into place.

15        And -- but, no, I don't blame him for that,

16        no, sir.

17   Q.   Okay.  Is there anything else that Mr. Walker

18        or anybody that you consider to be his agent

19        or his company would have done to contribute

20        to the loss of Choctaw County -- or Choctaw

21        Tribal Schools?

22   A.   Other than promoting the product and in

23        competition with US Beverage.
```

*NORMAN TODD -- September 15, 2006*

49

1   Q.     Okay.  So other than that, no?

2   A.     No.

3   Q.     Thank you.  And what about the last school?

4         Let me see if I pronounce this correct,

5         Pontotoc?

6   A.     Pontotoc County School Systems.

7   Q.     Okay.  And that's in Mississippi also?

8   A.     Yes.

9   Q.     Okay.  Why did US Beverage lose this customer?

10  A.     Because she's best friends with Amy Murphy.

11  Q.     And who is "she"?

12  A.     Myra Tims.

13               THE REPORTER:  Can you spell that

14                   last name?

15               THE WITNESS:  T-I-M-S, I believe is

16                   her name.

17  Q.     Did you have a conversation with Myra Tims

18         about the contract there?

19  A.     Yes, sir.  She said she was going to go with

20         another company.

21  Q.     Did she mention having talked to Amy Murphy?

22  A.     No, sir.

23  Q.     Who told you she was best friends with Amy

*NORMAN TODD -- September 15, 2006*

50

```
 1        Murphy?
 2   A.   That's just what I was told through
 3        word-of-mouth through the other directors in
 4        the state.
 5   Q.   Who was the source of the word-of-mouth?
 6   A.   Mr. Coker.
 7   Q.   Anybody other than Mr. Coker that would have
 8        told you that?
 9   A.   No, sir.
10   Q.   Can you think of anything that Mr. Walker did
11        or his company would have done to contribute
12        to the loss of this school district?
13   A.   Well, to back up, I think the statement
14        made by -- supposedly made by Scotty West to
15        Amy Murphy would have had a lot to do with it,
16        yes, sir.
17   Q.   Okay.
18   A.   About the financial status of US Beverage and
19        the ability for them to provide them with the
20        product that they need.
21   Q.   Has anyone told you that Myra -- that anyone
22        from US Beverage has communicated to Myra Tims
23        that your company is in financial problems?
```

NORMAN TODD -- September 15, 2006

```
 1    A.    Anybody from US Beverage has communicated that
 2          to her?
 3    Q.    No.  I'm sorry.  Anyone from Mr. Walker or his
 4          company or his agents communicated to Myra
 5          Tims that US Beverage is in financial
 6          problems?
 7    A.    No, sir.  Nobody has told me that.
 8    Q.    Anyone told you that they heard Amy Murphy
 9          repeat that statement to Myra Tims?
10    A.    No, sir.
11    Q.    Did you have any complaints from any of these
12          customers other than what we've talked about?
13          We've talked about Amy Murphy with a --
14          requesting point-of-sale materials, and we
15          talked about a problem with following up with
16          the Choctaw schools.  Any of these other
17          school districts complain to you or US
18          Beverage?
19    A.    No, sir.  None other than just the normal
20          maintenance issues with machines that were
21          taken care of in a timely manner.
22    Q.    Any other school districts other than the one
23          we've talked about complain about
```

*NORMAN TODD -- September 15, 2006*

```
 1          point-of-sale materials?

 2   A.     No, sir.

 3   Q.     Have you had any other customers, not talking

 4          about schools, but any other customers

 5          complain about point-of-sale materials?

 6   A.     No, sir.

 7   Q.     What about convenience stores?

 8   A.     I haven't received any.

 9   Q.     Okay.  And these school districts, these four

10          that we've talked about that were lost in

11          Mississippi, do you have any idea how much

12          sales were lost by US Beverage?

13   A.     I know Oxford Separate School District bought

14          about $24,000 worth of product in the '05/'06

15          school year.

16   Q.     Okay.  Do you have any idea what these other

17          school districts would have bought in '05/'06?

18   A.     I would say that Lincoln County would probably

19          be running roughly the same amount, if not a

20          little bit more.

21   Q.     Okay.  What about Choctaw Tribal Schools?

22   A.     That was a new account.

23   Q.     That's a new account.  So you didn't sell to
```

*NORMAN TODD -- September 15, 2006*                    53

1          them in '05/'06?

2    A.    No, sir.

3    Q.    What about Pontotoc; is that how you say it?

4    A.    I hate to speculate on that.  That was only

5          two schools.

6    Q.    Okay.  And was that a new account too?

7    A.    No, sir.

8    Q.    So you had them in '05/'06 too?

9    A.    Yes, sir.

10   Q.    Would they have been larger or smaller than

11         Lincoln County?

12   A.    Smaller.  It's only two schools.

13   Q.    Okay.  Well, I don't know how many schools

14         there are in Lincoln County.  I'm just amazed

15         there is a county in Mississippi called

16         Lincoln County.  Okay.  And I'm trying to rush

17         this.  I know we've got places to be, but --

18              MR. GILL:  Are we going to try to

19                   finish today or --

20              MR. JACKSON:  Yeah.  I'm going to

21                   try to.

22   Q.    Have you ever had any specific requests for

23         customers for particular types of

NORMAN TODD -- September 15, 2006

```
 1          point-of-sale materials?
 2   A.     None other than maybe some posters to go up on
 3          the walls.  But other than that, no, sir.
 4   Q.     Okay.  And would those have been schools
 5          asking for posters?
 6   A.     Yes, sir.
 7   Q.     What about, like, at convenience stores?
 8   A.     I don't -- I haven't received any really, any
 9          requests from any of those people.
10   Q.     Never had any requests for window signs --
11   A.     No, sir.
12   Q.     -- or materials that hang from the ceiling?
13   A.     Not from convenience stores, no, sir.
14   Q.     Okay.  What about, like, signs on gas pumps?
15   A.     I've had no -- I've received no requests from
16          any convenience store about any POS materials.
17   Q.     And other than the four school systems we
18          talked about a few minutes ago, are you aware
19          of any other customers that US Beverage has
20          lost due to competition from or any other
21          action of US -- I'm sorry, John Walker or his
22          company, Trident Marketing?
23   A.     I don't know of any right off the top of my
```

*NORMAN TODD -- September 15, 2006*

```
 1          head, no, sir.

 2    Q.    What about any customers that have been lost

 3          due to competition with Dispensing Systems?

 4    A.    I can't speculate on that, sir.

 5    Q.    Do you know who Dispensing Systems is?

 6    A.    I've heard of them, sir.

 7    Q.    Have you ever bid against Dispensing Systems?

 8    A.    Yes, sir.

 9    Q.    Have you ever discussed this case with Grady

10          Kittrell -- and I'm talking about outside the

11          presence of attorneys; I'm not asking for

12          anything that was said in front of any

13          attorneys.

14    A.    No, sir, I have not.

15    Q.    What about with Tom Clark?

16    A.    No, sir, I have not.

17    Q.    Anyone else working for US Beverage that

18          you've discussed this case with?  Again,

19          outside of attorneys; I'm not asking for

20          anything that was in the presence of

21          attorneys.

22    A.    No, sir, I haven't.

23    Q.    Have you told any customers or potential
```

*NORMAN TODD -- September 15, 2006*

```
 1              customers of US Beverage that US Beverage owns

 2              the trademarks or other rights to Juice Alive?

 3     A.       I don't specifically think that I've ever told

 4              anybody that US Beverage owns Juice Alive

 5              because I don't know.

 6     Q.       Let me ask you about this document, which I'm

 7              going to mark Defendants' 4.  Do you recognize

 8              this document?

 9                        (The referred-to document was

10                         marked for identification as

11                         Defendants' Exhibit No. 4.)

12                        (Off-the-record discussion.)

13     A.       Yes, sir, I do.

14     Q.       Was this document prepared by you?

15     A.       Yes, sir, it was.

16     Q.       And, I guess, it's not signed, but it has,

17              thanks, Buddy Todd, Sales Manager for US

18              Beverage, Inc., at the bottom; correct?

19     A.       Yes, sir.

20     Q.       And it says "to child nutrition directors."

21              Specifically, which child nutrition directors

22              are we talking about here?

23     A.       The ones that were current customers of US
```

NORMAN TODD -- September 15, 2006

```
 1        Beverage.

 2   Q.   Would that have been just in Mississippi?

 3   A.   Yes, sir.

 4   Q.   Would you have sent this to any child

 5        nutrition directors in Alabama?

 6   A.   No, sir.

 7   Q.   Anywhere else?

 8   A.   No, sir.

 9   Q.   What did you say about the Juice Alive brand

10        in your letter there?  I'll give you a second

11        to read through it.

12   A.   (As read:) Juice Alive brand was developed for

13        sales and distribution solely by US Beverage,

14        Inc.

15   Q.   Okay.  And what was your basis for stating

16        that?

17   A.   That was what I was told.

18   Q.   Do you have any other independent knowledge or

19        any other -- anything else to base that

20        statement on other than what you were told?

21   A.   No, sir.

22   Q.   And who were you told that by?

23   A.   I was told that by Tom Clark.
```

*NORMAN TODD -- September 15, 2006*

1   Q.   Okay.  Again, I'm not asking anything your

2        attorneys would have said or anything said in

3        the presence of your attorneys, but anyone

4        else other than Tom Clark tell you that the

5        Juice Alive brand was developed for sales and

6        distribution solely by US Beverage, Inc.?

7   A.   No, sir.

8   Q.   What about the next sentence.  It says (as

9        read:) John Walker is currently using his

10       inside knowledge of bid prices and current

11       rates being charged to US Beverage customers

12       to bid in an attempt to conduct business in

13       the state of Mississippi.

14                  What was your basis of making

15       that statement in this letter?

16  A.   Because Mr. Walker was privy to that

17       information.  He was privy to our current

18       prices to our customers in the state of

19       Mississippi.  And it was apparent that he went

20       to the quote price of $60 per case because we

21       had -- with existing customers in the state of

22       Mississippi that were less than that price.

23  Q.   Okay.  Now, you used the term "it was

```
 1           apparent."  How was it apparent to you?
 2    A.     Other than what I just explained?
 3    Q.     Yes.
 4    A.     It was apparent that he knew that we didn't
 5           have any customers in the state or in the
 6           company except for one specific bid that was
 7           less than $60 a case, school customers.
 8    Q.     And when you say that -- current price, what
 9           school year are you referring to as being the
10           current price?
11    A.     '05/'06.
12    Q.     Did he have any reason to know what your
13           prices were going to be for '06/'07?
14    A.     I don't -- no, sir, I don't think so.
15    Q.     Do you know if he was privy to the information
16           dealing with any bids or anything that was
17           being sent out by your company or quotes for
18           '06/'07?
19    A.     No, sir.
20    Q.     Okay.  The next sentence says (as read:) It is
21           clearly a federal violation of contracts -- of
22           the contracts submitted with each bid
23           reference Section II, Subsection 16,
```

1    Paragraphs H.  And then there's a quotation of

2    that, and I'm not going to read it for the

3    record.  What was your basis of making this

4    statement?

5  A.    My basis for making this statement was on the

6    knowledge obtained through Tom Clark that John

7    Walker was one-third owner of US Beverage, and

8    in by being one-third owner of US Beverage, he

9    would be signing or submitting bid

10    documentation in public entities in violation

11    of this statement because he would be

12    receiving monies from both sides -- either

13    which way the bid went, if he won it, or if we

14    won it, he would be receiving monetary

15    supplements from either way.

16  Q.    Okay.  Are you a lawyer?

17  A.    I'm not a lawyer, but any layman can get that

18    out of that statement.

19  Q.    Any layman can determine whether or not a

20    federal violation has occurred?

21  A.    Can I read it for the record so that --

22  Q.    Oh, sure.  Go ahead and read it.

23  A.    (As read:)  It says, by signing this document,

*NORMAN TODD -- September 15, 2006*

```
 1          the contractor certifies that this proposal is

 2          made without prior understanding, agreement,

 3          or connection with any corporation, firm or

 4          person submitting a proposal for the same

 5          materials, supplies, or equipment and is in

 6          all respects fair and without collusion or

 7          fraud.  The contractor certifies that

 8          collusive bidding is a violation of federal

 9          law and can result in fines, prison sentences,

10          and civil damage awards.

11                    So to answer your question

12          that you previously asked me, with him being

13          one-third owner of US Beverage and him also

14          being owner of Trident Marketing, either way

15          the bid went, whomever got the bid, Trident

16          Marketing, Juice Alive, Dispensing Systems, or

17          US Beverage, he's going to benefit because

18          he's getting monies from the product that's

19          being sold by those companies that are bidding

20          in these public bids.

