1                    US BEVERAGE, INC.,

2                       Plaintiff,

3                           v.

4        JOHN BUSTER WALKER, II, and TRIDENT MARKETING,

5                         INC.,

6                      Defendants.

7      -------------------------------------------------

8        JOHN BUSTER WALKER, II, and TRIDENT MARKETING,

9                         INC.,

10                 Counterclaim Defendants,

11                          and

12      GRADY DOWLING KITTRELL, THOMAS GOING CLARK,

13           III, and NORMAN "BUDDY" TODD,

14             Third Party Defendants.

15

16                   CIVIL ACTION NO.

17                  2:06-CV-496-SRW

18

19

20

21    DEPONENT:  Grady Dowling Kittrell

22    DATE:  September 15, 2006

23

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF ALABAMA
 2                       NORTHERN DIVISION

 3     US BEVERAGE, INC.,
                    Plaintiff,
 4     vs.
       JOHN BUSTER WALKER,
 5     II, and TRIDENT
       MARKETING, INC.,          CIVIL ACTION NO.
 6          Defendants.
       ---------------------     2:06-CV-496-SRW
 7     JOHN BUSTER WALKER,
       II, and TRIDENT
 8     MARKETING, INC.,
               Counterclaim
 9          Plaintiffs,

10     vs.

       US BEVERAGE, INC.,
11             Counterclaim
            Defendant,
       and
12     GRADY DOWLING
       KITTRELL, THOMAS
13     GOING CLARK, III, and
       NORMAN "BUDDY" TODD,
14          Third Party
               Defendants.

16        *    *    *    *    *    *    *

17            DEPOSITION OF GRADY DOWLING KITTRELL,
       taken pursuant to notice and stipulation on
18     behalf of the Defendant/Counterclaim
       Plaintiffs, in the Law Offices of Copeland,
19     Franco, Screws & Gill, 444 South Perry Street,
       Montgomery, Alabama, before Tiffany B.
20     Beasley, Certified Court Reporter and Notary
       Public in and for the State of Alabama at
21     Large, on September 15, 2006, commencing at
       8:39 a.m.
22

23
```

2

APPEARANCES

FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT/THIRD

PARTY DEFENDANTS:

**C. NELSON GILL, ESQUIRE**

Copeland, Franco, Screws & Gill

444 South Perry Street

Montgomery, Alabama 36104

FOR THE DEFENDANTS/COUNTERCLAIM PLAINTIFFS:

**RAYMOND L. JACKSON, JR., ESQUIRE**

**CLIFF TUNNELL**

660 North College Street

Suite D

Auburn, Alabama 36830

ALSO PRESENT:

THOMAS GOING CLARK, III

JOHN BUSTER WALKER, II

---

STIPULATIONS

It is stipulated and agreed by and between counsel representing the parties that the deposition of **GRADY DOWLING KITTRELL** may be taken before Tiffany B. Beasley, Certified Court Reporter and Notary Public in and for the State of Alabama at Large, without the formality of a commission; and all formality with respect to other procedural requirements is waived; that objections to questions, other than objections as to the form of the questions, need not be made at this time, but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose by either party as provided by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between the parties hereto and the witness, that the signature of the witness to this deposition is hereby waived.

---

4

INDEX

**EXAMINATION**                                    **Page**
MR. JACKSON.............................    7

**EXHIBITS**                                       **Page**
1    Letter from James R. Cooper,           73
     Jr., to U.S. Beverage, dated
     February 11, 2002

2    Agreement to Purchase                  74
     Corporate Stock of Tropical
     Perfections, Inc., dated
     April 24, 2002

3    US Beverage Outline,                   153
     Bates-Stamped US Beverage 096
     through 097

4    Proposal for US Beverage Web           164
     Site, dated 10/14/04

5    Register4less Receipt, dated           165
     8/9/04

6    Various Labels                         185

7    Label                                  185

8    Letter from Ryan Hamner and            197
     John Walker to US Beverage,
     Inc., dated 5/24/04

9    Letter from US Beverage to             201
     John Walker, dated December
     20, 2004, Bates-Stamped US
     Beverage 093

10   Letter from Mr. Walker to              203

1   A.   **Not without a -- not without a P&L.**

2   Q.   Okay.  What about in terms of just sale of

3        slush products.  How big a chunk of your

4        business was the sale of slush products?

    A.   **It's not going to be the major portion at that**

6        **point, and that's one of the reasons we were**

7        **aggressively seeking to get into it.**

8   Q.   Okay.  Do you have any idea?  Can you give us

9        a rough estimate?  20 percent?

10  A.   **Again, without a P&L and a specific time**

11       **stamp, I couldn't off the top of my head give**

12       **you that information.**

13  Q.   I assume your business keeps those type

14       records that we could eventually obtain.

15  A.   **Oh, sure.**

16  Q.   What about -- let's talk about after

17       Mr. Walker came onboard with your company.

18       How big a component is the sale of slush

19       products for your business, let's say today?

20  A.   **Oh, it's a large component today.**

21  Q.   Could you put a percentage basis or rough

22       percentage on it today?

23  A.   **I couldn't give you -- again, without looking**

                                    38

1        **at financial information, give you a --**

2        **anything would just be a stab in the dark.**

3   Q.   Okay.  There's -- what about proportionality

4        in terms of comparing your slush business

5        before Mr. Walker came onboard with you

6        compared to today.  Two times greater?  Three

7        times greater?

8   A.   **Well, again, I guess I get confused with the**

9        **term "slush."  It's still just juice**

10       **concentrate.  It's all juice concentrate to**

11       **me, so I see it as product business makes up**

12       **the majority of our business.**

13  Q.   Well, in terms of your sales of fruit juice

14       concentrate, sitting here today, how much of

15       the sales would you attribute to just the sale

16       of just product that ends up just being juice,

17       you know, not slushy machine or --

18  A.   **Yeah.  The juice business is the majority of**

19       **our business.  It's always been the focus of**

20       **our business.**

21  Q.   Okay.  And, again, I'm trying to ask you to

22       explain for us the -- the makeup or the

23       breakdown of that business.  And I know

1        your -- I'm talking about slush, and I know

2        you're saying that you're considering fruit

3        juice concentrate to be all the same.

4   A.   **Correct.**

5   Q.   But in terms of selling juice in a slush

6        product or a product that's intended to be

7        sold to the customer in slush form, compared

8        to a product that's continued to be sold to

9        the customer in a liquid form, can you break

10       down for us the breakdown percentages between

11       the two?

12  A.   **I cannot.  And, again, I view them as the**

13       **juice concentrate being sold.  I don't**

14       **distinguish the difference as the makeup of**

15       **our business.  It's the same product --**

16  Q.   Okay.

17  A.   **-- is what I'm saying.  I mean, so I don't**

18       **know how the customer may end up using it.**

19       **They may dispense it as a liquid sometimes.**

20       **They may dispense it as a slush sometimes.**

21       **Sometimes we package the same product in**

22       **bag-in-a-box to be dispensed through a**

23       **machine.  I don't understand the distinction**

                                    40

1        you're making.  I'm sorry.

2   Q.   So I guess if your company is putting slush

3        machines into convenience stores, when you're

4        selling that juice to go into a slush machine,

5        your accountants don't in some way distinguish

6        so you can find out how much your sales are

7        from the slush machine compared to other

8        sales?

9   A.   **Sure.  We can distinguish whether it was a day**

10       **care, a C-store, a ballpark or any of those**

11       **things.  I cannot -- I cannot accurately**

12       **depict that today, though, without a P&L in**

13       **front of me.**

14  Q.   Okay.

15  A.   **Because, again, when I look at numbers, I look**

16       **at it as juice concentrate.  Product sales is**

17       **how I view it versus equipment.**

18  Q.   Has US Beverage ever been in the business of

19       creating promotional materials or POS

20       materials for customers?

21  A.   **Have we ever been in the business of that?  I**

22       **don't understand the question.**

23  Q.   Okay.  Has that ever been a, I guess, part of

**77**

```
 1   could not complete objectives and make
 2   decisions effectively with him being absent on
 3   a daily basis.  Now, true, he would still need
 4   to travel and do the things he'd need to do,
 5   but he would need to be subservient to the
 6   corporate needs, as all of us should be as
 7   corporate officers.  Those discussions
 8   happened often.
 9 Q.  Was there any minutes at the board of
10     directors' meetings to reflect any of those
11     discussions?
12 A.  If I'm not mistaken, there may be some minutes
13     from one where John Walker did agree and gave
14     a designated time line that he would move
15     back.
16 Q.  Okay.  Could you search your records and --
17 A.  Be glad to.
18 Q.  -- produce those to your attorney so he can
19     produce those to us?  And I think you also
20     indicated that at one point, you said,
21     Mr. Walker -- at least one point, Mr. Walker
22     agreed to move back to Alabama.  Would you
23     describe to us when this disagreement occurred
```

**78**

```
 1     and what you recall about that?
 2 A.  I recall early on Mr. Walker engaging in these
 3     conversations that he recognized that there
 4     was being -- problems being caused by his
 5     absence; that we could not have the synergies
 6     needed to run the company; and that we were
 7     off sync on what the company felt -- or the
 8     quorum felt was the objectives of sales versus
 9     what he felt because of his personal needs.
10     And he even at that time had addressed that he
11     felt if he was here with us every day, he
12     would benefit him because he felt like he
13     wasn't a part of the company at times.  Both
14     sides of the table felt it was imperative for
15     him to come back and be active in the
16     business.
17 Q.  And when did these discussions occur?
18 A.  These discussions occurred pretty early on.
19 Q.  Well, how long after the acquisition?  Are you
20     talking months or years or --
21 A.  No.  No.  It was within -- I would say it was
22     within months.  We had discussions on several
23     occasions based on the welfare of Mr. Walker's
```

**79**

```
 1   family what was going to be best as well.
 2   Tough position for the company to be in to
 3   elevate a humanistic need over the company's
 4   need, and I feel we made a mistake in allowing
 5   that to happen at the time.  But then we came
 6   back after the purchase of his home, discussed
 7   it at length, and had even made a proposal to
 8   offset the losses he may incur in selling his
 9   house in a down market if he would agree to
10   move.
11 Q.  Any of those discussions in writing?
12 A.  I'll have to check.
13 Q.  Specifically the offer to offset the sale of
14     his house.  Was that in writing?
15 A.  Again, I'll have to look and see.  We had so
16     many discussions there.  I mean, it was almost
17     an on-and-on on the phone type of discussion,
18     because, again, he was in Texas.
19 Q.  Did Mr. Walker discuss with you what prompted
20     him and his wife to move to Texas, why they
21     were in Texas?
22 A.  The only knowledge that I had of why he was in
23     Texas was because of a job that Tiffany
```

**80**

