```
 1                    IN THE MATTER OF:
 2              US BEVERAGE, INC., Plaintiff,
 3                          vs.
 4              JOHN BUSTER WALKER, II,
 5         and TRIDENT MARKETING, INC., Defendants.
 6     ---------------------------------------------
 7              JOHN BUSTER WALKER, II,
 8              and TRIDENT MARKETING, INC.,
 9                  Counterclaim Plaintiffs,
10                          vs.
11                  US BEVERAGE, INC.,
12                  Counterclaim Defendant,
13                          and
14              GRADY DOWLING KITTRELL,
15              THOMAS GOIN CLARK, III,
16              and NORMAN "BUDDY" TODD,
17                  Third Party Defendants.
18
19                  CIVIL ACTION NO.
20                  2:06-CV-496-SRW
21
22     DEPONENT:  THOMAS GOIN CLARK, III
23     DATE:  November 16, 2006
```

```
               IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF ALABAMA
                         NORTHERN DIVISION

     US BEVERAGE, INC.,
             Plaintiff,
     vs.
     JOHN BUSTER WALKER,
     II, and TRIDENT           CIVIL ACTION NO.
     MARKETING, INC.,
             Defendants.       2:06-CV-496-SRW
     ---------------------
     JOHN BUSTER WALKER,
     II, and TRIDENT
     MARKETING, INC.,
             Counterclaim
             Plaintiffs,
     vs.
     US BEVERAGE, INC.,
             Counterclaim
             Defendant,
     and
     GRADY DOWLING
     KITTRELL, THOMAS GOIN
     CLARK, III, and
     NORMAN "BUDDY" TODD,
             Third Party
             Defendants.


           *     *     *     *     *     *
              DEPOSITION OF THOMAS GOIN CLARK, III,
     taken pursuant to notice and stipulation on
     behalf of the Defendants/Counterclaim
     Plaintiffs, in the Law Offices of Copeland,
     Franco, Screws & Gill, 444 South Perry Street,
     Montgomery, Alabama, before Tiffany B.
     Beasley, Certified Court Reporter and Notary
     Public in and for the State of Alabama at
     Large, on November 16, 2006, commencing at
     8:57 a.m.
```

---

                                APPEARANCES

FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT/THIRD PARTY DEFENDANTS:

  **C. NELSON GILL, ESQUIRE**

  Copeland, Franco, Screws & Gill

  444 South Perry Street

  Montgomery, Alabama 36104


FOR THE DEFENDANTS/COUNTERCLAIM PLAINTIFFS:

  **RAYMOND L. JACKSON, JR., ESQUIRE**

  660 North College Street

  Suite D

  Auburn, Alabama 36830


ALSO PRESENT:

  GRADY DOWLING KITTRELL

  JOHN BUSTER WALKER, II

---

                               STIPULATIONS

It is stipulated and agreed by and between counsel representing the parties that the deposition of **THOMAS GOIN CLARK, III**, may be taken before Tiffany B. Beasley, Certified Court Reporter and Notary Public in and for the State of Alabama at Large, without the formality of a commission; and all formality with respect to other procedural requirements is waived; that objections to questions, other than objections as to the form of the questions, need not be made at this time, but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose by either party as provided by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between the parties hereto and the witness, that the signature of the witness to this deposition is hereby waived.

---

                                  INDEX

**EXAMINATION**                             **Page**

MR. JACKSON............................      5

**DEFENDANTS' EXHIBITS**                    **Page**

1        Composite Exhibit                  175


(The following exhibits were previously marked in this case and referred to at the following pages:)

| Exhibit | Page |
|---|---|
| 4 | 134 |
| 5 | 132 |
| 16 | 92 |
| 18 | 143 |
| 19 | 148 |
| 20 | 152 |
| 21 | 160 |
| 22 | 167 |
| 23 | 169 |
| 24 | 172 |
| 25 | 173 |

45

1  A.  I know for sure that John and I did. And I
2     believe Grady did on at least one occasion,
3     but I don't recall.
4  Q.  So you said there was at least one occasion
5     where John Walker voted --
6  A.  On all occasions, John agreed.
7  Q.  Are there any minutes from any of these
8     meetings?
9  A.  No.
10 Q.  Do you have any notes or any other documents
11    that would verify these votes?
12 A.  I don't -- possibly. We tried to establish
13    meetings, but -- and we have notes on some
14    meetings. I'm not sure if we have notes on
15    that particular meeting.
16 Q.  Can you check your corporate records and --
17 A.  I would.
18 Q.  And if you do have those notes, can you
19    provide to your attorney to provide to us?
20 A.  Yes.
21 Q.  And these votes you're talking about, would
22    they have occurred after the merger?
23 A.  Yes.

