```
 1              US BEVERAGE, INC.,
 2                 Plaintiff,
 3                    v.
 4   JOHN BUSTER WALKER, II, and TRIDENT MARKETING,
 5                   INC.,
 6                Defendants.
 7   ---------------------------------------------
 8   JOHN BUSTER WALKER, II, and TRIDENT MARKETING,
 9                   INC.,
10           Counterclaim Defendants,
11                   and
12   GRADY DOWLING KITTRELL, THOMAS GOING CLARK,
13       III, and NORMAN "BUDDY" TODD,
14           Third Party Defendants.
15
16              CIVIL ACTION NO.
17               2:06-CV-496-SRW
18
19
20
21   DEPONENT:  Norman Todd
22   DATE:  September 15, 2006
23
```

WORDCRAFT REPORTING, LLC
334.462.4665

1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF ALABAMA
 2                      NORTHERN DIVISION

 3   US BEVERAGE, INC.,
            Plaintiff,
 4   vs.
     JOHN BUSTER WALKER,
 5   II, and TRIDENT       CIVIL ACTION NO.
     MARKETING, INC.,
 6          Defendants.    2:06-CV-496-SRW
     ----------------------
 7   JOHN BUSTER WALKER,
     II, and TRIDENT
 8   MARKETING, INC.,
            Counterclaim
 9          Plaintiffs,
     vs.
10   US BEVERAGE, INC.,
            Counterclaim
11          Defendant,
     and
12   GRADY DOWLING
     KITTRELL, THOMAS
13   GOING CLARK, III, and
     NORMAN "BUDDY" TODD,
14          Third Party
            Defendants.

16         *   *   *   *   *   *

17         DEPOSITION OF NORMAN TODD,
     taken pursuant to notice and stipulation on
18   behalf of the Defendant/Counterclaim
     Plaintiff, in the Law Offices of Copeland,
19   Franco, Screws & Gill, 444 South Perry Street,
     Montgomery, Alabama, before Tiffany B.
20   Beasley, Certified Court Reporter and Notary
     Public in and for the State of Alabama at
21   Large, on September 15, 2006, commencing at
     4:23 p.m.
22

23
```

2

```
 1             APPEARANCES

 2

 3   FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT/THIRD

 4   PARTY DEFENDANTS:

 5       C. NELSON GILL, ESQUIRE

 6       Copeland, Franco, Screws & Gill

 7       444 South Perry Street

 8       Montgomery, Alabama 36104

 9

10   FOR THE DEFENDANT/COUNTERCLAIM PLAINTIFF:

11       RAYMOND L. JACKSON, JR., ESQUIRE

12       CLIFF TUNNELL

13       660 North College Street

14       Suite D

15       Auburn, Alabama 36830

16

17   ALSO PRESENT:

18       THOMAS GOING CLARK, III

19       JOHN BUSTER WALKER, II
```

3

```
 1                STIPULATIONS
 2         It is stipulated and agreed by and
 3   between counsel representing the parties that
 4   the deposition of NORMAN TODD may be taken
 5   before Tiffany B. Beasley, Certified Court
 6   Reporter and Notary Public in and for the
 7   State of Alabama at Large, without the
 8   formality of a commission; and all formality
 9   with respect to other procedural requirements
10   is waived; that objections to questions, other
11   than objections as to the form of the
12   questions, need not be made at this time, but
13   may be reserved for a ruling at such time as
14   the deposition may be offered in evidence or
15   used for any other purpose by either party as
16   provided by the Federal Rules of Civil
17   Procedure.
18         It is further stipulated and agreed by
19   and between the parties hereto and the
20   witness, that the signature of the witness to
21   this deposition is hereby waived.
```

4

```
 1                    INDEX
 2
 3   EXAMINATION              Page
 4   MR. JACKSON...........................  5
 5
 6   EXHIBITS                 Page
 7   1    E-mails between Amy Murphy      37
          and Buddy Todd, various
 8        dates, Bates-Stamped US
          Beverage 138
 9
     2    E-mails between Amy Murphy      41
10        and Buddy Todd, various
          dates, Bates-Stamped US
11        Beverage 140

12   3    Typewritten Notes of Mr.        45
          Todd, dated 7/11/2006,
13        Bates-Stamped US Beverage 141

14   4    Memo from Buddy Todd to Child   56
          Nutrition Directors, undated,
15        Bates-Stamped US Beverage 137