21    Q.    Okay.  Are you reading the first sentence of

22          this quote as defining what collusion is under

23          the federal law?
```

1          MR. GILL:  Object to the form.  He

2                    didn't say that.

3          MR. JACKSON:  He said any layman

4                    could read this and conclude

5                    that a federal violation --

6          MR. GILL:  He read it and told you

7                    his conclusion.  I mean...

8    A.   What was the question again?

9    Q.   I'm asking you, since you're a layman reading

10        this, are you reading this as stating that the

11        first sentence in this quote defines what

12        collusion under federal law is?

13         MR. GILL:  Object to the form.

14   A.   I don't understand what you're asking, and I

15        couldn't...

16         MR. GILL:  You can answer the

17                   question.

18   A.   The first sentence defines collusion?  I don't

19        think if fully defines it.

20   Q.   But in your statement before the quote, it

21        says clearly a federal violation of the

22        contract submitted -- and this refers in the

23        last sentence of the quote to collusion under

```
 1        federal law.  And so I'm asking you -- I guess

 2        I'm just trying to understand how -- how you

 3        came to make an allegation in a letter sent

 4        out to the child nutrition directors in the

 5        state of Mississippi that my client was

 6        violating federal collusion law?

 7                   MR. GILL:  Object to form.

 8   A.   Because your client is one-third owner of US

 9        Beverage, Inc.

10   Q.   So?

11   A.   And he is -- he's bidding in a public bid with

12        public monies, and he's going to benefit

13        either way it goes.  So to me, that's

14        bid-rigging.  I'm not a lawyer.  No, I'm not a

15        lawyer.  But I do know when you're dealing

16        with public funds, you have to be by the book.

17        And that's where collusion laws come into

18        play.  But I'm not a lawyer by any means.

19   Q.   Okay.  Well, we understand that.  It's just a

20        very serious allegation to send a letter out

21        all over the state of Mississippi accusing

22        someone of violation of the federal collusion

23        act.
```

*NORMAN TODD -- September 15, 2006*

```
 1                   MR. GILL:  Object to the form.

 2   Q.    Is that not serious to you?  If Mr. Walker

 3         sent a letter out accusing you of violating

 4         federal law, specifically a criminal law,

 5         wouldn't that bother you?

 6   A.    It would bother me, sir, but I feel that

 7         everything I put in here is the truth based on

 8         the knowledge that I have.

 9   Q.    How many child nutrition directors was this

10         sent out to?

11   A.    I'm not sure of the exact number, sir.

12   Q.    Do you know how many counties there are in

13         Mississippi?

14   A.    I think there's roughly 68 of them.

15   Q.    Would there have been at least one child

16         nutrition director per county?

17   A.    We don't have every county.  And I didn't send

18         this to anybody but our current customers.

19   Q.    Okay.  And you don't know how many current

20         customers you have in the state of Mississippi

21         schools?

22   A.    I don't know how many that got this, no, sir,

23         I don't.  I can't recall it.
```

*NORMAN TODD -- September 15, 2006*

```
 1   Q.    Do you know when this letter was sent?  It's
 2         not dated.
 3   A.    No, sir, I don't, not the exact date.
 4   Q.    You don't have any idea at all?
 5   A.    No.
 6   Q.    Early summer?  Late summer?
 7   A.    I really don't.
 8   Q.    June, July, or August?
 9   A.    All I could say is sometime after the
10         conversation at the Alabama state show between
11         the two of them.
12   Q.    Was this -- and there was another e-mail we
13         talked about in the first deposition today, an
14         e-mail that you sent out with a letter
15         attached from Tom Clark.  Do you remember that
16         e-mail?
17   A.    Yes, sir, I do.
18   Q.    Was this particular letter sent before or
19         after the e-mail that you sent out with the
20         letter attached to Tom Clark?
21   A.    I'm not sure, sir.  I haven't specifically
22         mailed anything to any director, so if it
23         didn't go e-mail, then they didn't get this.
```

*NORMAN TODD -- September 15, 2006*

1   Q.   And would you have the e-mail itself that this

2        was attached to, this memo?

3   A.   This one we're looking at now, sir?

4   Q.   Yes.

5   A.   I don't believe that this one was e-mailed.

6   Q.   You don't believe it was e-mailed?

7   A.   If it was, I still have a record of it.  If it

8        was, I would be able to provide that

9        information to my attorney.

10  Q.   And I'm just trying to understand.  Are you

11       saying this was never sent out?

12  A.   If this isn't the letter that was attached to

13       the other one, than, no, sir, it wasn't.

14  Q.   Okay.  So you remember writing this letter;

15       correct?

16  A.   Yes, sir.  I did write it, because I wrote it

17       under the direction of Tom Clark.

18  Q.   Okay.  But you remember writing it, but you

19       don't have any idea --

20  A.   I know it wasn't mailed.

21  Q.   Do you know whether it was e-mailed?

22  A.   I don't recall.  I'll have to go back and look

23       at my e-mail records.

NORMAN TODD -- September 15, 2006

```
 1    Q.      You stated earlier in your deposition the
 2            letter did go out to child nutrition
 3            directors.
 4    A.      I don't -- I thought this was the letter that
 5            was connected to the other one, sir, I don't
 6            know.
 7    Q.      Okay.
 8                    MR. GILL:  Do we have the other
 9                        letter, the other e-mail that
10                        has -- attached -- I'm just
11                        not sure we marked that today.
12                    MR. WALKER:  We talked about it in
13                        my deposition.
14                    MR. GILL:  We talked about it
15                        yesterday.
16                    MR. JACKSON:  I may have still have
17                        it in my box, then.
18    A.      While you find that, may I go to the rest
19            room?
20    Q.      Certainly.  We'll take a quick break.
21                    (Brief recess taken.)
22    Q.      I ask you to look at what we've marked as
23            Defendants' Exhibit 5.  We talked a few
```

```
 1            minutes ago about an e-mail that was sent out

 2            by you with a letter attached.

 3                    (The referred-to document was

 4                    marked for identification as

 5                    Defendants' Exhibit No. 5.)

 6   A.    Yes, sir.

 7   Q.    Does this appear to be the e-mail that was

 8         sent out -- or I guess a forwarded copy of it?

 9   A.    A forwarded copy of this, yes, sir.

10   Q.    And it was forwarded by Amy Murphy?

11   A.    Do what, now?

12   Q.    It was forwarded by Amy Murphy to John Walker;

13         is that what it says at the top, for

14         clarification at the top of the e-mail?

15   A.    Yes, sir, it was.

16   Q.    Okay.  And this letter, it has a long list of

17         "tos," people that it went to, starting with

18         Amanda Boler and the last one being Wendy

19         Tucker.  Would this have been all the

20         recipients of this e-mail?

21   A.    Yes, sir.

22   Q.    Were there any other forwards other than this?

23   A.    No, sir.  Not to my knowledge.
```

NORMAN TODD -- September 15, 2006

```
 1   Q.    Okay.  And the date of this e-mail -- your
 2         e-mail not the forward -- was it June 9th,
 3         2006?
 4   A.    That's correct.
 5   Q.    And that's when you remember sending this
 6         letter out by e-mail?
 7   A.    Yes, sir.
 8   Q.    Having seen this, does this refresh your
 9         memory as to whether this other letter we've
10         marked Defendants' Exhibit 4 was created
11         before or after the letter from Tom Clark?
12   A.    Excuse me, sir.  I didn't hear that.  Was
13         created what?
14   Q.    We talked before about the time of creation
15         for Defendants' Exhibit 4, whether it was
16         before or after this letter from Tom Clark,
17         which is dated June 5th and was sent out by
18         you June 9th.
19   A.    I'm not sure, sir, when this letter was
20         created, and I'm not 100 percent sure -- I
21         don't remember whether or not this letter ever
22         went out, sir.  I don't know.
23   Q.    If it had gone out, would it have gone out to
```

*NORMAN TODD -- September 15, 2006* 70

1          the people on the list here in front of us?

2     A.    Yes, sir.

3     Q.    Amanda Boler --

4     A.    If it went out, it would have been sent to the

5          existing customers.

6     Q.    And these people on this list, are these all

7          child nutrition directors?

8     A.    Yes, sir.

9     Q.    Anybody on the list that's not?

10    A.    Not that I know of, sir.

11    Q.    Have you ever told any customers, potential

12         customers of US Beverage, that John Walker or

13         his company are barred from selling slush or

14         juice drinks?

15    A.    No, sir.

16    Q.    Ever tell them that they're barred from using

17         the name Juice Alive?

18    A.    No.

19    Q.    Ever hear anybody else from US Beverage tell a

20         customer or potential customer something

21         similar to that?

22    A.    No, sir.

23    Q.    You ever discuss this lawsuit that we're here

*NORMAN TODD -- September 15, 2006*

```
1              about today with any customer or potential

2              customer of US Beverage?

3    A.        None other than this letter that was drafted

4              by the attorneys.

5    Q.        Okay.  And anyone from that -- you sent that

6              letter to call you and ask you to send

7              pleadings or information about the lawsuit?

8    A.        No, sir.

9    Q.        Anybody from that e-mail that you sent the

10             e-mail to call you and ask you for more

11             details about the lawsuit?

12   A.        No, sir.

13   Q.        And I think I've asked this before, but do you

14             contend that Dispensing Systems has taken any

15             slush or juice drink business from US

16             Beverage?

17   A.        Not to my knowledge.

18   Q.        I may be finished.  If you'll give me a second

19             to confer with my client.

20                  (Brief recess taken.)

21                  MR. JACKSON:  I don't have any more

22                      questions.  And, again, I

23                      reserve the right --
```

*NORMAN TODD -- September 15, 2006*

1              (Off-the-record discussion.)

2              MR. JACKSON:  And, again, I reserve

3                    the right after preliminary

4                    injunction stage to recall

5                    this witness for another

6                    deposition if necessary.

7              MR. GILL:  I agree to that

8                    stipulation, and I will not

9                    ask any questions at this

10                    point.

11        (The deposition of **NORMAN TODD**

12        concluded at approximately 5:41 p.m. on

13        September 15, 2006.)

14

15

16

17

18

19

20

21

22

23