```
 1   possessed.
 2 Q.  And is Tiffany Mr. Walker's wife?
 3 A.  Yes.
 4 Q.  What did you know about that job?
 5 A.  That her father-in-law was the -- excuse me,
 6     her step-father had a position that had given
 7     her title to a position through nepotism.
 8 Q.  When you say "nepotism," is this your opinion
 9     or is this what Mr. Walker --
10 A.  That was the way it was described to me.
11 Q.  Do you recall Mr. Walker using the term
12     "nepotism" to refer to his wife's job?
13 A.  Oh, I think he probably used -- I cannot
14     remember the gentleman's name, but because
15     so-and-so was her step-father, you know, he
16     set her up with this.  She may be qualified.
17     I can't answer that.
18 Q.  Okay.  And normally and when you use --
19     someone throws out the term "nepotism,"
20     usually it's inferring someone is not
21     qualified to do their job, isn't it?
22 A.  It can be.  It can also be using the
23     relationship status of family ties.
```

1   Q.   Are y'all currently in the ice cream business?

2   A.   No.

3   Q.   Is that something you used to sell?

4   A.   **Well, to become the Granita distributor, you**
**had to take the full line. They've shifted**
6        **their mix of things since we've gone on with**
7        **them because of acquisitions they made.**

8   Q.   How long ago did you stop being the Granita
9        distributor through company stock?

10  A.   **We still are.**

11  Q.   You still are? But the exclusive relationship
12       you were talking about, exclusive
13       distributorship.

14  A.   **I would have to check with Carpigiani on that.**

15  Q.   Do you have any idea --

16  A.   **They've changed the way they did their**
17       **business. I couldn't -- they've been through**
18       **several acquisitions. I couldn't --**

19  Q.   Are we talking several years ago or months ago
20       or any idea?

21  A.   **I couldn't give you an accurate answer as to**
22       **how they redefined what a distributor, what a**
23       **dealer, what a rep was.**

                          126

1   Q.   Was that before or after John came onboard,
2        John Walker?

3   A.   **We were -- we were already a dealer before**
4        **John came onboard.**

5   Q.   But your exclusive relationship?

6   A.   **Before John came onboard.**

7   Q.   Were you still an exclusive dealer when he
8        came onboard?

9   A.   **Yeah.**

10  Q.   And you don't recall how long after John came
11       onboard that that relationship changed?

12  A.   **Probably we relinquished the -- probably four**
13       **months ago. But, again, they shifted what**
14       **they described as a dealer/rep or distributor.**

15  Q.   Okay. Is it your contention that Carpigiani
16       did anything wrong in selling equipment to
17       John? Did they violate any sort of the
18       exclusivity arrangements with your company?

19  A.   **No.**

    Q.   Do you have any records or documents that
21       would show or, I guess, back up your
22       contention that Mr. Walker used company -- US
23       Beverage assets to further his other company,

1        Trident Marketing?

2   A.   **Yes.**

3   Q.   Is that something you've already provided to
4        your attorney?

5   A.   **No.**

6   Q.   Can you provide those to your attorney?

7   A.   **It will take some time.**

8   Q.   But you'll work on that?

9   A.   **Yeah.**

10  Q.   Do you have any other proof of him using
11       company assets, other than these documents you
12       said you're going to get to your attorney?

13            MR. GILL: Object to the form.

14  Q.   I'm just asking any other evidence or any
15       other proof that -- you know, that supports
16       your contention that Mr. Walker was using US
17       Beverage assets to benefit Trident Marketing.

18            MR. GILL: Object to form.

19  A.   **I would have to say yes.**

20  Q.   Okay. What would that be?

21  A.   **Statements made by other individuals, you**
22       **know, research that we've done.**

23  Q.   Okay. Well, let's start with statements. Who

                          128

1        told you that Mr. Walker was using US Beverage
2        assets to further Trident Marketing?

3   A.   **Well, again, I note Jim Marmion, Gary Dukes**
4        **with Supreme Manufacturing.**

5   Q.   Anybody else?

6   A.   **Not that I can recall right now.**

7   Q.   Okay. But Jim Marmion or Gary Dukes, testify
8        to any knowledge of use of cell phone or gas
9        cards or --

10  A.   **No. I think they would testify to the use of**
11       **the relationship, which I see as an asset of**
12       **the corporation.**

13  Q.   Okay. And I was just trying to define what --
14       what you've learned from them. I think I
15       understand that, though. We'll go on.

16            You said "research." What
17       sort of research has the company done?

18  A.   **Well, obviously, when we became aware that**
19       **John Walker was competing with us as a**
20       **corporate officer and a shareholder, we had to**
21       **protect the company, not to mention several**
22       **discussions with Mr. Walker during the time of**
23       **the negotiations of trying to resolve this**

1    conflict.

2  Q.   Did -- did Mr. Walker tell you he was using

3        company assets to benefit any other company?

4  A.   **He may not have described it as that, but when**

5        **he would say he used our gas to go to North**

6        **Carolina and there was a gas charge, then,**

7        **obviously, he's telling me that.**

8  Q.   Okay. And are you saying the trip -- or trip

9        or trips to North Carolina you're describing

10       are trips to benefit his own enterprises

11       rather than yours?

12 A.   **Yes.**

13 Q.   Does US Beverage have any business in North

14       Carolina?

15 A.   **We have.**

16 Q.   You have currently?

17 A.   **We do currently.**

18 Q.   Okay. What sorts of business do you have in

19       North Carolina currently?

20 A.   **We have some schools in North Carolina,**

21       **actually.**

22 Q.   How many schools?

23 A.   **I couldn't answer that.**

                                        130

1  Q.   How recent -- well, how long have you had

2        these schools as customers of US Beverage?

3  A.   **Oh, these are new customers from current**

4        **business.**

5  Q.   When you say "new," like, within the last

6        three or four months or --

7  A.   **Yeah.**

8  Q.   Okay. Any other customers in North Carolina

9        other than these schools we're talking about?

10 A.   **As of to date, no.**

11 Q.   What about in the past? Any other -- what

12       type of business has your company done in

13       North Carolina in the past?

14 A.   **We have sold to other distributors, again,**

15       **seeking to grow our territory that we could**

16       **cover. North Carolina was slated as one of**

17       **the states that we wanted to develop.**

18 Q.   How was it slated as one of the states you

19       wanted to develop?

20 A.   **In the original goals of this company, it was**

21       **to have a 14-state distribution for US**

22       **Beverage that US Beverage controlled and**

23       **operated in, and North Carolina was one of**

1    **those states that was highlighted as a**

2    **territory that we were trying to gain access**

3    **to, and we actively sought business in that**

4    **state through distributors or direct business.**

5    **Not always successful, but it was the**

6    **intention of us to do that.**

7  Q.   And these goals we're talking about, are they

8        written form? Is there any written document

9        outlining this goal?

10 A.   **There may be some notes, but it was also**

11       **outlined in that original Cool Tropics**

12       **contract.**

13 Q.   And do you still have a copy of the Cool

14       Tropics contract?

15 A.   **I don't know if I do or don't.**

16 Q.   Would Mr. Cooper have been the lawyer that had

17       developed that contract?

18 A.   **That would have been Cool Tropics' attorney.**

19 Q.   Okay.

20 A.   **Frank Masabny (phonetic) would be in**

21       **possession of that or anything related.**

22 Q.   Can you search your records and see if you can

23       find the Cool Tropics' contract?

                                        132

1  A.   **Uh-huh.**

2  Q.   And if so, provide it to your attorney,

3        please?

4  A.   **Yes.**

5  Q.   Who are the distributors in North Carolina you

6        said you were trying to do business through?

7  A.   **We met with a -- let's see, I cannot remember.**

8        **We had sold to a gentleman in Virginia who**

9        **actually came into North Carolina, was my**

10       **belief. I cannot remember the name of his --**

11       **Tropical Paradise, I believe was the name of**

12       **his company maybe. I can't remember the name**

13       **of it. There was a JD Carr & Associates that**

14       **we had met with. There was a Jeff Bernstein,**

15       **I believe, was the gentleman's name.**

16       **Books-A-Million had locations in North**

17       **Carolina.**

18 Q.   These discussions you had, can you tell us

19       roughly when they occurred? For instance, JD

20       Carr & Associates?

21 A.   **That's within the last two years.**

22 Q.   Did you actually sell any product through JD

23       Carr?

**142**

1   A.   **Uh-huh.**

2   Q.   -- the customer buys $20,000 worth of slush or

3       whatever, juice products, three months later

4       decides to become another -- to associate with

5       another slush company; $20,000 worth of

6       product that had been bought and paid for.

7       Would Mr. Walker have retained a commission

8       for that?

9   A.   **It would depend on if Mr. Walker maintained**

10       **the account. There's more to it than just**

11       **signing the initial customer profile. That**

12       **means constant maintenance and contact with**

13       **the customer; that means visitations to the**

14       **company; that means solving service-related**

15       **problems for the customer; that means taking**

16       **orders from the customer when necessary, when**

17       **they're short-falling; that means delivering**

18       **that product to that customer during a**

19       **shortfall, not alienating the customer.**

20   Q.   Who made the decision as to whether Mr. Walker

21       had maintained the customer?

22   A.   **That would probably have fallen on the**

23       **responsibility of Mr. Clark, because all**

**142**

1       **service negotiations and all delivery**

2       **shortfalls come through him.**

3   Q.   Okay. Are you aware of any situations where

4       there was product sold through Mr. Walker for

5       which he's not been paid commission?

6   A.   **I would have to look at the records. I**

7       **believe that Mr. Walker has been paid**

8       **commissions for what he's owed.**

9   Q.   Okay. But were there instances where product

10       was sold but there was a decision made that

11       the customer had not been maintained?

12   A.   **Without records in front of me, I couldn't**

13       **answer that accurately.**

14   Q.   You don't have any idea? I'm not asking

15       you -- if you could just quantify it for us.

16   A.   **I could not.**

17   Q.   Did the -- the agreement that we have here

18       before -- in Plaintiff's (sic) Exhibit 1 and

19       2, did it provide that the partners of US