46

1  Q.  How do you claim that Mr. Walker's moving to
2     Texas has harmed US Beverage?
3  A.  I claim that there is an inability for the
4     partners to meet on a regular basis, an
5     efficiency in our sales effort, because much
6     of his time is spent travelling just to his
7     first stop. Our customers -- most of our
8     customers are Monday-through-Friday people, so
9     if one day in and one day out, 40 percent of
10    his time is just travelling to the first stop
11    in that week. But -- and the inability to
12    establish a good working relationship just
13    simply because he's not there and the partners
14    aren't meeting every day. That would be it.
15 Q.  Do you allege that John refused to travel?
16 A.  No.
17 Q.  Is any of US Beverage's business, I guess, to
18    the west of here, from Montgomery going west
19    toward Texas; do you have any business that's
20    west of Montgomery?
21 A.  Yes. We have Mississippi and Arkansas and
22    south Texas.
23 Q.  In terms of proximity of that business, then,

47

1     let's say Arkansas and Texas, proximity-wise,
2     how does Houston compare to Montgomery?
3  A.  As -- is it closer? Are you asking me that?
4  Q.  Yes.
5  A.  Geographically?
6  Q.  Yes.
7  A.  I don't know. I know -- I know Corpus
8     Christi, Texas, is closer to Texas than it is
9     to Montgomery, but I don't know about the
10    other states. I think it's further away, if
11    I'm not mistaken.
12 Q.  Okay. So you think that Houston is further
13    away from Arkansas than Montgomery is?
14 A.  Travel time-wise, I think it is.
15 Q.  In Mr. Walker's role of being vice-president
16    of sales for US Beverage, do you think it was
17    more important for him to be on the road
18    making sales or to be physically in Montgomery
19    at meetings?
20     MR. GILL: Object to form.
21 A.  I think that it was equally important.
22 Q.  If the -- if the -- if the other partners in
23    US Beverage, including you, were upset about

48

1     John living in Texas, why didn't you and Grady
2     just buy out John?
3  A.  Well, we eventually attempted to do that.
4  Q.  Okay. When did you attempt to do that?
5  A.  I think we had a buyout offer in
6     December 2003. And I'm saying that because of
7     a document that I saw at one of the
8     depositions, would be the first time, I think.
9  Q.  Prior to that buyout offer, were you and Grady
10    okay with John being in Texas?
11 A.  No.
12 Q.  Why did US Beverage decide in October of 2003
13    to change a compensation scheme for
14    Mr. Walker?
15    MR. GILL: Object to the form.
16 A.  We were -- if I'm not mistaken, we were
17    changing the compensation scheme for all of
18    us, and so we changed John's compensation
19    scheme, Mr. Walker's compensation scheme, as
20    we changed all of the compensation schemes.
21 Q.  Well, how did Mr. Walker's compensation scheme
22    change in October of 2003?
23 A.  He was -- his compensation scheme, I believe,

49

1     included a salary plus commission.
2 Q. Were you or Grady placed on a salary plus
3     commission at that time?
  A. No.
  Q. Why not?
6 A. Well, the -- the sales model, we believed, was
7     based on -- the sales model that we were
8     trying to develop was the salary plus
9     commission, with also a portion of that
10     commission being based on relationships. And
11     we felt that was the best way of -- that was
12     the best incentive package for a salesperson,
13     or a person involved in sales.
14 Q. Were you and Grady put on a set salary at that
15     point in time?
16 A. We were put on salary. I mean, we were always
17     on salary.
18 Q. Did Mr. Walker consent to having a salary
19     based on commission?
20 A. Yes.
21 Q. Do you have any notes or minutes reflecting
22     that consent?
23 A. I don't know. I can look and see.

50

1 Q. Can you check?
2 A. Yeah.
3 Q. Do you recall what the amount of sales
4     Mr. Walker needed to reach in order to receive
5     his maximum salary?
6 A. No.
7 Q. After Mr. Walker was placed on commission, do
8     you know why the company did not pay any sales
9     commissions to him until August of 2004?
10     MR. GILL: Object to the form.
11 A. I don't recall that it was August 2004. I
12     don't know.
13 Q. Do you know when Mr. Walker started submitting
14     sales commission reports?
15 A. No.
16 Q. Do you know if it would have been in December
17     of 2003?
18 A. I don't know.
  Q. Do you recall there being a gap between Mr. --
    gap in time between Mr. Walker's submitting
21     sales commission reports and the company
22     paying sales commissions to Mr. Walker?
23 A. I don't recall that, Raymond -- or

51

1     Mr. Jackson. I'm sorry.
2 Q. That's fine.
3 A. -- however, I wasn't involved in payroll at
4     that time. That was one of the accounting
5     duties that -- or part that Grady was involved
6     in, and so -- and there's a lot of these
7     questions that you ask me, I just wasn't
8     involved in those. I was told at the last,
9     which was in accordance with the way that we
10     designed the company.
11 Q. Did you and Mr. Kittrell have to approve
12     Mr. Walker's commission request?
13 A. A formal commission -- or a formal approval?
14     I wasn't -- I didn't have to. I wasn't
15     involved in that.
16 Q. Who would have been in charge of that at that
17     time?
18 A. John and Grady would have been involved in
19     that aspect of it.
20 Q. At the time that Mr. Walker's compensation was
21     changed in October 2003, did he have any other
22     duties with the company other than sales?
23     MR. GILL: Object to the form.