16   5    E-mail with Attached Letter     68
          between Amy Murphy and John
17        Walker, dated June 9, 2006
```

**Page 17**

1    in a conversation until this lawsuit came up.
2 Q. Do you recall any conversations involving John
3    Walker's name?
4 A. **Not specifics, no, sir.**
   Q. Any generalities?
6 A. **Other than what's going on with this lawsuit,**
7    **as far as me sending the letter that I was**
8    **instructed to send, That's the only -- the**
9    **only specifics that I can recall.**
10 Q. Have you had any special training or education
11    related to this position as sales manager with
12    US Beverage?
13 A. **No, sir.**
14 Q. What's the nature of your relationship with
15    Grady Kittrell?
16 A. **He's the president of the company that I work**
17    **for.**
18 Q. How long have you known him?
19 A. **Since July 6th of '05.**
20 Q. So you didn't know him before you went to work
21    for US Beverage?
22 A. **No, sir, I did not.**
23 Q. You ever socialize with Mr. Kittrell outside

**Page 18**

1    of the office?
2 A. **No, sir.**
3 Q. What about with Tom Clark; how long have you
4    known Tom Clark?
5 A. **Since July of '05.**
6 Q. And, again, you didn't know him prior to going
7    to work for US Beverage?
8 A. **No, sir.**
9 Q. You ever socialize with Mr. Clark?
10 A. **Not outside of business, no, sir.**
11 Q. Do you have any ownership interest in US
12    Beverage?
13 A. **No, sir.**
14 Q. Has anyone ever discussed bringing you in to
15    US Beverage as a partner or an owner?
16 A. **No, sir.**
17 Q. How are you paid as an employee of US
18    Beverage?
19 A. **I make salary plus commissions.**
   Q. Do you have any idea what your annual salary
     and commissions are?
22 A. **No, sir.**
23 Q. Under which brands have you sold slush or

**Page 19**

1    juice drinks while working at US Beverage?
2 A. **Which -- would be Cool Tropics.**
3      MR. GILL: I'm sorry. Is that when
4      he was sales manager?
5      MR. JACKSON: Any time while he's
6      been working for US Beverage,
7      whether as a sales manager or
8      as a route driver, you know,
9      in terms of delivering or
10      distributing or selling slush
11      or juice drinks.
12 A. **Cool Tropics, Juice Alive, and now Fruzers.**
13 Q. Does the company still sell any Cool Tropics
14    products?
15 A. **No, sir.**
16 Q. When was the last time that you recall selling
17    or distributing any Cool Tropics products?
18 A. **I can't recall. It was back right after I**
19    **started, sir.**
20 Q. Okay. So sometime after July of 2005?
21 A. **Yes, sir.**
22 Q. Okay. What about Fruzers; when did you first
23    start selling or distributing Fruzers brand

**Page 20**

1    product?
2 A. **I can't recall the exact date.**
3 Q. Well, just roughly. I'm not asking for a
4    specific date. Was it 2005?
5 A. **No. It was 2006.**
6 Q. Can you recall a month in 2006?
7 A. **All I remember is it was sometime after the**
8    **Alabama show, sir. I don't know the date.**
9 Q. Okay. Do you recall when the Alabama show
10    was?
11 A. **Not without -- I've been to several shows this**
12    **year.**
13 Q. Okay. What about Juice Alive; do you recall
14    selling or distributing products with the
15    Juice Alive brand?
16 A. **Yes, sir. I've already spoken of that brand.**
17    **That was one of the three I mentioned.**
18 Q. Has your company stopped selling product
19    bearing the Juice Alive brand?
20 A. **Yes, sir.**
21 Q. When did that occur? When did they stop
22    selling products bearing the Juice Alive name?
23 A. **I don't know of a specific date. I just know**

### Page 21

1       that it went away because the new label came
2       in, and that's all I know about that.
3    Q. Okay. When you're talking about the new
4       label, you're talking about Fruzers?