```
1                 *   *   *   *   *   *   *   *

2                 REPORTER'S CERTIFICATE

3                 *   *   *   *   *   *   *   *

4

5      STATE OF ALABAMA

6      COUNTY OF ELMORE

7

8              I, Tiffany B. Beasley, Certified

9      Court Reporter and Notary Public in and for

10     the State of Alabama at Large, do hereby

11     certify that on September 15, 2006, pursuant

12     to notice and stipulation on behalf of the

13     Defendant/Counterclaim Plaintiff, I reported

14     the deposition of NORMAN TODD, who was first

15     duly sworn by me to speak the truth, the whole

16     truth, and nothing but the truth, in the

17     matter of US BEVERAGE, INC., Plaintiff, versus

18     JOHN BUSTER WALKER, II, and TRIDENT MARKETING,

19     INC., Defendants; JOHN BUSTER WALKER, II, and

20     TRIDENT MARKETING, INC., Counterclaim

21     Plaintiffs, versus US Beverage, Inc.,

22     Counterclaim Defendant, and GRADY DOWLING

23     KITTRELL, THOMAS GOING CLARK, III, and NORMAN
```

*NORMAN TODD -- September 15, 2006*

1      "BUDDY" TODD, Third Party Defendants, Civil

2      Action Number 2:06-CV-496-SRW, now pending in

3      the United States District Court for the

4      Middle District of Alabama, Northern Division;

5      that the foregoing 73 typewritten pages

6      contain a true and accurate transcription of

7      the examination of said witness by counsel for

8      the parties set out herein; that the reading

9      and signing of said deposition was waived by

10     witness and counsel for the parties.

11              I further certify that I am

12     neither of kin nor of counsel to the parties

13     to said cause, nor in any manner interested in

14     the results thereof.

15          This 3rd day of October, 2006

16

17

18          *Tiffany B Beasley*

19          Tiffany B. Beasley, CCR
            Reporter and Notary Public

20          State of Alabama at Large

21

22

23

*NORMAN TODD -- September 15, 2006*

75

## $

**$24,000** [1] - 52:14
**$60** [2] - 58:20, 59:7

## '

**'05** [4] - 7:23, 8:5, 17:19, 18:5
**'05/'06** [5] - 52:14, 52:17, 53:1, 53:8, 59:11
**'06** [1] - 34:1
**'06/'07** [2] - 59:13, 59:18
**'93** [2] - 8:20, 9:22
**'94** [1] - 10:1
**'95** [1] - 9:23
**'96** [3] - 9:23, 10:1, 10:2
**'98** [2] - 9:20, 10:4

## 1

**1** [3] - 4:7, 37:12, 37:16
**100** [4] - 42:14, 42:19, 42:21, 69:20
**11th** [3] - 45:10, 45:11, 45:12
**137** [1] - 4:15
**138** [1] - 4:8
**140** [1] - 4:11
**141** [1] - 4:13
**15** [3] - 1:21, 72:13, 73:11
**16** [1] - 59:23
**1974** [1] - 7:16
**1st** [5] - 39:14, 40:22, 41:9, 41:11, 41:12

## 2

**2** [3] - 4:9, 41:17, 41:20
**200** [2] - 7:11, 35:22
**2005** [2] - 19:20, 20:4
**2005/2006** [1] - 40:12
**2006** [15] - 1:21, 4:17, 20:5, 20:6, 40:23, 41:9, 42:17, 43:20, 43:23, 44:19, 45:10, 69:3, 72:13, 73:11, 74:15
**2006/2007** [1] - 46:1
**2007** [1] - 44:19
**21st** [1] - 7:16
**2:06-CV-496-SRW** [2] - 1:6, 74:2

## 3

**3** [3] - 4:12, 45:2, 45:7
**30th** [4] - 42:5, 42:9, 44:7, 44:14
**36022** [1] - 7:12
**36104** [1] - 2:8
**36830** [1] - 2:15
**37** [1] - 4:7
**3rd** [2] - 43:5, 74:15

## 4

**4** [5] - 4:14, 56:7, 56:11, 69:10, 69:15
**41** [1] - 4:9
**444** [2] - 1:19, 2:7
**45** [1] - 4:12
**4:23** [1] - 1:21
**4th** [1] - 43:5

## 5

**5** [4] - 4:4, 4:16, 67:23, 68:5
**56** [1] - 4:14
**5:41** [1] - 72:12
**5th** [1] - 69:17

## 6

**660** [1] - 2:13
**68** [2] - 4:16, 64:14
**6th** [5] - 7:23, 17:19, 42:17, 43:20, 43:23

## 7

**7/11/2006** [1] - 4:12
**73** [1] - 74:5
**7th** [1] - 43:5

## 9

**9** [1] - 4:17
**9th** [2] - 69:2, 69:18

## A

**ability** [1] - 50:19
**able** [1] - 66:8
**According** [1] - 35:5
**account** [6] - 39:7, 39:12, 39:17, 52:22, 52:23, 53:6
**accounts** [13] - 12:7, 13:15, 13:20, 14:5, 14:10, 14:11, 14:18, 14:22, 15:1, 15:5, 21:12, 35:18
**accurate** [1] - 74:6
**accusing** [2] - 63:21, 64:3
**acquired** [2] - 13:10, 39:12
**act** [1] - 63:23
**Action** [1] - 74:2
**ACTION** [1] - 1:5
**action** [1] - 54:21
**address** [1] - 7:10
**administrative** [1] - 38:10
**age** [1] - 5:1
**agency** [2] - 31:16, 31:21
**agent** [2] - 34:4, 48:18
**agents** [1] - 51:4
**ago** [2] - 54:18, 68:1
**agree** [1] - 72:7
**agreed** [4] - 3:2, 3:18, 25:22, 30:23
**agreement** [1] - 61:2
**ahead** [1] - 60:22
**ALABAMA** [2] - 1:1, 73:5
**Alabama** [20] - 1:19, 1:20, 2:8, 2:15, 3:7, 7:11, 20:8, 20:9, 26:3, 26:22, 27:1, 29:18, 30:5, 31:20, 35:22, 57:5, 65:10, 73:10, 74:4, 74:20
**Alive** [44] - 19:12, 20:13, 20:15, 20:19, 20:22, 21:13, 21:14, 21:22, 22:1, 22:4, 22:11, 22:14, 22:16, 23:3, 23:7, 23:11, 23:17, 25:12, 25:14, 26:4, 27:1, 27:10, 27:21, 28:13, 28:19, 29:11, 31:9, 32:9, 32:16, 32:22, 34:9, 34:23, 36:20, 39:16, 40:2, 45:23, 46:3, 56:2, 56:4, 57:9, 57:12, 58:5, 61:16, 70:17
**allegation** [2] - 63:3, 63:20
**alleged** [1] - 47:5
**alleging** [1] - 47:2
**aloud** [1] - 42:10
**ALSO** [1] - 2:17
**Amanda** [2] - 68:18, 70:3
**amazed** [1] - 53:14
**ambulance** [1] - 10:8
**Ambulance** [2] -

**accurate** [1] - 74:6
**amount** [1] - 52:19
**Amy** [25] - 4:7, 4:9, 4:16, 36:15, 37:2, 37:9, 37:23, 38:16, 39:1, 39:4, 43:6, 45:19, 45:22, 46:15, 46:17, 46:18, 47:3, 49:10, 49:21, 49:23, 50:15, 51:8, 51:13, 68:10, 68:12
**And..** [1] - 37:1
**annual** [1] - 18:20
**answer** [2] - 61:11, 62:16
**answered** [1] - 33:4
**answering** [1] - 6:9
**anyway** [2] - 6:7
**apologize** [1] - 41:3
**apparent** [4] - 58:19, 59:1, 59:4
**appealing** [1] - 32:13
**appear** [1] - 68:7
**APPEARANCES** [1] - 2:1
**Applebee's** [6] - 9:12, 10:6, 10:15, 10:17, 10:19, 11:5
**applying** [1] - 15:13
**approached** [1] - 36:15
**Arkansas** [1] - 13:7
**artwork** [3] - 31:17, 31:23, 32:2
**assistance** [1] - 41:6
**assume** [1] - 29:5
**assure** [2] - 40:23, 41:4
**attached** [6] - 65:15, 65:20, 66:2, 66:12, 67:10, 68:2
**Attached** [1] - 4:16
**attempt** [1] - 58:12
**attempted** [1] - 34:8
**attend** [1] - 8:22
**attention** [1] - 16:23
**attorney** [2] - 5:9, 66:9
**attorneys** [8] - 37:18, 55:11, 55:13, 55:19, 55:21, 58:2, 58:3, 71:4
**attractive** [1] - 32:15
**Auburn** [1] - 2:15
**August** [3] - 34:1, 43:6, 65:8
**AUM** [3] - 8:23, 9:1, 9:6
**average** [1] - 12:11
**awards** [1] - 61:10

**aware** [4] - 29:9, 33:6, 47:2, 54:18

## B

**background** [1] - 8:12
**bar** [1] - 21:12
**barred** [2] - 70:13, 70:16
**base** [1] - 57:19
**based** [1] - 64:7
**basis** [1] - 57:15, 58:14, 60:3, 60:5
**Bates** [4] - 4:8, 4:10, 4:13, 4:15
**Bates-Stamped** [4] - 4:8, 4:10, 4:13, 4:15
**bearing** [2] - 20:19, 20:22
**Beasley** [4] - 1:20, 3:5, 73:8, 74:19
**Beau** [1] - 34:7
**beginning** [1] - 41:14
**behalf** [2] - 1:18, 73:12
**behind** [2] - 28:2, 30:16
**benefit** [2] - 61:17, 63:12
**best** [3] - 40:4, 49:10, 49:23
**better** [1] - 32:21
**between** [13] - 3:3, 3:19, 4:7, 4:9, 4:16, 16:21, 30:3, 30:11, 30:19, 44:5, 46:15, 65:10
**Beverage** [94] - 4:8, 4:11, 4:13, 4:15, 5:12, 6:1, 7:18, 7:20, 7:22, 8:9, 9:2, 11:4, 11:6, 11:13, 12:1, 12:6, 12:15, 15:11, 15:14, 15:18, 15:20, 16:5, 16:14, 16:17, 16:19, 17:12, 17:21, 18:7, 18:12, 18:15, 18:18, 19:1, 19:6, 22:21, 23:2, 24:13, 26:23, 27:15, 27:19, 28:22, 29:20, 30:17, 30:23, 31:1, 32:5, 32:18, 33:7, 33:22, 34:2, 34:14, 35:13, 35:15, 35:18, 36:12, 37:2, 37:19, 39:9, 39:16, 42:18, 43:9, 46:4, 47:4, 47:11, 47:13, 47:20, 48:23, 49:9,

50:18, 50:22, 51:1, 51:5, 51:18, 52:12, 54:19, 55:17, 56:1, 56:4, 56:18, 57:1, 57:13, 58:6, 58:11, 60:7, 60:8, 61:13, 61:17, 63:9, 70:12, 70:19, 71:2, 71:16, 73:21

BEVERAGE [3] - 1:3, 1:10, 73:17

beverages [1] - 21:8

bid [18] - 34:11, 34:14, 35:3, 35:7, 35:9, 36:22, 42:19, 55:7, 58:10, 58:12, 59:6, 59:22, 60:9, 60:13, 61:15, 63:11, 63:14

bid-rigging [1] - 63:14

bidding [5] - 35:14, 35:15, 61:8, 61:19, 63:11

bids [2] - 59:16, 61:20

bit [3] - 7:4, 11:1, 52:20

blame [1] - 35:13, 35:15, 44:17, 44:21, 48:7, 48:12, 48:15

BLR [2] - 31:16, 31:21

Boler [2] - 68:18, 70:3

book [1] - 63:16

born [1] - 7:15

bother [2] - 64:5, 64:6

bottom [2] - 42:3, 56:18

bought [2] - 52:13, 52:17

box [1] - 67:17

boxes [1] - 31:4

brand [31] - 19:23, 20:15, 20:16, 20:19, 22:12, 22:14, 22:16, 23:3, 23:11, 23:16, 23:17, 24:21, 25:5, 26:4, 26:12, 29:21, 30:7, 30:8, 30:16, 31:11, 31:12, 32:8, 32:10, 32:17, 32:21, 32:22, 40:22, 57:9, 57:12, 58:5

brands [1] - 18:23

break [2] - 6:17, 67:20

Brief [4] - 11:17,

26:21, 67:21, 71:20

brief [1] - 6:18

briefly [1] - 8:11

bringing [1] - 18:14

brochures [1] - 38:8

brought [2] - 5:11, 5:18

BUDDY [2] - 1:13, 74:1

Buddy [5] - 4:7, 4:10, 4:14, 7:7, 56:17

business [9] - 11:10, 16:9, 18:10, 33:3, 33:4, 47:4, 47:11, 58:12, 71:15

BUSTER [5] - 1:4, 1:7, 2:19, 73:18, 73:19

buy [1] - 25:2

buying [2] - 26:8, 26:10

BY [1] - 5:4

## C

car [1] - 5:21

care [3] - 27:23, 41:5, 51:21

Carolina [7] - 14:4, 14:5, 14:8, 14:16, 14:19, 15:2, 15:6

Carteret [1] - 14:21

case [6] - 5:17, 6:3, 55:9, 55:18, 58:20, 59:7

CCR [1] - 74:19

cease [1] - 29:10

cease-and-desist [1] - 29:10

ceiling [1] - 54:12

Certainly [1] - 67:20

CERTIFICATE [1] - 73:2

Certified [3] - 1:20, 3:5, 73:8

certifies [2] - 61:1, 61:7

certify [2] - 73:11, 74:11

chance [1] - 16:8

change [4] - 29:15, 29:21, 42:13, 45:23

changed [1] - 34:22

changing [1] - 22:13

charge [1] - 27:20

charged [1] - 58:11

check [1] - 34:16

checking [1] - 28:2

checklist [1] - 28:16

Child [1] - 4:14,

45:17, 45:20, 46:7

child [11] - 32:14, 32:15, 48:4, 56:20, 56:21, 57:4, 63:4, 64:9, 64:15, 67:2, 70:7

children [2] - 32:13, 38:12