20       Beverage, the three of y'all were supposed to

21       be paid equally?

22   A.   **As well as equally manage the business.**

23   Q.   Okay. But it did provide that the partners

**143**

1       were supposed to be paid equally?

2   A.   **Provided there was --**

3           MR. GILL: Object to the form.

4   A.   **-- equal participation.**

5   Q.   Well, we'll go through it. Let's find that

6       portion of the contract.

7           MR. GILL: Are you talking about

8                Page 11? Is that what you're

9                talking about? If that's not

10                what you're talking about, I

11                apologize.

12   Q.   Okay. Yeah. I believe what's Bates-stamped

13       at the bottom US Beverage 011 and US Beverage

14       012 on Plaintiff's (sic) Exhibit 1. Let's

15       just -- if you don't mind for the record just

16       read numbered Paragraph 5. Just read it

17       aloud, if you don't mind.

18   A.   **Okay. (As read:) The stockholders should**

19       **jointly manage the business.**

20           (Off-the-record discussion.)

21   A.   **(As read:) Any increase in compensation shall**

22       **require a two-thirds vote of the shares of**

23       **outstanding stock in the corporation. Any**

**144**

1       **increase shall apply to all stockholders**

2       **equally. Any decrease will require unanimous**

3       **vote of all shareholders to the outstanding**

4       **stock of the corporation.**

5   Q.   Okay. Did Mr. Walker consent to having --

6       being changed to this sales commission

7       arrangement we've just discussed?

8   A.   **Absolutely.**

9   Q.   He did?

10   A.   **Yes, he did.**

11   Q.   It's your testimony today that he agreed to

12       that --

13   A.   **Absolutely.**

14   Q.   Do you have any paperwork or documents to show

15       his agreement to that?

16   A.   **I will have to search. Probably not.**

17   Q.   Did Mr. Walker agree to allow you and Mr. --

18       you and Mr. Clark to increase your salaries in

19       October of 2003?

20           MR. GILL: Object to the form.

21   A.   **Yes, he did.**

22   Q.   Is it your -- is it your belief that the

23       arrangement you just testified to is

1  those during the break, lunch
2  break.
3  (The referred-to document was
   marked for identification as
   Defendants' Exhibit No. 3.)
6  Q.  But -- and, again, Mr. Kittrell, is the
7      outline you were just discussing?
8  A.  This -- this was one of the outlines that
9      was -- that was utilized that day, I believe.
10 Q.  Are there any other outlines that...
11 A.  I don't recall.
12 Q.  Was this produced before or after the meeting?
13 A.  This was produced prior to the meeting. This
14     was a coverage of my recommended action plan,
15     is what this was.
16 Q.  Okay. Were there any notes or minutes
17     produced as a result of the meeting?
18 A.  There was probably notes taken by all three of
19     us on that day. It was a very lengthy
20     meeting, and what has happened to everyone's
21     notes on that, I couldn't tell you.
22 Q.  Are there any official notes or corporate
23     records taken?

                        154

1  A.  Again, I will have to say that Tom Clark
2      usually presided as the secretary and
3      treasurer of the meetings and usually took
4      notes. Where those have gotten to, I couldn't
5      attest.
6  Q.  Okay. Did John Walker agree to handle the
7      day-to-day affairs of Rio Grande?
8  A.  No.
9  Q.  Did he agree to go on the payroll of Rio
10     Grande?
11 A.  No.
12 Q.  Was there a decision made at that -- on that
13     meeting, that day, that Mr. Walker would not
14     return to the payroll of US Beverage?
15 A.  There was not a decision made that day, no,
16     other than his own.
17 Q.  Okay. And I may be misunderstanding what you
18     testified earlier. I thought you testified
19     that a decision was made that Mr. Walker
20     should go take over working for Rio Grande and
21     be paid out of Rio Grande. Did I
22     misunderstand you?
23 A.  That was -- that was a suggestion in my plan,

1  to eliminate his travel so that he could be
2  more effective.
3  Q.  Okay. And there wasn't any discussion at that
4      point of him going on Rio Grande's payroll and
5      dropping off of US Beverage's payroll?
6  A.  There was that discussion, yes.
7  Q.  Are you saying there wasn't a decision made
8      that day?
9  A.  I'm saying that John Walker told us at that
10     meeting that he would not participate, but he
11     would agree to not taking a salary, but he
12     would not work without getting compensated but
13     expected us to continue to maintain the
14     profitability of the company and work every
15     day while he did not participate.
16 Q.  Are those the exact words he used?
17 A.  I cannot say that.
18 Q.  Did he tell you he refused to participate in
19     US Beverage?
20 A.  He said, if I don't get paid, I don't work.
21 Q.  Is that a fair statement?
22 A.  No.
23     I mean, we talked yesterday about hats;

                        156

1  there's many hats that people wear,
2  corporate -- corporate officer, shareholder,
3  employee. Do you expect employees to work
4  without being paid?
5  A.  I expect a fiduciary to either answer to a
6      cash call or elect that he be diluted for a
7      cash call, resign as an officer so that we can
8      place someone in fact who would carry on that
9      fiduciary. But I do expect someone who has
10     made a capital investment in something, who is
11     an officer, shareholder, and employee, to work
12     at all means to save the investment.
13 Q.  Did Mr. Walker agree during this July 19th
14     meeting to permanently drop off the payroll of
15     US Beverage?
16 A.  I would have to say no, he didn't agree to
17     permanently drop off.
18 Q.  Was there any discussion of this decision to
19     stop paying the three members, or three
20     shareholders, of US Beverage as being -- any
21     discussion of a particular time limit,
22     60 days, 90 days?
23 A.  Yes, there was.

193

1  produce this on our behalf, not to go create a
2  competing entity to us to restrain our growth,
3  which he should have been a part of
4  participating in our growth, not restricting
5  it.
6  Q.  Did Mr. Clark disagree with you on those
7      objections?
8  A.  I think that Mr. Clark -- this is my
9      opinion -- took the position that John Walker
10     had some knowledge of our business that he was
11     willing to put out for hire and that he would
12     damage us. And Mr. Clark was very -- my
13     opinion again -- reserved in creating any sort
14     of riff that would cause John Walker to take
15     and assist our competitors in hurting us. We
16     felt we were being extorted and coerced.
17 Q.  Well, let's flip through the second page.
18     Have you seen that document before?
19 A.  These are two separate documents.
20 Q.  I'm going to ask about the second page.
21 A.  I've not -- I've not seen this one.
22 Q.  You're not aware of that ever -- having seen
23     that document?

194

1  A.  I have no recollection of this document.
2  Q.  What does it appear to be?
3  A.  Appears to be a flyer.
4  Q.  For what?
5  A.  Juice Alive.
6  Q.  What's the contact information at the bottom?
7  A.  Www.juicealive.com.
8  Q.  What about the telephone number?
9  A.  866-94JUICE.
10 Q.  Is that a number for US Beverage?
11 A.  Not to my knowledge.
12 Q.  Let's flip to the next page.
13 A.  Okay.
14 Q.  Have you seen that document before?
15 A.  Yes, I have.
16 Q.  What is this document?
17 A.  It's a flyer for US Beverage selling Juice
18     Alive.
19 Q.  Who did this document go out to?
   A.  Again, I did not handle this project. This
20     was under the purview of Mr. Walker.
21
22 Q.  Well, anyone else in the company aware of the
23     project.

195

1  A.  Oh, yeah. I mean, I was aware of the project.
2      And I'm assuming from the title it went to day
3      cares. I don't know specifically which zip
4      codes or where it got targeted too, though.
5  Q.  Okay. But is this part -- would this have
6      been part of this project we talked about
7      earlier to market Juice Alive brand juice to
8      day cares?
9          MR. GILL:  Object to the form.
10 A.  This is certainly a marketing piece created to
11     advertise to day cares the Juice Alive brand.
12 Q.  And you recognize this as being part of the
13     initial project we've talked about, when we
14     talked before about Mr. Walker approaching you
15     about a -- about marketing to day cares in
16     certain states --
17 A.  Uh-huh.
18 Q.  -- and you -- and they were going to --
19     Trident Marketing was going to market to day
20     cares in other states and that we talked about
21     Mr. Hamner helping to create some logos and so
22     forth and materials?
23 A.  Correct.

196

1  Q.  And I'm asking you if you recognize this as
2      being one of the pieces of material that was
3      created by Mr. Hamner as part of that initial
4      project to market to day cares.
5          MR. GILL:  Object to the form.
6  A.  I do not recognize this being the work of
7      Mr. Hamner.
8  Q.  Okay. Do you any reason -- what's your basis
9      for not --
10 A.  Oh, I have no reason to -- I do not have that
11     knowledge that Mr. Hamner produced this or
12     John Walker produced it or a printing company
13     produced it. I don't know.
14 Q.  Okay. Did US Beverage help pay for the
15     printing costs for these flyers?
16 A.  Again, I do not know what participation US
17     Beverage had on the cost of this piece,
18     whether it was printing or mailing. But I
19     would have assumed we did have a cost incurred
20     in printing and mailing these.
21 Q.  But you're just not certain?
22 A.  I'm not certain without financial
23     documentation in front of me.

1 Q. Okay.

2 (Off-the-record discussion.)

3 Q. Let's look at one more document, then we'll

4 take a break and lunch. We're going to mark

5 this as Defendants' 8. And can you -- if you

6 can identify this document, sir.

7 (The referred-to document was

8 marked for identification as

9 Defendants' Exhibit No. 8.)

10 A. Okay.

11 Q. Okay. Can you identify the document?

12 A. I believe this to have been a proposal that

13 was submitted by John Walker.

14 Q. Okay. Have you seen this before today?

15 A. Yeah.

16 Q. And you've read it before today?

17 A. Yes, sir.

18 Q. Would you have received it roughly May 24th,

19 2004, or a few days afterwards?

20 A. I cannot -- I cannot remember when I saw it.

21 Q. Do you have any reason to not believe you

22 would have received it sometime after May

23 24th, 2004?

198

1 A. No. I have no reason to believe that.

2 Q. Okay. Let's look at the fourth arrow or

3 bullet point.

4 A. Okay.

5 Q. And the first line says (As read:) Marketing

6 services for the 100 percent day care juice

7 line in Alabama, Mississippi, and Arkansas.

8 Are those states that we were talking about

9 earlier that US Beverage was allocated to sell

10 day care juice under Juice Alive brand?

11 A. My belief that it extended past those

12 boundaries.

13 Q. Okay. Based on what?

14 A. Well, based on where we had current

15 distribution.

16 Q. Okay.

17 A. I'm not denying that that proposed this.

18 Q. Okay. Is there some other document that was

19 created that -- out of these discussions that

20 would have shown where US Beverage would sell

21 these products?

22 A. I believe there was a document sent to an