52

1 A. Official -- we had no job descriptions, so was
2     there an official or unofficial duty? That, I
3     couldn't tell you. His -- I can only go back
4     to our original agreement, was that I would
5     handle everything so that he could totally be
6     involved in sales.
7 Q. Do you know if Mr. Walker's responsibilities
8     with US Beverage changed in October of 2003?
9 A. No, I don't know if they did or not. I
10     believe that they were more focused on sales.
11     And that was the point, that if he was to
12     operate as a commission salesperson, then he
13     should be given the freedom to sell and to
14     manage the sales effort.
15 Q. Okay. Did you have any role in the company --
16     and let's talk about the period October 2003
17     to roughly July of 2005 -- in determining
18     which expenses would be reimbursed by the
19     company?
20 A. Yes.
21 Q. And what was your role as -- as to that?
22 A. My role was to analyze what we could afford to
23     pay out and determine if we could pay

73

1   territory"?
2 A. Uh-huh.
3 Q. How is that?
  A. We had accounts there, and it was one of
5     the -- it was probably the pick state that we
6     had mapped out for our company. If you look
7     at the business that we're involved in and the
8     density of population, it's the prime state in
9     that group.
10 Q. Which accounts did you have in North Carolina?
11 A. We had several. I don't remember what they
12    were at the time.
13 Q. You can't remember any clients at all?
14 A. That was John's area, not mine. I'm
15    operations. And, you know, we had, at one
16    time, a thousand customers -- we had over a
17    thousand customers. I just can't remember
18    them all.
19 Q. Are you saying a thousand customers in North
20    Carolina?
21 A. No. We had over a thousand customers
22    company-wide. My -- I had the task of -- of
23    getting proper service with two or three

74

1    service people in a multi-state area, and it
2    was more than a full-time job, and that's
3    where my focus was. Not in memorizing
4    clients' names. But I do know that we had
5    customers in North Carolina. I'm not sure of
6    the importance of that, but their names won't
7    change the fact that's where they are. And I
8    have records that we had clients in North
9    Carolina.
10 Q. Okay. Do you have records that would show
11    when you acquired those clients in North
12    Carolina?
13 A. I'm not sure if we would or not. That, I
14    don't know. I know that I started -- one of
15    the things that I implemented was I started
16    implementing a plan to document when we
17    acquired clients, so I might have some of
18    those, but some of those, I might not, because
19    I had to go back and retrofit some of that
20    information.
21 Q. Can you search your records --
22 A. Sure.
23 Q. -- and provide those records to your attorney?

75

1 A. Uh-huh.
2 Q. And you mentioned that you called -- I think
3    you called North Carolina a prime state. Was
4    there some sort of marketing study done by US
5    Beverage of North Carolina?
6 A. Yeah.
7 Q. Okay. Describe the study.
8 A. I looked at the census -- I acquired the
9    census records for all of the states and
10   looked at the population density and felt
11   like -- or looking at specifically the number
12   of people per square mile, feeling like that's
13   the most for the kind of business we did.
14   That -- that was the -- that was my factor in
15   determining which states would be most
16   advantageous to go to, and that's what I did.
17 Q. Did you hire any outside consultants in
18   identifying prime states?
19 A. No. It wasn't an official one. We didn't
20   have the money to do an official, you know,
21   elaborate study like that. We could barely
22   pay our bills.
23 Q. Are there any notes or minutes from any

76

1    meetings in which you discuss North Carolina
2    as a prime state for development?
3 A. No minutes, no, sir.
4 Q. Nothing in writing at all discussing that?
5 A. No. Our meetings were long and protracted,
6    and we would start minutes and never finish
7    them.
8         MR. JACKSON: Can we take just a
9             brief break, five minutes?
10        MR. GILL: Sure.
11        (Brief recess taken.)
12 Q. You mentioned some census data for North
13   Carolina. Where did you obtain that data
14   from?
15 A. Internet.
16 Q. Was it free data?
17 A. Yes.
18 Q. Do you recall any proposal to sell Juice Alive
19   to day care centers?
20 A. Yes.
21 Q. Do you recall if that proposal was before or
22   after this telephone conversation that you
23   mentioned with John Walker?