5    A. Yes, sir.
6    Q. To whom was your company selling Cool Tropics
7       when you first -- you mentioned you sold some
8       Cool Tropics' beverages.
9    A. Well, the only thing -- I mean, I distributed
10       Cool Tropics to, like, the service stations,
11       and I had one school route. Most of my
12       accounts were bar accounts.
13    Q. Okay. What about Juice Alive? To whom have
14       y'all sold Juice Alive products to or
15       distributed to?
16    A. To slush customers.
17    Q. Are those the same type slush customers we
18       just talked about --
19    A. Yes, sir.
20    Q. And I guess the same thing with Fruzers?
21    A. Yes, sir.
22    Q. When did you first learn about the Juice Alive
23       name? When did you first hear the name Juice

### Page 22

1       Alive?
2    A. When we started implementing or we started --
3       stopped using the Cool Tropics and started
4       using Juice Alive.
5    Q. And that would have been after you were hired
6       on to the company?
7    A. That's correct.
8    Q. Do you recall how long after you were hired on
9       the company you stopped using Cool Tropics --
10    A. No, sir, I don't.
11    Q. What were you told about the Juice Alive
12       brand?
13    A. I was told that we were -- we were changing to
14       the Juice Alive brand because Cool Tropics --
15       let me back up. I was told that the Juice
16       Alive brand was being implemented because
17       tropical -- Cool Tropics wanted more royalties
18       for the product for their labels for
19       distributing that label to us. And since we
20       were responsible for the development of
21       that -- or that since US Beverage was
22       responsible for the development of that
23       product, they felt that -- they didn't feel

### Page 23

1       necessary to pay the extra royalties, so they
2       were developing -- US Beverage was developing
3       Juice Alive brand.
4    Q. Okay. So is it -- basically, you were told
5       that the -- the royalties for Cool Tropics
6       were more than the royalties that were going
7       to be paid for Juice Alive?
8    A. I didn't even know there were going to be any
9       royalties paid, sir. I'm not privy to that.
10    Q. Okay. What did you think about the Juice
11       Alive brand?
12    A. As far as?
13       MR. GILL: Object to form.
14    Q. I'm just asking as a salesperson or someone
15       out there in the marketplace trying to sell a
16       brand, what did you think about the Juice
17       Alive brand?
18    A. Specifically --
19       MR. GILL: Object to the form.
20    A. To be honest with you, sir, the product in
21       itself is all the same. As far as the label
22       goes, you're not selling the label; you're
23       selling the product. All three of those

### Page 24

1       labels that I've mentioned to you are all the
2       same -- the same product, just three different
3       labels.
4    Q. And the customers you're dealing with in the
5       marketplace, did it not make a difference to
6       them which label was put on the product?
7    A. No, sir.
8    Q. Is part of your job distributing point-of-sale
9       materials? Are you familiar with
10       point-of-sale materials, POS materials?
11    A. Yes, sir. At this point, it is, yes, sir.
12    Q. Okay. What sort of point-of-sale materials
13       does US Beverage distribute?
14    A. We would distribute a flyer, nutritional
15       information, handouts, flavor sheets.
16    Q. Is there any point-of-sale materials that go
17       on the machines?
18    A. Yes, sir.
19    Q. And what -- what would those materials look
20       like?
21    A. They would just be a sticker with the brand of
22       the product on the front of the sticker.
23    Q. Is that a sticker that the consumer -- if I