Choctaw [8] - 33:16, 47:16, 47:17, 47:20, 48:20, 51:16, 52:21

chose [2] - 29:20, 36:21

chosen [1] - 37:7

City [1] - 36:10

civil [1] - 61:10

CIVIL [1] - 1:5

Civil [2] - 3:16, 74:1

clarification [1] - 68:14

CLARK [3] - 1:13, 2:18, 73:23

Clark [18] - 15:12, 15:21, 18:3, 18:4, 18:9, 25:21, 30:20, 31:14, 31:16, 55:15, 57:23, 58:4, 60:6, 65:15, 65:20, 66:17, 69:11, 69:16

clearly [2] - 59:21, 62:21

client [5] - 6:20, 15:22, 63:5, 63:8, 71:19

CLIFF [1] - 2:12

close [1] - 36:4

CND [2] - 34:7, 36:16

Coker [5] - 45:17, 46:6, 46:13, 50:6, 50:7

College [1] - 2:13

college [3] - 8:13, 8:21, 9:5

colleges [1] - 8:22

collusion [8] - 61:6, 61:22, 62:12, 62:18, 62:23, 63:6, 63:17, 63:22

collusive [1] - 61:8

colorfulness [1] - 26:14

commencing [1] - 1:21

commission [1] - 3:8

commissions [2] - 18:19, 18:21

communicated [3] - 50:22, 51:1, 51:4

communication [1] - 44:13

companies [5] - 30:21, 31:5, 34:22, 42:13, 61:19

company [26] - 5:10, 10:8, 17:16, 19:13, 20:18, 21:6, 22:6, 22:9, 25:3, 29:9, 31:9, 37:7, 43:4, 44:17, 46:5, 48:5, 48:7, 48:19, 49:20, 50:11, 50:23, 51:4, 54:22, 59:6, 59:17, 70:13

company's [1] - 44:18

compares [1] - 32:8

competing [1] - 35:17

competition [3] - 48:23, 54:20, 55:3

complain [3] - 51:17, 51:23, 52:5

complaints [2] - 38:23, 51:11

complete [1] - 8:23

compromise [1] - 31:2

concentrate [1] - 12:3

conclude [1] - 62:4

concluded [1] - 72:12

conclusion [1] - 62:7

conduct [1] - 58:12

confer [1] - 71:19

confuse [1] - 14:13

confused [1] - 30:13

connected [1] - 67:5

connection [1] - 61:3

conservation [1] - 16:21

consider [1] - 48:18

consideration [1] - 42:22

considering [1] - 42:13

consumer [1] - 24:23

contact [1] - 41:6

contacted [1] - 45:17

contain [1] - 74:6

contend [1] - 71:14

Continue [1] - 42:15

contract [4] - 35:16, 44:23, 49:18, 62:22

contractor [2] - 61:1, 61:7

contracts [2] - 59:21, 59:22

contribute [2] - 48:19, 50:11

convenience [4] -

52:7, 54:7, 54:13, 54:16

conversation [11] - 17:1, 30:3, 30:10, 30:19, 42:17, 43:20, 43:23, 45:19, 46:17, 49:17, 65:10

conversations [2] - 17:2, 46:14

cook [2] - 11:20

Cool [12] - 19:2, 19:12, 19:13, 19:17, 21:6, 21:8, 21:10, 22:3, 22:9, 22:14, 22:17, 23:5

cooperation [1] - 41:3

Copeland [2] - 1:18, 2:6

copied [1] - 38:2

copy [2] - 68:8, 68:9

corporation [2] - 35:20, 61:3

Correct [1] - 45:13

correct [10] - 7:2, 22:7, 29:12, 37:19, 38:18, 44:10, 49:4, 56:18, 66:15, 69:4

couldn't.. [1] - 62:15

counsel [4] - 3:3, 74:7, 74:10, 74:12

Counterclaim [4] - 1:8, 1:10, 73:20, 73:22

counties [2] - 14:23, 64:12

COUNTY [1] - 73:6

County [20] - 7:13, 14:20, 15:1, 33:10, 33:19, 33:23, 34:2, 35:4, 35:14, 35:21, 36:3, 45:18, 46:7, 48:20, 49:6, 52:18, 53:11, 53:14, 53:16

county [3] - 53:15, 64:16, 64:17

Court [4] - 1:20, 3:5, 73:9, 74:3

COURT [1] - 1:1

court [1] - 11:1

Craven [1] - 14:21

created [4] - 31:23, 69:10, 69:13, 69:20

creation [1] - 69:14

criminal [1] - 64:4

current [9] - 12:5, 12:7, 56:23, 58:10, 58:17, 59:8, 59:10, 64:18, 64:19

customer [12] -

*NORMAN TODD -- September 15, 2006*

12:20, 12:22, 33:23,
34:3, 36:13, 46:8,
46:10, 49:9, 70:20,
71:1, 71:2
  customers [30] -
13:4, 13:11, 21:16,
21:17, 24:4, 26:5,
26:7, 26:11, 27:9,
27:14, 33:6, 51:12,
52:3, 52:4, 53:23,
54:19, 55:2, 55:23,
56:1, 56:23, 58:11,
58:18, 58:21, 59:5,
59:7, 64:18, 64:20,
70:5, 70:11, 70:12

## D

damage [1] - 61:10
date [7] - 20:2, 20:4,
20:8, 20:23, 45:16,
65:3, 69:1
dated [6] - 4:12,
4:17, 42:5, 42:8, 65:2,
69:17
dates [3] - 4:8, 4:10,
29:19
  Davis [2] - 8:16, 8:17
days [3] - 12:13,
12:14, 35:1
deal [3] - 12:23, 13:5,
13:12
dealing [4] - 14:6,
24:4, 59:16, 63:15
  Deatsville [3] - 7:11,
7:13, 8:15
  December [2] - 8:5,
39:13
decision [1] - 15:19
Defendant [2] - 1:11,
73:22
  DEFENDANT/
COUNTERCLAIM [1] -
2:10
  Defendant/
Counterclaim [2] -
1:18, 73:13
  DEFENDANT/
THIRD [1] - 2:3
  Defendants [4] - 1:6,
1:14, 73:19, 74:1
  DEFENDANTS [1] -
2:4
  Defendants' [12] -
37:12, 37:16, 41:17,
41:20, 45:1, 45:7,
56:7, 56:11, 67:23,
68:5, 69:10, 69:15
defines [3] - 62:11,
62:18, 62:19

defining [1] - 61:22
delivered [1] - 48:1
delivering [1] - 19:9
denies [1] - 46:17
deny [1] - 46:20
Department [5] - 9:7,
9:9, 9:14, 9:17, 9:22
depicted [1] - 32:7
deposition [13] - 3:4,
3:14, 3:21, 5:12, 6:6,
37:12, 65:13, 67:1,
67:13, 72:6, 72:11,
73:14, 74:9
  DEPOSITION [1] -
1:17
describe [1] - 47:22
desist [1] - 29:10
destroyed [1] - 29:4
destroying [1] -
28:22
details [1] - 71:11
determine [1] - 60:19
develop [1] - 12:7
developed [2] -
57:12, 58:5
developing [2] - 23:2
development [2] -
22:20, 22:22
difference [1] - 24:5
different [2] - 16:2,
24:2
dinner [3] - 30:4,
30:11, 30:18
direction [1] - 66:17
director [5] - 34:7,
46:7, 48:4, 64:16,
65:22
  Director [2] - 45:18,
45:20
directors [9] - 38:7,
50:3, 56:20, 56:21,
57:5, 63:4, 64:9, 67:3,
70:7
  Directors [1] - 4:14
discuss [1] - 70:23
discussed [5] -
18:14, 25:14, 30:8,
55:9, 55:18
discussing [1] - 30:6
discussion [2] -
56:12, 72:1
  Dispensing [5] -
55:3, 55:5, 55:7,
61:16, 71:14
distribute [3] -
24:13, 24:14, 25:10
distributed [2] -
21:9, 21:15
distributing [6] -
19:10, 19:17, 19:23,

20:14, 22:19, 24:8
distribution [2] -
57:13, 58:6
  District [6] - 36:11,
36:17, 45:21, 52:13,
74:3, 74:4
  DISTRICT [2] - 1:1,
1:1
district [4] - 40:3,
46:11, 47:3, 50:12
districts [5] - 47:9,
51:17, 51:22, 52:9,
52:17
  Division [1] - 74:4
  DIVISION [1] - 1:2
document [10] -
37:14, 41:18, 44:22,
45:5, 56:6, 56:8, 56:9,
56:14, 60:23, 68:3
documentation [1] -
60:10
done [4] - 27:16,
29:16, 48:19, 50:11
  DOWLING [2] - 1:12,
73:22
  Dozier [1] - 15:17
drafted [1] - 71:3
drink [1] - 71:15
drinks [4] - 12:3,
19:1, 19:11, 70:14
  Drive [1] - 7:11
driver [1] - 19:8
due [3] - 39:9, 54:20,
55:3
duly [2] - 5:2, 73:15
during [3] - 39:15,
39:18, 46:14
duties [1] - 12:5

## E

e-mail [35] - 36:23,
37:1, 37:3, 37:5, 37:6,
37:13, 37:17, 38:17,
38:20, 38:21, 39:2,
41:15, 42:4, 42:8,
43:7, 43:13, 43:22,
44:7, 65:12, 65:14,
65:16, 65:19, 65:23,
66:1, 66:23, 67:9,
68:1, 68:7, 68:14,
68:20, 69:1, 69:2,
69:6, 71:9, 71:10
  E-mail [1] - 4:16
e-mailed [3] - 66:5,
66:6, 66:21
e-mails [2] - 37:9,
44:2
  E-mails [2] - 4:7, 4:9
  Early [1] - 65:6

education [1] - 17:10
educational [1] -
8:11
either [8] - 3:15,
36:14, 46:22, 60:12,
60:15, 61:14, 63:13
elected [1] - 45:22
  Elmore [1] - 7:13
  ELMORE [1] - 73:6
employed [1] - 7:17
employee [2] -
16:14, 18:17
employer [1] - 5:11
employers [2] - 9:2,
9:5
  EMT [1] - 10:9
end [1] - 40:11
ended [1] - 39:20
entire [1] - 40:1
entities [1] - 60:10
equipment [2] -
48:14, 61:5
  ESQUIRE [2] - 2:5,
2:11
etc [1] - 38:9
evening [1] - 26:3
everywhere [1] -
12:19
evidence [1] - 3:14
exact [6] - 20:2,
29:19, 35:10, 40:8,
64:11, 65:3
  EXAMINATION [2] -
4:3, 5:3
examination [1] -
74:7
examples [1] - 14:18
except [1] - 59:6
  Excuse [1] - 69:12
  Exhibit [11] - 37:12,
37:16, 41:17, 41:20,
45:2, 45:7, 56:11,
67:23, 68:5, 69:10,
69:15
  EXHIBITS [1] - 4:6
existence [1] - 30:9
existing [2] - 58:21,
70:5
expenditures [1] -
34:12
explained [1] - 59:2
expressed [2] -
30:21, 34:18
extra [2] - 23:1,
38:12
extremely [1] - 38:15

## F

fact [1] - 39:8

fair [1] - 61:6
familiar [1] - 24:9
far [9] - 12:17, 16:22,
17:7, 23:12, 23:21,
25:15, 25:17, 26:13,
35:19
fast [1] - 6:11
father [1] - 11:11
father-in-law [1] -
11:11
  Federal [1] - 3:16
federal [11] - 59:21,
60:20, 61:8, 61:23,
62:5, 62:12, 62:21,
63:1, 63:6, 63:22,
64:4
feeding [1] - 38:11
felt [1] - 22:23
few [2] - 54:18, 67:23
field [1] - 38:9
financial [5] - 46:4,
47:13, 50:18, 50:23,
51:5
fine [1] - 34:19
fines [1] - 61:9
finish [1] - 53:19
finished [1] - 71:18
firm [1] - 61:3
first [12] - 5:2, 19:22,
21:7, 21:22, 21:23,
40:5, 45:2, 61:21,
62:11, 62:18, 65:13,
73:14
  Five [2] - 12:13,
12:14
flavor [2] - 24:15,
25:9
  Florida [2] - 13:11,
13:12
flyer [1] - 24:14
flyers [2] - 25:8,
26:15
follow [6] - 39:10,
47:21, 47:22, 48:8,
48:11, 48:13
follow-through [1] -
39:10
follow-up [5] - 47:21,
47:22, 48:8, 48:11,
48:13
following [1] - 51:15
follows [1] - 5:2
food [1] - 38:12
FOR [3] - 1:1, 2:3,
2:10
foregoing [1] - 74:5
form [15] - 3:11,
23:13, 23:19, 29:13,
29:22, 32:11, 32:19,
32:23, 43:10, 44:20,

48:9, 62:1, 62:13, 63:7, 64:1
**formality** [2] - 3:8
**forward** [1] - 69:2
**forwarded** [4] - 68:8, 68:9, 68:10, 68:12
**forwards** [1] - 68:22
**four** [2] - 52:9, 54:17
**frame** [1] - 35:11
**Franco** [2] - 1:19, 2:6
**fraud** [1] - 61:7
**free** [1] - 41:6
**friends** [2] - 49:10, 49:23
**front** [4] - 24:22, 40:19, 55:12, 70:1
**frozen** [3] - 42:14, 42:19, 42:21
**fruit** [4] - 12:2, 42:14, 42:20, 42:21
**Fruzer** [5] - 29:21, 30:7, 30:8, 30:16, 40:5
**Fruzers** [20] - 19:12, 19:22, 19:23, 21:4, 21:20, 25:5, 26:12, 31:9, 31:11, 31:12, 31:22, 32:6, 32:8, 32:17, 32:21, 39:16, 40:10, 40:17, 40:22, 41:9
**full** [1] - 6:21
**fully** [1] - 62:19
**funds** [1] - 63:16
**furthest** [2] - 12:20, 12:22

## G

**gas** [1] - 54:14
**generalities** [1] - 17:5
**generally** [1] - 5:20
**geographic** [1] - 12:18
**Georgia** [4] - 13:14, 13:17, 13:19
**Gill** [2] - 1:19, 2:6
**GILL** [27] - 2:5, 5:6, 7:3, 10:23, 19:3, 23:13, 23:19, 26:16, 29:13, 29:22, 32:11, 32:19, 32:23, 41:23, 43:10, 44:20, 48:9, 53:18, 62:1, 62:6, 62:13, 62:16, 63:7, 64:1, 67:8, 67:14, 72:7
**glad** [1] - 6:16
**GOING** [1] - 1:13,

2:18, 73:23