23 attorney in Columbus, Georgia, or Phenix City,

---

1 Georgia, representing Mr. Walker as to what we

2 believed there should be distribution in.

3 Q. At this point in time, May of 2004?

4 A. I'm not sure if it was May 2004.

5 Q. And was that letter to the lawyer in Columbus,

6 Georgia, or wherever, was that letter

7 referring to the day care juice product?

8 A. I cannot remember specifically. It had many,

9 many purposes, I think, if I'm not mistaken.

10 Q. Okay. In response to this letter, did you

11 take any legal action?

12 A. Did we take legal action?

13 MR. GILL: Object to the form.

14 Q. I'm just asking if you took legal action. I'm

15 not asking --

16 A. I don't understand "took legal action." Did

17 we consult with our attorneys?

18 Q. No. I'm asking more firmly than that. Did

19 you send a cease and desist to John Walker?

20 Did you file a lawsuit?

21 A. No, we did not.

22 Q. Okay. But from this letter, it's clear that

23 Mr. Walker has created a -- his own brand?

200

1 A. Absolutely.

2 Q. And is it clear he also was working under this

3 company called Trident Marketing?

4 A. At this point, it becomes aware that he is not

5 working on the best interest of US Beverage by

6 trying to charge for the services he should be

7 providing in the position that he held.

8 Q. Is it your point that -- is it your contention

9 that at this point in at least as early as May

10 of 2004 that Mr. Walker had breached his

11 fiduciary duties and had committed some sort

12 of wrong against US Beverage?

13 A. Oh, I do believe that.

14 Q. And, again, you didn't take any -- you didn't

15 have a lawyer send a cease-and-desist letter?

16 A. No. We sought the advice of counsel, and

17 counsel advised us to take a different path

18 for resolution.

19 Q. Okay. And we can't --

20 MR. GILL: I'm going to go ahead and

21 advise you not to discuss,

22 even though it wasn't with me,

23 any discussions you may have

1 Q. Was he an attorney for US Beverage?

2 A. **He is an attorney that US Beverage did use for**

3 **this transaction.**

Q. Did he prepare these documents?

A. **He prepared these documents. My belief was**

6 **that he had passed them back and forth to a**

7 **gentleman, again, in either Phenix City or**

8 **Columbus. I cannot remember the attorney's**

9 **name, but it was John Walker's counsel at the**

10 **time.**

11 Q. Okay. Is it your understanding that James

12 Cooper would have drafted these documents?

13 A. **He would have drafted them and then had them**

14 **reviewed by the other attorney, correct.**

15 Q. Did he provide you with the original copies or

16 original drafts of these documents?

17 A. **That, I could not answer, if they were the**

18 **original drafts or not.**

19 Q. Okay. Can you check with Mr. Cooper? Does he

20 still do work for the company?

21 A. **Yes.**

22 Q. Do you have reason to believe that he would

23 have kept the original drafts of these

238

documents?

2 A. **I have no way to answer that.**

3 MR. GILL: Are you asking for an

4 original draft that we

5 drafted?

6 MR. JACKSON: I guess what I'm

7 asking is I'm getting from the

8 witness -- the witness is

9 equivocating about the

10 document stating that it's

11 been sent to another lawyer,

12 and I guess inferring the

13 other lawyer might have

14 drafted part of the document.

15 And it's important to know who

16 drafted the document, who

17 drafted what portions,

18 especially the non-compete.

19 MR. GILL: I think he said it was

20 negotiated between the two

21 lawyers. But, I mean, I think

22 a document in his lawyer's

23 possession would be

privileged. But I don't know.

I have no knowledge --

3 MR. JACKSON: A document that had

4 been sent to Mr. Walker's

5 attorney?

6 MR. GILL: Well, if it had been sent

7 to Mr. Walker's attorney, no,

8 I don't, but --

9 MR. JACKSON: And we'll inquire with

10 his attorney. Maybe his

11 attorney had the original

12 draft sent.

13 Q. But let me ask you, as to the bottom of

14 page -- Bates-Stamped Page 7, the 200-mile

15 geographical limitation, who suggested that

16 limitation?

17 A. **I don't know who suggested that. I know that**

18 **John Walker and I were both present with**

19 **Mr. Cooper when we discussed that mile range.**

20 Q. Who suggested the three-year time limitation?

21 A. **Again, John Walker and I were both present.**

22 **Don't know that either one of us suggested it**

23 **or that Cooper suggested it. I couldn't**

240

answer that.

2 Q. Okay. When did you first become aware of

3 actions that you contend show that Mr. Walker

4 was competing against US Beverage?

5 A. **Competing. I would say that -- I would say**

6 **sometime in July -- it was just after we**

7 **closed on the SBA loan, was my belief, that**

8 **Mr. Walker had sought to apply for an SBA loan**

9 **to start his own entity. And forgot how I**

10 **became aware of it. But that he had also**

11 **contacted vendors to have conversations. So**

12 **it would have been -- if I knew the -- if I**

13 **could -- if I could look at the date of the**

14 **SBA closing, I would have some idea of when**

15 **that was. And I may be wrong. But that --**

16 Q. You said July. Do you know particular year?

17 Are you referring to a particular year?

18 A. **I'm gonna -- I cannot with -- without knowing**

19 **that date, that would be my time line would be**

20 **just after the US Beverage signing of the SBA**

21 **loan that summer.**

22 Q. Okay. What's the next instance of competing

23 with US Beverage that you can remember

1   whole list.  I thought you said when I was
2   first made aware.
3   Q.  Well, I asked when you -- I asked for the
4   first instance, and we're trying to work our
5   way forward.  And then you said you couldn't
6   put it in a timeline form.  So I just asked
7   you generally to list for us.
8   A.  The Mississippi trade show was a big incident
9   we felt of competition.  John Walker, in fact,
10  brought his agents down for the sole purpose
11  of competing directly with us at that trade
12  show.  Had secured their own booth.  And we
13  were advised to that by the trade show people,
14  and I contacted Mr. Walker about that.  I
15  said, John, you know, in the middle of these
16  negotiations, this would be a bad time for you
17  to create a wedge between our negotiations
18  that way by blatantly competing with us at an
19  open trade show.
20  Q.  When did that occur?
21  A.  It was the Mississippi trade show for last
22  year.  Probably last -- last fall sometime.
23  Q.  Did you lose any sales as a result of this

                                                   246

1   alleged competition?
2   A.  On that date?
3   Q.  Just as a result of what happened --
4   A.  Oh, yes.  We feel that our price point has
5   been driven down by the threat of Mr. Walker
6   bidding; the information that he has passed to
7   competitors of ours based on what he calls the
8   Trident Marketing association with Dispensing
9   Systems; we feel that our bids have been
10  damaged tremendously.  We have lost pieces of
11  business due to him creating a competitive
12  entity.  So, yes, we do feel that we've lost
13  business and lost revenues, an enormous amount
14  of revenues due to this competition.
15  Q.  Could you put a dollar figure on this enormous
16  amount of revenues?
17  A.  I could not today.
18  Q.  What would it take for you to be able to
19  quantify this?
20  A.  I would need time to go through an account
21  list.
22  Q.  Did Mr. Walker give you leads that occurred
23  during the Mississippi trade show or give US

Beverage leads?
2   A.  At that point, when we -- when we had let
3   Mr. Walker know that we saw this as an act of
4   aggression.  And we sat down at that trade
5   show in a conference room at a hotel to try to
6   work some things out.  And, again, it has
7   always been our intention to put the business
8   first and protect it, US Beverage, because it
9   can't speak for itself.  So we as corporate
10  officers have to speak for it, and sometimes
11  we do have to put the needs of the company
12  ahead of our personal needs.  And in doing so,
13  we did agree to some things that we felt we
14  were coerced into for the protection of the
15  greater good of US Beverage.
16      On that date we made what we
17  felt was an amicable good-faith arrangement,
18  which he breached on many occasions.  Did he
19  give us leads?  We were there are at the show
20  and got the leads alongside him because he was
21  in the booth with us.  So did he give us
22  leads?  No.  He went out and actively bid
23  against us during that school year and this

                                                   248

1   school year through his agents.
2   Q.  Okay.  Now, which school years are we talking
3   about?  You said "that school year."  Are you
4   referring to 2005/2006?
5   A.  Correct.
6   Q.  Which schools did he bid against you in
7   2005/2006?
8   A.  And, again, I'll have to -- I'll have to
9   look -- he may not have bid actively in 2005,
10  but he was making contact in 2006 to create a
11  path for him to sell to these accounts, which
12  would have been the 2005/2006 school year.  So
13  spring of '06 he was out actively trying to
14  create a distributor network, and agents for
15  John Walker doing business as Juice Alive and
16  Trident Marketing to infiltrate territories
17  that US Beverage currently distributed in and
18  compete with us.
19  Q.  What was your response or your company's
20  response to these perceived instances of
21  competition that you've listed a few minutes
22  ago?
23  A.  What was our response?

1    dropped that case price actually down to

2    around 16 or $17, is my recollection. And I

3    may be off a little bit.

4   Q.   How much of the 16 or $17 per case went to the

5    owner of the Cool Tropics' brand?

6   A.   **I think at the time, we agreed to pay -- we**

7    **paid it in the form of a margin, like, a**

8    **certain percentage. And I do not recall that**

9    **percentage. And, again, it was agreed upon**

10    **because when we had taken over Tropical**

11    **Perfections, some of that distribution was**

12    **already in place. We felt it was prudent to**

13    **keep those customers using that same product**

14    **brand name.**

15   Q.   So you can't today tell us what -- what was

16    the charge for using the brand?

17   A.   **No. Not right now I couldn't.**

18   Q.   When you say it was a margin, was it margin

19    over and above the 16 or $17 a case?

20   A.   **I think that was inclusive, but, again, I'm**

21    **not sure.**

22   Q.   And did Supreme Beverage make the product for

23    Cool Tropics you were selling?

262

1   A.   **Well, actually Supreme Beverage manufactured**

2    **that product for us, and Cool Tropics agreed**

3    **to move their business over there with us at**

4    **the same time.**

5   Q.   Okay.

6   A.   **So Supreme and Tom Clark worked on those**

7    **products, getting them right, and then Cool**

8    **Tropics actually in its own distribution**

9    **followed suit and moved to Supreme with us in**

10    **order to gain the same pricing we were**

11    **getting, which was better than what they were**

12    **getting.**

13   Q.   Okay. And we saw earlier Defendants'

14    Exhibit 16, which is -- we talked about

15    before, which, basically, informed Gary Dukes

16    of the 1.20 increase or the case up-charge.

17    Would there have been a similar document sent

18    earlier regarding your relationship with Cool