81

1  Q.   So I guess when you say "shipping costs,"
2       you're talking about, I guess, shipping the
3       product to US Beverage?
   A.   I believe we paid for the shipping of anything
5       involved in that, if I'm not mistaken.
6  Q.   Okay. Well, you've already touched on it.
7       Why don't you describe for us in as much
8       detail as you can why you claim that US
9       Beverage owns the name Juice Alive?
10 A.   The Juice Alive name was developed -- although
11      I don't recall the date that it was developed,
12      I do recall that it was a date when our
13      vice-president of sales, who was initially
14      given -- or given on the front end,
15      responsibility of marketing and developing our
16      sales program, and while John -- while
17      Mr. Walker was on our payroll, that that brand
18      was developed. I think I just -- mumbo jumbo
19      sentence. But -- and that it was -- and that
20      it's John's responsibility as the
21      vice-president of sales -- his job was to
22      develop our -- and market our products. And
23      at the time that he was developing Juice

82

1       Alive, he was being paid full salary; he was
2       using our time, our phone, our contacts, US
3       Beverage contacts; he was using our gas card;
4       he was using US Beverage's knowledge of the
5       industry to develop these things, and he was
6       paid to develop those things; and that the --
7       certainly, the principal area of -- the areas
8       of distribution encompassed those areas that
9       we distributed -- that we distributed as a --
10      that US Beverage distributes as a company.
11 Q.   Anything else? I want to make sure that
12      there's anything else that you claim shows
13      ownership of the trademark.
14 A.   For US Beverage?
15 Q.   Yes.
16 A.   I believe that we told John when he
17      presented -- when it was presented to each of
18      us, that we told John that we didn't -- that
19      he didn't have the authority to do this
20      outside the parameters; he didn't have the
21      authority to compete against us; he didn't
22      have the authority to develop something using
23      US Beverage for his own personal use, and

83

1       certainly not to compete against us. And this
2       was said to John by me the minute I heard that
3       there was another brand, or that he had
4       developed that brand and was planning on using
5       it against us. And in my conversations with
6       Grady, Grady said the same thing. So John was
7       notified on the -- on the front end by both of
8       us, and we were adamant about it in every
9       conversation, that the brand was ours. When
10      we started using the brand, we didn't pay for
11      it. It wasn't until later on, when we agreed
12      to pay for it as part of a buyout plan, that
13      we would give John the brand and pay for it,
14      that we ever started paying for it, and the
15      whole thing got out of control and, you know,
16      became a weapon. Our own tool became a weapon
17      to be used against us.
18 Q.   Okay. Like I said, I want to give you a
19      chance. If there's anything else, I want to
20      get it fully on the record, any facts or
21      evidence that you're aware of that supports
22      your allegation that US Beverage owns Juice
23      Alive.

84

1            MR. GILL: Object to the form.
2  A.   Those are the things that I can think of right
3       now. But I would not want to be held that
4       this is the complete sum of everything that I
5       think, or we'd be here past 1 o'clock. Just
6       want to -- but that's a summary of things.
7  Q.   Okay. Well, if there's any other facts or --
8       that you're aware of --
9  A.   I'd have to --
10 Q.   We can stay here as long as we need to. We
11      can reconvene the deposition if we have to.
12 A.   I didn't bring my notes with me. If there's
13      anything pertinent, I'll submit it. I
14      apologize for that.
15 Q.   Well, that's fine. I will ask you, if there
16      is anything that is pertinent that you haven't
17      told us today, when you review your notes
18      later, or whatever, if you'll provide that to
19      your attorney.
20 A.   And I would.
21 Q.   What money did US Beverage spend in creating
22      the Juice Alive name?
23 A.   Well, we were paying -- we were paying John a

125

1  MR. GILL: Well, he is not a lawyer.
2  A.  I'm the dumb one. I don't even know what a
3     TRO is. I mean, what --
4     MR. GILL: We didn't serve a TRO in
5         this case.
6  A.  What is a TRO?
7     MR. JACKSON: I asked him if -- in
8         response to -- rather than
9         signing this, and he says,
10        well, you're the attorney; you
11        know we couldn't get that done
12        in two or three days. Well,
13        damn, you know. But we'll go
14        forward. Let's take a brief
15        break, and we'll...
16    (Brief recess taken.)
17 Q. Who manufactures the Fruzers brand product?
18 A. Supreme Beverage.
19 Q. Okay. And who owns the -- I guess, the
20    formulas for the product?
21 A. I don't know.
22 Q. Do you know if Supreme claims ownership to the
23    formulas for the juice product?

126

1  A.  I don't know if they do or not.
2  Q. What business do you claim that Mr. Walker has
3     competed for or taken from US Beverage within
4     200 miles of Montgomery?
5  A. I'd have to look at that and -- I know -- the
6     only -- the only things I can say for sure is
7     all of the Alabama business that's within
8     200 miles -- or I shouldn't say all of the
9     Alabama business. I know that Mr. Walker or
10    his representatives have competed against us
11    in Alabama territories within 200 miles, and I
12    would have to look at a geographic map to --
13    or a map of a compass, I guess, to -- to give
14    you some specifics on that.
15 Q. You mentioned Mr. Walker's representatives.
16    Who are his representatives you're referring
17    to?
18 A. In the -- are you -- I'm referring to in
19    Alabama as several -- I think we've competed
20    against Dispensing Systems of Florida, maybe
21    Dispensing Systems of Georgia, and Dispensing
22    Systems of Alabama.
23 Q. And is it your contention that those companies