```
                                                    25                                                          27
 1         went into a Quick Stop or some service         1         Alive POS on its machines prior to the Alabama
 2         station, if I was going to buy a slush product  2         trade show?
 3         from your company, would there be a sticker on  3    A.  Yes, sir.
 4         the slush machine that says -- would say        4    Q.  And so the POS that you say that Mr. Walker
 5         Fruzers or whatever brand --                    5         told y'all that y'all weren't privy to, was
 6    A.   Yes, sir.                                       6         that some sort of POS other than the labels on
 7    Q.   Any other point-of-sale materials other than   7         the machine?
 8         what we've talked about, the flyers, the        8    A.  Yes, sir.
 9         flavor sheets, the materials on the machine     9    Q.  Do any stores, schools, or other customers
10         that you distribute?                           10         still have Juice Alive POS materials on their
11    A.  As of this point, that's all.                   11         machines?
12    Q.  Okay. What about with Juice Alive? Did you     12    A.  Not to my knowledge, sir.
13         have the same type of point-of-sale materials  13    Q.  Have you personally removed any of the POS
14         for Juice Alive that we just discussed?        14         materials from machines for any customers for
15    A.  I was -- yes, as far as the machine posters,   15         US Beverage?
16         yes, the machine stickers, yes, sir. But as   16    A.  Have I personally done it?
17         far as the other stuff, it was stuff that was 17    Q.  Yes, sir.
18         having to be make-shifted until -- until, I   18    A.  No, sir.
19         believe, he had provided us some at one time. 19    Q.  Do you know if anybody at US Beverage is in
20         But we were told -- I was told by him while I 20         charge of removing the old POS for Juice
21         was standing with Mr. Clark that we were not  21         Alive?
22         privy to the POS material until we agreed to  22    A.  The route sales people are responsible for
23         pay more for the product, that he was holding 23         taking care of the removal and replacement of
                                                    26                                                          28
 1         back on that.                                   1         the POS.
 2    Q.  And when was that statement made?                2    Q.  Do you know if anybody is checking behind the
 3    A.  The evening of the Alabama show.                 3         route salespeople to make sure that's
 4    Q.  How do you think the Juice Alive brand was       4         happening?
 5         received by customers?                          5    A.  The territory managers are supposed to, sir.
 6    A.  Once again, I would have to reiterate, sir,      6    Q.  Okay. Do the territory managers report to
 7         that it's my standing that the customers       7         you?
 8         aren't really buying the label.                 8    A.  Yes, sir.
 9    Q.  Okay.                                            9    Q.  Have you asked the territory managers about
10    A.  They're buying the product.                     10         that?
11    Q.  What about -- how -- how have customers        11    A.  Yes, sir, I have.
12         responded to the Fruzers brand?                12    Q.  Have they indicated the POS materials have
13    A.  They like -- they have responded as far as the 13         been removed for Juice Alive?
14         colorfulness of the machine POS and also the  14    A.  That are indicating that it has been removed,
15         flyers.                                        15         yes, sir.
16              MR. GILL: Do y'all want us to             16    Q.  Is there any checklist or record showing the
17                   leave -- we can step outside         17         removal of this material?
18                   for one second?                      18    A.  No, sir.
19              MR. JACKSON: Yeah. Just give us          19    Q.  What's happened to the Juice Alive POS
20                   one second.                          20         materials that have been removed?
21              (Brief recess taken.)                     21    A.  I don't know.
22    Q.  And you had mentioned the Alabama trade show.  22    Q.  Is US Beverage destroying them, returning
23         Did US Beverage have POS -- I'm sorry, Juice  23         them? Do you know?
```

**Page 29**

1  A.  Not returning them, because once you take them
2     off the machine, they're not any good anymore.
3  Q.  Okay. Do you know if those materials have
4     been thrown away or destroyed?
5  A.  I would assume they were thrown away. I mean,
6     that would be -- that would be my guess. I
7     don't know. I'm not there when it's
8     happening.
9  Q.  But you're aware that your company received a
10    cease-and-desist notice requiring the removal
11    of Juice Alive point-of-sale materials;
12    correct?
13        MR. GILL: Object to the form.
14 A.  I never seen this letter until I received my
15    lawsuit. But I was instructed to change out