**graduate** [1] - 8:19
**Graduated** [1] - 8:13
**Grady** [3] - 16:21, 17:15, 55:9
**GRADY** [2] - 1:12, 73:22
**guess** [11] - 21:20, 29:6, 30:11, 30:15, 32:2, 37:18, 37:22, 47:16, 56:16, 63:1, 68:8

## H

**handle** [1] - 15:3
**handouts** [1] - 24:15
**hang** [1] - 54:12
**happy** [1] - 32:17
**harder** [1] - 11:3
**hate** [1] - 53:4
**head** [1] - 55:1
**healthy** [2] - 38:14, 41:1
**hear** [4] - 11:2, 21:23, 69:12, 70:19
**heard** [5] - 16:21, 30:14, 47:15, 51:8, 55:6
**hearing** [1] - 11:3
**helpful** [1] - 38:16
**hereby** [2] - 3:21, 73:10
**herein** [1] - 74:8
**hereto** [1] - 3:19
**high** [3] - 8:13, 8:14, 9:3
**higher** [1] - 31:3
**himself** [1] - 34:6
**hire** [1] - 15:19
**hired** [3] - 11:13, 22:5, 22:8
**holding** [1] - 25:23
**honest** [1] - 23:20
**Hopkins** [2] - 6:23, 7:1

## I

**idea** [6] - 18:20, 43:19, 52:11, 52:16, 65:4, 66:19
**identification** [5] - 37:15, 41:19, 45:6, 56:10, 68:4
**identify** [1] - 45:2
**II** [6] - 1:5, 1:7, 2:19, 59:23, 73:18, 73:19
**III** [3] - 1:13, 2:18, 73:23

**immediate** [1] - 15:10
**immediately** [1] - 10:7
**implemented** [1] - 22:16
**implementing** [2] - 22:2, 30:7
**important** [2] - 6:8, 6:15
**IN** [1] - 1:1
**inability** [1] - 44:18
**INC** [7] - 1:3, 1:5, 1:8, 1:10, 73:17, 73:19, 73:20
**Inc** [6] - 42:18, 56:18, 57:14, 58:6, 63:9, 73:21
**independent** [1] - 57:18
**INDEX** [1] - 4:1
**Indian** [1] - 33:16
**indicated** [1] - 28:12
**indicating** [1] - 28:14
**inform** [1] - 40:16
**information** [6] - 6:14, 24:15, 58:17, 59:15, 66:9, 71:7
**injunction** [1] - 72:4
**inquisition** [1] - 6:13
**inside** [1] - 58:10
**instructed** [4] - 17:8, 29:15, 29:17, 34:10
**interest** [1] - 18:11
**interested** [1] - 74:13
**interruption** [1] - 11:17
**introduced** [2] - 31:11, 31:12
**involve** [2] - 5:23, 12:9
**involved** [2] - 12:2, 16:23
**involving** [1] - 17:2
**issues** [1] - 51:20
**Itawamba** [2] - 45:18, 46:7
**item** [1] - 41:2
**itself** [3] - 23:21, 32:12, 66:1

## J

**JACKSON** [10] - 2:11, 5:4, 5:7, 19:5, 26:19, 53:20, 62:3, 67:16, 71:21, 72:2
**Jackson** [1] - 5:8
**JACKSON**...............
.......... [1] - 4:4

**January** [2] - 8:4, 39:14
**Jeff** [2] - 8:16, 8:17
**job** [6] - 7:20, 8:1, 8:8, 12:9, 24:8
**jobs** [2] - 9:3, 9:4
**JOHN** [5] - 1:4, 1:7, 2:19, 73:18, 73:19
**John** [22] - 4:16, 5:9, 15:22, 16:6, 16:8, 16:11, 16:13, 16:16, 16:20, 17:2, 30:12, 30:19, 30:20, 33:7, 34:4, 35:13, 36:14, 54:21, 58:9, 60:6, 68:12, 70:12
**Jones** [1] - 14:21
**JR** [1] - 2:11
**juice** [8] - 12:3, 19:1, 19:11, 42:14, 42:20, 42:21, 70:14, 71:15
**Juice** [44] - 19:12, 20:13, 20:15, 20:19, 20:22, 21:13, 21:14, 21:22, 21:23, 22:4, 22:11, 22:14, 22:15, 23:3, 23:7, 23:10, 23:16, 25:12, 25:14, 26:4, 26:23, 27:10, 27:20, 28:13, 28:19, 29:11, 31:8, 32:9, 32:16, 32:22, 34:9, 34:23, 36:20, 39:16, 40:2, 45:23, 46:3, 56:2, 56:4, 57:9, 57:12, 58:5, 61:16, 70:17
**July** [7] - 7:23, 17:19, 18:5, 19:20, 45:11, 45:12, 65:8
**June** [17] - 4:17, 40:22, 41:9, 41:11, 41:12, 42:5, 42:9, 42:17, 43:20, 43:23, 44:7, 44:14, 45:10, 65:8, 69:2, 69:17, 69:18
**junk** [1] - 38:12

## K

**Kenny** [2] - 45:17, 46:6
**kin** [1] - 74:12
**kind** [1] - 31:2
**Kitchen** [1] - 11:20
**Kittrell** [3] - 17:15, 17:23, 55:10
**KITTRELL** [2] - 1:12, 73:23

**knowledge** [10] - 27:12, 30:1, 30:2, 40:4, 57:18, 58:10, 60:6, 64:8, 68:23, 71:17
**known** [3] - 17:18, 18:4, 35:18
**Knoxville** [1] - 14:2

## L

**label** [9] - 21:1, 21:4, 22:19, 23:21, 23:22, 24:6, 26:8, 31:3, 32:12
**labels** [4] - 22:18, 24:1, 24:3, 27:6
**Lack** [2] - 47:21, 47:22
**lack** [6] - 38:7, 39:1, 39:10, 41:3, 48:8, 48:11
**landscaping** [2] - 11:11, 11:12
**Large** [4] - 1:21, 3:7, 73:10, 74:20
**larger** [1] - 53:10
**last** [6] - 19:16, 40:11, 49:3, 49:14, 62:23, 68:18
**Late** [1] - 65:6
**latter** [1] - 39:13
**law** [8] - 11:11, 61:9, 61:23, 62:12, 63:1, 63:6, 64:4
**Law** [1] - 1:18
**lawful** [1] - 5:1
**lawn** [2] - 11:10, 11:12
**laws** [1] - 63:17
**lawsuit** [8] - 5:10, 5:18, 17:1, 17:6, 29:15, 70:23, 71:7, 71:11
**lawyer** [5] - 60:16, 60:17, 63:14, 63:15, 63:18
**layman** [4] - 60:17, 60:19, 62:3, 62:9
**learn** [1] - 21:22
**learning** [1] - 31:8
**least** [1] - 64:15
**leave** [1] - 26:17
**left** [2] - 9:8, 11:22
**less** [2] - 58:22, 59:7
**letter** [26] - 17:7, 29:14, 57:10, 58:15, 63:3, 63:20, 64:3, 65:1, 65:14, 65:18, 65:20, 66:12, 66:14,

67:2, 67:4, 67:9, 68:2, 68:16, 69:6, 69:9, 69:11, 69:16, 69:19, 69:21, 71:3, 71:6
**Letter** [1] - 4:16
**lie** [2] - 46:21, 47:1
**Lincoln** [12] - 33:10, 33:12, 33:22, 34:2, 35:4, 35:14, 35:21, 36:2, 52:18, 53:11, 53:14, 53:16
**line** [1] - 36:4
**list** [6] - 9:5, 33:9, 68:16, 70:1, 70:6, 70:9
**listen** [1] - 6:15
**listening** [1] - 30:3
**local** [1] - 35:8
**look** [6] - 24:19, 37:13, 41:15, 44:22, 66:22, 67:22
**looking** [1] - 66:3
**looks** [3] - 38:1, 42:3, 43:15
**lose** [5] - 33:22, 34:2, 36:12, 47:20, 49:9
**loss** [2] - 48:20, 50:12
**lost** [5] - 33:7, 52:10, 52:12, 54:20, 55:2
**Louisiana** [2] - 13:3, 36:4
**lower** [1] - 36:18
**lying** [1] - 46:19

## M

**machine** [9] - 25:4, 25:9, 25:15, 25:16, 26:14, 27:7, 29:2, 47:23, 48:3
**machines** [11] - 24:17, 27:1, 27:11, 27:14, 29:16, 35:1, 35:2, 36:19, 43:5, 48:1, 51:20
**mail** [36] - 4:16, 36:23, 37:1, 37:3, 37:5, 37:6, 37:13, 37:17, 38:17, 38:20, 38:21, 39:2, 41:15, 42:4, 42:8, 43:7, 43:13, 43:22, 44:7, 65:12, 65:14, 65:16, 65:19, 65:23, 66:1, 66:23, 67:9, 68:1, 68:7, 68:14, 68:20, 69:1, 69:2, 69:6, 71:9, 71:10
**mailed** [5] - 65:22,

66:5, 66:6, 66:20, 66:21
**mails** [4] - 4:7, 4:9, 37:9, 44:2
**maintain** [1] - 12:7
**maintenance** [1] - 51:20
**make-shifted** [1] - 25:18
**management** [2] - 9:11, 10:14
**Manager** [1] - 56:17
**manager** [7] - 7:21, 8:3, 11:20, 12:6, 15:18, 17:11, 19:4, 19:7, 32:18
**managers** [3] - 28:5, 28:6, 28:9
**manner** [2] - 51:21, 74:13
**mark** [3] - 41:16, 45:1, 56:7
**Mark** [1] - 37:11
**marked** [8] - 37:15, 41:19, 45:6, 56:10, 67:11, 67:22, 68:4, 69:10
**MARKETING** [4] - 1:5, 1:8, 73:18, 73:20
**Marketing** [3] - 5:10, 54:22, 61:14, 61:16
**marketplace** [3] - 23:15, 24:5, 32:9
**material** [7] - 25:22, 28:17, 36:18, 39:7, 39:12, 40:14, 40:21
**materials** [32] - 24:9, 24:10, 24:12, 24:16, 24:19, 25:7, 25:9, 25:13, 27:10, 27:14, 28:12, 28:20, 29:3, 29:11, 31:21, 32:5, 38:5, 38:15, 39:1, 40:6, 40:10, 40:16, 40:17, 41:9, 51:14, 52:1, 52:5, 54:1, 54:12, 54:16, 61:5
**matter** [1] - 73:17
**mean** [6] - 16:2, 21:9, 29:5, 32:14, 32:16, 48:10
**mean..** [1] - 62:7
**meaning** [1] - 48:13
**means** [1] - 63:18
**medium** [1] - 31:3
**meetings** [1] - 16:2
**Memo** [1] - 4:14
**memo** [1] - 66:2
**memory** [1] - 69:9
**Memphis** [1] - 14:2

**mention** [1] - 49:21
**mentioned** [4] - 20:17, 21:7, 24:1, 26:22
**message** [1] - 37:22
**mid** [1] - 8:4
**Middle** [1] - 74:4
**middle** [1] - 37:21
**MIDDLE** [1] - 1:1
**might** [1] - 44:5
**miles** [2] - 35:22, 35:23
**Millbrook** [5] - 9:8, 9:17, 9:19, 10:2, 10:3
**mind** [1] - 37:21
**minutes** [2] - 54:18, 68:1
**Mississippi** [23] - 13:4, 33:10, 33:14, 33:17, 33:19, 36:2, 36:7, 36:9, 40:6, 40:9, 45:18, 47:18, 49:7, 52:11, 53:15, 57:2, 58:13, 58:19, 58:22, 63:5, 63:21, 64:13, 64:20
**misunderstood** [1] - 43:11
**moment** [4] - 14:7, 30:9, 32:20, 48:14
**monetary** [1] - 60:14
**money** [1] - 31:6
**monies** [3] - 60:12, 61:18, 63:12
**Montgomery** [10] - 1:19, 2:8, 8:17, 9:7, 9:13, 9:21, 10:20, 12:21, 12:22, 35:22
**month** [3] - 15:9, 20:6, 31:19
**Moody's** [2] - 10:8, 10:10
**Most** [2] - 6:8, 21:11
**most** [1] - 6:14
**mouth** [2] - 50:3, 50:5
**move** [1] - 44:23
**MR** [37] - 4:4, 5:4, 5:6, 5:7, 7:3, 10:23, 19:3, 19:5, 23:13, 23:19, 26:16, 26:19, 29:13, 29:22, 32:11, 32:19, 32:23, 41:23, 43:10, 44:20, 48:9, 53:18, 53:20, 62:1, 62:3, 62:6, 62:13, 62:16, 63:7, 64:1, 67:8, 67:12, 67:14, 67:16, 71:21, 72:2, 72:7

**Murphy** [28] - 4:7, 4:9, 4:16, 36:15, 37:2, 37:10, 37:23, 39:2, 39:4, 40:15, 42:5, 44:8, 44:13, 44:19, 45:20, 45:22, 46:15, 46:17, 46:19, 47:3, 49:10, 49:21, 50:1, 50:15, 51:8, 51:13, 68:10, 68:12
**Myra** [6] - 49:12, 49:17, 50:21, 50:22, 51:4, 51:9

## N

**name** [9] - 6:22, 17:3, 20:22, 21:23, 32:22, 49:14, 49:16, 70:17
**names** [1] - 7:6
**nature** [1] - 17:14
**necessary** [4] - 23:1, 38:9, 41:1, 72:6
**need** [3] - 3:12, 6:17, 50:20
**needed** [2] - 34:23, 48:5
**needs** [1] - 42:14
**NELSON** [1] - 2:5
**never** [5] - 16:3, 16:23, 29:14, 37:8, 66:11
**Never** [1] - 54:10
**new** [9] - 12:8, 21:1, 21:3, 36:19, 40:17, 40:22, 52:22, 52:23, 53:6
**next** [7] - 38:13, 40:18, 41:14, 44:9, 44:15, 58:8, 59:20
**nickname** [1] - 7:8
**night** [1] - 30:4
**NO** [1] - 1:5
**Nobody** [1] - 51:7
**None** [3] - 51:19, 54:2, 71:3
**normal** [1] - 51:19
**Norman** [1] - 6:23
**NORMAN** [7] - 1:13, 1:17, 3:4, 5:1, 72:11, 73:14, 73:23
**North** [6] - 2:13, 14:8, 14:16, 14:19, 15:2, 15:6
**Northampton** [1] - 14:20
**Northern** [1] - 74:4
**NORTHERN** [1] - 1:2
**Notary** [4] - 1:20,

3:6, 73:9, 74:19
**note** [2] - 45:9, 45:15
**Notes** [1] - 4:12
**notes** [3] - 45:3, 45:4
**nothing** [1] - 73:16
**notice** [3] - 1:17, 29:10, 73:12
**notified** [2] - 43:8, 48:3
**notify** [1] - 34:14
**number** [1] - 64:11
**Number** [1] - 74:2
**Nutrition** [3] - 4:14, 45:17, 45:20
**nutrition** [10] - 46:7, 48:4, 56:20, 56:21, 57:5, 63:4, 64:9, 64:16, 67:2, 70:7
**nutritional** [1] - 24:14

## O

**Object** [14] - 23:13, 23:19, 29:13, 29:22, 32:11, 32:19, 32:23, 43:10, 44:20, 48:9, 62:1, 62:13, 63:7, 64:1
**objections** [2] - 3:10, 3:11
**obtained** [2] - 30:3, 60:6
**occasion** [1] - 39:4
**occur** [2] - 20:21, 31:18
**occurred** [2] - 46:18, 60:20
**October** [1] - 74:15
**OF** [4] - 1:1, 1:17, 73:5, 73:6
**Off-the-record** [2] - 56:12, 72:1
**offer** [1] - 42:19
**offered** [1] - 3:14
**office** [3] - 12:12, 12:15, 18:1
**officer** [1] - 35:20
**Offices** [1] - 1:18
**often** [1] - 12:14
**old** [1] - 27:20
**Once** [2] - 5:16, 26:6
**once** [2] - 29:1, 36:14
**one** [23] - 12:16, 20:17, 21:11, 25:19, 26:18, 26:20, 37:8, 41:23, 42:2, 44:2, 44:22, 51:22, 59:6, 60:7, 60:8, 61:13,

*NORMAN TODD -- September 15, 2006*