19    Tropics?

   A.   **I could not state that. I'm not sure.**

21   Q.   Is it possible there was a document that was

22    sent to Supreme informing them of what the

23    case up-charge would be?

1   A.   **I'm just unaware of it.**

2   Q.   This case up-charge of $1.20 per case for

3    Juice Alive, do you contend that's not a fair

4    case up-charge? And I'm not talking about

5    the ownership of the IP, but I'm talking about in

6    terms of buying a product in the marketplace.

7    You know, whether you're buying Cool Tropics

8    or you're buying Juice Alive or some other --

9    some other product in the marketplace that's a

10    slush product that you're paying a case

11    up-charge to use a brand. Do you contend that

12    $1.20 case up-charge for a case of this juice

13    product is unreasonable?

14      MR. GILL: Object to form.

15   A.   **I contend it's unreasonable when that brand**

16    **should be an internal issue.**

17   Q.   Again, I'm not asking you -- I'm not asking

18    you to agree with us as the ownership of the

19    brand. I'm just asking you in terms of if you

20    were negotiating a case up-charge for Cool

21    Tropics or -- or, you know --

22   A.   **I would find it to be excessive for the**

23    **services provided, yes.**

264

1   Q.   So if Cool Tropics was charging you $1.20, a

2    case up-charge --

3   A.   **We left Cool Tropics because they were**

4    **charging us for the up-charge in giving their**

5    **service.**

6   Q.   Okay. And you don't recall how much they were

7    charging. Was it more or less than $1.20 per

8    case?

9   A.   **I don't recall.**

10   Q.   Okay. What about for this other internal

11    brand you were talking about, the Harvest

12    Pure; is that the brand?

13   A.   **Correct.**

14   Q.   Did you pay a case up-charge for Harvest Pure?

15   A.   **I'm going to say, yes, we probably did. I**

16    **could not tell you the amount at this time.**

17   Q.   Do you have any idea?

18   A.   **I do not.**

19   Q.   Do you think $1.20 case up-charge for the

20    Harvest Pure brand, would that be excessive?

21   A.   **I think at the level that US Beverage has**

22    **obtained, that that is an internal issue and**

23    **that almost any price that we would pay for**

1      Exhibit 24. And, again, these are documents
2      that were produced by your attorney to me in
3      this case. See if you --
           (The referred-to document was
           marked for identification as
6          Defendants' Exhibit No. 24.)
7 A.    **Okay.**
8 Q.    Do these appear to be purchase orders for the
9      purchase of Juice Alive products by your
10     company?
11 A.   **Yes.**
12 Q.   And it looks like the vendor is Supreme
13     Manufacturing; is that correct?
14 A.   **Correct.**
15 Q.   Okay. And these are showing some pretty
16     significant purchases; is that correct?
17 A.   **I mean, I don't know how significant. $22,000**
18     **is a lot of money to me.**
19 Q.   Yeah. I mean, that's what I'm asking. Looks
20     like the first page would be at least $22,000.
21 A.   **Well, the total is $22,000 for the entire**
22     **purchase order.**
23 Q.   Oh, I'm sorry. So this is all part of the

282

1      same purchase order, then?
2 A.   **It appears to be.**
3 Q.   Okay. And do you know if a case up-charge was
4     paid to -- to Trident Marketing off the
5     purchase of these products on this purchase
6     order?
7 A.   **Without a per-case cost, I could not, without**
8     **a calculator, decipher if there was one placed**
9     **on the PO or not.**
10 Q.   But isn't it your understanding that you were
11     paying a case up-charge when you made this
12     purchase order?
13 A.   **I would have to refer back to the facts that**
14     **you had supplied to me earlier before I would**
15     **even be able to --**
16 Q.   Certainly. I'll be glad to.
17 A.   **-- know a time on.**
18 Q.   Okay. I'll let you look at the fax that's
19     Defendants' 16.
    A.   **I would believe at this time there probably**
21     **was some sort of an up-charge included, but,**
22     **again, without a breakdown of cost per case,**
23     **I'm unable without a calculator to work it**

1      **backward to confirm or deny that statement.**
2 Q.   The purchase order is dated what?
3 A.   **12/13/2005.**
4 Q.   And the fax from Mr. Clark to Mr. Dukes at
5     Supreme is dated what?
6 A.   **11/18/2005.**
7 Q.   And based on those two dates, it would be a
8     good assumption that a case up-charge was paid
9     for these products that were purchased?
10 A.   **Again, without documentation of what we paid**
11     **per case and what the up-charge -- I can't**
12     **answer or deny, you know, positively or**
13     **negatively the -- that statement. I don't**
14     **mean to be evasive. I just don't -- I don't**
15     **have --**
16 Q.   Do you deny that your company paid a case
17     up-charge when it bought Juice Alive products
18     through Supreme?
19 A.   **Do I deny? No, we definitely -- I would**
20     **believe that throughout the POs that requested**
21     **the Juice Alive brand, there was some**
22     **additional charge at times. Yes, we have**
23     **purchased Juice Alive at no charge prior to**

284

1      **this, though.**
2 Q.   Any records showing that?
3 A.   **Yeah. There will be purchase orders that**
4     **would confirm that, I'm sure.**
5 Q.   Okay. Can you produce those to your attorney?
6 A.   **I'm sure we can.**
7 Q.   Okay. What business do you contend that
8     Mr. Walker has done within a 200-mile radius
9     in Montgomery that you contend violates the
10     non-compete agreement that we were talking
11     about earlier today?
12         MR. GILL: Object to form. Calls
13            for a legal conclusion.
14 A.   **Well, again, my contention is not only the**
15     **non-compete but the breach of fiduciary**
16     **responsibility and --**
17 Q.   And I understand that. But is it your
18     understanding that your company has a claim
19     against Mr. Walker for violating the
20     non-compete agreement?
21 A.   **It's my contention that Mr. Walker has**
22     **breached the fiduciary obligation that he had**
23     **as an officer and employee of the corporation.**

289

1      **targeted for sales calls.**

2 Q.   Okay. But, again, I'm asking you for any

3      basis of your assertion that Mr. Walker gave

      proprietary information to Dispensing Systems.

  A.   **Again --**

6 Q.   I mean, I know what you're saying, you have

7      suspicions, you have reasons to believe. I'm

8      just asking for facts.

9          MR. GILL: Object to the form.

10 A.   **Well, and again, the fact that they compete**

11      **only predominantly with places that we already**

12      **have relationships with based on the fact that**

13      **they've purchased from those vendors would**

14      **lead us to believe that. Based on bid pricing**

15      **that they come into the marketplace, would**

16      **lead us to believe that.**

17 Q.   Okay. Anything other than that? Any other

18      information, any statements to you, anything

19      else other than what you've just stated that

20      leads you to believe --

21 A.   **Only that John Walker had advised me that if**

22      **we did not concede to his desires for a**

23      **greater price and higher buyout price and a**

290

1      **higher price on Juice Alive, he was going to,**

2      **in fact, do that.**

3 Q.   In fact do what?

4 A.   **Give proprietary information and try to damage**

5      **US Beverage.**

6 Q.   Okay. Is that the exact words that Mr. Walker

7      used?

8 A.   **Mr. Walker used the words, it's your**

9      **responsibility to this corporation, Grady, to**

10      **do the right thing -- and I'm paraphrasing,**

11      **so -- so I -- I stipulate that. But that it's**

12      **worth it to you to pay me a higher price to go**

13      **away than to have me bury you.**

14 Q.   Did Mr. Walker make any physical threats to

15      you at that conversation?

16 A.   **On that day?**

17 Q.   Yes.

18 A.   **No. Not on that day.**

19 Q.   And when, roughly, did this conversation we're

20      just describing occur?

21 A.   **This conversation probably occurred prior**

22      **to -- prior to the lawsuit.**

23 Q.   Okay. During this conversation, was there any

291

1      specific threats to turn over proprietary

2      information to anyone else?

3 A.   **Not specifically, no.**

4 Q.   And other than the threat to bury you, any

5      other threats made by Mr. Walker that you

6      haven't told us on the record here today

7      during this conversation?

8          MR. GILL: Object to form.

9 A.   **During that conversation?**

10 Q.   Yes.

11 A.   **I mean, other than extrapolating on that same**

12      **point, that, you know, he would seek to**

13      **compete in the markets with us.**

14 Q.   Are you aware of any specific business that

15      you've lost to Mr. Walker within 200 miles of

16      Montgomery?

17 A.   **Without an account list in front of me, I**

18      **would have to go through that to state**

19      **specifically which accounts.**

20 Q.   Are you aware of any business that Mr. Walker

21      has done within 200 miles of Montgomery in

22      which he's sold product that you think

23      violates the non-compete or violates his

292

1      fiduciary duty that you allege?

2 A.   **Well, yes. I believe that any account that**

3      **Dispensing Systems of Alabama has called on**

4      **would violate that 200-mile radius.**

5 Q.   Are you aware of Dispensing Systems selling

6      any product within the 200-mile radius?

7 A.   **I'm aware of them attempting to sell product.**

8      **The fact that we beat them in the streets is**

9      **not relevant. The attempt to compete with us**

10      **and to lower our price did happen.**

11 Q.   Well, relevancy is up to the judge and so

12      we're not -- I mean, what I think is relevant

13      and you think is relevant is irrelevant, so --

14      but I'm just asking you specifically as to

15      products sold in the marketplace by Dispensing

16      Systems within 200 miles of Montgomery.

17 A.   **And let me understand what you mean by --**

18      **competition is not just the actual winning.**

19 Q.   And I didn't specifically ask you about

20      competition within 200 miles. I'm asking the

21      specific question of products sold within

22      200 miles of Montgomery. Do you know of any

23      products sold within 200 miles of Montgomery

1  by Dispensing Systems?
2  **A.    And, again, I would have to defer to some**
3  **employee questioning and things like that to**
4  **go through those.  Off the top of my head, I**
5  **cannot give you a specific example of them**
6  **selling a product.**
7  Q.    Okay.  And, again, you've -- I've asked you
8  before if you're aware of any accounts that US
9  Beverage has lost within this 200-mile radius
10  of Montgomery as a result of alleged
11  competition of Mr. Walker or Trident Beverage.
12  **A.    There was an account -- and, again, without**
13  **some account lists -- in south Mississippi**
14  **that would have fallen within that, that**
15  **Mr. Walker did request bids for to bid against**
16  **us.  He did not win the bids, and he may have**
17  **pulled out of the bid at the last minute, but**
18  **it was well within the 200-mile radius.**
19  Q.    And what county would that be?