127

1     are the representative of Mr. Walker?
2  A. Yes.
3  Q. How so?
4  A. Well, on one of the brands, they -- or on one
5     of the bids, they bid Juice Alive. After
6     the -- there was a period of time after we
7     sent a letter to Dispensing Systems, they quit
8     putting that on the bid. But I also contend
9     that -- at the Alabama trade show, I contend
10    that just based on what John Walker told me
11    was that he was working with Dispensing
12    Systems at the trade show while he was
13    representing us; that he had set a tentative
14    arrangement contingent on us succumbing to his
15    demands that he would start selling to them,
16    and then they did start bidding Juice Alive on
17    one of the bids -- at least one of the bids.
18    I think several of the bids, but...
19 Q. You've referred to one bid in particular.
20    Which bid was that?
21 A. I'm not sure.
22 Q. Are you aware of any customers that US
23    Beverage has lost within 200 miles of

128

1     Montgomery due to Mr. Walker's activities?
2  A. I would have to -- once again, I think we've
3     lost some in that 200-mile radius, but I would
4     have -- have to look at a map of that, really,
5     and with a -- some sort of measurement device.
6     I do think that we've had to drop our price on
7     a lot of business due to the competing against
8     our own partner with our own brand.
9  Q. Well, let's limit it to the state of Alabama.
10    Are you aware of any customers that you've
11    lost in the state of Alabama due to the
12    activities of Mr. Walker?
13 A. Dispensing Systems didn't do very well against
14    us. We don't think they -- I think their plan
15    to put us out of business there hasn't worked
16    so far, although we have lowered our price
17    many, many times on a Dispensing Systems bid,
18    thousands of -- tens of thousands of dollars
19    worth.
20 Q. What about any customers in the state of
21    Mississippi that US Beverage claims it's lost
22    due to the activities of Mr. Walker?
23 A. That's where I would have to look at the map.

129

```
 1      I think we've lost a few, but I'm not sure who
 2      they might be.  Once again, passing out
 3      flyers, I was told that passing out flyers,
 4      making calls that said $60 a case when we were
 5      at 74.52, we lost some business.  I don't know
 6      exactly who they are, but we certainly have
 7      had to lower our prices, and it's cost us tens
 8      of thousands of dollars.
 9  Q.  Would your records reflect which customers in
10      Mississippi you claim you've lost due to the
11      activities of Mr. Walker?
12  A.  Yeah.  And if I saw a map, I could tell you,
13      but I -- or if I saw -- if I looked at a map
14      and took my little measuring device, figured
15      out what the radius was -- would it show us --
16      I already know -- I don't know that our
17      records would actually -- there's nothing that
18      says, lost due to John Walker or lost due to
19      Juice Alive or anything like that, but we know
20      who we do business with and who we don't do
21      business with.  And, once again, we've got
22      about 1200 accounts.  Not all schools.  But I
23      just don't -- I don't know everybody and
```

130

```
 1      everybody's geography.
 2  Q.  And make sure I understand.  So what you're
 3      saying is if you -- are you saying it is
 4      possible or not possible that if you looked at
 5      your records that you could --
 6  A.  If I look at the records, I could tell you,
 7      yes.
 8  Q.  Is that something you could look at later and
 9      provide that information to your attorney?
10  A.  Yes.
11  Q.  Thank you.  Have you made any statements
12      regarding John Walker or Juice Alive to any --
13      I guess start with anyone.
14  A.  I've made millions of statements.
15  Q.  Okay.  Well, what about since this lawsuit has
16      been filed?
17  A.  I've made lots of statements.
18  Q.  Okay.  Who do you recall having made
19      statements to regarding -- and I'm not talking
20      about your attorney or anybody associated with
21      your attorney or me or anything in this
22      litigation; I'm talking about third parties
23      not involved -- not involved with US Beverage
```

131

```
 1      or involved in this dispute.
 2  A.  My statements -- I -- my statements concerning
 3      John have all been very favorable to John.
 4      Any statement I've made -- and I've made many
 5      of those frequently -- to customers, to
 6      friends, to people who are outside the
 7      business that are just -- that are wondering
 8      what's going on, I have oftentimes said that
 9      John is one of the nicest fellows you'll ever
10      meet; he's a darn good salesperson, and I do
11      not criticize John to our customers, to
12      anybody.  This isn't a personal matter.  But I
13      do not say bad things about John to anybody.
14  Q.  What about statements you've made regarding
15      Juice Alive or the Juice Alive brand to any
16      third party?  Again, not talking about
17      anybody -- any of your attorneys or anybody
18      inside US Beverage, but to third parties.
19  A.  The only thing that I've said about the Juice
20      Alive brand, I wrote a letter to the child
21      nutrition directors of Mississippi who were --
22      after receiving a lot of complaints, they
23      didn't understand what was going on and that
```