16    the POS on the machines, sir, have it done.
17 Q.  When were you instructed to do that?
18 A.  Sometime after the Alabama show, sir. I don't
19    know the exact dates.
20 Q.  What were you told about why US Beverage chose
21    to change to the Fruzer brand?
22        MR. GILL: Object to the form.
23 A.  Basically, I wasn't told anything about it.

**Page 30**

1     The only thing -- the only knowledge that I
2     have about it was the knowledge that I
3     obtained listening to the conversation between
4     the two of them the night at dinner after the
5     Alabama show was over.
6  Q.  What do you recall about them discussing the
7     Fruzer brand or implementing --
8  A.  The Fruzer brand wasn't discussed at that
9     moment. That wasn't even in existence.
10 Q.  Okay. Well, what conversation are you
11    referring to at dinner between -- I guess, you
12    were talking about John Walker --
13 A.  I'm confused -- what was the question again?
14 Q.  I was asking you about what -- what you heard
15    or understood was the -- I guess, the
16    reasoning behind shifting to the Fruzer brand
17    for US Beverage.
18 A.  Well, it started, like I said, at the dinner
19    table between -- the conversation between John
20    Walker and Tom Clark, when John Walker
21    expressed to Tom that he had outside companies
22    that were willing to pay him more for the
23    product than what US Beverage had agreed to

**Page 31**

1     pay him for the product, and if US Beverage
2     didn't compromise or come to some kind of
3     medium on a higher paying price per label for
4     the boxes, that he was going to have to go
5     with these other companies so that he could
6     make more money.
7  Q.  Anything else you remember being told or
8     learning about, you know, the shift from Juice
9     Alive to Fruzers by your company?
10 A.  No, sir.
11 Q.  Who introduced you to the Fruzers brand?
12 A.  Who introduced me to the Fruzers brand?
13 Q.  Yes.
14 A.  Tom Clark.
15 Q.  How did he do that?
16 A.  I went with Tom Clark to the BLR agency and
17    went over the artwork with...
18 Q.  When did that occur?
19 A.  I'm not sure what month, sir. I just know it
20    was sometime after that -- the Alabama show.
21 Q.  Did the BLR agency prepare the POS materials
22    for Fruzers?
23 A.  They created the artwork for it, sir. I'm not

**Page 32**

1     sure who actually prepared it.
2  Q.  And, I guess, the artwork would have been sent
3     to a printer?
4  A.  Yes, sir.
5  Q.  What sort of POS materials does US Beverage
6     have for Fruzers?
7  A.  Same as I've already depicted for you.
8  Q.  How do you think the Fruzers brand compares in
9     success in the marketplace to the Juice Alive
10    brand?
11        MR. GILL: Object to form.
12 A.  I think that the label itself is more
13    appealing to the children because it's more of
14    a child -- I mean, it's more of a -- it's more
15    attractive to me for a child than what --
16    Juice Alive. I mean, that's my opinion.
17 Q.  So you're happy with the Fruzers brand as a
18    sales manager for US Beverage?
19        MR. GILL: Object to the form.
20 A.  I would say at the present moment, yes.
21 Q.  Do you think the Fruzers brand is a better
22    brand name than Juice Alive?
23        MR. GILL: Object to the form.

53

1 them in '05/'06?
2 A. No, sir.
3 Q. What about Pontotoc; is that how you say it?
4 A. I hate to speculate on that. That was only two schools.
6 Q. Okay. And was that a new account too?
7 A. No, sir.
8 Q. So you had them in '05/'06 too?
9 A. Yes, sir.
10 Q. Would they have been larger or smaller than Lincoln County?
12 A. Smaller. It's only two schools.
13 Q. Okay. Well, I don't know how many schools there are in Lincoln County. I'm just amazed there is a county in Mississippi called Lincoln County. Okay. And I'm trying to rush this. I know we've got places to be, but --
18       MR. GILL: Are we going to try to finish today or --
20       MR. JACKSON: Yeah. I'm going to try to.
22 Q. Have you ever had any specific requests for customers for particular types of

54

1 point-of-sale materials?
2 A. None other than maybe some posters to go up on the walls. But other than that, no, sir.
4 Q. Okay. And would those have been schools asking for posters?
6 A. Yes, sir.
7 Q. What about, like, at convenience stores?
8 A. I don't -- I haven't received any really, any requests from any of those people.
10 Q. Never had any requests for window signs --
11 A. No, sir.
12 Q. -- or materials that hang from the ceiling?
13 A. Not from convenience stores, no, sir.
14 Q. Okay. What about, like, signs on gas pumps?
15 A. I've had no -- I've received no requests from any convenience store about any POS materials.
17 Q. And other than the four school systems we talked about a few minutes ago, are you aware of any other customers that US Beverage has lost due to competition from or any other action of US -- I'm sorry, John Walker or his company, Trident Marketing?
23 A. I don't know of any right off the top of my

55

1 head, no, sir.
2 Q. What about any customers that have been lost due to competition with Dispensing Systems?
4 A. I can't speculate on that, sir.
5 Q. Do you know who Dispensing Systems is?
6 A. I've heard of them, sir.
7 Q. Have you ever bid against Dispensing Systems?
8 A. Yes, sir.