63:8, 64:15, 66:3, 66:5, 66:13, 67:5, 68:18
**one-third** [4] - 60:7, 60:8, 61:13, 63:8
**ones** [1] - 56:23
**open** [1] - 15:6
**opening** [1] - 35:10
**opinion** [2] - 32:16, 35:16
**opportunity** [1] - 39:3
**original** [2] - 39:6, 39:11
**outside** [7] - 16:9, 17:23, 18:10, 26:17, 30:21, 55:10, 55:19
**owner** [6] - 18:15, 60:7, 60:8, 61:13, 61:14, 63:8
**ownership** [1] - 18:11
**owns** [2] - 56:1, 56:4
**Oxford** [9] - 33:14, 36:7, 36:9, 36:10, 36:12, 36:16, 45:20, 47:3, 52:13

## P

**p.m** [2] - 1:21, 72:12
**Page** [2] - 4:3, 4:6
**page** [3] - 37:21, 42:3, 43:2
**pages** [1] - 74:5
**paid** [3] - 18:17, 23:7, 23:9
**pamphlets** [1] - 38:8
**paper** [1] - 35:8
**Paragraphs** [1] - 60:1
**parents** [1] - 38:11
**part** [6] - 8:5, 9:4, 24:8, 36:2, 39:13, 39:14
**part-time** [1] - 9:4
**particular** [4] - 34:13, 44:23, 53:23, 65:18
**parties** [5] - 3:3, 3:19, 74:8, 74:10, 74:12
**partner** [1] - 18:15
**parts** [2] - 13:17, 13:23
**Party** [2] - 1:14, 74:1
**PARTY** [1] - 2:4
**party** [1] - 3:15
**passing** [1] - 16:4
**pay** [4] - 23:1, 25:23,

30:22, 31:1
**paying** [2] - 16:22, 31:3
**pending** [1] - 74:2
**people** [7] - 16:17, 27:22, 38:2, 54:9, 68:17, 70:1, 70:6
**per** [3] - 31:3, 58:20, 64:16
**percent** [4] - 42:14, 42:19, 42:21, 69:20
**performance** [1] - 16:14
**Perry** [2] - 1:19, 2:7
**person** [1] - 61:4
**personal** [1] - 35:16
**personally** [5] - 13:8, 14:6, 27:13, 27:16, 33:6
**perturbed** [1] - 39:9
**Philadelphia** [2] - 33:17, 47:17
**phone** [2] - 34:15, 34:20
**pick** [3] - 34:23, 43:4, 48:5
**picked** [1] - 35:1
**picture** [2] - 43:16, 43:17
**place** [1] - 48:14
**places** [2] - 6:19, 53:17
**PLAINTIFF** [1] - 2:10
**Plaintiff** [4] - 1:3, 1:18, 73:13, 73:17
**PLAINTIFF/ COUNTERCLAIM** [1] - 2:3
**Plaintiffs** [2] - 1:9, 73:21
**play** [1] - 63:18
**pleadings** [1] - 71:7
**plus** [1] - 18:19
**point** [24] - 6:10, 6:16, 6:17, 24:8, 24:10, 24:11, 24:12, 24:16, 25:7, 25:11, 25:13, 29:11, 39:15, 39:18, 40:6, 40:10, 40:15, 40:17, 41:8, 51:14, 52:1, 52:5, 54:1, 72:10
**point-of-sale** [16] - 24:8, 24:10, 24:12, 24:16, 25:7, 25:13, 29:11, 40:6, 40:10, 40:15, 40:17, 41:8, 51:14, 52:1, 52:5, 54:1
**Police** [5] - 9:7, 9:9,

9:14, 9:17, 9:22
**Pontotoc** [4] - 33:19, 49:5, 49:6, 53:3
**POS** [21] - 24:10, 25:22, 26:14, 26:23, 27:1, 27:4, 27:6, 27:10, 27:13, 27:20, 28:1, 28:12, 28:19, 29:16, 31:21, 32:5, 36:18, 40:13, 40:21, 41:1, 54:16
**position** [3] - 12:5, 17:11, 47:10
**positive** [1] - 38:14
**possible** [1] - 6:19
**posters** [4] - 25:15, 38:8, 54:2, 54:5
**potential** [4] - 55:23, 70:11, 70:20, 71:1
**Prattville** [2] - 10:21, 10:22
**preliminary** [1] - 72:3
**prepare** [1] - 31:21
**prepared** [2] - 32:1, 56:14
**presence** [3] - 55:11, 55:20, 58:3
**present** [4] - 14:7, 32:20, 42:20, 46:14
**PRESENT** [1] - 2:17
**president** [1] - 17:16
**previous** [1] - 42:17
**previously** [1] - 61:12
**price** [7] - 31:3, 36:18, 37:4, 58:20, 58:22, 59:8, 59:10
**prices** [1] - 58:10
**printer** [1] - 32:3
**prison** [1] - 61:9
**privy** [6] - 23:9, 25:22, 27:5, 58:16, 58:17, 59:15
**problem** [1] - 51:15
**problems** [4] - 38:7, 47:14, 50:23, 51:6
**procedural** [1] - 3:9
**Procedure** [1] - 3:17
**process** [2] - 35:4, 35:7
**produced** [2] - 37:9, 37:18
**product** [28] - 20:1, 20:18, 22:18, 22:23, 23:20, 23:23, 24:2, 24:6, 24:22, 25:2, 25:23, 26:10, 30:23, 31:1, 34:9, 34:11,

34:13, 36:18, 36:20, 36:21, 38:14, 42:20, 47:23, 48:6, 48:22, 50:20, 52:14, 61:18
**products** [5] - 19:14, 19:17, 20:14, 20:22, 21:14
**promise** [1] - 36:17
**promised** [1] - 39:6
**promising** [1] - 39:11
**promote** [1] - 38:13
**promoting** [1] - 48:22
**promotion** [1] - 41:1
**promotional** [6] - 38:5, 38:8, 38:15, 39:1, 39:7, 39:11
**promptly** [1] - 41:5
**pronounce** [1] - 49:4
**proposal** [2] - 61:1, 61:4
**provide** [4] - 41:8, 44:4, 50:19, 66:8
**provided** [4] - 3:16, 25:19, 41:11, 41:16
**public** [5] - 60:10, 61:20, 63:11, 63:12, 63:16
**Public** [4] - 1:20, 3:6, 73:9, 74:19
**pumps** [1] - 54:14
**purpose** [1] - 3:15
**pursuant** [2] - 1:17, 73:11
**put** [8] - 24:6, 35:8, 36:22, 48:3, 48:14, 64:7
**putting** [1] - 40:5

## Q

**questions** [5] - 3:10, 3:12, 6:9, 71:22, 72:9
**quick** [1] - 67:20
**Quick** [1] - 25:1
**quickly** [1] - 5:20
**quite** [1] - 11:9
**quotation** [1] - 60:1
**quote** [14] - 37:2, 37:4, 38:18, 42:19, 43:9, 44:3, 44:9, 44:15, 44:18, 58:20, 61:22, 62:11, 62:20, 62:23
**quotes** [1] - 59:17

## R

**range** [3] - 12:18,

14:11, 14:14
**rates** [1] - 58:11
**rather** [1] - 45:14
**Raymond** [1] - 5:8
**RAYMOND** [1] - 2:11
**read** [19] - 38:4, 40:21, 42:7, 42:12, 42:16, 43:3, 45:13, 45:14, 45:16, 57:11, 57:12, 58:9, 59:20, 60:2, 60:21, 60:22, 60:23, 62:4, 62:6
**reading** [6] - 37:22, 42:9, 61:21, 62:9, 62:10, 74:8
**real** [1] - 5:20
**really** [3] - 26:8, 54:8, 65:7
**reason** [4] - 46:18, 46:21, 47:1, 59:12
**reasoning** [1] - 30:16
**receive** [1] - 40:23
**received** [12] - 26:5, 29:9, 29:14, 34:15, 34:20, 37:5, 38:23, 41:4, 43:13, 52:8, 54:8, 54:15
**receiving** [3] - 40:10, 60:12, 60:14
**recently** [1] - 13:10
**recess** [3] - 26:21, 67:21, 71:20
**rechecked** [1] - 35:5
**recipients** [1] - 68:20
**recognize** [1] - 56:7
**record** [9] - 6:22, 28:16, 37:22, 45:14, 56:12, 60:3, 60:21, 66:7, 72:1
**records** [1] - 66:23
**reference** [3] - 45:19, 46:22, 59:23
**referred** [6] - 37:14, 41:18, 43:22, 45:5, 56:9, 68:3
**referred-to** [5] - 37:14, 41:18, 45:5, 56:9, 68:3
**referring** [2] - 30:11, 59:9
**refers** [1] - 62:22
**refresh** [1] - 69:8
**regards** [1] - 37:6
**reiterate** [1] - 26:6
**related** [2] - 15:2, 17:11
**relationship** [1] - 17:14
**remember** [7] - 20:7, 31:7, 65:15, 66:14,

*NORMAN TODD -- September 15, 2006*

66:18, 69:5, 69:21
reminded [1] - 38:11
removal [3] - 27:23, 28:17, 29:10
removed [4] - 27:13, 28:13, 28:14, 28:20
removing [1] - 27:20
Repeat [1] - 33:11
repeat [1] - 51:9
repeatedly [1] - 38:5
replacement [1] - 27:23
report [1] - 28:6
reported [2] - 16:11, 73:13
Reporter [4] - 1:20, 3:6, 73:9, 74:19
REPORTER [4] - 5:5, 7:1, 33:11, 49:13
reporter [1] - 11:1
REPORTER'S [1] - 73:2
representative [1] - 46:3
representing [1] - 3:3
represents [1] - 5:9
request [1] - 42:18
requested [1] - 42:16
requesting [2] - 37:3, 51:14
requests [4] - 53:22, 54:9, 54:10, 54:15
requirements [1] - 3:9
requiring [1] - 29:10
reserve [2] - 71:23, 72:2
reserved [1] - 3:13
resolve [1] - 6:3
Resort [2] - 11:16, 11:19
respect [1] - 3:9
respectfully [1] - 42:18
respects [1] - 61:6
respond [1] - 37:5
responded [2] - 26:12, 26:13
response [1] - 43:1
responsible [6] - 13:16, 13:21, 14:6, 22:20, 22:22, 27:22
rest [1] - 67:18
restate [1] - 6:16
result [1] - 61:9
results [1] - 74:14
returning [2] - 28:22, 29:1
rigging [1] - 63:14

rights [1] - 56:2
Rockingham [1] - 14:20
room [1] - 67:19
roommate [3] - 15:15, 15:16, 15:17
roughly [5] - 12:19, 20:3, 36:5, 52:19, 64:14
Roughly [1] - 10:1
route [4] - 19:8, 21:11, 27:22, 28:3
Route [1] - 8:7
royalties [5] - 22:17, 23:1, 23:5, 23:6, 23:9
Rules [1] - 3:16
ruling [1] - 3:13
running [1] - 52:19
rush [1] - 53:16

## S

salary [2] - 18:19, 18:20
sale [19] - 12:2, 24:8, 24:10, 24:12, 24:16, 25:7, 25:13, 29:11, 39:7, 39:11, 40:6, 40:10, 40:15, 40:17, 41:8, 51:14, 52:1, 52:5, 54:1
Sales [2] - 7:21, 56:17
sales [12] - 8:3, 8:7, 12:6, 17:11, 19:4, 19:7, 27:22, 32:18, 38:12, 52:12, 57:13, 58:5
salespeople [1] - 28:3
salesperson [1] - 23:14
school [39] - 8:13, 8:14, 9:4, 9:6, 14:22, 21:11, 34:8, 35:4, 36:8, 38:6, 38:13, 39:15, 39:18, 39:20, 40:2, 40:3, 40:11, 41:14, 42:23, 44:9, 44:15, 44:19, 45:23, 46:10, 47:3, 47:9, 49:3, 50:12, 51:17, 51:22, 52:9, 52:15, 52:17, 54:17, 59:7, 59:9
School [7] - 33:16, 33:19, 36:11, 36:16, 45:21, 49:6, 52:13
Schools [3] - 47:17,

48:21, 52:21
schools [16] - 15:1, 15:2, 27:9, 36:8, 36:10, 39:8, 40:7, 40:9, 47:20, 51:16, 52:4, 53:5, 53:12, 53:13, 54:4, 64:21
Scotty [7] - 34:5, 36:15, 46:3, 46:15, 47:5, 47:12, 50:14
Screws [2] - 1:19, 2:6
second [7] - 26:18, 26:20, 37:5, 37:11, 41:15, 57:10, 71:18
secretary [1] - 34:18
Section [1] - 59:23
see [3] - 34:17, 41:21, 49:4
sell [4] - 19:13, 23:15, 34:8, 52:23
selling [11] - 19:10, 19:16, 19:23, 20:14, 20:18, 20:22, 21:6, 23:22, 23:23, 40:2, 70:13
send [4] - 17:8, 63:20, 64:17, 71:6
sending [2] - 17:7, 69:5
sent [20] - 32:2, 37:3, 37:8, 38:18, 57:4, 59:17, 63:3, 64:3, 64:10, 65:1, 65:14, 65:18, 65:19, 66:11, 68:1, 68:8, 69:17, 70:4, 71:5, 71:9
sentence [7] - 42:10, 58:8, 59:20, 61:21, 62:11, 62:18, 62:23
sentences [1] - 61:9
Separate [4] - 36:10, 36:16, 45:21, 52:13
September [3] - 1:21, 72:13, 73:11
serious [2] - 63:20, 64:2
service [2] - 21:10, 25:1
set [1] - 74:8
settled [1] - 6:4
several [3] - 16:2, 16:4, 20:11
sheets [2] - 24:15, 25:9
Sheree [1] - 15:17
shift [1] - 31:8
shifted [1] - 25:18
shifting [1] - 30:16
show [9] - 20:8, 20:9,

26:3, 26:22, 27:2, 29:18, 30:5, 31:20, 65:10
showing [1] - 28:16
shows [1] - 20:11
Shreveport [1] - 13:1
sides [1] - 60:12
signature [1] - 3:20
signed [1] - 56:16
signing [3] - 60:9, 60:23, 74:9
signs [2] - 54:10, 54:14
similar [1] - 70:21
Simonson [6] - 34:7, 34:9, 34:10, 34:13, 34:17, 35:5
sinking [1] - 16:22
situation [1] - 34:15