20  **A.    Again, I would have to go and defer to some**
21  **account list to get you the specifics on that.**
22  Q.    Is that an account that you had for 2005,
23  2006, US Beverage?

294

1  A.    Without that information, I can't -- I can't
2  fully answer that.
3  Q.    Who won the bid for that particular school in
4  south Mississippi?
5  **A.    I believe US Beverage did.**
6  Q.    Okay.  Any other -- any other instances within
7  200 miles?
8  **A.    And, again, I would have to probably defer to**
9  **Mr. Clark on almost all of those.  He would be**
10  **much more intimate with that knowledge than I**
11  **am.**
12        MR. JACKSON:  Let me take a
13        five-minute break.
14     (Brief recess taken.)
15  Q.    I'm going to show you another document,
16  Mr. Kittrell, and ask you if you can identify
17  that document.
18     (The referred-to document was
19        marked for identification as
20        Defendants' Exhibit No. 25.)
21  **A.    It's a bid submission form.**
22  Q.    Okay.  Is it related to Escambia County?
23  **A.    That's what it says.**

1  Q.    Or Escambia County Board of Education?
2  **A.    That's what it says.**
3  Q.    Okay.  And just to kind of short circuit the
4  process, are you aware of what relationship
5  this document has to this present lawsuit?
6  **A.    This particular document?**
7  Q.    Yes.  And, again, this document was produced
8  by your attorney to us, and --
9  **A.    I'm going to have to say -- again, I**
10  **would only -- I would not know what the**
11  **significance was specifically at this moment.**
12  Q.    Okay.  And we'll just go on and keep going.
13  Who is US Beverage's major competitors in the
14  marketplace?
15  **A.    Today?**
16  Q.    Today.
17  **A.    I would state that currently Ice Makers,**
18  **Dispensing Systems.  I would see that John**
19  **Walker d/b/a Juice Alive via Scotty West, or**
20  **however that is structured.  You know, when I**
21  **hear Juice Alive is bidding against us or**
22  **Juice Alive is trying to get the business, I'm**
23  **hearing that as a term of -- a generic term**

296

1  for a competitor which may be in several
2  forms, Trident Marketing, Dispensing Systems.
3  A gentleman out of the Tallahassee lower
4  Georgia market.  Some various other people
5  representing those products.  So it's, kind
6  of -- that's kind of a generic -- Slush
7  Puppie.
8  Q.    Is that Slush Puppie like you would see at
9  convenience stores?  Is that like the products
10  you see at convenience stores, Slush Puppie?
11  **A.    Well, they have many forms, Vita Pup and so on**
12  **and so forth.  So probably not the C-store**
13  **product based on who we're running into.  I'm**
14  **going to guess Vita Pup would be more -- but**
15  **it's a Slush Puppie brand.  They have --**
16  Q.    Is that --
17  **A.    -- several brands.**
18  Q.    -- a fruit juice -- I'm sorry.
19  **A.    Yes.  It's going to be a 50 percent or**
20  **greater.**
21  Q.    When most people think of Slush Puppie,
22  they're not thinking of a fruit juice, are
23  they?  I'm just asking just --

297

1  A.   You know, at one time, Slush Puppie, back when
2     I first got started with this, had 100 percent
3     product, I believe.  Then they went to a
4     50 percent product.  So were they perceived to
5     be 100 percent juice?  I think it depends on
6     the market and what particular line that
7     distributor really focused on.
8  Q.   Okay.  Well, let's keep -- any other -- I
9     think you mentioned, is it Ice Makers; is
10    that --
11  A.   Ice Makers.
12  Q.   Dispensing Systems.  You've talked about
13    various incarnations of Juice Alive?
14  A.   Yeah.  Buffalo Rock.
15  Q.   Buffalo Rock?
16  A.   Uh-huh.
17  Q.   Is that the company that also distributes
18    Pepsi?
19  A.   Yeah.  They do distribute Pepsi.
20  Q.   Okay.  And you mentioned Slush Puppie?
21  A.   Correct.
22  Q.   Any other competitors or major competitors in
23    the marketplace?

298

1  A.   There's several others, Sunshine Beverage.
2     There's several other competitors that may be
3     much of a smaller scale.  There's another one
4     out of Pensacola, Florida, Damon's, which
5     touts 100 percent all natural.  There's
6     several others that we -- you know,
7     different -- different markets we've -- we see
8     different competitors.
9  Q.   Do you bid against these competitors?
10  A.   It depends on the market and depends on the
11    product.
12  Q.   What about for the school segment of your
13    business?
14  A.   Again, depends on the market.  Different
15     markets require bids.  Some require just a
16     sales call or a pilot program or different
17     things.  So there's obvious ways -- I'm aware
18     of some markets where they can put multiple
19     vendors in.
20  Q.   What about the Mississippi market?  Is that a
21    market that's bid for schools?
22  A.   And off the top of my head, I would have to
23     look at data.  Some do require a bid, it's my

299

1     understanding.  Some do not.
2  Q.   Have you recently lost any bids to any of
3    these competitors we've just listed?
4  A.   I would have to go through some notes and talk
5     to some salespeople to find out which markets,
6     which competitors, which bids.  I'm not -- my
7     head is a small attic.
8  Q.   Okay.  In your complaint you allege that
9    Mr. Walker has caused and continues to cause
10    you to lose customer sales.  How is Mr. Walker
11    continuing to cause you to lose customer
12    sales?
13  A.   Well, you know, we view that any reduction in
14     price per case on a bid that we won would be a
15     continual loss.  We also contend that any
16     business that Mr. Walker created using the
17     Juice Alive name, which we feel is
18     intellectual property of ours, is business
19     that we should have had, and it's an ongoing
20     loss.  Then any place that he's created a
21     competitive situation that has taken business
22     would obviously be considered a loss.  And,
23     again, I would have to go case-by-case through

300

1     a lot of documentation to -- you know, to give
2     you specific examples.
3  Q.   Are you alleging that Mr. Walker, in the
4    various incarnations of Juice Alive, is able
5    to manipulate the market price for fruit juice
6    products?
7  A.   When you say "manipulate the price," I think
8     I'm understanding, but I want to make sure.
9  Q.   Okay.  You said a few minutes ago any instance
10    where you allege your competition from
11    Mr. Walker you get paid less from a
12    customer --
13  A.   Uh-huh.
14  Q.   -- you think that's damage.  And what I'm
15    asking is in terms of doing business in the
16    marketplace, is Mr. Walker's company, is it
17    able to set the market price for your product,
18    for the juice product.
19  A.   I think if -- if we're in a situation and we
20     have a relationship with a customer, we have a
21     price that we've gone in at and he sends a
22     flyer or a letter stating that he can deliver
23     that product at a lower price, that would

1     probably force us to have to lower our pricing
2     to maintain those accounts.
3  Q.  Well, do any of these other -- these other
       competitors we've talked about have any impact
       on the price in the market as to the sale of
6     fruit juice concentrate?
7  A.  Again, I think specifically they are at no
8     more of an advantage than we are against them.
9     I think the problem comes with John Walker is
10    that he does have proprietary knowledge to
11    know what our costs are going in.  He knows
12    our financial capabilities; he knows our cost
13    per machines; he knows our inventory levels;
14    he knows our sales relationships.  I think
15    that those things do enable him to create more
16    disparity for us than a Slush Puppie or
17    Buffalo Rock to manipulate the market price.
18  Q.  But let's say if I'm a -- I own a convenience
19    store and I want to put in a slush machine and
20    sell some sort of fruit juice concentrate.
21    Let's just say it's some sort of frozen
22    lemonade.
23  A.  Okay.

302

1  Q.  Could I call up Ice Makers and get that
2    product from Ice Makers?
3  A.  Could you get that product?
4  Q.  Yeah.  I'm just talking about a generic frozen
5    lemonade.  I'm not talking about anything --
6  A.  Yeah.  I would think they would have something
7    similar.
8  Q.  What about Buffalo Rock?  Could I call them
9    up?
10  A.  I would think they would have something
11    similar.
12  Q.  Slush Puppie or Vita Pup?
13  A.  They would have something similar.
14  Q.  Okay.  And I could call up your company and
15    get it?
16  A.  (Nods head.)
17  Q.  What about Damon's out of Pensacola, would
18    they have something similar?
19  A.  Uh-huh.
    Q.  If I'm buying that product from the
21    marketplace, are you stating that there's not
22    an impact on the market value of the product
23    from the fact that there's multiple vendors

1    out selling the same product?
2          MR. GILL:  Object to the form.
3  A.  Ask me that again.
4  Q.  I guess I'm asking that if I'm in the
5    marketplace and if I'm trying to buy this
6    product and I know there's, at least on my
7    sheet here, six or seven companies I could
8    call up and say, hey, I want fruit juice
9    concentrate; I want to sell frozen lemonade --
10  A.  Okay.
11  Q.  -- does that not affect the market or fair
12    market price of frozen fruit juice
13    concentrate?
14  A.  Well, what I would say is that in a lot of
15    these instances, to be more specific, we would
16    have been considered a sole-source provider in
17    some of these markets.  And because of the
18    solicitation by Mr. Walker, you know, we've
19    had to create an open market situation, which
20    is not conducive to US Beverage's favor.
21  Q.  What do you mean by a sole-source provider?
22  A.  Well, there's some of these geographic regions
23    that we were one of the few people

304

1    distributing in those regions and had absence
2    of competition.  And in essence, Mr. Walker
3    created that competition for us.  And, again,
4    as an officer of our corporation and an
5    employee, you know, we just don't feel that's
6    something he should have done.  And he knew
7    these markets.  He had proprietary information
8    to know which markets they were.
9  Q.  Okay.  Which markets are we talking about?
10  A.  Again, without an account list, I would have
11    to, you know, hold that question back.  I
12    could not answer specifically yet.
13  Q.  Okay.  Are you saying there's parts --
14    let's -- for instance, let's say Alabama.  Are
15    there parts of Alabama that Buffalo Rock won't
16    service?
17  A.  Yeah.  There's parts of any footprint that
18    certain companies don't distribute to with
19    certain products.
20  Q.  If you were to consult with your records,
21    could you provide your attorney a list of
22    these sole-source provider areas that you're
23    contending?

1   A.   **Yeah. I think we could sit down and look at a**
2        **lot of these areas that we're contending that**
3        **this competition breach happened.**
4   Q.   And what about like in an area like
5        Montgomery? Is Montgomery considered a
6        sole-source area?
7   A.   **No. It's an open bid.**
8   Q.   Okay. And when you have an open bid --
9   A.   **Well, I'm giving you a term that's not**
10      **accurate. There are active competitors in the**
11      **Montgomery market.**