132

```
 1      it might cost us some business just born out
 2      of confusion.  I wrote a letter to them trying
 3      to clarify my position on the whole issue.
 4  Q.  And is that the letter that's been discussed
 5      in the other depositions?
 6  A.  Which -- which letter is that?
 7          (Off-the-record discussion.)
 8  Q.  And I'll show you what's marked as Defendants'
 9      Exhibit 5 to the deposition of Norman Todd.
10      Ask him if he can identify the document.
11          (Defendants' Exhibit 5 was
12           previously marked and is not
13           attached hereto.)
14  A.  Yeah.  And this is the one that I thought you
15      might be asking about.  No, I did not
16      authorize this.  Did not produce this letter.
17          MR. GILL:  Look at it closely.
18  A.  It says it's Buddy Todd's.  Sales manager.  I
19      didn't do it.
20          MR. GILL:  Well, I understand but
21              look at the -- all the pages.
22  Q.  I believe there was an attachment to that
23      e-mail that you have.
```

1  A.   I'm saying that --
2  Q.   Again, I don't want to put words in your
3       mouth. The other -- the other --
   A.   Oh, I'm sorry --
   Q.   Mr. Todd testified that he sent your letter
6       out via e-mail.
7  A.   I didn't do that. I thought that's what you
8       were asking me to --
9  Q.   Okay.
10 A.   This is the one that I authored, yes.
11 Q.   And you recognize that? You read through it?
12 A.   I didn't read the whole thing, but it looks
13      like --
14              MR. GILL: And just for the record,
15                  this is -- I guess, Bates
16                  number is 165 and 166 of
17                  your -- of John Walker's
18                  production.
19              MR. JACKSON: Right.
20              MR. GILL: I just -- there are a
21                  couple of documents. I don't
22                  want any confusion.
23 A.   This appears to be. I've read through it, and

134

1       it appears to be the document that I wrote.
2  Q.   I'll ask you to look at what's marked as
3       Defendants' Exhibit 4 of Norman Todd's
4       deposition. See if you recognize that
5       document?
6           (Defendants' Exhibit 4 was
7            previously marked and is not
8            attached hereto.)
9  A.   I recognize it from Buddy Todd's deposition.
10      That's the first time that I had seen this,
11      and I don't know where it came from.
12      Certainly did not authorize it or author it or
13      have any hand in that.
14 Q.   Do you know if that letter was sent to any
15      third parties?
16 A.   I believe it was not sent to anybody.
17 Q.   What's your belief based on?
18 A.   That Buddy asked me if he could send something
19      to the child nutrition directors, and I said
20      in no way could he do that; that everything
21      that we did I first ran by our attorney to
22      make sure that we weren't stepping out of
23      line; and that -- that I did not even want him

1       to produce anything like that for my review;
2       that that's not his area of responsibility.
3  Q.   Prior to his deposition, had you seen this
4       document?
5  A.   Not that I recall.
6  Q.   Are there any other letters sent out to any
7       other third parties regarding Juice Alive
8       or --
9  A.   There was one letter sent out to Dispensing
10      Systems -- there was a legal letter.
11 Q.   And I'm not asking about communications from
12      your attorney. I know --
13 A.   None that I'm aware of.
14 Q.   Aware of any other e-mails, any other
15      communications to third parties?
16 A.   By me to -- by me or anybody?
17 Q.   By you specifically. Talking about you first.
18 A.   I don't recall anything that I've sent. I'm
19      not on direct communication with most people.
20      I can't think of anybody -- any customers that
21      I'm in direct communication with.
22 Q.   Are you aware of any e-mails sent by anybody
23      else at US Beverage regarding Juice Alive to

136

1       any other third parties?
2  A.   No, I'm not aware of any. I'm aware of some
3       by our customers stating that John is -- that
4       Mr. Walker and one of his -- juice
5       representative were contacting them stating
6       that they weren't involved with US Beverage
7       and wanting to know what the real story was.
8  Q.   Do you know if there was a reply sent to those
9       customer e-mails?
10 A.   I know there was not one by me, and I know
11      of -- I know of no others, you know, honestly.
12 Q.   Does US Beverage keep its company e-mail?
13 A.   Do we keep -- meaning --
14 Q.   For instance, e-mails that are sent by your
15      employees. First, let me ask you, does US
16      Beverage have its own e-mail service or e-mail
17      accounts?
18 A.   Yes.
19 Q.   Is that the accounts your -- your employees
20      would use to communicate with customers?
21 A.   Most of them -- the only person -- the answer
22      is yes, I suppose. Yes.
23 Q.   And e-mails sent pursuant -- out of that

137

```
 1         account, that US Beverage account, e-mail
 2         account, are those e-mails kept
 3         electronically?
    A.     Mine are. But we have the opportunity to
           purge those from time to time, so they -- the
 6         system naturally keeps them, and you have to
 7         do something to delete them.
 8  Q.     Is there a method by which you could check to
 9         see if there was any e-mails still in
10         existence --
11  A.     Well, I mean, I could go on each computer,
12         yeah, or get with -- the only person who would
13         be e-mailing to customers that I could think
14         of possibly would be Buddy and possibly me.
15         But I know that I didn't. But I'm --
16         certainly -- assuming that it's appropriate,
17         you'd certainly be welcome to that.
18  Q.     Okay. How do you contend that Mr. Walker has
19         used US Beverage's proprietary knowledge that
20         he has gained through his association with US
21         Beverage?
22             MR. GILL: Object to the form.
23                        You can answer that.
```