9 Q. Have you ever discussed this case with Grady Kittrell -- and I'm talking about outside the presence of attorneys; I'm not asking for anything that was said in front of any attorneys.
14 A. No, sir, I have not.
15 Q. What about with Tom Clark?
16 A. No, sir, I have not.
17 Q. Anyone else working for US Beverage that you've discussed this case with? Again, outside of attorneys; I'm not asking for anything that was in the presence of attorneys.
22 A. No, sir, I haven't.
23 Q. Have you told any customers or potential

56

1 customers of US Beverage that US Beverage owns the trademarks or other rights to Juice Alive?
3 A. I don't specifically think that I've ever told anybody that US Beverage owns Juice Alive because I don't know.
6 Q. Let me ask you about this document, which I'm going to mark Defendants' 4. Do you recognize this document?
9         (The referred-to document was marked for identification as Defendants' Exhibit No. 4.)
12         (Off-the-record discussion.)
13 A. Yes, sir, I do.
14 Q. Was this document prepared by you?
15 A. Yes, sir, it was.
16 Q. And, I guess, it's not signed, but it has, thanks, Buddy Todd, Sales Manager for US Beverage, Inc., at the bottom; correct?
19 A. Yes, sir.
20 Q. And it says "to child nutrition directors." Specifically, which child nutrition directors are we talking about here?
23 A. The ones that were current customers of US

## Page 57

1       Beverage.
2  Q.  Would that have been just in Mississippi?
3  A.  Yes, sir.
4  Q.  Would you have sent this to any child
5       nutrition directors in Alabama?
6  A.  No, sir.
7  Q.  Anywhere else?
8  A.  No, sir.
9  Q.  What did you say about the Juice Alive brand
10      in your letter there? I'll give you a second
11      to read through it.
12 A.  (As read:) Juice Alive brand was developed for
13      sales and distribution solely by US Beverage,
14      Inc.
15 Q.  Okay. And what was your basis for stating
16      that?
17 A.  That was what I was told.
18 Q.  Do you have any other independent knowledge or
19      any other -- anything else to base that
20      statement on other than what you were told?
21 A.  No, sir.
22 Q.  And who were you told that by?
23 A.  I was told that by Tom Clark.

## Page 58

1  Q.  Okay. Again, I'm not asking anything your
2       attorneys would have said or anything said in
3       the presence of your attorneys, but anyone
4       else other than Tom Clark tell you that the
5       Juice Alive brand was developed for sales and
6       distribution solely by US Beverage, Inc.?
7  A.  No, sir.
8  Q.  What about the next sentence. It says (as
9       read:) John Walker is currently using his
10      inside knowledge of bid prices and current
11      rates being charged to US Beverage customers
12      to bid in an attempt to conduct business in
13      the state of Mississippi.
14          What was your basis of making
15      that statement in this letter?
16 A.  Because Mr. Walker was privy to that
17      information. He was privy to our current
18      prices to our customers in the state of
19      Mississippi. And it was apparent that he went
20      to the quote price of $60 per case because we
21      had -- with existing customers in the state of
22      Mississippi that were less than that price.
23 Q.  Okay. Now, you used the term "it was

## Page 59

1       apparent." How was it apparent to you?
2  A.  Other than what I just explained?
3  Q.  Yes.
4  A.  It was apparent that he knew that we didn't
5       have any customers in the state or in the
6       company except for one specific bid that was
7       less than $60 a case, school customers.
8  Q.  And when you say that -- current price, what
9       school year are you referring to as being the
10      current price?
11 A.  '05/'06.
12 Q.  Did he have any reason to know what your
13      prices were going to be for '06/'07?
14 A.  I don't -- no, sir, I don't think so.
15 Q.  Do you know if he was privy to the information
16      dealing with any bids or anything that was
17      being sent out by your company or quotes for
18      '06/'07?
19 A.  No, sir.
20 Q.  Okay. The next sentence says (as read:) It is
21      clearly a federal violation of contracts -- of
22      the contracts submitted with each bid
23      reference Section II, Subsection 16,

## Page 60

1       Paragraphs H. And then there's a quotation of
2       that, and I'm not going to read it for the
3       record. What was your basis of making this
4       statement?
5  A.  My basis for making this statement was on the
6       knowledge obtained through Tom Clark that John
7       Walker was one-third owner of US Beverage, and
8       in by being one-third owner of US Beverage, he
9       would be signing or submitting bid
10      documentation in public entities in violation
11      of this statement because he would be
12      receiving monies from both sides -- either
13      which way the bid went, if he won it, or if we
14      won it, he would be receiving monetary
15      supplements from either way.
16 Q.  Okay. Are you a lawyer?
17 A.  I'm not a lawyer, but any layman can get that
18      out of that statement.
19 Q.  Any layman can determine whether or not a
20      federal violation has occurred?
21 A.  Can I read it for the record so that --
22 Q.  Oh, sure. Go ahead and read it.
23 A.  (As read:) It says, by signing this document,