slush [2] - 12:3, 18:23, 19:10, 21:16, 21:17, 25:2, 25:4, 70:13, 71:15
smaller [1] - 53:10
Smaller [1] - 53:12
socialize [2] - 17:23, 18:9
sold [4] - 18:23, 21:7, 21:14, 61:19
solely [2] - 57:13, 58:6
someone [3] - 5:19, 23:14, 63:22
Sometime [1] - 29:18
sometime [4] - 19:20, 20:7, 31:20, 65:9
sorry [8] - 14:13, 19:3, 26:23, 33:11, 42:2, 45:12, 51:3, 54:21
sort [5] - 5:17, 8:11, 24:12, 27:6, 32:5
source [1] - 50:5
South [4] - 1:19, 2:7, 14:4, 14:5
southwest [1] - 36:5
special [1] - 17:10
specific [4] - 20:4, 20:23, 53:22, 59:6
specifically [3] - 56:3, 64:4, 65:21
Specifically [2] - 23:18, 56:21
specifics [2] - 17:4, 17:9
speculate [3] - 33:1, 53:4, 55:4
speculation [1] - 33:2

spell [1] - 49:13
spend [1] - 12:11
spent [1] - 16:3
spiel [1] - 6:7
spoken [1] - 20:16
staff [1] - 38:10
stage [1] - 72:4
Stamped [4] - 4:8, 4:10, 4:13, 4:15
standing [2] - 25:21, 26:7
start [5] - 6:21, 14:14, 19:23, 42:7, 42:9
started [3] - 19:19, 22:2, 22:3, 30:18
starting [1] - 68:17
starts [2] - 38:2, 42:10
state [15] - 13:14, 13:18, 13:19, 13:20, 13:23, 14:1, 50:4, 58:13, 58:18, 58:21, 59:5, 63:5, 63:21, 64:20, 65:10
State [4] - 1:20, 3:7, 73:10, 74:20
STATE [1] - 73:5
statement [11] - 26:2, 47:5, 50:13, 51:9, 57:20, 58:15, 60:4, 60:5, 60:11, 60:18, 62:20
statements [1] - 47:12
STATES [1] - 1:1
States [1] - 74:3
stating [2] - 57:15, 62:10
station [1] - 25:2
stations [1] - 21:10
status [1] - 50:18
stay [1] - 10:3
step [1] - 26:17
sticker [4] - 24:21, 24:22, 24:23, 25:3
stickers [1] - 25:16
Still [3] - 11:16, 11:18, 11:21
still [6] - 19:13, 27:10, 35:19, 42:13, 66:7, 67:16
stipulated [2] - 3:2, 3:18
stipulation [3] - 1:17, 72:8, 73:12
STIPULATIONS [1] - 3:1
stipulations [1] - 5:5
Stop [1] - 25:1

*NORMAN TODD -- September 15, 2006*

stop [2] - 6:12, 20:21
stopped [5] - 20:18, 22:3, 22:9, 47:4, 47:11
stopping [1] - 9:6
store [1] - 54:16
stores [4] - 27:9, 52:7, 54:7, 54:13
straight [2] - 9:16, 11:5
Street [3] - 1:19, 2:7, 2:13
stuff [2] - 25:17
submit [3] - 44:8, 44:15, 44:18
submitted [2] - 59:22, 62:22
submitting [2] - 60:9, 61:4
Subsection [1] - 59:23
subsequent [1] - 38:20
success [1] - 32:9
suit [1] - 5:22
Suite [1] - 2:14
summer [2] - 65:6
supervisor [1] - 15:10
supplements [1] - 60:15
supplier [1] - 42:20
supplies [1] - 61:5
supposed [1] - 28:5
supposedly [1] - 50:14
survive [1] - 46:5
swapped [1] - 36:22
switch [1] - 39:16
sworn [2] - 5:2, 73:15
System [1] - 33:19
system [2] - 34:8, 36:8
systems [1] - 54:17
Systems [6] - 49:6, 55:3, 55:5, 55:7, 61:16, 71:14

## T

table [1] - 30:19
teachers [1] - 38:10
Tennessee [1] - 13:20
term [1] - 58:23
termination [1] - 5:22
terms [1] - 19:9
territories [1] - 12:8

territory [4] - 13:10, 28:5, 28:6, 28:9
testified [1] - 5:2
testimony [2] - 40:1, 43:11
THE [13] - 1:1, 1:1, 2:3, 2:10, 5:5, 7:1, 7:2, 7:5, 33:11, 33:12, 41:21, 49:13, 49:15
thereof [1] - 74:14
they've [1] - 47:10
third [6] - 35:6, 42:10, 60:7, 60:8, 61:13, 63:8
Third [1] - 1:14, 74:1
THOMAS [3] - 1:12, 2:18, 73:23
three [3] - 20:17, 23:23, 24:2
throughout [1] - 38:6
thrown [2] - 29:4, 29:5
Tiffany [4] - 1:19, 3:5, 73:8, 74:19
timely [1] - 51:21
Tims [5] - 49:12, 49:17, 50:22, 51:5, 51:9
TIMS [1] - 49:15
title [2] - 7:20, 8:1
today [5] - 6:8, 53:19, 65:13, 67:11, 71:1
TODD [7] - 1:13, 1:17, 3:4, 5:1, 72:11, 73:14, 74:1
Todd [11] - 4:7, 4:10, 4:12, 4:14, 5:8, 6:23, 7:10, 38:3, 38:4, 45:4, 56:17
together [2] - 43:16, 43:18
Tom [18] - 15:12, 15:21, 16:21, 18:3, 18:4, 30:20, 30:21, 31:14, 31:16, 55:15, 57:23, 58:4, 60:6, 65:15, 65:20, 66:17, 69:11, 69:16
top [4] - 43:2, 54:23, 68:13, 68:14
tos [1] - 68:17
trade [2] - 26:22, 27:2
trademarks [1] - 56:2
training [1] - 17:10
transcription [1] - 74:6
transfer [1] - 36:19
travel [1] - 12:17

travelling [2] - 12:9, 12:12
Tribal [3] - 33:16, 48:21, 52:21
Tribe [1] - 47:17
TRIDENT [4] - 1:5, 1:7, 73:18, 73:20
Trident [4] - 5:10, 54:22, 61:14, 61:15
tropical [2] - 22:17
Tropics [11] - 19:2, 19:12, 19:13, 19:17, 21:6, 21:10, 22:3, 22:9, 22:14, 22:17, 23:5
Tropics' [1] - 21:8
trouble [1] - 46:4
true [1] - 74:6
truth [4] - 64:7, 73:15, 73:16
try [3] - 6:18, 53:18, 53:21
Try [1] - 7:3
trying [5] - 23:15, 45:14, 53:16, 63:2, 66:10
Trying [1] - 9:11
Tucker [1] - 68:19
TUNNELL [1] - 2:12
two [9] - 9:15, 11:7, 30:4, 35:1, 35:9, 43:15, 53:5, 53:12, 65:11
type [3] - 5:21, 21:17, 25:13
types [1] - 53:23
Typewritten [1] - 4:12
typewritten [2] - 45:3, 74:5

## U

undated [1] - 4:14
under [4] - 61:22, 62:12, 62:23, 66:17
Under [1] - 18:23
understood [1] - 30:15
unemployed [1] - 11:7
United [1] - 74:3
UNITED [1] - 1:1
up [16] - 7:3, 10:23, 17:1, 22:15, 34:23, 35:2, 43:4, 47:21, 47:22, 48:5, 48:8, 48:11, 48:13, 50:13, 51:15, 54:2
upcoming [3] - 41:2,

42:23, 45:23
US [98] - 1:3, 1:10, 4:8, 4:10, 4:13, 4:15, 5:11, 5:23, 7:17, 7:20, 7:22, 8:8, 9:2, 11:4, 11:5, 11:13, 12:1, 12:6, 12:15, 15:10, 15:14, 15:18, 15:19, 16:5, 16:14, 16:17, 16:19, 17:12, 17:21, 18:7, 18:11, 18:15, 18:17, 19:1, 19:6, 22:21, 23:2, 24:13, 26:23, 27:15, 27:19, 28:22, 29:20, 30:17, 30:23, 31:1, 32:5, 32:18, 33:7, 33:22, 34:2, 34:14, 35:13, 35:15, 35:17, 35:18, 36:12, 37:2, 37:18, 39:9, 39:15, 42:17, 43:9, 46:4, 47:4, 47:11, 47:13, 47:20, 48:23, 49:9, 50:18, 50:22, 51:1, 51:5, 51:17, 52:12, 54:19, 54:21, 55:17, 56:1, 56:4, 56:17, 56:23, 57:13, 58:6, 58:11, 60:7, 60:8, 61:13, 61:17, 63:8, 70:12, 70:19, 71:2, 71:15, 73:17, 73:21
Usual [1] - 5:5

## V

various [2] - 4:7, 4:10
versus [2] - 73:17, 73:21
violating [2] - 63:6, 64:3
violation [7] - 59:21, 60:10, 60:20, 61:8, 62:5, 62:21, 63:22
vs [2] - 1:4, 1:9

## W

waiting [1] - 48:1
waived [3] - 3:10, 3:21, 74:9
Walker [29] - 4:17, 5:9, 15:22, 16:6, 16:9, 16:11, 16:16, 16:20, 27:4, 30:12, 30:20, 33:7, 34:6, 35:13, 36:15, 39:6, 44:17, 48:7, 48:17, 50:10, 51:3, 54:21, 58:9,

58:16, 60:7, 64:2, 68:12, 70:12
WALKER [6] - 1:4, 1:7, 2:19, 67:12, 73:18, 73:19
Walker's [3] - 16:13, 17:3, 34:4
walls [1] - 54:3
warehouse [1] - 15:18
Waters [3] - 11:16, 11:18, 11:21
week [2] - 12:11, 12:16, 34:16, 34:21
weeks [1] - 35:9
Wendy [1] - 68:18
West [7] - 34:5, 36:15, 46:3, 46:15, 47:6, 47:12, 50:14
Whitley [1] - 7:11
whole [2] - 45:15, 73:15
Wilkes [1] - 14:20
willing [1] - 30:22
window [1] - 54:10
with.. [1] - 31:17
WITNESS [5] - 7:2, 7:5, 33:12, 41:21, 49:15
witness [5] - 3:20, 72:5, 74:7, 74:10
won [2] - 60:13, 60:14
wondering [2] - 42:11, 42:12
word [2] - 50:3, 50:5
word-of-mouth [2] - 50:3, 50:5
words [1] - 48:10
worth [1] - 52:14
wreck [1] - 5:21
write [1] - 66:16
writing [2] - 66:14, 66:18
wrongful [1] - 5:22
wrote [1] - 66:16

## Y

y'all [2] - 21:14, 26:16, 27:5
year [22] - 8:19, 11:23, 20:12, 38:6, 38:13, 39:15, 39:18, 39:20, 40:2, 40:11, 40:14, 40:18, 41:3, 41:14, 42:23, 43:4, 44:9, 44:15, 44:19, 46:1, 52:15, 59:9
years [6] - 9:15, 9:21,

*NORMAN TODD -- September 15, 2006*

10:12, 10:16, 10:18, 11:7
  **yesterday** [1] - 67:15

Ms Murphy

I will have all the POS material for the new brand Fruzers by June 01, 2006. I assure you that you will receive all POS necessary for the healthy promotion of this item prior to use in the upcoming school year. I apologize for the lack of cooperation you have received and assure that it will be taken care of promptly. If I can be of any other assistance, feel free to contact me at any time.

Thanks again,
Buddy Todd
U S Beverage Inc
800-337-5202 Office
334-328-6361 Cell

---

**From:** Amy Murphy [mailto:atmurphy@olemiss.edu]
**Sent:** Friday, May 19, 2006 9:03 AM
**To:** Norman Todd; Amanda Boler; Ann Nicholson; Beau Simonson; Becke Bounds; Bettye Clinton; Bettye Hart; Cindy Peden; Darlene Rush; Darnell Boyd; Debbie Chatagnier; Fleeta Blackwell; Gail Kavanaugh; Glenda Thomas; Joeirma Smith; Joyce Herbert; June Smith; Kenny Coker; Lisa McKee; Lynda Callender; Lynda Ellis; Mary Alice Marsh; Mary Duck; Mary Lou Dodd; Myra Tims; Pam Easterling; "Pam McSwain (Business Fax)"@zod.pns.networktel.net; Ragina Ducksworth; Rena Pritchard; Rhonda Robertson; Shirley Taylor; Susan Shumpert; Tanya Morgan; Wendy Tucker
**Subject:** Re: Thank You

Mr. Todd, I have repeatedly asked for promotional materials throughout the school year. I am not sure if other directors have had problems with lack of promotional pamphlets, brochures, posters, etc. However, in our field it is necessary that our teachers, administrative staff, and parents are reminded that we are not feeding our children junk food items for extra sales. This next school year we would like to promote your healthy product in a positive way and promotional materials would be extremely helpful. Thanks, Amy

----- Original Message -----
**From:** Norman Todd
**To:** Amanda Boler ; Amy Murphy ; Ann Nicholson ; Beau Simonson ; Becke Bounds ; Bettye Clinton ; Bettye Hart ; Cindy Peden ; Darlene Rush ; Darnell Boyd ; Debbie Chatagnier ; Fleeta Blackwell ; Gail Kavanaugh ; Glenda Thomas ; Joeirma Smith ; Joyce Herbert ; June Smith ; Kenny Coker ; Lisa McKee ; Lynda Callender ; Lynda Ellis ; Mary Alice Marsh ; Mary Duck ; Mary Lou Dodd ; Myra Tims ; Pam Easterling ; "Pam McSwain (Business Fax)"@zod.pns.networktel.net ; Ragina Ducksworth ; Rena Pritchard ; Rhonda Robertson ; Shirley Taylor ; Susan Shumpert ; Tanya Morgan ; Wendy Tucker
**Sent:** Thursday, May 18, 2006 7:01 PM
**Subject:** Thank You

I would like to thank you for your business this school year. I have enjoyed working with you and your staff tremendously. I look forward to a new year and implementing the Fruzers brand of 100% fruit juice. As always if you have any questions or concerns, please feel free to contact me at any time. I will be in contact to discuss delivery dates for product during the month of July. Thanks again.