12   Q.   Does that affect the price of the fruit juice
13      product in the Montgomery market?
14   A.   **I would say it would.**
15   Q.   Do you have -- do you contend Mr. Walker has
16      manipulated the price of fruit juice products
17      in the Montgomery market?
18          MR. GILL: Object to form.
19   A.   **In Montgomery, Alabama?**
20   Q.   Yes.
21   A.   **I feel by the presence of Juice Alive in the**
22      **hands of Dispensing Systems, it created market**
23      **confusion in the Montgomery market, possibly.**

306

1   Q.   Okay. Are you contending that drove down the
2      price of fruit juice products in Montgomery?
3   A.   **Yes, I will contend that.**
4   Q.   Would that have affected the price that Ice
5      Makers or Buffalo Rock or Slush Puppie or Vita
6      Pup would charge?
7   A.   **No. They're going to bid at what they have to**
8      **bid at.**
9   Q.   Is there not a price that the market supports
10      for this particular commodity?
11   A.   **Well, the fortunate thing for us is by buying**
12      **power, we are buying so -- with a lot of**
13      **favoritism in the market, and we're able to be**
14      **profitable at certain levels. But the**
15      **presence of this self-made competition through**
16      **John Walker competing with us in the open**
17      **market has forced us to drive down what we**
18      **would consider reasonable bid prices, yes.**
19   Q.   Are you testifying today that you -- if -- you
20      have an ability to obtain product at a less
21      cost than a company, for instance, Buffalo
22      Rock would obtain the same product for?
23   A.   **I could not -- I've never seen Buffalo Rock's**

1      pricing. I can only make assumptions based on
2      where our volume is at in that particular
3      category.
4   Q.   Is being a sole-source provider equivalent to
5      being a monopoly in these areas we were
6      talking about earlier?
7   A.   **No. Because there's no restriction of trade.**
8   Q.   Okay. In these areas where you're a
9      sole-source, could you sell the product for
10      any price you wanted?
11   A.   **No. Because they communicate with other child**
12      **nutrition directors. They obviously know the**
13      **value of the product in the marketplace. You**
14      **could not get an excessive or exorbitant**
15      **price, but you may be able to get a more fair**
16      **price based on the low volume that they**
17      **produce.**
18   Q.   And when you're talking about more fair price,
19      more fair price to who?
20   A.   **To us -- to us as a company trying to make a**
21      **profit.**
22   Q.   Okay. Not necessarily to the school systems?
23   A.   **No. I would say in that statement, I'm**

308

1      talking about, you know, obviously holding our
2      margins as a company driven by profit.
3   Q.   But you said earlier that even in a
4      sole-source market, they have the capability
5      of finding out what products are being sold in
6      other areas?
7   A.   **Correct. And they have the right to -- to**
8      **seek out someone who would actually distribute**
9      **to them if they would engage in that. But,**
10      **again, we feel that -- and I would have to get**
11      **you the documentation -- that an employee and**
12      **officer of ours sought to create competition**
13      **in those markets for us.**
14   Q.   How do you contend that Mr. Walker has
15      intentionally interfered with your contractor
16      business relations? And, again, this comes
17      from your complaint. That's one of the
18      allegations against Mr. Walker, that he's
19      interfered with your contract -- your contract
20      relations or business relations.
21   A.   **Well, Mr. Walker and agents of Mr. Walker and**
22      **John Walker d/b/a Juice Alive, Juice Alive,**
23      **Trident Marketing, Dispensing Systems, Scotty**

1 West has made contact with customers that we
2 are doing business with. We see that as
3 interference. Again, based on the fact that
4 Juice Alive, we feel, is intellectual property
5 of US Beverage. It creates market confusion.
6 We feel that John Walker was a fiduciary to
7 the company and that his responsibility should
8 have been to grow our business. Not create
9 competing entities.
10 Q. Well, and again, I'm trying to specifically
11 ask you about interfering with your contractor
12 customer relations, anything that he --
13 Mr. Walker would have done --
14 A. Well, for example, currently --
15 MR. GILL: Can you repeat that? I'm
16 sorry. Can you repeat that
17 question?
18 MR. JACKSON: I'm just asking
19 Mr. Kittrell to recount for us
20 any instances in which he
21 thinks Mr. Walker has
22 interfered with the contract
23 relationships or business

310

relationships of US Beverage.
2 A. Well, again --
3 MR. GILL: Has he not been through a
4 lot of this? I mean, we've
5 been going at this and he's
6 been explaining the things
7 that he believes Mr. Walker
8 did all day.
9 MR. JACKSON: Well, I understand
10 that.
11 MR. GILL: We're just going through
12 a legal claim discussion now
13 or --
14 MR. JACKSON: Well, I have a right
15 to ask about your claims. You
16 know, this is --
17 MR. GILL: You have a right to ask
18 the facts. I mean --
19 MR. JACKSON: I do.
MR. GILL: -- I think he's given it
21 to you.
22 MR. JACKSON: But interference
23 with -- potential interference

1 with contractor relations or
2 business relations is
3 different from breach of
4 fiduciary duty. We talked a
5 lot about fiduciary duty, and
6 that's great. But in terms of
7 saying --
8 MR. GILL: Similar to you and me,
9 but, I mean -- anyway, ask
10 your question again. Maybe I
11 won't object to it. I'll let
12 him go.
13 Q. Okay. And again, I'm asking you -- and I'm
14 not asking you about breach of fiduciary
15 duties or any duties as an employee or officer
16 of the company; I'm talking specifically about
17 things that you contend that Mr. Walker has
18 done to interfere with the contracts or
19 customers or business relationships of your
20 company.
21 A. I guess I'm seeing them as the same. I mean,
22 if we have a client and Juice Alive or any of
23 its agents are trying to contact that client

312

to get the business, we see that as
2 interference.
3 Q. Okay. All right. Well, other than allegedly
4 soliciting business from your clients, do you
5 have any other allegations of interference or
6 any other --
7 A. Scotty West making comments to food and -- or
8 child nutrition directors that US Beverage is
9 filing for bankruptcy.
10 Q. Who told you that Scotty West said that?
11 A. That has come back to me. And, again, I'd
12 have to go back to my office and go through,
13 you know, whatever memory bank I have to --
14 but if I'm not mistaken, that came via some
15 child nutrition directors or through a
16 discussion about notes that we had of what was
17 happening in the streets when we consulted
18 with our sales force in the street or our
19 delivery drivers.
20 Q. You didn't hear Scotty West make that comment,
21 did you?
22 A. No. I've never spoken to Scotty West.
23 Q. Do you know if anybody else that works for US

1  shareholders meeting to enact that for
2  everyone so that we could sit down officially
3  and talk about it.
4  Q.  Okay.  And this -- the purpose of this e-mail,
5  which was attached into the discovery in this
6  case by your lawyer, was, basically, to call a
7  shareholders meeting; is that correct?
8  A.  It was to call a shareholder meeting, correct.
9  Q.  And, again, this is dated December 8th, 2004;
10  is that correct?
11  A.  Correct.  Because John had requested that if
12  we wanted to, we should buy him out.  And I
13  was not of the authority to purchase his stock
14  without everyone's consent or vote.
15  Q.  Okay.  Let's talk some more about Juice Alive.
16  Who do you contend developed the Juice Alive
17  name?
18  A.  I would -- I would contend that some formation
19  of John Walker and Ryan Hamner.
20  Q.  Do you know when it was created?  Any idea?
21  A.  On or about March of '04, maybe.
22  Q.  Did Mr. Walker tell you that he intended to
23  seek a federal trademark for the Juice Alive

322

1  name?
2  A.  Mr. Walker may have had those discussions in
3  passing.  He never submitted a letter to me,
4  nor any documentation stating, I'm going to
5  register this under the name of Trident
6  Marketing or John Walker or Ryan Hamner.
7  Q.  Okay.
8  A.  I received no documentation on that.
9  Q.  Okay.  I'm asking you about conversations you
10  remember.  Do you remember any conversations
11  in which Mr. Walker told you that he intended
12  to seek a federal trademark for the Juice
13  Alive --
14  A.  I do not remember specific conversations, but
15  I will state that John Walker has probably in
16  passing mentioned that he would register that
17  trademark.
18  Q.  Did that concern you when he told you he was
19  going to register the trademark?
20  A.  To be honest, again, I thought he was working
21  on our behalf and would never have guessed
22  that he wasn't going to register it on behalf
23  of US Beverage.

1  Q.  Did he tell you he was going to register it on
2  behalf of US Beverage?
3  A.  Again, I don't -- I would say that he just
4  probably stated, hey, I'm going to get a
5  trademark for this or I'm going to register
6  this or, you know, here's what I'm working on.
7  Q.  What funds did US Beverage expend in
8  developing the Juice Alive trademark?
9  A.  Well, I would say that some of the funds would
10  have been the salary that John Walker was
11  paid.  Again, seeing that it's intellectual
12  property, if he had been involved in the
13  creation of it, I would assume that, you know,
14  a lot of his time had been spent doing that.
15  His travel expenses, his -- you know, he
16  testified yesterday that he had used his cell
17  phone to communicate with Ryan Hamner.  I
18  believe that we spent a dollar something a
19  case.  Prior to the Juice Alive logo or label
20  ever being produced, we spent some fee in that
21  arrangement of purchasing prior to the date of
22  that trademark.  Maybe not.  I'm not sure.  We
23  certainly spent monies on those flyers and

324

1  mailers that were sent out, and we spent
2  resources and time of our people out marketing
3  and selling direct door to door to customers.
4  Q.  Any other funds that you allege that US
5  Beverage spent in the development of Juice
6  Alive?
7  A.  Again, I would have to search the check
8  register to see if there was any others.
9  Q.  Do you have any other -- do you have any
10  documents related to the creation of the Juice
11  Alive brand or logo?
12  A.  Documents relating to the concept development
13  of the term "Juice Alive."
14  Q.  Yes.
15  A.  I'm not sure I understand that.
16  Q.  Okay.  Do you have any concept drafts with the
17  logo, drafts of the logo as they were being
18  worked on; do you have any of those?
19  A.  Well, no.  John would have been privy to all
20  of that because that was a project that he was
21  in charge of working on.
22  Q.  Well, I'm not asking about what John has.  I'm
23  asking about what US Beverage has.

1   A.   Well, what I'm saying, that would -- I would

2       see that as property of US Beverage that he

3       has in his possession.

4   Q.   And I understand we have differing points of

5       view on that. I'm asking specifically as to

6       any records US Beverage currently has. Not

7       talking about any records that John Walker may

8       have. And I'll give you your stipulation that

9       you might claim some of John Walker's records.