138

```
 1             THE WITNESS: Okay.
 2  A.     As I stated earlier, to a significant number
 3         of our -- at the time of the -- or at the time
 4         that Mr. Walker started competing against
 5         himself, against US Beverage, to the line
 6         share of our business -- he was US Beverage.
 7         It's a relationship business, and it's not a
 8         loyalty to a -- it's not a loyalty to a brand
 9         as much as -- or a company as much it is a
10         loyalty to the relationship.
11                  Mr. Walker was receiving --
12         Mr. Walker had prepared up to the time that
13         he was no longer actively involved in the
14         company, kept all of those contacts in a
15         couple of forms on his -- you know, his
16         computer at home, on his PDA thing, whatever
17         that thing is called, in his phone, phone
18         records, phone numbers, and he also received
19         regular copies of our books, and he also
20         prepared every one of our bids that I can
21         recall. And so he had a -- very, very
22         exponent knowledge since they all -- even at
23         the show, Mississippi show, I presented John
```

139

```
 1         still as our partner, believed that John was
 2         with US Beverage. And -- and as our single
 3         sales force, they wouldn't know anybody else
 4         but John. And John would know -- and John had
 5         every one of those contacts. He knows our
 6         prices, he knows what we pay for our product
 7         because he received a royalty on the 1.20
 8         agreement. Over and above our invoice price
 9         we invoiced, we sent him POs along with
10         Supreme, so he knew exactly what we paid for
11         the product; he knew how to structure our
12         bids -- or he knew how we structured our bids
13         because he had been doing the bidding, and he
14         knew every -- John intimately, because he was
15         our sales force through -- intimately to every
16         facet of that side of the business.
17  Q.     Any other type of proprietary knowledge other
18         than what you've already listed?
19  A.     He knew our financial position; he knew our
20         debts, he knew or pay scales, he knew all of
21         our employees. You know, in that -- he also
22         used -- in developing the Juice Alive brand,
23         used our resources and started developing
```

140

```
 1         customers under the Juice Alive name that we
 2         didn't know about that we felt like were ours
 3         and did not have access to those. So John --
 4         John was US Beverage to our customers.
 5         That's...
 6  Q.     You mentioned bids, in preparing bids. Were
 7         these bids for public contracts?
 8  A.     Yes.
 9  Q.     Do you know if your bids would be public
10         record?
11  A.     Yes, our bids would be public record.
12  Q.     What about the identity of your public
13         clients, like your clients in school systems
14         and so forth; is that information -- would
15         that be publicly available?
16  A.     Now, that, I don't know. Both our bid price
17         and our -- and who our clients are, you can --
18         if you owned the company, you could find that
19         out in seconds. Just look at your books.
20         We -- you have to work very, very hard at
21         times to get bid prices and find out who those
22         customers are without just driving to the
23         location and looking to see who they are. But
```

153

1  attached hereto.)
2  A. The significance, once again, shows the
3     ineffectiveness of John's sales effort. I
4     believe, if I can read this correctly, that in
5     2004, we actually had more customers than we
6     had in 2005; that we were losing them faster
7     than we were gaining them, and for a growth
8     company, that's not very good. And when
9     you're paying out the kind of monies we're
10    paying, that's not a great -- that's not a
11    great issue.
12 Q. And --
13 A. But also -- it also shows that back when -- in
14    November -- I keep hearing people talk
15    about -- of the previous year, when we're
16    talking about -- or whenever it was, when
17    we're saying, well, do we develop a brand, do
18    we devote our attention to the brand, do we
19    spend our money there, it shows that when we
20    said, well, we want to do it, but that's not
21    the most important thing; that what we need to
22    do is to go door-to-door selling because we
23    are losing customers -- we are losing volume;

154

1     we are not going to make it as a team if we
2     don't sell. This shows that -- that we over
3     the past two years -- and we were over a
4     thousand -- a thousand something the previous
5     year, that -- that this just wasn't working.
6  Q. Well, and one point of clarification, this
7     document is actually cut off along the right
8     margin; is that correct?
9  A. Looks like it.
10 Q. And when you say comparing two thousand, I
11    guess, four, 2005, we actually can't read
12    these -- these don't read 2004, 2005?
13 A. What do they read?
14 Q. Well, I don't -- tell me what they read.
15 A. Well, you're handing me an incomplete
16    document, and --
17       MR. GILL: Whoa, whoa. I would have
18          produced that in that manner,
19          so if it's cut off --
20 A. Well, I'm sorry --
21       MR. GILL: If it's cut off, again, I
22          will provide one. I didn't
23          realize it. I didn't look

155

1           through every page of every --
2        MR. JACKSON: And I understand,
3           but -- you know, and, I guess,
4           I'm just trying to clarify it
5           for the record. You know, if
6           we've got a complete document
7           that's not cut off, definitely
8           we'd like to see it because --
9        MR. GILL: I will go through every
10          one of those documents that
11          look like that, and I will
12          provide you with another copy
13          if necessary.
14       MR. JACKSON: Okay.
15       MR. GILL: That's all I can say.
16       MR. JACKSON: Okay.
17 Q. And let me ask you, Mr. Clark, there's more
18    writing, down on this margin. To the extent
19    you can read it, can you read the writing
20    below, I guess, the line that starts with 908?
21 A. This seems a little unfair. When I filled in
22    the blanks here, I'm chastised for it. Now
23    you want me to fill in the blanks here?