Buddy Todd
Sales Manager


DEFENDANT'S EXHIBIT
tabbies

US Beverage 138

## Buddy Todd

| | |
|---|---|
| **From:** | Amy Murphy [atmurphy@olemiss.edu] |
| **Sent:** | Monday, July 10, 2006 10:02 AM |
| **To:** | ntodd@usbeverageinc.com |
| **Subject:** | Re: 100% frozen fruit juice |

We will be going with another company this school year. You may pick up your machines on the 3,4 or 7th of August. Thanks for working with us, Amy

—— Original Message —–
**From:** Buddy Todd
**To:** atmurphy@olemiss.edu
**Sent:** Friday, June 30, 2006 2:01 PM
**Subject:** 100% frozen fruit juice

Ms Murphy

I hope all is well with you this summer. I have still not received a bid or quote request from your school system concerning the upcoming 2006-2007 school year. I was just wondering if you were still considering a change in companies for your 100% frozen fruit juice needs. If so, as I requested in our previous conversation on June 06, 2006, U S Beverage Inc. would respectfully request to offer a quote/bid on the 100% Frozen Fruit Juice product. As your present supplier of the 100% Frozen Fruit Juice we would thank you for your consideration in the upcoming school year.


Thank you
Buddy Todd
Sales Manager
U S Beverage Inc
334-281-1226(office)
334-328-6361(cell)



DEFENDANT'S
EXHIBIT
2

US Beverage 140

07/11/2006

On this date I was contacted by Kenny Coker, CND Itawamba County MS, in reference to a conversation he had with Amy Murphy, CND Oxford Separate School District. He stated to me Amy Murphy told him she had elected to change to Juice Alive for the upcoming school year 2006/2007. She stated to him she had been told by Scotty West, representative of Juice Alive, that U S beverage was in financial trouble and would not survive as a company much longer.



DEFENDANT'S
EXHIBIT

US Beverage 141

TO:        Child Nutrition Directors
FROM:      Buddy Todd
           Sales Manager
           U S Beverage Inc
SUBJECT:   Juice Alive

I would like to take this opportunity to thank each of you for using U S Beverage to provide your 100% juice needs. We have elected to change the brand name of our juice from Juice Alive to Fruzers. With this change not only comes an exiting name but an exiting experience for the children through but not limited to POS and promotional items. There will be four additional flavors added with the implementation of the Fruzers brand.

As Sales Manager of U S Beverage it is my duty to inform my customers of potentially harmful information. I would like to take this time to alert you to a situation occurring in the State of Mississippi. It has been brought to the attention of the corporate officials of U S Beverage Inc. that the Vice President of Sales, John Walker 1/3 owner of U S Beverage Inc., has contracted on his own other companies and persons to market the Juice Alive brand. The Juice Alive brand was developed for sales and distribution solely by U S Beverage Inc. John Walker is currently using his inside knowledge of bid prices and current rates being charged to U S Beverage Inc. customers to bid and attempt to conduct business in the State of Mississippi. It is clearly a Federal Violation of the contracts submitted with each bid reference Section II sub-section 16 paragraphs H.

> *By signing this document, the contractor certifies that this proposal is made without prior understanding, agreement or connection with any corporation, firm or person submitting a proposal for the same materials, supplies, or equipment, and is in all respects fair and without collusions or fraud. The contractor certifies that collusive bidding is a violation of federal law and can result in fines, prison sentences, and civil damage awards.*

There is currently a federal lawsuit being served to John Walker and his affiliates concerning his actions. A copy of this document can be offered at your request. If you should have any further questions or concerns feel free to contact me at any time. Once again thank you for using U S Beverage Inc.

Thanks
Buddy Todd
Sales Manager
U S Beverage Inc.



**From:** Amy Murphy [mailto:atmurphy@olemiss.edu]
**Sent:** Friday, June 09, 2006 2:01 PM
**To:** johnwalker@juicealive.net
**Subject:** Fw: Note

Not sure what to think about all of this...can we still get product if we choose to go wtih your company...read attachment...


----- Original Message -----
**From:** Norman Todd
**To:** Amanda Boler ; Amy Murphy ; Ann Nicholson ; Beau Simonson ; Becke Bounds ; Bettye Clinton ; Bettye Hart ; Cindy Peden ; Darlene Rush ; Darnell Boyd ; Debbie Chatagnier ; Fleeta Blackwell ; Gail Kavanaugh ; Glenda Thomas ; Joeirma Smith ; Joyce Herbert ; June Smith ; Kenny Coker ; Lisa McKee ; Lynda Callender ; Lynda Ellis ; Mary Alice Marsh ; Mary Duck ; Mary Lou Dodd ; Myra Tims ; Pam Easterling ; Ragina Ducksworth ; Rena Pritchard ; Rhonda Robertson ; Shirley Taylor ; Susan Shumpert ; Tanya Morgan ; Wendy Tucker
**Sent:** Friday, June 09, 2006 1:57 PM
**Subject:** Note

I would like to take this opportunity to share with you a note forwarded to me by the Vice President of U S Beverage. I felt I should forward it to you for your personal knowledge. If you should have any questions or concerns, feel free to contact me.

Buddy Todd
Sales Manager
U S Beverage
334-281-1226(office)
334-328-6361(cell)



DEFENDANT'S EXHIBIT
5

000165

June 5, 2006

Dear Mississippi Child Nutrition Directors,

It has been brought to our attention that John Walker is engaging to market and distribute the "Juice Alive" brand in the state of Mississippi through his corporation, Trident Marketing. However, John is the current Vice President of Sales for US Beverage. He is therefore an officer of US Beverage who serves on its board of directors, owns 1/3 of the shares of stock, owns 1/3 of the building that houses US Beverage, receives full health insurance benefits and life insurance benefits from US Beverage, files a US Beverage tax return and is a personal guarantor of loans and leases for US Beverage. John is and was an officer of the corporation when the Juice Alive brand was developed for US Beverage in 2005. John participated with US Beverage at the Mississippi Child Nutrition show in 2005 and was introduced there as a partner of US Beverage. Because he is now attempting to market Juice Alive on behalf of his own company, Trident Marketing, John Walker potentially stands to gain as a participant with multiple companies in a bid in Mississippi. Furthermore, John, as an officer and shareholder of US Beverage, has access to the books, including customer lists, pricing, bids, etc. We feel that this would give him an unfair advantage in any competitive bid situation.

It has been told to us by several directors around the State that John Walker has made statements indicating that he has no involvement with US Beverage and that he has the right to offer and bid Juice Alive in the state of Mississippi. We have also been told that either John and/or his agents have made injurious statements referencing our financial stability. We have heard the name Scott or Scottie West on several occasions in regard to these injurious and false statements. If these or similar statements relative to these matters have been made to you, please know that they are false.

Last week, US Beverage filed a federal law suit in the United States District Court for the Middle District of Alabama against John Walker, Trident Marketing, and his agents. The claims in the federal lawsuit relate, at least in part, to the actions described herein. This is a matter of public record; however I can send you a copy of the filed document at your request. In addition, I am traveling to Mississippi to meet with the Attorney General's office regarding this very serious matter.

It is believed that John is doing similar things in the state of Alabama, and other states, through other entities which may include: Dispensing Systems of Alabama, Dispensing Systems of Florida, and Dispensing Systems of Georgia. One of the Dispensing Systems recently

presented its first bid in Alabama. Although the Dispensing Systems' affiliate bid a lower price than US Beverage, (appearing to have prior knowledge of US Beverage's books), US Beverage was awarded the bid based on a disqualification of the lower bid. In regard to this and other matters, we are meeting with the Alabama Attorney General's Office this week.

I regret that this problem has come to fruition. Although he is still an officer of US Beverage during the pending federal lawsuit, I want to express that John Walker is acting individually and his current actions are in no way connected to US Beverage. US Beverage is entering its third year of involvement with the great state of Mississippi. We stand on a reputation of integrity, built by honesty and fair practices. We have introduced a product that has enriched the food program of thousands of Mississippi school kids. We also have an outstanding reputation for providing you with excellent levels of service, and we at US Beverage are looking forward to working with you again in the 2006-2007 school year.

Thank you very much for your time and attention. If I can provide any further information in regard to this matter, please do not hesitate to contact me or Grady Kittrell, President of US Beverage.


Very Truly Yours,


Tom Clark
Vice President
US Beverage, Inc.