10      But any records that your company has in its

11      possession now.

12   A.   I would say that the earliest drafts we would

13      have seen would have been probably label

14      proofs, maybe, or some things like that.

15   Q.   Do you have any of those in your records now?

16   A.   In my personal files, I do not. But there may

17      be some in someone else's files.

18   Q.   Can you search your company records for those?

19   A.   Yeah. We'll be glad to do that.

20   Q.   What about any meeting notes discussing the

21      development of a logo or the name Juice Alive?

22   A.   Again, I -- you know, John was charged with

23      that in the capacity that he served. He was

326

1      free to work on that project without having to

2      consult with us for every step of the way.

3   Q.   When did US Beverage first sell any product

4      bearing the Juice Alive name?

5   A.   Again, I would have to go to sales records to

6      give you a definite answer on that.

7   Q.   Can you do that and get back with your

8      attorney?

9   A.   Yes.

10        (Off-the-record discussion.)

11        (Brief recess taken.)

12   Q.   How did Juice Alive -- how was it marketed by

13      US Beverage?

14        MR. GILL: Object to form.

15   Q.   I can clean it up. Let me strike that

16      question and state it in English instead.

17        How did US Beverage market

18      Juice Alive, or products bearing the Juice

19      Alive name?

20   A.   Well, in several forms. I mean, we sent a

21      mailer out; we passed out cut sheets; we went

22      door to door; we participated in trade shows.

23      You know, we promoted the product door to

---

1      door.

2   Q.   Did US Beverage do any advertising other than

3      what you've just mentioned of the Juice Alive

4      name?

5   A.   I would have to confer with other team members

6      to give you an accurate answer on that.

7   Q.   Okay. And the mailer you described, is that

8      the day care juice mailer we talked about

9      earlier this morning?

10   A.   Yes, it is.

11   Q.   Any other mailer other than day care juice

12      mailer?

13   A.   Again, I would have to confer with team

14      members to see what else was done on behalf --

15   Q.   You mentioned cut sheets. For people that

16      aren't in your industry, what are cut sheets?

17   A.   A cut sheet would be a technical specification

18      data sheet.

19   Q.   Is that just giving data about the product?

20   A.   Well, that, and it's a promotional piece in

21      our industry. You use that as a marketing

22      tool.

23   Q.   Were the Juice Alive flyers that we talked

328

1      about for the mailer created by Ryan Hamner?

2   A.   Again, I'm not sure. John Walker handled that

3      project.

4   Q.   When you say, going door to door, are you

5      talking about, like, visiting convenience

6      stores, or what are you talking about going

7      door to door?

8   A.   Well, any client that could potentially use

9      the product.

10   Q.   So that would be schools or convenience

11      stores?

12   A.   Anywhere the product could be used, that they

13      would market it to.

14   Q.   We're not talking about what people

15      traditionally think of door to door, like,

16      Encyclopedia salesman going down the street

17      talking to people -- not talking about

18      households; talking about --

19   A.   No. Businesses, yeah.

20   Q.   We talked about trademarking of Juice Alive.

21      Why didn't your company, US Beverage, file a

22      trademark application for Juice Alive?

23   A.   Well, again, that project was entrusted with

329

1   **John Walker to handle.**
2   Q.   When did you first become aware of Mr. Walker
3        having filed a trademark application listing
4        Trident Marketing as the owner of Juice Alive?
    A.   **Honestly?**
6   Q.   Yes.
7   A.   **Upon discovery of the documents you turned**
8        **over to me, I believe, was the first time I**
9        **saw a trademark filing on it.**
10  Q.   Is that the first time anybody at US Beverage
11       would have known about that?
12  A.   **I would say no.**
13  Q.   Didn't your lawsuit contain a request to have
14       the federal court strike the trademark
15       registration to Trident Marketing for the
16       Juice Alive?
17  A.   **You said -- you said what was my first seeing**
18       **of that document, was on that time.  I was**
19       **aware through Tom Clark that that**
20       **trademark had been -- that there was some sort**
21       **of trademark situation there.**
22  Q.   I'm sorry for confusing you, but when did you
23       first become aware through any source of a

330

1        trademark being issued to Trident Marketing
2        for the Juice Alive name?
3   A.   **I couldn't give you a specific date on that.**
4   Q.   But I assume it predated your lawsuit?
5   A.   **Yeah.  Absolutely.**
6   Q.   Okay.  You don't know how many -- whether it's
7        months or years?
8   A.   **You know, again, I could not.  I think that I**
9        **may have been alerted in -- I could not give**
10       **you a date.**
11  Q.   And, again, you don't remember when John
12       Walker first told you that he had filed a
13       trademark application on behalf of Trident
14       Marketing?
15  A.   **No.  I could not give you a date.**
16  Q.   Has US Beverage created its own brand for
17       selling slush drinks?
18  A.   **Yes.**
19  Q.   And what's that?  What brand?
    A.   **The first one I thought was Juice Alive.**
21  Q.   Okay.  Well, other than Juice Alive, what has
22       US Beverage created another brand for
23       selling --

331

1   A.   **Fruzers.**
2   Q.   -- slush?  Fruzers.  Okay.  When was that
3        brand created?
4   A.   **Tom Clark was in charge of that project.  I**
5        **would have to defer that to him.**
6   Q.   Well, when did you first become aware yourself
7        as president of US Beverage that US Beverage
8        was selling a product called Fruzers?
9   A.   **It would have been '06.**
10  Q.   Okay.  This year; right?
11  A.   **February, maybe.  February was the first**
12       **inception of it, maybe.**
13  Q.   Did your company hire anyone to help it
14       develop this brand?
15  A.   **Yes, we sought outside consultation.**
16  Q.   What did you consult with?
17  A.   **BLR.**
18  Q.   BLR?
19  A.   **Uh-huh.**
20  Q.   Where is BLR located?
21  A.   **Birmingham, Alabama, which was the original**
22       **firm that we had consulted with, with**
23       **Mr. Walker.**

332

1   Q.   Okay.  When -- when was this original
2        consultation you're talking about?
3   A.   **Shortly after the acquisition of Tropical**
4        **Perfections.**
5   Q.   Did you pay BLR any money to help develop this
6        brand, Fruzers brand?
7   A.   **There have been some fees associated with it.**
8   Q.   Do you have any idea what the fees would run?
9   A.   **I do not.  Not at this time.**
10  Q.   Do you know if it would be less or more than
11       $5,000?
12  A.   **For the development of the brand name?**
13  Q.   Yes.
14  A.   **Again, I don't have that information.**
15  Q.   You can't ballpark it for us?
16  A.   **I was not involved in the actual detailed**
17       **transaction, so, I mean, no, I couldn't**
18       **ballpark it for you.**
19  Q.   You don't recall signing a check for BLR?
20  A.   **I very well could have signed a lot of checks.**
21       **I mean, I sign a lot of checks on a daily**
22       **basis, and I don't recall.**
23  Q.   Who would know that as to how much money has

1  been paid to BLR?

2  A.  **I would say Tom Clark would know.**

3  Q.  Okay. Why did your company decide to create
   the Fruzers brand?

   A.  **We felt that with the Juice Alive situation,**
6  **that there was market confusion, and we felt**
7  **that the behavior of an officer and employee**
8  **of ours in misrepresenting that brand was**
9  **causing damages.**

10  Q.  Well, has the Fruzers brand been successful?

11  A.  **We feel it's been very successful.**

12  Q.  Are you happy with the Fruzers brand?

13  A.  **We're happy with the distribution and sale of**
14  **the products that we sell.**

15  Q.  Do you plan to continue using Fruzers as the
16  brand.

17  A.  **I would say at this point that is our**
18  **marketing strategy.**

19  Q.  If you were to be successful in this case and
20  be awarded Juice Alive, do you plan to stop
21  using Fruzers and start using the Juice Alive
22  name?

23        MR. GILL:  Object to form.

                    334

1  A.  **I would have to -- again, that would be a**
2  **meeting that our team as a marketing team and**
3  **sales-driven team would have to meet on at**
4  **that time and juncture. If it's 20 years from**
5  **now, if it's two days from now -- there would**
6  **be too many variables for me to even**
7  **speculate.**

8  Q.  Do you think Juice Alive is a better brand
9  name than Fruzers?

10        MR. GILL:  Object to the form.

11  A.  **I feel that we have put an intense amount of**
12  **effort into whatever it is that we represent.**

13  Q.  I'm just asking your opinion.

14  A.  **In my opinion do I think --**

15  Q.  You've been in this business a long time. In
16  your opinion, what's a better brand name for a
17  juice product, Fruzers or Juice Alive?

18  A.  **I think it's subjective. I could say that I**
19  **prefer some of the -- the marketing appeal**
20  **that Fruzers brings.**

21  Q.  Let me show you another document I'm going to
22  mark as Defendants' 28 and ask if you can
23  identify that document for me.

1        (The referred-to document was
2              marked for identification as
3              Defendants' Exhibit No. 28.)

4  A.  **Okay.**

5  Q.  Okay. Would you characterize this as a
6  cease-and-desist letter?

7  A.  **Not being an attorney, I wouldn't know how to**
8  **characterize it, to be honest.**

9  Q.  Let's look at the fourth paragraph of that
10  letter and ask you to read that sentence
11  starting with the word "accordingly."

12  A.  **Okay.**

13  Q.  Read it aloud, please, for the record.

14  A.  **(As read:) Accordingly, US Beverage asks that**
15  **Trident Marketing and John Walker cease and**
16  **desist from using the brand name Juice Alive,**
17  **as it is property of US Beverage.**

18  Q.  And having read that sentence, would you
19  consider this to be a cease-and-desist letter
20  that was sent by attorneys for US Beverage to
21  John Walker and his company, Trident
22  Marketing?

23  A.  **Yes.**

                    336

1  Q.  And, again, did you ask -- did your attorneys
2  ask on behalf of US Beverage that Trident
3  Marketing and John Walker cease using the name
4  Juice Alive?

5  A.  **Yes.**

6  Q.  Did they have direction -- did your attorneys
7  have direction and authority from your company
8  to issue this cease-and-desist letter?

9  A.  **Yes.**

10  Q.  Is this the first cease-and-desist letter that
11  would have been issued on behalf of US
12  Beverage to John Walker or Trident Marketing?

13  A.  **I would have to say yes.**

14  Q.  And what's the date of this letter?

15  A.  **June 19, 2006.**

16  Q.  Okay. Thank you.

17        MR. GILL:  I would guess you're
18              going to produce this now, and
19              I don't have to produce it?

20        MR. JACKSON:  I'm sorry.

21        MR. GILL:  Since you marked this
22              with your Bates number. I
23              mean, this is what I gave you