156

1  Q. I want you to read what you can read. If you
2     can't read it, tell me.
3  A. Lost Customy (phonetic), sold by someone other
4     than Joe recently cost to a Juice Alive
5     competitor.
6        MR. GILL: If you know what it
7           says --
8        THE WITNESS: I know what it said
9           right there, Nelson. For god
10          sakes, I mean, give me the
11          rules here so I can -- I can
12          work on it.
13 A. Somewhere on the document here, I have
14    blackened out in some ink customers that we've
15    had -- there was -- along with this, there was
16    blackened out somewhere, there was customers
17    that I knew of at that moment when I created
18    this document that we had lost them to Juice
19    Alive. On this thing that's been produced as
20    evidence to me, it's not on here.
21       MR. GILL: Let's take two minutes
22          and see if we can work out
23          any --

**Page 158**

```
 1   (Brief recess taken.)
 2        MR. JACKSON:  Did you have a better
 3            copy of it or --
 4        MR. GILL:  I mean, I do.  I didn't
 5            look for it right now.  I'm
 6            sorry.  I was trying to get
 7            through with it.
 8        MR. JACKSON:  That's fine.
 9        MR. GILL:  If I do -- I mean, I
10            don't recollect that the words
11            are cut off.
12        MR. JACKSON:  Yeah.  It's probably
13            something the copy machine
14            did.  Yeah, I'm sure you
15            didn't, and...
16   Q.  Okay.  I think you said -- before our break, I
17       think you mentioned that your recollection of
18       this -- of the document like this was there
19       was a document that had customers scratched
20       through; is that what you're --
21   A.  There was some customers highlighted, yes.
22   Q.  Okay.  And just flipping through that
```

**Page 159**

```
 1   document, is it -- I personally have not seen
 2   any highlighting on that particular document,
 3   Exhibit 20.  Do you?
 4   A.  Well, I don't see anything here.  But I
 5       authored this, and I -- the reason I produced
 6       it was to illustrate a point.  I would have
 7       to -- and I actually -- and I don't know --
 8       but that's what this -- that's what this line
 9       was for, was to illustrate the customers that
10       we had lost by someone other than -- or
11       customers sold by someone other than John --
12       let's see, hold on a second.  Lost customer --
13       oh, I'm sorry.  I think there was three --
14       there may have been three different things.
15       There's three points.  Lost customer sold by
16       someone other than John -- or two points.
17       Recently lost to a Juice Alive competitor.  So
18       there's two -- there's two colors here
19       highlighted, I believe.
20   Q.  Okay.  And in that document there, you're not
21       saying that everybody on that -- that three-
22       or four-page list was a lost customer?
23   A.  No.  I think they're highlighted in a color
```

**Page 160 area (col 2 top)**

```
 1   maybe -- I -- now that you mention it,
 2   you're probably right.  I don't remember
 3   exactly everything about this, but I think
 4   that's what the intention was.
 5   Q.  Well, we'll go on.
 6   A.  So, no, I'm not claiming that this --
 7        MR. GILL:  I mean, I don't want to
 8            have to reconvene a deposition
 9            over this document.
10   A.  But to answer the question, I'm --
11        MR. JACKSON:  Well, I'll probably
12            avoid doing that.  I just --
13   A.  I'm not saying that John lost these customers.
14        MR. GILL:  I mean, if there's one
15            with colors on it, I'll just
16            produce it.  I'm sorry.  I
17            really had no intention of --
18        MR. JACKSON:  Yeah.  Well, and
19            that's fine if you produce it
20            with colors on it.  I just
21            don't want to be surprised at
22            a hearing with this document
23            meaning something other than
```

**Page 160**

```
 1            what he's just testified to.
 2        MR. GILL:  No.  I'll --
 3   A.  And, once again, my apologies.  And my third
 4       and final clarification, there was three
 5       things.  One is lost customers, one is sold by
 6       someone other than John, and then the third is
 7       recently lost to a Juice Alive competitor, so
 8       there were three markings on that.
 9        MR. GILL:  And I may very well not
10            have one with it.
11        MR. JACKSON:  Okay.  Well, that's
12            fine.
13   Q.  Just if you can -- if you have one, if you'll
14       produce it to us is in color.  Or if your
15       attorney doesn't, if you'll give your attorney
16       a copy in color, we would appreciate it.
17            Let's look at Defendants'
18       Exhibit 21 to Mr. Kittrell's deposition
19       quickly.  If you'll identify that document,
20       sir.
21        (Defendants' Exhibit 21 was
22            previously marked and is not
23            attached hereto.)
```